# 21-543(L)

## 21-559(CON)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

PARKER H. PETIT, WILLIAM TAYLOR,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## APPENDIX FOR DEFENDANTS-APPELLANTS
## VOLUME I OF VI
### (Pages A-1 to A-300)

ALEXANDRA A.E. SHAPIRO
ERIC S. OLNEY
DANIEL J. O'NEILL
AMELIA COURTNEY HRITZ
SHAPIRO ARATO BACH LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

*Attorneys for Defendant-Appellant
  Parker H. Petit*

NATHANIEL Z. MARMUR
THE LAW OFFICES OF
  NATHANIEL Z. MARMUR, PLLC
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4894

*Attorney for Defendant-Appellant
  William Taylor*

# TABLE OF CONTENTS

PAGE

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Indictment, filed on November 25, 2019 (Dkt. 1) . . . . . . . . . . . . . . . . . . . . . A-36

Government's Requests to Charge, filed on October 19, 2020
    (Dkt. 96) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-80

Defendants' Requests to Charge, filed on October 19, 2020
    (Dkt. 98) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-151

Excerpts of Transcript of Final Pre-Trial Conference,
    dated October 23, 2020 (pp. 1-12) . . . . . . . . . . . . . . . . . . . . . . . . . . . A-187

Excerpts of Trial Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-199

Government's Exhibits:

    GX-101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-843

    GX-103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-882

    GX-105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-911

    GX-105-A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1021

    GX-105-B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1022

    GX-106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1023

    GX-300 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1116

    GX-605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1120

    GX-701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1126

    GX-717 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1127

    GX-718 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1128

ii

                                                             PAGE

GX-720 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1130

GX-722 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1131

GX-723 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1132

GX-724 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1133

GX-725 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1134

GX-1018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1135

GX-1027 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1137

GX-1033 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1139

GX-1042 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1140

GX-1051 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1143

GX-1054 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1146

GX-1072 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1148

GX-1091 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1149

GX-1093 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1154

GX-1094 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1155

GX-1098 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1156

GX-1113 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1163

GX-1201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1164

GX-1306 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1173

GX-1500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1176

Defendants' Exhibits:

DX-118 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1178

DX-132 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1180

DX-134 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1183

iii

|  | PAGE |
|---|---|
| DX-135 | A-1185 |
| DX-140 | A-1186 |
| DX-142 | A-1187 |
| DX-146 | A-1190 |
| DX-168 | A-1191 |
| DX-254 | A-1196 |
| DX-279 | A-1200 |
| DX-411 | A-1202 |
| DX-430 (not offered) | A-1204 |
| DX-604 | A-1207 |
| DX-605 | A-1207.1 |
| DX-634 | A-1208 |
| DX-639 | A-1210 |
| DX-652 | A-1557 |
| DX-673 | A-1560 |

The Court's Instructions of Law to the Jury,
draft dated November 10, 2020 .................................. A-1564

Taylor's Proposed Amendments to Jury Instructions,
filed on November 15, 2020 (Dkt. 118) ......................... A-1595

Defendant Parker H. Petit's Notice of Appeal,
filed on March 8, 2021 (Dkt. 155) .............................. A-1613

Defendant William Taylor's Notice of Appeal,
filed on March 9, 2021 (Dkt. 156) .............................. A-1615

Memorandum Order of the Honorable Jed S. Rakoff,
entered May 23, 2021 (Dkt. 204) ............................... A-1617

# A-1

**Query    Reports    Utilities    Help    Log Out**

CLOSED,APPEAL,ECF

## U.S. District Court
## Southern District of New York (Foley Square)
## CRIMINAL DOCKET FOR CASE #: 1:19-cr-00850-JSR All Defendants

| | |
|---|---|
| Case title: USA v. Petit et al | Date Filed: 11/25/2019 |
| | Date Terminated: 03/01/2021 |

Assigned to: Judge Jed S. Rakoff

**Defendant (1)**

| | |
|---|---|
| **Parker H. Petit**<br>*TERMINATED: 02/24/2021* | represented by **Eric Brendan Bruce**<br>Freshfields Bruckhaus Deringer US LLP<br>700 13th Street, NW<br>Ste 10th Floor<br>Washington D.C., DC 20005<br>202-777-4500<br>Email: eric.bruce@freshfields.com<br>*TERMINATED: 03/29/2021*<br>*LEAD ATTORNEY*<br>*Designation: Retained*<br><br>**Alexandra A. E. Shapiro**<br>Shapiro Arato Bach LLP<br>500 Fifth Avenue<br>40th Floor<br>New York, NY 10110<br>212-257-4881<br>Email: ashapiro@shapiroarato.com<br>*ATTORNEY TO BE NOTICED*<br>*Designation: Retained*<br><br>**Altin Herbert Sila**<br>Freshfields Bruckhaus Deringer US LLP<br>601 Lexington Avenue<br>Ste 31st Floor<br>New York, NY 10022<br>212-277-4000<br>Email: altin.sila@freshfields.com<br>*TERMINATED: 03/29/2021*<br>*Designation: Retained*<br><br>**Amanda Nicole Tuminelli**<br>Kobre & Kim LLP<br>800 Third Avenue<br>6th Floor |

# A-2

New York, NY 10022
212-488-1200
Email: amanda.tuminelli@kobrekim.com
*TERMINATED: 03/29/2021*
*Designation: Retained*

**Daniel Jonathan O'Neill**
Shapiro Arato Bach LLP
500 Fifth Avenue
40th Floor
New York, NY 10110
212-257-4885
Email: doneill@shapiroarato.com
*ATTORNEY TO BE NOTICED*

**Jennifer Loeb**
700 13th Street NW
10th Floor
Washington, DC 20005
202-777-4524
Email: jennifer.loeb@freshfields.com
*TERMINATED: 03/29/2021*
*PRO HAC VICE*
*Designation: Retained*

**Matthew I. Menchel**
Kobre & Kim LLP
800 Third Avenue
New York, NY 10022
(212) 488-1208
Fax: (212) 488-1208
Email: matthew.menchel@kobrekim.com
*TERMINATED: 03/29/2021*
*Designation: Retained*

**Sarah Caruana**
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW
Ste 10th Floor
Washington D.C., DC 20005
202-777-4500
Email: sarah.caruana@freshfields.com
*TERMINATED: 03/29/2021*
*Designation: Retained*

**William Weinreb**
Quinn Emanuel
111 Huntington Ave.
Ste 520
Boston, MA 02199
617-712-7114
Email: billweinreb@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

# A-3

| **Pending Counts** | **Disposition** |
|---|---|
| 15:78J.F SECURITIES FRAUD (2) | IMPRISONMENT: Twelve (12) months. SUPERVISED RELEASE: (None) |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 18:371.F CONSPIRACY TO COMMIT SECURITIES FRAUD, TO MAKE FALSE FILINGS WITH THE SEC, AND TO IMPROPERLY INFLUENCE THE CONDUCT OF AUDITS (1) | Dismissed |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

---

Assigned to: Judge Jed S. Rakoff

**Defendant (2)**

| **William Taylor**<br>*TERMINATED: 03/01/2021* | represented by | **William Anthony Burck**<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>777 6th Street NW 11th floor<br>Washington, DC 20005<br>202-538-8000<br>Fax: 202-538-8100<br>Email: williamburck@quinnemanuel.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**Daniel Rickert Koffmann**<br>Quinn Emanuel Urquhart & Sullivan LLP<br>51 Madison Avenue<br>22nd Floor<br>New York, NY 10010<br>212-849-7617<br>Fax: 212-849-7100<br>Email: danielkoffmann@quinnemanuel.com<br>*ATTORNEY TO BE NOTICED*<br><br>**Kathleen Marini**<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>111 Huntington Ave<br>Suite 520<br>Boston, MA 02199 |
|---|---|---|

# A-4

617-712-0219
Email: kathleenmarini@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Michael Barry Carlinsky**
Quinn Emanuel
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
Fax: (212) 849-7100
Email:
michaelcarlinsky@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Michael Thomas Packard**
Quinn Emanuel Urquhart & Sullivan, LLP
(Boston)
111 Huntington Avenue
Suite 520
Boston, MA 02199
617-712-7118
Email: michaelpackard@quinnemanuel.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**William Weinreb**
(See above for address)
*ATTORNEY TO BE NOTICED*

| | |
|---|---|
| **Pending Counts** | **Disposition** |
| 18:371.F CONSPIRACY TO COMMIT SECURITIES FRAUD, TO MAKE FALSE FILINGS WITH THE SEC, AND TO IMPROPERLY INFLUENCE THE CONDUCT OF AUDITS (1) | IMPRISONMENT: Twelve (12) months jail. |

**Highest Offense Level (Opening)**

Felony

| | |
|---|---|
| **Terminated Counts** | **Disposition** |
| 15:78J.F SECURITIES FRAUD (2) | |

**Highest Offense Level (Terminated)**

Felony

| | |
|---|---|
| **Complaints** | **Disposition** |
| None | |

**A-5**

**Plaintiff**

**USA**                              represented by **Daniel Marc Tracer**
DOJ, United States Attorney's Office,
SDNY
One St. Andrew's Plaza
New York, NY 10007
212-637-1087
Fax: 212-637-2443
Email: daniel.tracer@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Edward Arthur Imperatore**
United States Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212)-637-2327
Fax: (212)-637-2387
Email: edward.imperatore@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Scott Andrew Hartman**
U.S. Attorney's Office
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2357
Fax: (212) 637-2527
Email: scott.hartman@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Drew Turner Johnson Skinner**
United States Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212)-637-1587
Fax: (212)-637-2527
Email: drew.skinner@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/25/2019 | 1 | SEALED INDICTMENT FILED as to Parker H. Petit (1) count(s) 1, 2, William Taylor (2) count(s) 1, 2. (jbo) (Entered: 11/27/2019) |
| 11/26/2019 | 2 | Order to Unseal Indictment as to Parker H. Petit, William Taylor. (Signed by Magistrate Judge Robert W. Lehrburger on 11/26/19)(jbo) (Entered: 11/27/2019) |

| 11/26/2019 | | Case Designated ECF as to Parker H. Petit, William Taylor. (jbo) (Entered: 11/27/2019) |
|---|---|---|
| 11/26/2019 | | INDICTMENT UNSEALED as to Parker H. Petit, William Taylor. (jbo) (Entered: 11/27/2019) |
| 11/26/2019 | | Arrest of Parker H. Petit, William Taylor in the United States District Court - Northern District of Georgia. (jm) (Entered: 12/03/2019) |
| 12/02/2019 | 5 | NOTICE OF ATTORNEY APPEARANCE: William Anthony Burck appearing for William Taylor. Appearance Type: Retained. (Burck, William) (Entered: 12/02/2019) |
| 12/02/2019 | 6 | NOTICE OF ATTORNEY APPEARANCE: Michael Barry Carlinsky appearing for William Taylor. Appearance Type: Retained. (Carlinsky, Michael) (Entered: 12/02/2019) |
| 12/02/2019 | 7 | MOTION for William D. Weinreb to Appear Pro Hac Vice *Filing fee $ 200.00, receipt number ANYSDC-18186049.* **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by William Taylor. (Attachments: # 1 Declaration of William D. Weinreb, # 2 Proposed Order, # 3 Certificate of Good Standing - Massachusetts)(Weinreb, William) (Entered: 12/02/2019) |
| 12/02/2019 | 8 | MOTION for Michael T. Packard to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-18186853. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by William Taylor. (Attachments: # 1 Declaration of Michael T. Packard, # 2 Proposed Order, # 3 Certificate of Good Standing - Massachusetts)(Packard, Michael) (Entered: 12/02/2019) |
| 12/02/2019 | 9 | **FILING ERROR - DEFICIENT DOCKET ENTRY (SEE 11 Notice of Appearance)** - NOTICE OF ATTORNEY APPEARANCE: Eric Brendan Bruce appearing for Parker H. Petit, William Taylor. Appearance Type: Retained. (Bruce, Eric) Modified on 12/5/2019 (db). (Entered: 12/02/2019) |
| 12/02/2019 | 10 | NOTICE OF ATTORNEY APPEARANCE: Altin Herbert Sila appearing for Parker H. Petit. Appearance Type: Retained. (Sila, Altin) (Entered: 12/02/2019) |
| 12/02/2019 | 11 | NOTICE OF ATTORNEY APPEARANCE: Eric Brendan Bruce appearing for Parker H. Petit. Appearance Type: Retained. (Bruce, Eric) (Entered: 12/02/2019) |
| 12/03/2019 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 7 MOTION for William D. Weinreb to Appear Pro Hac Vice** *Filing fee $ 200.00, receipt number ANYSDC-18186049.* **Motion and supporting papers to be reviewed by Clerk's Office staff., 8 MOTION for Michael T. Packard to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-18186853. Motion and supporting papers to be reviewed by Clerk's Office staff. The document has been reviewed and there are no deficiencies. (aea)** (Entered: 12/03/2019) |
| 12/03/2019 | 12 | Rule 5(c)(3) Documents Received as to Parker H. Petit, William Taylor from the United States District Court - Northern District of Georgia. (jm) (Main Document 12 replaced on 12/4/2019) (jm). (Entered: 12/03/2019) |
| 12/04/2019 | 13 | ORDER FOR ADMISSION PRO HAC VICE as to William Taylor (2)on 8 MOTION for Michael T. Packard to Appear Pro Hac Vice. (Signed by Judge Jed S. Rakoff on 12/4/2019) (ap) (Entered: 12/04/2019) |
| 12/04/2019 | 14 | ORDER FORADMISSION PRO HAC VICE as to William Taylor (2) on 7 Motion for William D. Weinreb to Appear Pro Hac Vice. (Signed by Judge Jed S. Rakoff on 12/4/2019) (ap) (Entered: 12/04/2019) |
| 12/04/2019 | 15 | Minute Entry for proceedings held before Magistrate Judge Barbara C. Moses: Initial Appearance as to Parker H. Petit held on 12/4/2019. Defendant present with retained |

**A-7**

| | | |
|---|---|---|
| | | counsel Eric Bruce. AUSA Edward Imperatore present for the government. BAIL DISPOSITION: AGREED CONDITIONS OF RELEASE; $1 MILLION PRB, SECURED BY REAL PROPERTY WITH SUFFICIENT EQUITY TO SECURE THE FULL BOND AMOUNT; 1 FRP; TRAVEL RESTRICTED CONTINENTAL U.S; SURRENDER ALL TRAVEL DOCUMENTS AND MAKE NO NEW APPLICATIONS; PRETRIAL SUPERVISION AS DIRECTED BY PTS; DEFT NOT TO POSSESS FIREARMS/DESTRUCTIVE DEVICES/OTHER WEAPONS; DEFT TO BE RELEASED ON OWN SIGNATURE; REMAINING CONDITIONS TO BE MET BY 12/12/19; DEFT TO BE SUPERVISED IN NDGA; ABSENT THE ADVANCE WRITTEN APPROVAL OF THE GOVERNMENT, DEFT SHALL HAVE NO CONTACT (DIRECT OR INDIRECT), OUTSIDE OF THE PRESENCE OF COUNSEL, WITH (A) CURRENT OR FORMER MIMEDX EMPLOYEES (B) CURRENT OR FORMER EMPLOYEES/REPRESENTATIVES OF MIMEDX DISTRIBUTORS OR AUDITORS; (C) CURRENT OR FORMER MIMEDX COUNSEL; EXPCEPT FOR INADVERTENT/NONSUBSTANTIVE SOCIAL CONTACT; DEF. SHALL HAVE NO SUBSTANTIVE DICUSSION CONCERNING THIS CASE, OUTSIDE OF THE PRESENCE OF COUNSEL, WITH HIS CO-DEFT; DEFT SHALL HAVE NO SUBSTANTIVE DISCUSSION CONCERNING THIS CASE, OUTSIDE OF THE PRESENCE OF COUNSEL, WITH HIS CHILDREN OR WITH TODD CAMPBELL. Conference before District Judge on 12/4/19. (jbo) (Entered: 12/04/2019) |
| 12/04/2019 | [16](#) | Minute Entry for proceedings held before Magistrate Judge Barbara C. Moses: Initial Appearance as to William Taylor held on 12/4/2019. Defendant present with retained counsel Bill Weinreb. AUSA Edward Imperatore present for the government. Voluntary arrest. BAIL DISPOSITION: AGREED CONDITIONS OF RELEASE; $500,000 PERSONAL RECOGNIZANCE BOND; TO BE COSIGNED BY ONE FINANCIALLY RESPONSIBLE PERSON; TRAVEL RESTRICTED TO THE CONTINENTAL U.S.; SURRENDER TRAVEL DOCUMENTS AND NO NEW APPLICATIONS; PRETRIAL SUPERVISION AS DIRECTED BY PRETRIAL SERVICES; DEFT TO BE RELEASED ON OWN SIGNATURE; REMAINING CONDITIONS TO BE MET BY 12/12/19; *Defendant to be supervised in N.D.Ga.; *Absent the advance written approval of the government, defendant shall have no contact (direct or indirect), outside of the presence of counsel, with (a) current or former MiMedx employees (b) current or former employees/representatives of MiMedx distributors or auditors; (c) current or former MiMedx counsel; except for inadvertent/ nonsubstantive social contact. *Defendant shall have no substantive discussion concerning this case, outside of the presence of counsel, with his co-def. *Defendant shall have no no contact, outside the presence of counsel, with defendant Petit's children or with Todd Campbell. Conference before District Judge on 12/4/19. (jbo) (Entered: 12/04/2019) |
| 12/04/2019 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Parker H. Petit, William Taylor held on 12/4/201. A telephone conference (without audio/transcript) was held in the above captioned case. (lnl) (Entered: 12/05/2019) |
| 12/04/2019 | [17](#) | Appearance Bond as to William Taylor (jw) (Entered: 12/05/2019) |
| 12/04/2019 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Arraignment as to Parker H. Petit (1) Count 1,2 and William Taylor (2) Count 1,2 held on 12/4/2019. Defendant #1, Petit, present w/attorney Eric Bruce. Defendant #2, Taylor, present w/attorney William Burck. Government present by Edward Imperatore, AUSA. Court reporter present. Discovery to close 12-18-2019, Motions due 12-18-2020, next appearance 1-23-2020 at 2:00pm, TDS 7-7-2020. TIME EXCLUDED in the interest of justice, pursuant to Section 3161 of Title 18. Defendants' bail continued. (jbo); Modified on 1/22/2020 (bw). (Entered: 12/13/2019) |

**A-8**

| | | |
|---|---|---|
| 12/04/2019 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Plea entered by Parker H. Petit (1) Count 1,2 and William Taylor (2) Count 1,2 Not Guilty. (jbo) (Entered: 12/13/2019) |
| 12/04/2019 | 22 | APPEARANCE BOND Entered as to Parker H. Petit: $1 MILLION PRB, SECURED BY REAL PROPERTY WITH SUFFICIENT EQUITY TO SECURE THE FULL BOND AMOUNT; 1 FRP; TRAVEL RESTRICTED CONTINENTAL U.S; SURRENDER ALL TRAVEL DOCUMENTS AND MAKE NO NEW APPLICATIONS; PRETRIAL SUPERVISION AS DIRECTED BY PTS; DEFT NOT TO POSSESS FIREARMS/DESTRUCTIVE DEVICES/OTHER WEAPONS; DEFT TO BE RELEASED ON OWN SIGNATURE; REMAINING CONDITIONS TO BE MET BY 12/12/19; DEFT TO BE SUPERVISED IN NDGA; ABSENT THE ADVANCE WRITTEN APPROVAL OF THE GOVERNMENT, DEFT SHALL HAVE NO CONTACT (DIRECT OR INDIRECT), OUTSIDE OF THE PRESENCE OF COUNSEL, WITH (A) CURRENT OR FORMER MIMEDX EMPLOYEES (B) CURRENT OR FORMER EMPLOYEES/REPRESENTATIVES OF MIMEDX DISTRIBUTORS OR AUDITORS; (C) CURRENT OR FORMER MIMEDX COUNSEL; EXCEPT FOR INADVERTENT/NON-SUBSTANTIVE SOCIAL CONTACT; DEF. SHALL HAVE NO SUBSTANTIVE DISCUSSION CONCERNING THIS CASE, OUTSIDE OF THE PRESENCE OF COUNSEL, WITH HIS CO-DEFT; DEFT SHALL HAVE NO SUBSTANTIVE DISCUSSION CONCERNING THIS CASE, OUTSIDE OF THE PRESENCE OF COUNSEL, WITH HIS CHILDREN OR WITH TODD CAMPBELL. (Advice of Penalties and Sanctions attached.) (jbo) (Entered: 01/02/2020) |
| 12/05/2019 | 18 | PROTECTIVE ORDER as to Parker H. Petit, William Taylor...regarding procedures to be followed that shall govern the handling of confidential material... (Signed by Judge Jed S. Rakoff on 12/4/2019) (ap) (Entered: 12/05/2019) |
| 12/05/2019 | 19 | LETTER by USA as to William Taylor addressed to Judge Jed S. Rakoff from Edward Imperatore, Scott Hartman, Daniel Tracer dated 12/3/2019 re: The Government writes to request a conference to address potential conflict of interest Document filed by USA. (ap) (Entered: 12/05/2019) |
| 12/11/2019 | 20 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Conference held on 12/4/19 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Sonya Ketter Moore, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/2/2020. Redacted Transcript Deadline set for 1/13/2020. Release of Transcript Restriction set for 3/10/2020. (McGuirk, Kelly) (Entered: 12/11/2019) |
| 12/11/2019 | 21 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Conference proceeding held on 12/4/19 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 12/11/2019) |
| 12/12/2019 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Telephone Conference as to Parker H. Petit held on 12/12/2019 (jw) (Entered: 01/16/2020) |
| 01/16/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Telephone Conference as to Parker H. Petit held on 1/16/2020 (jw) (Entered: 01/16/2020) |
| 01/17/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference |

**A-9**

| | | |
|---|---|---|
| | | (without audio/transcript) as to Parker H. Petit held on 1/17/2020. (jbo) (Entered: 01/21/2020) |
| 01/21/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Parker H. Petit, William Taylor held on 1/21/2020. A telephone conference (without audio/transcript) was held in the above captioned case. (lnl) (Entered: 01/22/2020) |
| 01/22/2020 | 23 | JOINT MOTION to Compel *(Notice of Motion)*. Document filed by Parker H. Petit as to Parker H. Petit, William Taylor. (Bruce, Eric) (Entered: 01/22/2020) |
| 01/22/2020 | 24 | MEMORANDUM in Support by Parker H. Petit as to Parker H. Petit, William Taylor re 23 JOINT MOTION to Compel *(Notice of Motion)*.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V)(Bruce, Eric) (Entered: 01/22/2020) |
| 01/22/2020 | 25 | Certificate of Service of 23 JOINT MOTION to Compel *(Notice of Motion)*., 24 Memorandum in Support of Motion,, by Parker H. Petit as to Parker H. Petit, William Taylor.. (Bruce, Eric) (Entered: 01/22/2020) |
| 01/23/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Parker H. Petit, William Taylor held on 1/23/2020. Defts' interrogatories by 1-30-2020, SEC & Gov't to respond to wording of said interrogatories by 2-4-2020. Defts' bail continued. Deft #1, Petit, on phone, counsel in courtroom - Eric Bruce & Altin Sila, Deft #2, Taylor on phone, counsel in courtroom: William Weinreb & Michael Packard, Govt present by Scott Hartman & Edward Imperatore, AUSA's; Court reporter present. ARG heard on defts' motion at 23 on the docket. (ap) (Entered: 01/23/2020) |
| 01/23/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Telephone Conference as to Parker H. Petit, William Taylor held on 1/23/2020. A telephone conference (without audio/transcript) was held in the above captioned case (jw) (Entered: 01/27/2020) |
| 01/27/2020 | 26 | **FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU -** JOINT RESPONSE by Parker H. Petit, William Taylor *to 1/23/20 Letter from MiMedx*. (Weinreb, William) Modified on 1/28/2020 (ka). (Entered: 01/27/2020) |
| 01/28/2020 | | **NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR as to Parker H. Petit, William Taylor: Notice to Attorney Weinreb, William to RE-FILE Document 26 Response. Use the event type Letter found under the event list Other Documents. (ka)** (Entered: 01/28/2020) |
| 01/28/2020 | 27 | LETTER by Parker H. Petit, William Taylor addressed to Judge Jed S. Rakoff, from Attorneys for both parties dated 1/27/2020 re: Defense counsel writes to request that the Court deny request for order. (ap) (Entered: 01/28/2020) |
| 01/28/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Parker H. Petit, William Taylor held on 1/28/2020. A telephone conference (without audio/transcript) was held in the above captioned case. (bw) (Entered: 01/28/2020) |
| 01/31/2020 | 28 | LETTER as to Parker H. Petit, William Taylor addressed to Judge Jed S. Rakoff from David M. Rody, dated 1/23/2020, re: Counsel writes on behalf of MiMedx Group, Inc. to request that your Honor grant their request to quash Exhibit J (ECF #24-10), Exhibit M (ECF #24-13), and Exhibit Q (ECF# 24-17), and any reference to these documents in Defendants' Motion to Compel, and have these materials removed from the public docket. Counsel further requests that the Court order Defendants, the SEC, and the Department of Justice to return or destroy all copies of the documents referenced above in their possession in whatever format. (lnl) (Entered: 01/31/2020) |

# A-10

| | | |
|---|---|---|
| 01/31/2020 | 29 | LETTER as to Parker H. Petit, William Taylor addressed to Judge Jed S. Rakoff from David M. Rody, dated 1/29/2020, re: Counsel writes on behalf of MiMedx Group, Inc. in response to the January 27, 2020 letter submitted to the Court on behalf of Defendants Parker H. Petit and William Taylor ("Defendants' Letter") (ECF #26). (lnl) (Entered: 01/31/2020) |
| 01/31/2020 | 30 | LETTER by Parker H. Petit addressed to Judge Jed S. Rakoff from Eric B. Bruce, Altin H. Sila, dated 1/23/2020, re: Counsel writes: Undersigned counsel respectfully submits this letter on behalf of Defendant Parker H. Petit, who is not present in the courtroom today. I hereby represent that I have discussed with Mr. Petit his right to personally attend today's status conference and that Mr. Petit has waived his right to personally attend today's proceedings. (lnl) (Entered: 01/31/2020) |
| 01/31/2020 | 31 | LETTER by William Taylor addressed to Judge Jed S. Rakoff from William D. Weinreb, Michael T. Packard, dated 1/23/2020, re: Counsel writes: Undersigned counsel respectfully submits this letter on behalf of Defendant William Taylor, who is n LETTER by William Taylor addressed to Judge Jed S. Rakoff from William D. Weinreb, Michael T. Packard, dated 1/23/2020, re: Counsel writes: Undersigned counsel respectfully submits this letter on behalf of Defendant William Taylor, who is not present in the courtroom today. I hereby represent that I have discussed with Mr. Taylor his right to personally attend today's status conference and that Mr. Taylor has waived his right to personally attend these proceedings. Document fiot present in the courtroom today. I hereby represent that I have discussed with Mr. Taylor his right to personally attend today's status conference and that Mr. Taylor has waived his right to personally attend these proceedings. Document filed by William Taylor. (lnl) (Main Document 31 replaced on 2/11/2020) (lnl). (Entered: 01/31/2020) |
| 02/03/2020 | 32 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Conference held on 1/23/2020 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Kelly Surina, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/24/2020. Redacted Transcript Deadline set for 3/5/2020. Release of Transcript Restriction set for 5/4/2020. (McGuirk, Kelly) (Entered: 02/03/2020) |
| 02/03/2020 | 33 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Conference proceeding held on 1/23/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 02/03/2020) |
| 02/07/2020 | 34 | MEMORANDUM ORDER as to Parker H. Petit, William Taylor: MiMedx's letter motion with respect to what would qualify as fact work product is denied, whereas its motion with respect to opinion work product is granted. Accordingly, after careful review the exhibits, the Court directs defendants to redact the following parts of Exhibits J, M, and Q from the public docket, strike any references thereto in their motion to compel discovery, and refile the relevant documents by no later than February 10, 2020, at 5:00 p.m. (Signed by Judge Jed S. Rakoff on 2/6/2020) (***SEE ORDER AS FURTHER SET FORTH***)(lnl) (Entered: 02/10/2020) |
| 02/10/2020 | 35 | LETTER by USA as to Parker H. Petit, William Taylor addressed to Judge Jed S. Rakoff from Stephen C. McKenna, dated 2/4/2020, re: The United States Securities and Exchange Commission ("SEC") submits this letter in response to Defendants' January 30, 2020 letter responding to this Court's January 23, 2020 Order regarding the submission of |

# A-11

| | | |
|---|---|---|
| | | interrogatories to the Government and the SEC in the criminal matter United States v. Parker H Petit& William Taylor, 19 Cr. 85. Document filed by United States Securities and Exchange Commission. (lnl) (Entered: 02/10/2020) |
| 02/10/2020 | 36 | LETTER by USA as to Parker H. Petit, William Taylor addressed to Judge Jed S. Rakoff from Edward Imperatore, dated 2/4/2020, re: The Government respectfully submits this letter to oppose allowing the defendants to propound interrogatories to the Securities and Exchange Commission (the "SEC") and this Office ("the Government") regarding interactions with the audit committee of the board of directors of MiMedx Group, Inc. ("MiMedx") (the "Audit Committee").' Document filed by USA. (lnl) (Entered: 02/10/2020) |
| 02/10/2020 | 37 | LETTER by Parker H. Petit, William Taylor addressed to Judge Jed S. Rakoff from Eric B. Bruce et al., dated 1/30/2020, re: Counsel writes to submit for the Court's consideration the enclosed proposed interrogatories to the Government and the Securities and Exchange Commission (SEC). (lnl) (Entered: 02/10/2020) |
| 02/10/2020 | 38 | NOTICE of Filing Redacted Versions of Defendants' Joint Motion to Compel Discovery and Set Disclosure Deadlines and Supporting Exhibits J, M, and Q as to Parker H. Petit, William Taylor re: 34 Order,,. (Attachments: # 1 Redacted Memorandum of Law, # 2 Exhibit J(R), # 3 Exhibit M(R), # 4 Exhibit Q(R), # 5 Certificate of Service)(Bruce, Eric) (Entered: 02/10/2020) |
| 02/11/2020 | 39 | ORDER as to Parker H. Petit (1), William Taylor (2): defendants' motion to propound these interrogatories or take other discovery is hereby denied. Nor will the Court entertain any revised interrogatories or any other attempt to salvage defendants' motion, which the Court now perceives as wholly lacking 23. merit. The Clerk of the Court is directed to close the entry bearing docket number 23. SO ORDERED. (Signed by Judge Jed S. Rakoff on 2/10/2020) (See ORDER as set forth) (lnl) (Entered: 02/11/2020) |
| 02/12/2020 | 40 | NOTICE of Filing Further Redacted Version of Exhibit J(R) in Support of Defendants' Joint Motion to Compel Discovery and Set Disclosure Deadlines as to Parker H. Petit, William Taylor re: 38 Notice (Other),. (Attachments: # 1 Exhibit J(R2), # 2 Certificate of Service)(Bruce, Eric) (Entered: 02/12/2020) |
| 02/12/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Parker H. Petit, William Taylor held on 2/12/2020. A telephone conference (without audio/transcript) was held in the above captioned case. (ap) (Entered: 02/28/2020) |
| 03/12/2020 | 41 | NOTICE OF ATTORNEY APPEARANCE: Matthew I. Menchel appearing for Parker H. Petit. Appearance Type: Retained. (Menchel, Matthew) (Entered: 03/12/2020) |
| 03/12/2020 | 42 | NOTICE OF ATTORNEY APPEARANCE: Amanda Nicole Tuminelli appearing for Parker H. Petit. Appearance Type: Retained. (Tuminelli, Amanda) (Entered: 03/12/2020) |
| 05/07/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Parker H. Petit, William Taylor held on 5/7/2020. A Telephonic Conference was held before Judge Rakoff on May 7, 2020. Counsel for Mr. Petit, Mr. Taylor, and the Government were present. Memo: "Due to the ongoing pandemic, jury trial for this case, previously scheduled to start on July 7, 2020 at 9:30 a.m., will instead start on October 5, 2020, at 9:30 a.m." (Jury Trial set for 10/5/2020 at 09:30 AM before Judge Jed S. Rakoff) (ap) (Entered: 05/08/2020) |
| 05/07/2020 | | MEMORANDUM TO THE DOCKET CLERK: as to Parker H. Petit, William Taylor. Court's Decision: Time is excluded in the interest of justice pursuant to Section 3161 of Title 18 until October 5, 2020. (ap) (Entered: 05/08/2020) |
| 05/11/2020 | 43 | NOTICE OF ATTORNEY APPEARANCE Drew Turner Johnson Skinner appearing for |

# A-12

| | | USA. (Skinner, Drew) (Entered: 05/11/2020) |
|---|---|---|
| 07/15/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Parker H. Petit held on 7/15/2020. A phone application was held before Judge Rakoff on July 15, 2020 without transcription or recording. Present were counsel for both sides. (lnl) (Entered: 07/15/2020) |
| 08/03/2020 | 44 | SUPPLEMENTAL PROTECTIVE ORDER as to Parker H. Petit, William Taylor...regarding procedures to be followed that shall govern the handling of confidential material...(Signed by Judge Jed S. Rakoff on 8/3/2020)(lnl) (Entered: 08/04/2020) |
| 08/12/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Telephonic Conference as to Parker H. Petit held on 8/12/2020 without transcription or recording. Counsel for all sides were present (jw) (Entered: 08/12/2020) |
| 08/12/2020 | 45 | ORDER GRANTING DEFENDANT WILLIAM TAYLOR'SUNOPPOSED MOTION FOR A TRIAL SUBPOENA TO ANNA MCPARLANDPURSUANT TO 28 U.S.C. § 1783 as to Parker H. Petit, William Taylor. This matter comes before the Court on Defendant's William Taylor's Unopposed Motion for a Trial Subpoena to Anna McParland Pursuant to 28 U.S.C. § 1783 (the "Motion"), the Court hereby ORDERS that: 1. The Motion is GRANTED; 2. The Clerk of Court shall issue, pursuant to Federal Rule of Criminal Procedure 17( e )(2) and 28 U.S.C. § 1783, a subpoena for the trial testimony of Anna McParland; 3. Pursuant to 28 U.S.C. § 1783(6), Defendant William Taylor shall reimburse Ms. McParland for necessary travel and attendance expenses, estimated not to exceed $3,000; and 4. Pursuant to Federal Rule of Criminal Procedure 17(e)(2), 28 U.S.C. § 1783, and Federal Rule of Civil Procedure 4(f)(3), Defendant may effect service by emailing the subpoena to Ms. McParland's counsel in the United States. (Signed by Judge Jed S. Rakoff on 8/12/2020) (jbo) (Entered: 08/12/2020) |
| 08/12/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Parker H. Petit, William Taylor held on 8/12/2020 without transcription or recording. Counsel for all sides were present. (jbo) (Entered: 08/12/2020) |
| 08/14/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Parker H. Petit held on 8/14/2020. A telephonic conference was held on August 14,2020 before Judge Rakoff. Present were counsel for both sides. (ap) (Entered: 08/14/2020) |
| 08/17/2020 | 46 | **FILING ERROR - DEFICIENT DOCKET ENTRY** - MOTION for Jennifer B. Loeb to Appear Pro Hac Vice *on behalf of Petit Parker*. Filing fee $ 200.00, receipt number NYSDC-21190557. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Parker H. Petit as to Parker H. Petit, William Taylor. (Attachments: # 1 Exhibit A-Declaration of Jennifer B. Loeb, # 2 Exhibit B, # 3 Exhibit C, # 4 Text of Proposed Order)(Loeb, Jennifer) Modified on 8/18/2020 (bcu). Modified on 8/18/2020 (bcu). (Entered: 08/17/2020) |
| 08/18/2020 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice as to Parker H. Petit, William Taylor to RE-FILE Document No. 46 MOTION for Jennifer B. Loeb to Appear Pro Hac Vice *on behalf of Petit Parker*. Filing fee $ 200.00, receipt number ANYSDC-21190557. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Supreme Court of California;. Re-file the motion as a Corrected Motion to Appear Pro Hac Vice - attach the correct signed PDF - select the correct named filer/filers - attach valid Certificates of Good Standing issued within the past 30 days - attach Proposed Order.. (bcu)** (Entered: 08/18/2020) |
| | | |

# A-13

| 08/18/2020 | 47 | ORDER GRANTING MOTION TO ADMIT COUNSEL PRO HAC VICE as to Parker H. Petit, William Taylor. (Signed by Judge Jed S. Rakoff on 8/18/2020) (ap) (Entered: 08/18/2020) |
| 08/21/2020 | 48 | ENDORSED LETTER as to Parker H. Petit, William Taylor addressed to Judge Jed S. Rakoff from Edward Imperatore, Scott Hartman, Daniel Tracer dated 8/20/2020 re: The Government writes to request the Court exclude time. ENDORSEMENT: SO ORDERED. (Signed by Judge Jed S. Rakoff on 8/21/2020) (ap) (Entered: 08/21/2020) |
| 08/24/2020 | 49 | NOTICE OF ATTORNEY APPEARANCE: Daniel Rickert Koffmann appearing for William Taylor. Appearance Type: Retained. (Koffmann, Daniel) (Entered: 08/24/2020) |
| 09/01/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Parker H. Petit held on 9/1/2020. A telephone conference was held 9-1-2020, before Judge Rakoff without recording or transcription. Present were counsel for both sides. (lnl) (Entered: 09/02/2020) |
| 09/25/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Parker H. Petit, William Taylor held on 9/25/2020. A phone conference was held before Judge Rakoff on September 25, 2020. PRESENT: For Petit: Eric Bruce, Jennifer Loeb, and Matthew Menchel. For Taylor: William Weinreb, Michael Packard, and Daniel Kaufman. For the Government: Scott Hartman, Edward Imperatore, and Daniel Tracer, AUSA's. (lnl) (Entered: 09/25/2020) |
| 09/25/2020 | 50 | ENDORSED LETTER as to Parker H. Petit, William Taylor addressed to Judge Jed S. Rakoff from Edward Imperatore, Scott Hartman and Daniel Tracer dated 9/25/2020 re: The Government and counsel for defendants Parker H. Petit and William Taylor jointly and respectfully write to propose an agreed-upon schedule governing pretrial matters in the above-captioned case. See Proposed Schedule Order...ENDORSEMENT... Approved. SO ORDERED. (Signed by Judge Jed S. Rakoff on 9/25/20)(jw) (Entered: 09/25/2020) |
| 09/25/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Parker H. Petit, William Taylor held on 9/25/2020. A telephonic conference was held before Judge Rakoff on September 25,2020 without transcription or recording. Present for the Government was Scot Hartman, AUSA, present for defendant Petit was Altin Sila; present for Defendant Taylor was Michael Packard. (ap) (Entered: 09/29/2020) |
| 10/02/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Parker H. Petit, William Taylor held on 10/2/2020.A phone PTC was held before Judge Rakoff without recording or transcription on October 2, 2020. Appearances: For deft Taylor was William Weinreb, for deft Petit was Eric Bruce, and for the Government was Scott Hartman, AUSA. Court's decision: A telephonic PTC is scheduled for October 5, 2020 at 11:00 a.m. The public may dial in: USA Toll-Free: (888) 363-4735; USA Caller Paid/International Toll: (215) 446-3657; Access Code: 1086415. (Pretrial Conference set for 10/5/2020 at 11:00 AM before Judge Jed S. Rakoff) (ap) (Entered: 10/02/2020) |
| 10/05/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Parker H. Petit, William Taylor held on 10/5/2020. On October 5, 2020 a telephonic PTC was held before Judge Rakoff. Present were a court reporter, Counsel for defendant Petit Eric Bruce, Amanda Tuminelli, and Jennifer Loeb, Counsel for defendant Taylor William Weinreb and William Burke, Counsel for the government, AUSA's Edward Imperator, Scott Hartman, and Daniel Tracer. Court's Ruling: Any and all defense motions must be submitted by 10-9-2020, Government responses 10-15-2020, all replies by 10-19-2020. (Motions due by 10/9/2020. Responses due by 10/15/2020. Replies due by 10/19/2020.) (lnl) (Entered: 10/05/2020) |
| 10/05/2020 | 51 | MOTION in Limine *(Notice of Motion in Limine)*. Document filed by Parker H. Petit. |

|  |  | (Bruce, Eric) (Entered: 10/05/2020) |
|---|---|---|
| 10/05/2020 | 52 | MEMORANDUM in Support by Parker H. Petit re 51 MOTION in Limine *(Notice of Motion in Limine)*.. (Attachments: # 1 Exhibit A)(Bruce, Eric) (Entered: 10/05/2020) |
| 10/05/2020 | 53 | MOTION in Limine *#1: to exclude evidence relating to the MiMedx Audit Committees investigation and findings in 2018 and 2019*. Document filed by William Taylor. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | 54 | MEMORANDUM in Support by William Taylor re 53 MOTION in Limine *#1: to exclude evidence relating to the MiMedx Audit Committees investigation and findings in 2018 and 2019*.. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | 55 | MOTION in Limine *#2: to exclude evidence of MiMedxs financial restatements*. Document filed by William Taylor. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | 56 | MEMORANDUM in Support by William Taylor re 55 MOTION in Limine *#2: to exclude evidence of MiMedxs financial restatements*.. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | 57 | MOTION in Limine *#3: to exclude evidence relating to AvKARE*. Document filed by William Taylor. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | 58 | MEMORANDUM in Support by William Taylor re 57 MOTION in Limine *#3: to exclude evidence relating to AvKARE*.. (Attachments: # 1 Exhibit A)(Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | 59 | MOTION in Limine *#4: to preclude the government from eliciting disguised expert testimony from certain witnesses*. Document filed by William Taylor. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | 60 | MEMORANDUM in Support by William Taylor re 59 MOTION in Limine *#4: to preclude the government from eliciting disguised expert testimony from certain witnesses*.. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | 61 | MOTION in Limine *#5: to exclude evidence regarding Mr. Taylor's termination from MiMedx*. Document filed by William Taylor. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | 62 | MEMORANDUM in Support by William Taylor re 61 MOTION in Limine *#5: to exclude evidence regarding Mr. Taylor's termination from MiMedx*.. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | 63 | MOTION in Limine *#6: to exclude certain prejudicial terms*. Document filed by William Taylor. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | 64 | MEMORANDUM in Support by William Taylor re 63 MOTION in Limine *#6: to exclude certain prejudicial terms*.. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | 65 | MOTION in Limine #7: *to exclude evidence of civil litigation involving Mr. Taylor*. Document filed by William Taylor. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | 66 | MEMORANDUM in Support by William Taylor re 65 MOTION in Limine *#7: to exclude evidence of civil litigation involving Mr. Taylor*.. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | 67 | MOTION in Limine *#8: to exclude Mr. Taylor's memorandum on revenue recognition unless the government establishes certain prerequisites*. Document filed by William Taylor. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | 68 | MEMORANDUM in Support by William Taylor re 67 MOTION in Limine *#8: to exclude Mr. Taylor's memorandum on revenue recognition unless the government* |

|  |  | *establishes certain prerequisites*.. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B)(Weinreb, William) (Entered: 10/05/2020) |
|---|---|---|
| 10/05/2020 | [69](#) | MOTION in Limine *#9: to require the government to prove the prerequisites for admission of certain alleged coconspirator statements outside the presence of the jury and prior to admitting them into evidence*. Document filed by William Taylor. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | [70](#) | MOTION in Limine *joining in Defendant Parker H. Petit's motions in limine, Dkt. No. 52*. Document filed by William Taylor. (Weinreb, William) (Entered: 10/05/2020) |
| 10/05/2020 | [71](#) | MOTION in Limine *to preclude expert testimony*. Document filed by USA as to Parker H. Petit, William Taylor. (Attachments: # [1](#) Exhibit A (expert notice))(Imperatore, Edward) (Entered: 10/05/2020) |
| 10/05/2020 | [72](#) | MOTION in Limine *to (1) admit prior act evidence to establish defendant Parker Petits knowledge of accounting/revenue recognition rules and intent as to the crimes charged in the Indictment; (2) preclude improper good acts evidence, (3) to preclude irrelevant post-conspiracy conduct, (4) to require the defendants to make a factual proffer to support any presence of counsel defense, and (5) to preclude argument or questioning regarding accounting advice that the defendants received, absent a proffered basis*. Document filed by USA as to Parker H. Petit, William Taylor. (Attachments: # [1](#) Exhibit, # [2](#) Exhibit) (Hartman, Scott) (Entered: 10/05/2020) |
| 10/06/2020 | [73](#) | MEMORANDUM in Support by William Taylor re [69](#) MOTION in Limine *#9: to require the government to prove the prerequisites for admission of certain alleged coconspirator statements outside the presence of the jury and prior to admitting them into evidence*.. (Weinreb, William) (Entered: 10/06/2020) |
| 10/09/2020 | [74](#) | MOTION to Continue *Trial*. Document filed by Parker H. Petit, William Taylor. (Weinreb, William) (Entered: 10/09/2020) |
| 10/09/2020 | [75](#) | MEMORANDUM in Support by Parker H. Petit, William Taylor re [74](#) MOTION to Continue *Trial*.. (Weinreb, William) (Entered: 10/09/2020) |
| 10/09/2020 | [76](#) | DECLARATION of Daniel Koffmann in Support as to Parker H. Petit, William Taylor re: [74](#) MOTION to Continue *Trial*.. (Weinreb, William) (Entered: 10/09/2020) |
| 10/09/2020 | [77](#) | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Conference held on 10/5/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Rebecca Forman, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/30/2020. Redacted Transcript Deadline set for 11/9/2020. Release of Transcript Restriction set for 1/7/2021. (McGuirk, Kelly) (Entered: 10/09/2020) |
| 10/09/2020 | [78](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Conference proceeding held on 10/5/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/09/2020) |
| 10/11/2020 | [79](#) | MOTION in Limine *to preclude certain evidence and argument*. Document filed by USA as to Parker H. Petit, William Taylor. (Imperatore, Edward) (Entered: 10/11/2020) |
| 10/13/2020 | [80](#) | JOINT MOTION to Compel *Clarification of Prior Witness Statements*. Document filed by Parker H. Petit as to Parker H. Petit, William Taylor. (Bruce, Eric) (Entered: |

# A-16

| | | |
|---|---|---|
| | | 10/13/2020) |
| 10/13/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Parker H. Petit, William Taylor held on 10/13/2020. A phone conference was held on October 13, 2020. Present for the Government were Danial Tracer and Edward Imperatore, AUSA's. For defendant Petit was William Weinreb and Michael Packard; and for defendant Taylor were Eric Bruce, Jennifer Loeb, Matthew Menchel, and Altin Sila. (lnl) (Entered: 10/14/2020) |
| 10/14/2020 | 81 | MEMORANDUM in Support by Parker H. Petit as to Parker H. Petit, William Taylor re 80 JOINT MOTION to Compel *Clarification of Prior Witness Statements*.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Bruce, Eric) (Entered: 10/14/2020) |
| 10/14/2020 | 82 | ORDER as to Parker H. Petit, William Taylor. I hereby authorize the defendants in the above-captioned matter to use the equipment listed below to supplement the existing technology in the courtroom for the duration of the trial proceedings set to begin on October 26, 2020. Defendants can proceed to make arrangements with the District Executive Office of the Court and William Jarrett of the Courtroom Technology department regarding installation (Signed by Judge Jed S. Rakoff on 10/14/20)(jw) (Entered: 10/14/2020) |
| 10/14/2020 | 83 | ORDER as to Parker H. Petit, William Taylor. It is hereby ORDERED that the following attorney(s) are authorized to bring the Personal Electronic Device(s) and/or the General Purpose Computing Device(s) (collectively, "Devices") listed below into the Courthouse for use in a proceeding or trial in the action captioned United States v. Parker H. Petit & William Taylor on case 19 cr 850 the dates for which such authorization is provided is 10/26/20 - 12/18/20. (Signed by Judge Jed S. Rakoff on 10/14/20)(jw) (Entered: 10/14/2020) |
| 10/14/2020 | 84 | ORDER as to Parker H. Petit, William Taylor. It is hereby ORDERED that the following attorney(s) are authorized to bring the Personal Electronic Device(s) and/or the General Purpose Computing Device(s) (collectively, "Devices") listed below into the Courthouse for use in a proceeding or trial in the action captioned US v. Parker H. Petit and William Taylor for case #19 cr 850 for the dates 10/26/20 - 12/18/20 (Signed by Judge Jed S. Rakoff on 10/14/20)(jw) (Entered: 10/14/2020) |
| 10/14/2020 | 85 | ORDER as to Parker H. Petit, William Taylor. I hereby authorize Courtroom Connect, a Southern District of New York contracted vendor, to provide the parties in the United States v. Parker H. Petit and William Taylor, 19-cr-00850 (JSR) with internet connectivity, including permission to bring external internet router to the Court, as well as Remote Real Time transcript feed that can be viewed by Court authorized individuals outside of the courthouse for the duration of the proceedings set to begin on October 26, 2020. Courtroom Connect can proceed to make arrangements with the District Executive Office of the Court. The approved attorneys and staff on the case may bring in the necessary electronic devices to connect to the Courtroom Connect Service (Signed by Judge Jed S. Rakoff on 10/14/20)(jw) (Entered: 10/14/2020) |
| 10/15/2020 | 86 | RESPONSE in Opposition by USA as to Parker H. Petit, William Taylor re: 74 MOTION to Continue *Trial*.. (Attachments: # 1 Exhibit A: August 19, 2020 Email from Defense Counsel, # 2 Exhibit B: September 21, 2020 Email from Defense Counsel)(Hartman, Scott) (Entered: 10/15/2020) |
| 10/15/2020 | 87 | MEMORANDUM in Opposition by USA as to Parker H. Petit, William Taylor re 51 MOTION in Limine *(Notice of Motion in Limine)*., 65 MOTION in Limine *#7: to exclude evidence of civil litigation involving Mr. Taylor*., 59 MOTION in Limine *#4: to preclude the government from eliciting disguised expert testimony from certain witnesses*., 61 MOTION in Limine *#5: to exclude evidence regarding Mr. Taylor's termination from* |

| | | |
|---|---|---|
| | | *MiMedx.*, 55 MOTION in Limine *#2: to exclude evidence of MiMedxs financial restatements.*, 70 MOTION in Limine *joining in Defendant Parker H. Petit's motions in limine, Dkt. No. 52* ., 67 MOTION in Limine *#8: to exclude Mr. Taylor's memorandum on revenue recognition unless the government establishes certain prerequisites.*, 69 MOTION in Limine *#9: to require the government to prove the prerequisites for admission of certain alleged coconspirator statements outside the presence of the jury and prior to admitting them into evidence.*, 63 MOTION in Limine *#6: to exclude certain prejudicial terms.*, 53 MOTION in Limine *#1: to exclude evidence relating to the MiMedx Audit Committees investigation and findings in 2018 and 2019.*, 52 MOTION in Limine *#3: to exclude evidence relating to AvKARE.*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Imperatore, Edward) (Entered: 10/15/2020) |
| 10/16/2020 | 88 | NOTICE OF ATTORNEY APPEARANCE: Sarah Caruana appearing for Parker H. Petit. Appearance Type: Retained. (Caruana, Sarah) (Entered: 10/16/2020) |
| 10/17/2020 | 89 | MEMORANDUM in Opposition by USA as to Parker H. Petit, William Taylor re 80 JOINT MOTION to Compel *Clarification of Prior Witness Statements.*. (Attachments: # 1 Exhibit A)(Imperatore, Edward) (Entered: 10/17/2020) |
| 10/17/2020 | 90 | SUPPLEMENTAL MOTION in Limine *to Exclude Evidence or Argument Concerning "Related Party Transactions"*. Document filed by Parker H. Petit. (Bruce, Eric) (Entered: 10/17/2020) |
| 10/17/2020 | 91 | MEMORANDUM in Support by Parker H. Petit re 90 SUPPLEMENTAL MOTION in Limine *to Exclude Evidence or Argument Concerning "Related Party Transactions".*. (Attachments: # 1 Exhibit A)(Bruce, Eric) (Entered: 10/17/2020) |
| 10/18/2020 | 92 | JOINT REPLY MEMORANDUM OF LAW in Support by Parker H. Petit as to Parker H. Petit, William Taylor re: 80 JOINT MOTION to Compel *Clarification of Prior Witness Statements*. . (Bruce, Eric) (Entered: 10/18/2020) |
| 10/19/2020 | 93 | REPLY MEMORANDUM OF LAW in Support by Parker H. Petit, William Taylor as to William Taylor re: 74 MOTION to Continue *Trial*. / *In Opposition to 86* . (Weinreb, William) (Entered: 10/19/2020) |
| 10/19/2020 | | MEMORANDUM TO THE DOCKET CLERK as to Parker H. Petit, William Taylor: A jury trial will be held on October 26, 2020 at 9:30 in courtroom 26B of 500 Pearl. Street. (lnl) (Entered: 10/19/2020) |
| 10/19/2020 | | Set/Reset Hearings as to Parker H. Petit, William Taylor: Jury Trial set for 10/26/2020 at 09:30 AM in Courtroom 26B, 500 Pearl Street, New York, NY 10007 before Judge Jed S. Rakoff. (lnl) (Entered: 10/19/2020) |
| 10/19/2020 | 94 | MEMORANDUM in Opposition by William Taylor as to Parker H. Petit, William Taylor re 72 MOTION in Limine *to (1) admit prior act evidence to establish defendant Parker Petits knowledge of accounting/revenue recognition rules and intent as to the crimes charged in the Indictment; (2) preclude improper good acts evidence, (3) to preclude.* (Weinreb, William) (Entered: 10/19/2020) |
| 10/19/2020 | 95 | MEMORANDUM ORDER as to Parker H. Petit, William Taylor: On October 13, 2020, defendants Parker H. Petit and William Taylor filed this joint motion to compel clarification of prior witness statements contained in the Governments recent disclosure under 18 U.S.C. § 3500 ("3500 materials"). Dkt. No. 80. For the reasons set forth below, the motion is granted in part and denied in part. SO ORDERED. (Signed by Judge Jed S. Rakoff on 10/19/2020) (See ORDER as set forth) (lnl) (Entered: 10/19/2020) |
| 10/19/2020 | 96 | Request To Charge by USA as to Parker H. Petit, William Taylor. (Imperatore, Edward) (Entered: 10/19/2020) |

# A-18

7/15/2021                                    SDNY CM/ECF NextGen Version 1.6

| 10/19/2020 | 97 | MEMORANDUM in Opposition by Parker H. Petit as to Parker H. Petit, William Taylor re 71 MOTION in Limine *to preclude expert testimony*.. (Attachments: # 1 Exhibit A) (Bruce, Eric) (Entered: 10/19/2020) |
|---|---|---|
| 10/19/2020 | 98 | Request To Charge by Parker H. Petit, William Taylor. (Tuminelli, Amanda) (Entered: 10/19/2020) |
| 10/20/2020 | 99 | MOTION in Limine *to preclude misleading summary witness testimony*. Document filed by Parker H. Petit, William Taylor. (Weinreb, William) (Entered: 10/20/2020) |
| 10/20/2020 | 100 | MEMORANDUM in Support by Parker H. Petit, William Taylor re 99 MOTION in Limine *to preclude misleading summary witness testimony*.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Weinreb, William) (Entered: 10/20/2020) |
| 10/21/2020 | | MEMORANDUM TO THE DOCKET CLERK: as to Parker H. Petit, William Taylor. A tele-conference is scheduled for Friday October 23, 2020 at 2:00 p.m. The public may dial in to listen at 888-363-4735 toll free USA, 215-446-3657 international caller paid, access code 1086415. (ap) (Entered: 10/21/2020) |
| 10/21/2020 | | Set/Reset Hearings as to Parker H. Petit, William Taylor: Telephone Conference set for 10/23/2020 at 02:00 PM before Judge Jed S. Rakoff. (ap) (Entered: 10/21/2020) |
| 10/21/2020 | 101 | PROPOSED EXAMINATION OF JURORS by USA as to Parker H. Petit, William Taylor. (Tracer, Daniel) (Entered: 10/21/2020) |
| 10/21/2020 | 102 | Proposed Voir Dire Questions by Parker H. Petit, William Taylor. (Weinreb, William) (Entered: 10/21/2020) |
| 10/21/2020 | 103 | MEMORANDUM ORDER as to Parker H. Petit, William Taylor. The defendants' motion to adjourn the trial borders on the frivolous and is hereby denied. The trial will commence at 9:45 a.m. on October 26, 2020 in Courtroom 26B of the Daniel Patrick Moynihan Courthouse. The Clerk of the Court is directed to close docket entry 74. (Signed by Judge Jed S. Rakoff on 10/21/2020) (See ORDER set forth) (ap) (Entered: 10/22/2020) |
| 10/21/2020 | 104 | ORDER as to Parker H. Petit, William Taylor: This judge is not necessarily opposed to many of these requests and will endeavor to accommodate them where possible. However, most of them violate the Southern District of New York's social distancing protocols promulgated by the Court as a whole, after careful study of what was best required to assure juror health. Accordingly, for now, the Court denies requests (1) - (6) and (8) without prejudice to reconsideration as the trial progresses. The one request that is not violative of the aforementioned protocols, request (7), is hereby granted. (Signed by Judge Jed S. Rakoff on 10/21/2020) (See ORDER set forth) (ap) (Entered: 10/22/2020) |
| 10/22/2020 | 105 | PROTECTIVE ORDER as to Parker H. Petit, William Taylor...regarding procedures to be followed that shall govern the handling of confidential material... (Signed by Judge Jed S. Rakoff on 10/22/2020) (ap) (Entered: 10/22/2020) |
| 10/22/2020 | | MEMORANDUM TO THE DOCKET CLERK: as to Parker H. Petit, William Taylor. A jury trial will be held before Judge Rakoff starting October 26, 2020 at 9:30 in courtroom 26B of the 500 Pearl Street courthouse. The public may listen in by dialing 888-363-4735 (USA toll free); 215-446-3657 (International caller paid); access code 1086415. (ap) (Entered: 10/22/2020) |
| 10/22/2020 | | Set/Reset Hearings as to Parker H. Petit, William Taylor: Jury Trial set for 10/26/2020 at 09:30 AM in Courtroom 26B, 500 Pearl Street, New York, NY 10007 before Judge Jed S. Rakoff. (ap) (Entered: 10/22/2020) |

# A-19

SDNY CM/ECF NextGen Version 1.6

| | | |
|---|---|---|
| 10/22/2020 | 106 | MOTION in Limine *to exclude evidence relating to the identities of investors in MiMedx*. Document filed by Parker H. Petit, William Taylor. (Weinreb, William) (Entered: 10/22/2020) |
| 10/22/2020 | 107 | MEMORANDUM in Support by Parker H. Petit, William Taylor re 106 MOTION in Limine *to exclude evidence relating to the identities of investors in MiMedx*.. (Attachments: # 1 Exhibit A)(Weinreb, William) (Entered: 10/22/2020) |
| 10/22/2020 | 108 | RESPONSE in Opposition by USA as to Parker H. Petit, William Taylor re: 90 SUPPLEMENTAL MOTION in Limine *to Exclude Evidence or Argument Concerning "Related Party Transactions"*.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Tracer, Daniel) (Entered: 10/22/2020) |
| 10/22/2020 | 109 | MOTION for Kathleen Marini to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number NYSDC-22268090. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by William Taylor as to Parker H. Petit, William Taylor. (Attachments: # 1 Declaration of Kathleen Marini in Support of Motion to Appear Pro Hac Vice, # 2 Certificate of Good Standing, # 3 Proposed Order)(Marini, Kathleen) (Entered: 10/22/2020) |
| 10/22/2020 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 109 MOTION for Kathleen Marini to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC-22268090. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (vba)** (Entered: 10/22/2020) |
| 10/22/2020 | 110 | MOTION to Quash *the government's Rule 17(c) subpoena duces tecum to defendants expert witness, Jason Flemmons*. Document filed by Parker H. Petit, William Taylor. (Weinreb, William) (Entered: 10/22/2020) |
| 10/22/2020 | 111 | MEMORANDUM in Support by Parker H. Petit, William Taylor re 110 MOTION to Quash *the government's Rule 17(c) subpoena duces tecum to defendants expert witness, Jason Flemmons*.. (Attachments: # 1 Exhibit A)(Weinreb, William) (Entered: 10/22/2020) |
| 10/22/2020 | | MEMORANDUM TO THE DOCKET CLERK as to Parker H. Petit, William Taylor. The in-court jury trial commencing 9:30am on October 26, 2020 will also have a dial in connection to which the public may dial in and listen:888-363-4735 (USA toll free); 215-446-3657 (International caller paid); access code 1086415) (jw) (Entered: 10/23/2020) |
| 10/23/2020 | 112 | RESPONSE in Opposition by USA as to Parker H. Petit, William Taylor re: 99 MOTION in Limine *to preclude misleading summary witness testimony*.. (Attachments: # 1 Exhibit A: GX-742 (MMDX_00514328))(Hartman, Scott) (Entered: 10/23/2020) |
| 10/26/2020 | 113 | ORDER FOR ADMISSION PRO HAC VICE granting 109 Motion for Kathleen Marini to Appear Pro Hac Vice as to William Taylor (2). (Signed by Judge Jed S. Rakoff on 10/23/2020) (lnl) (Entered: 10/26/2020) |
| 10/26/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Voir Dire held on 10/26/2020 as to Parker H. Petit, William Taylor. On October 26, 2020 Judge Rakoff picked a jury for a criminal trial. Evidence was entered. It is continued to the next day, October 27, 2020. Duration 5 hours. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michael Packard from Quinn Emanuel. (Court Reporter Rose Prater and Sam Mauro) (ap) (Entered: 10/26/2020) |

**A-20**

| 10/26/2020 | [114](#) | ORDER as to Parker H. Petit, William Taylor: The defense in the above-captioned case is hereby permitted to bring in approximately 20 boxes of documents in connection with the trial commencing today. SO ORDERED. (Signed by Judge Jed S. Rakoff on 10/26/2020) (lnl) (Entered: 10/27/2020) |
| 10/27/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 10/27/2020. On October 27, 2020 the trial continues, evidence was entered. It is continued to the next day, October 28, 2020. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michael Packard from Quinn Emanuel. (Court Reporter Rose Prater and Sam Mauro) (lnl) (Entered: 10/28/2020) |
| 10/28/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 10/28/2020. On October 28, 2020 trial continues, evidence was entered. It is continued to the next day, October 29, 2020. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michael Packard from Quinn Emanuel. (Court Reporter Rose Prater and Sam Mauro) (lnl) (Entered: 10/28/2020) |
| 10/29/2020 | [115](#) | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Conference held on 10/23/2020 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Andrew Walker, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/19/2020. Redacted Transcript Deadline set for 11/30/2020. Release of Transcript Restriction set for 1/27/2021. (McGuirk, Kelly) (Entered: 10/29/2020) |
| 10/29/2020 | [116](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Conference proceeding held on 10/23/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 10/29/2020) |
| 10/29/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Parker H. Petit, William Taylor held on 10/29/2020. On October 29, 2020 trial continues, evidence was entered. It is continued to the next day, October 30, 2020. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Taylor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michael Packard from Quinn Emanuel. (Court Reporter Rose Prater and Sam Mauro) (jw) (Entered: 11/02/2020) |
| 10/30/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Jury Trial as to Parker H. Petit, William Taylor held on 10/30/2020. On October 30, 2020 trial continues, evidence was entered. It is continued to the next business day, November 2 2020. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna |

# A-21

| | | |
|---|---|---|
| | | from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michael Packard from Quinn Emanuel. (Court Reporter Rose Prater and Sam Mauro) (jw) (Entered: 11/02/2020) |
| 11/01/2020 | [117](#) | MOTION for Reconsideration *re admission of previously offered Defense exhibits*. Document filed by Parker H. Petit. (Bruce, Eric) (Entered: 11/01/2020) |
| 11/03/2020 | [119](#) | LETTER by Parker H. Petit addressed to Judge Jed S. Rakoff from Eric B. Bruce dated 11/3/2020 re: For the foregoing reasons, Mr. Petit respectfully requests that Your Honor consider and admit these exhibits based on the applicable hearsay exceptions under the Rules of Evidence and for impeachment purposes, where indicated. (jbo) (Entered: 11/20/2020) |
| 11/03/2020 | [120](#) | LETTER by William Taylor addressed to Judge Jed S. Rakoff from Michael Packard dated 11/3/2020 re: to preview certain exhibits we may seek to introduce during the cross-examination. (jbo) (Entered: 11/20/2020) |
| 11/04/2020 | | MEMORANDUM TO THE DOCKET CLERK: as to Parker H. Petit, William Taylor. The jury trial has been adjourned for today, November 4, 2020 and will reconvene at 9:45a.m. tomorrow, November 5, 2020. (ap) (Entered: 11/04/2020) |
| 11/04/2020 | | Set/Reset Hearings as to Parker H. Petit, William Taylor: Jury Trial set for 11/5/2020 at 09:45 AM before Judge Jed S. Rakoff. (ap) (Entered: 11/04/2020) |
| 11/04/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/4/2020. Judge Jed S. Rakoff Trial as to Parker H. Petit, William Taylor held on 11/04/2020, trial continues, evidence was entered. It is continued to November 5, 2020. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michael Packard from Quinn Emanuel. (Court Reporter Rebecca Forman and Alena Lynch) (ap) (Entered: 11/09/2020) |
| 11/05/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/5/2020. Judge Jed S. Rakoff Trial as to Parker H. Petit, William Taylor held on 11/05/2020, trial continues, evidence was entered. It is continued to November 6, 2020. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michael Packard from Quinn Emanuel. (Court Reporters Rebecca Forman and Michael McDaniel) (ap) (Entered: 11/09/2020) |
| 11/06/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/6/2020. Judge Jed S. Rakoff Trial as to Parker H. Petit, William Taylor held on 11/06/2020, trial continues, evidence was entered. It is continued to November 9, 2020. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michael Packard from Quinn Emanuel. (Court Reporter Rebecca Forman and Alena Lynch) (ap) (Entered: 11/09/2020) |
| 11/06/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. |

# A-22

| | |
|---|---|
| | Petit, William Taylor held on 11/6/2020. Judge Jed S. Rakoff Trial as to Parker H. Petit, William Taylor held on 11/09/2020, trial continues, evidence was entered. It is continued to November 10, 2020. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michae Packard from Quinn Emanuel. (Court Reporter Rebecca Forman and Alena Lynch) (ap) (Entered: 11/09/2020) |
| 11/09/2020 | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/9/2020. Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/9, 10, 11 12, 13/2020. Judge Jed S. Rakoff, evidence was entered. It is continued to November 16, 2020. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michae Packard from Quinn Emanuel. (Court Reporter Rebecca Forman and Alena Lynch) (ap) (Entered: 12/02/2020) |
| 11/10/2020 | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/10/2020. Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/9, 10, 11 12, 13/2020. Judge Jed S. Rakoff, evidence was entered. It is continued to November 16, 2020. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michae Packard from Quinn Emanuel. (Court Reporter Rebecca Forman and Alena Lynch) (ap) (Entered: 12/02/2020) |
| 11/11/2020 | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/11/2020. Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/9, 10, 11 12, 13/2020. Judge Jed S. Rakoff, evidence was entered. It is continued to November 16, 2020. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michae Packard from Quinn Emanuel. (Court Reporter Rebecca Forman and Alena Lynch) (ap) (Entered: 12/02/2020) |
| 11/12/2020 | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/12/2020. Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/9, 10, 11 12, 13/2020. Judge Jed S. Rakoff, evidence was entered. It is continued to November 16, 2020. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michae Packard from Quinn Emanuel. (Court Reporter Rebecca Forman and Alena Lynch) (ap) (Entered: 12/02/2020) |
| 11/13/2020 | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/13/2020. Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/9, 10, 11 |

| | | |
|---|---|---|
| | | 12, 13/2020. Judge Jed S. Rakoff, evidence was entered. It is continued to November 16, 2020. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michae Packard from Quinn Emanuel. (Court Reporter Rebecca Forman and Alena Lynch) (ap) (Entered: 12/02/2020) |
| 11/15/2020 | 118 | Proposed Jury Instructions by William Taylor. (Attachments: # 1 Exhibit A - Proposed Amendments to Instructions, # 2 Exhibit B - Proposed Verdict Form)(Koffmann, Daniel) (Entered: 11/15/2020) |
| 11/16/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/16/2020. Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/16/20. Evidence was entered. Charge by the Court, exceptions to the charge. The jury retires to deliberate. The trial is continued to November 17, 2020. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michael Packard from Quinn Emanuel. (Court Reporter Rebecca Forman and Alena Lynch) (ap) (Entered: 12/02/2020) |
| 11/16/2020 | 127 | THE COURT'S INSTRUCTIONS OF LAW TO THE JURY as to USA v. Parker H. Petit, William Taylor. (bw) (Entered: 01/22/2021) |
| 11/17/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/17/2020. Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/17,18, 19/20. The jury continues to deliberate. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michael Packard from Quinn Emanuel. (Court Reporter Rebecca Forman and Alena Lynch) (ap) (Entered: 12/02/2020) |
| 11/18/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/18/2020. Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/17,18, 19/20. The jury continues to deliberate. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michael Packard from Quinn Emanuel. (Court Reporter Rebecca Forman and Alena Lynch) (ap) (Entered: 12/02/2020) |
| 11/19/2020 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/19/2020. Minute Entry for proceedings held before Judge Jed S. Rakoff: Jury Trial as to Parker H. Petit, William Taylor held on 11/17,18, 19/20. The jury continues to deliberate. Present for the government were AUSA's Daniel Tracer, Edward Imperatore, and Scott Hartman. Present for defendant #1, Peter Petit, were Eric Bruce, Jennifer Loeb, Alktin Sila, Sarah Carauna from Freshfields and Matthew Menchel, and Amanda Tuminelli from Kobre and Kim. For deft #2, William |

# A-24

|  |  |  |
|---|---|---|
|  |  | Tayor: William Weinreb, William Burck, Daniel Koffman, Michael Carlinsky, Michael Packard from Quinn Emanuel. On November 19, 2020, the jury returns a verdict (attached). PSI refs to Prob. SENS for Petit 2/23/2021 at 4:00pm. SENS for Taylor 2/24/2021 at 4:00pm. Any defense motions due 1-8-2021, Govt motions due 1/22/2021, Replies 1/29/2021. (Court Reporter Rebecca Forman and Alena Lynch) (ap) (Entered: 12/02/2020) |
| 11/19/2020 | 121 | JURY VERDICT as to Parker H. Petit (1) Guilty on Count 2 and William Taylor (2) Guilty on Count 1. Parker H. Petit (1) Not Guilty on Count 1 and William Taylor (2) Not Guilty on Count 2. (ap) (Entered: 12/02/2020) |
| 11/19/2020 |  | Oral Order of Referral to Probation for Presentence Investigation and Report as to Parker H. Petit, William Taylor. (Signed by Judge Jed S. Rakoff on 11/19/2020) (ap) (Entered: 12/02/2020) |
| 11/19/2020 |  | Set/Reset Deadlines as to Parker H. Petit, William Taylor:Any defense motions due 1-8-2021, Govt motions due 1/22/2021, Replies 1/29/2021. Motions due by 1/22/2021. Replies due by 1/29/2021. (ap) (Entered: 12/02/2020) |
| 11/19/2020 |  | Set/Reset Hearings as to Parker H. Petit: Sentencing set for 2/23/2021 at 04:00 PM before Judge Jed S. Rakoff. (ap) (Entered: 12/02/2020) |
| 11/19/2020 |  | Set/Reset Hearings as to William Taylor: Sentencing set for 2/24/2021 at 04:00 PM before Judge Jed S. Rakoff. (ap) (Entered: 12/02/2020) |
| 11/19/2020 |  | JURY VERDICT as to William Taylor (2) Not Guilty on Count 2. (lnl) (Entered: 03/01/2021) |
| 12/23/2020 | 122 | LETTER by Parker H. Petit addressed to Judge Jed S. Rakoff, from Eric B. Bruce/Jennifer B. Loeb dated 11/10/2020 re: Defense counsel writes regarding evidence and jury. (ap) (Entered: 12/23/2020) |
| 01/08/2021 | 123 | MOTION for Acquittal *(Notice of Motion)*. Document filed by Parker H. Petit. (Bruce, Eric) (Entered: 01/08/2021) |
| 01/08/2021 | 124 | MEMORANDUM in Support by Parker H. Petit re 123 MOTION for Acquittal *(Notice of Motion)*.. (Bruce, Eric) (Entered: 01/08/2021) |
| 01/08/2021 | 125 | MOTION for Acquittal ., MOTION for New Trial . Document filed by William Taylor. (Weinreb, William) (Entered: 01/08/2021) |
| 01/08/2021 | 126 | MEMORANDUM in Support by William Taylor re 125 MOTION for Acquittal . MOTION for New Trial .. (Weinreb, William) (Entered: 01/08/2021) |
| 01/22/2021 | 139 | MEMORANDUM in Opposition by USA as to Parker H. Petit, William Taylor re 125 MOTION for Acquittal . MOTION for New Trial .. *123 MOTION for Acquittal* (Hartman, Scott) (Entered: 01/22/2021) |
| 01/29/2021 | 140 | REPLY MEMORANDUM OF LAW in Support as to William Taylor re: 125 MOTION for Acquittal . MOTION for New Trial . . (Weinreb, William) (Entered: 01/29/2021) |
| 02/05/2021 |  | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Parker H. Petit, William Taylor held on 2/5/2021. A phone conference was held 2-5-21 without transcription or recording. Present for defendant Taylor was William Weinreb and Michael Packard; for defendant Petit, Eric Bruce, Matthew Menchel, and Jennifer Loeb; and for the Government, AUSAs Scott Hartman and Edward Imperatore. Court's decision: The sentencing for defendant Taylor, scheduled for February 24, 2021 at 4:00 p.m., will proceed in person in Courtroom 14B of the Daniel Patrick Moynihan |

# A-25

SDNY CM/ECF NextGen Version 1.6

| | | |
|---|---|---|
| | | Courthouse. (Sentencing set for 2/24/2021 at 04:00 PM in Courtroom 14B, 500 Pearl Street, New York, NY 10007 before Judge Jed S. Rakoff) (lnl) (Entered: 02/08/2021) |
| 02/10/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Telephone Conference as to Parker H. Petit, William Taylor held on 2/10/2021 with transcription or recording. Present for the Government were AUSAs Edward Imperatore and Daniel Tracer; for defendant Taylor were Bill Weinreb and Michael Packard; for defendant Petit were Eric Bruce, Jennifer Loeb, and Matthew Menchel. (jw) (Entered: 02/11/2021) |
| 02/12/2021 | | MEMORANDUM TO THE DOCKET CLERK as to Parker H. Petit: The sentencing for defendant Petit, set for February 23, 2021 at 4:00 p.m., will proceed via videoconference. The public can dial-in through the following access information: Dial in: +1 (917) 933-2166; Conference ID: 176672031. (lnl) (Entered: 02/12/2021) |
| 02/12/2021 | | Set/Reset Deadlines/Hearings as to Parker H. Petit: Sentencing set for 2/23/2021 at 04:00 PM before Judge Jed S. Rakoff. (lnl) (Entered: 02/12/2021) |
| 02/12/2021 | | Minute Entry - A phone conference was held February 12, 2021 before Judge Rakoff without recording or transcription. Present for the Government was AUSA Scott Hartman; for defendant Taylor was Michael Packard; and for defendant Petit was Jennifer Loeb (jw) (Entered: 02/16/2021) |
| 02/16/2021 | 143 | ORDER as to Parker H. Petit, William Taylor: Defendant William Taylor is hereby permitted to file under seal his sentencing memorandum in this matter and exhibits thereto. Further, he shall electronically file a redacted version of those materials. SO ORDERED. (Signed by Judge Jed S. Rakoff on 2/16/2021) (lnl) (Entered: 02/16/2021) |
| 02/16/2021 | 144 | SENTENCING SUBMISSION by Parker H. Petit. (Attachments: # 1 Appendix A, # 2 Appendix B, # 3 Appendix C)(Bruce, Eric) (Entered: 02/16/2021) |
| 02/16/2021 | 145 | SENTENCING SUBMISSION by USA as to Parker H. Petit, William Taylor. (Attachments: # 1 Exhibit A (Minkin report), # 2 Exhibit B (Minkin exhibits), # 3 Exhibit C (Minkin CV), # 4 Exhibit D (Petit money judgment), # 5 Exhibit E (Taylor money judgment))(Imperatore, Edward) (Entered: 02/16/2021) |
| 02/16/2021 | 146 | Sentencing Letter by Parker H. Petit addressed to Hon. Jed S. Rakoff from Parker H. Petit dated 2/16/2021 re: Supplemental letters in support of sentencing. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Menchel, Matthew) (Entered: 02/16/2021) |
| 02/17/2021 | 147 | MEMORANDUM OF LAW by William Taylor *(SENTENCING MEMORANDUM - REDACTED)*. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2 - Redacted, # 3 Exhibit 3 - Redacted, # 4 Exhibit 4 - Redacted, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8 - Redacted)(Weinreb, William) (Entered: 02/17/2021) |
| 02/17/2021 | 148 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 02/18/2021) |
| 02/19/2021 | 149 | RESPONSE by Parker H. Petit re: 145 Sentencing Submission, filed by USA . (Attachments: # 1 Exhibit A)(Bruce, Eric) (Entered: 02/19/2021) |
| 02/19/2021 | 150 | RESPONSE by USA as to Parker H. Petit, William Taylor *to defendants' sentencing submissions*. (Attachments: # 1 Exhibit A (Minkin rebuttal report), # 2 Exhibit B (Minkin exhibits), # 3 Exhibit C (BOP letter))(Imperatore, Edward) (Entered: 02/19/2021) |
| 02/21/2021 | 151 | OPINION AND ORDER 123 Motion for Acquittal as to Parker H. Petit (1); denying 125 Motion for Acquittal as to William Taylor (2); denying 125 Motion for New Trial as to William Taylor. For the foregoing reasons, the defendants' respective motions for a judgment of acquittal and, in the alternative, for a new trial, are denied. The Clerk of the Court is directed to close the entries at docket numbers 123 and 125 (Signed by Judge Jed S. Rakoff on 2/21/21) (jw) (Entered: 02/22/2021) |

**A-26**

| 02/22/2021 | 152 | RESPONSE by William Taylor *to 145 Sentencing Submission, filed by USA.* (Attachments: # 1 Exhibit A (Dr. Saha Rebuttal))(Weinreb, William) (Entered: 02/22/2021) |
|---|---|---|
| 02/22/2021 | | MEMORANDUM TO THE DOCKET CLERK as to Parker H. Petit: The Skype sentencing on Tuesday February 23 will commence at 3:30 pm The dial in information remains the same - (917) 933-2166; Conference ID: 176672031. (lnl) (Entered: 02/23/2021) |
| 02/22/2021 | | Set/Reset Deadlines/Hearings as to Parker H. Petit: Sentencing set for 2/23/2021 at 03:30 PM before Judge Jed S. Rakoff. (lnl) (Entered: 02/23/2021) |
| 02/23/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Sentencing held on 2/23/2021 for Parker H. Petit (1) Count 2. On 2-23-2021 a Skype sentencing was held before Judge Rakoff. Present were the defendant and his counsel Eric Bruce, Jennifer Loeb, and Matt Menchel. Present fir the government were AUSAs Scott Hartman, Daniel Tracer and Edward Imperatore and a court reporter. Sentence by the Court : On Count 2: 12 months jail, vol surrender to the institution on 9-21-2021 before 2:00pm. (NO supervised release). $100 assess, $1,000,000.00 fine to be paid within 90 days. (ap) (Entered: 02/24/2021) |
| 02/24/2021 | | MEMORANDUM TO THE DOCKET CLERK as to William Taylor. The sentencing for defendant Taylor will proceed in person at 4:00 p.m. today in Courtroom 14B. The public can dial-in: USA Toll-Free: (888) 363-4735; USA Caller Paid/International Toll: (215) 446-3657, access code 1086415 (jw) (Entered: 02/24/2021) |
| 02/24/2021 | | DISMISSAL OF COUNTS on Government Motion as to Parker H. Petit (1) Count 1. (ap) (Entered: 02/24/2021) |
| 02/24/2021 | 153 | JUDGMENT IN A CRIMINAL CASE as to Parker H. Petit (1). THE DEFENDANT: was found guilty on count 2 after a plea of not guilty. The defendant has been found not guilty on count 1. IMPRISONMENT: Count 2: Twelve (12) months jail. The court makes the following recommendations to the Bureau of Prisons: Incarceration in the Federal Medical Center at Lexington, Kentucky or the Federal Medical Center at Butner, North Carolina. The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons: before 2 p.m. on 9/21/2021. SUPERVISED RELEASE: (None). ASSESSMENT: $100.00 due immediately. FINE: $1,000,000.00. The determination of restitution is deferred until 5/21/2021. An Amended Judgment in a Criminal Case (AO 245C) will be entered after such determination. (Signed by Judge Jed S. Rakoff on 2/23/2021) (ap) (Entered: 02/24/2021) |
| 02/24/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Sentencing held on 2/24/2021 for William Taylor (2) Count 1. Present were deft Taylor and his counsel William Burck, AUSA Daniel Tracer for the government and court reporter Steve Greenblum. Sentence by the Court: On Count 1: 12 months jail, vol. surr to the institution on Sept. 21, 2021 before 2:00pm. (No supervised release) $100 assess, $250,000 fine to be paid within 1 year. (jbo) (Entered: 02/26/2021) |
| 03/01/2021 | 154 | JUDGMENT IN:A CRIMINAL CASE as to William Taylor (2). The Defendant was found guilty on count 1 after a plea of not guilty. The Defendant has been found not guilty on count 2. IMPRISONMENT: Twelve (12) months jail. The court makes the following recommendations to the Bureau of Prisons: Incarceration in Federal Prison Camp - Montgomery, Alabama. The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons: before 2 p.m. on 9/21/2021. ASSESSMENT: $100.00 due immediately. FINE $250,000.00. The fine of $250,000.00 shall be paid within one year of the sentencing date of 2-24-2021. (Signed by Judge Jed S. Rakoff on 2/26/2021) (lnl) (Entered: 03/01/2021) |

SDNY CM/ECF NextGen Version 1.6

| | | |
|---|---|---|
| 03/08/2021 | 155 | NOTICE OF APPEAL by Parker H. Petit from 153 Judgment. Filing fee $ 505.00, receipt number 465401275224. (nd) (Entered: 03/08/2021) |
| 03/08/2021 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Parker H. Petit to US Court of Appeals re: 155 Notice of Appeal. (nd) (Entered: 03/08/2021) |
| 03/08/2021 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Parker H. Petit re: 155 Notice of Appeal were transmitted to the U.S. Court of Appeals. (nd) (Entered: 03/08/2021) |
| 03/09/2021 | 156 | NOTICE OF APPEAL by William Taylor from 154 Judgment. (nd) (Entered: 03/09/2021) |
| 03/09/2021 | | USCA Appeal Fees received $ 505.00, receipt number 465401275320 as to William Taylor on 03/09/2021 re: 156 Notice of Appeal filed by William Taylor. (nd) (Entered: 03/09/2021) |
| 03/09/2021 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to William Taylor to US Court of Appeals re: 156 Notice of Appeal by William Taylor. (nd) (Entered: 03/09/2021) |
| 03/09/2021 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to William Taylor re: 156 Notice of Appeal by William Taylor were transmitted to the U.S. Court of Appeals. (nd) (Entered: 03/09/2021) |
| 03/16/2021 | 157 | TRANSCRIPT of Proceedings as to William Taylor re: Conference held on 2/24/21 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Steven Greenblum, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/6/2021. Redacted Transcript Deadline set for 4/16/2021. Release of Transcript Restriction set for 6/14/2021. (McGuirk, Kelly) (Entered: 03/16/2021) |
| 03/16/2021 | 158 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to William Taylor. Notice is hereby given that an official transcript of a Conference proceeding held on 2/24/21 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 03/16/2021) |
| 03/24/2021 | 159 | NOTICE OF ATTORNEY APPEARANCE: Alexandra A. E. Shapiro appearing for Parker H. Petit. Appearance Type: Retained. (Shapiro, Alexandra) (Entered: 03/24/2021) |
| 03/24/2021 | 160 | NOTICE OF ATTORNEY APPEARANCE: Daniel Jonathan O'Neill appearing for Parker H. Petit. Appearance Type: Retained. (O'Neill, Daniel) (Entered: 03/24/2021) |
| 03/26/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Telephone Conference as to Parker H. Petit, William Taylor held on 3/26/2021 without transcription or recording. All sides were present (jw) (Entered: 03/26/2021) |
| 03/26/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Second Telephone as to Parker H. Petit, William Taylor held on 3/26/2021, without transcription or recording. All sides were present (jw) (Entered: 03/26/2021) |
| 03/26/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Telephone as to Parker H. Petit, William Taylor held on 3/26/2021, without transcription or recording. All sides were present. (jw) (Entered: 03/26/2021) |

# A-28

| | | |
|---|---|---|
| 03/26/2021 | 161 | MOTION for Eric B. Bruce, Altin H. Sila, Jennifer B. Loeb, and Sarah Caruana from Freshfields Bruckhaus Deringer US LLP, and Matthew I. Menchel and Amanda N. Tuminelli from Kobre & Kim LLP to Withdraw as Attorney . Document filed by Parker H. Petit. (Attachments: # 1 Text of Proposed Order, # 2 Certificate of Service)(Bruce, Eric) (Entered: 03/26/2021) |
| 03/29/2021 | 162 | ORDER GRANTING MOTION TO WITHDRAW APPEARANCE as to Parker H. Petit (1) granting 161 Motion to Withdraw as Attorney. (Jennifer Loeb; Matthew I. Menchel; Altin Herbert Sila; Amanda Nicole Tuminelli; Eric Brendan Bruce and Sarah Caruana withdrawn from case.) (Signed by Judge Jed S. Rakoff on 3/29/2021) (lnl) (Entered: 03/29/2021) |
| 03/29/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Parker H. Petit, William Taylor held on 3/29/2021. A telephone conference was held March 29, 2021, without transcription or recording. Present for the Government was Scott Hartman (AUSA), for defendant Petit was Alexandra A. E. Shapiro and Daniel Jonathan O'Neill; for defendant Taylor was Michael Packard; and for MiMedx was David Rody and Brendan Smith. (lnl) (Entered: 03/29/2021) |
| 03/31/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Pretrial Conference as to Parker H. Petit, William Taylor held on 3/31/2021. A telephone conference was held March 31, 2021, without transcription or recording. Present for the Government was Scott Hartman (AUSA), for defendant Petit were Alexandra A. E. Shapiro and Daniel Jonathan O'Neill; for defendant Taylor was Michael Packard; and for MiMedx were David Rody, Ike Adams, Brendan Smith. (lnl) (Entered: 03/31/2021) |
| 04/02/2021 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Telephone Conference as to Parker H. Petit, William Taylor held on 4/2/2021. A telephone conference was held April 2, 2021, without transcription or recording. Present for the Government was Daniel Tracer (AUSA), for defendant Petit was for defendant Taylor was Michael Packard; and for MiMedx was David Rody, Ike Adams and Brendan Smith. (ap) (Entered: 04/05/2021) |
| 04/09/2021 | 163 | SENTENCING SUBMISSION by USA as to Parker H. Petit, William Taylor. (Tracer, Daniel) (Entered: 04/09/2021) |
| 04/14/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Telephone Conference as to Parker H. Petit, William Taylor held on 4/14/2021. A telephone conference without transcription or recording was held on April 14, 2021. Present for the Government was AUSA, Edward Imperatore, for defendant Taylor was Michael Packard, for defendant Petit was Daniel O'Neill. (ap) (Entered: 04/15/2021) |
| 04/14/2021 | 164 | ORDER MODIFYING CONDITIONS OF RELEASE as to William Taylor. For reasons stated in Mr. Taylor's Consent Motion to Modify Conditions of Release, thatmotion is hereby GRANTED. Accordingly Mr. Taylor's conditions of release and bail are hereby modified in two ways: (i) the security for Mr. Taylor's bond is now cash, rather than his home in Roswell, Georgia; and (ii) Mr. Taylor's bond amount is reduced from $500,000 to $250,000, to be fully secured by cash. Furthermore, in light of the aforementioned modifications, Mr. Taylor is released from the Agreement to Forfeit Property, executed by Mr. Taylor on December 18, 2019 (SDNY Case No. 19CR850; N.D. Ga. Case No. 1:19-MJ-1031-LTW). (Signed by Judge Jed S. Rakoff on 4/14/21)(jw) (Entered: 04/15/2021) |
| 04/16/2021 | 165 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Conference held on 10/26/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due |

| | | |
|---|---|---|
| | | 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 166 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 10/26/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 167 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 10/27/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 168 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 10/27/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 169 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 10/28/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 170 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 10/28/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 171 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 10/29/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 172 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 10/29/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be |

| | | |
|---|---|---|
| | | made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 173 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 10/30/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 174 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 10/30/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 175 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 11/2/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 176 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 11/2/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 177 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 11/5/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 178 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 11/5/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 179 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 11/6/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. |

# A-31

| | | |
|---|---|---|
| | | Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 180 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 11/6/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 181 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 11/9/2020 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 182 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 11/9/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 183 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 11/10/2020 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 184 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 11/10/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 185 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 11/11/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 186 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 11/11/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be |

| | | |
|---|---|---|
| | | made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 187 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 11/12/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 188 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 11/12/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 189 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 11/13/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 190 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 11/13/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 191 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 11/16/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 192 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 11/16/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 193 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 11/17/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. |

| | | |
|---|---|---|
| | | Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 194 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 11/17/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 195 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 11/18/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 196 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 11/18/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 197 | TRANSCRIPT of Proceedings as to Parker H. Petit, William Taylor re: Trial held on 11/19/20 before Judge Jed S. Rakoff. Court Reporter/Transcriber: Samuel Mauro, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2021. Redacted Transcript Deadline set for 5/17/2021. Release of Transcript Restriction set for 7/15/2021. (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | 198 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Parker H. Petit, William Taylor. Notice is hereby given that an official transcript of a Trial proceeding held on 11/19/20 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 04/16/2021) |
| 04/16/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference without transcription or recording as to Parker H. Petit, William Taylor held on 4/16/2021. Present for the Government was Daniel Tracer (AUSA), for defendant Taylor was Michael Packard, for defendant Petit was Daniel O'Neill. (jbo) (Entered: 04/20/2021) |
| 04/19/2021 | 199 | ORDER as to Parker H. Petit, William Taylor: Defendant William Taylor is hereby permitted to file under seal his restitution brief in this matter and exhibits thereto. Further, he shall electronically file a redacted version of those materials. (Signed by Judge Jed S. Rakoff on 4/19/2021) (ap) Modified on 4/20/2021 (ap). (Entered: 04/20/2021) |
| 04/23/2021 | 200 | SEALED DOCUMENT placed in vault. (jus) (Entered: 04/23/2021) |
| 04/23/2021 | 201 | RESPONSE by Parker H. Petit re: 163 Sentencing Submission filed by USA *and March 29, 2021 restitution submission of MiMedx Group, Inc.* (Shapiro, Alexandra) (Entered: |

# A-34

| | | |
|---|---|---|
| | | 04/23/2021) |
| 04/23/2021 | 202 | RESPONSE by William Taylor re: 163 Sentencing Submission filed by USA . (Attachments: # 1 Exhibit A - Rody Email re. Restitution, # 2 Exhibit B - SEC Time Entries)(Weinreb, William) (Entered: 04/23/2021) |
| 04/29/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff:Status Conference/Telephone as to Parker H. Petit, William Taylor held on 4/29/2021, without transcription or recording. Present for the Government was Daniel Tracer, AUSA and Edward Imperatore, AUSA; for defendant Petit was Alexandra Shapiro and Dan O'Neill; for defendant Taylor was Michael Packard; and for MiMex was David Rody and Ike Adams. (jw) (Entered: 04/29/2021) |
| 04/30/2021 | 203 | SENTENCING SUBMISSION by USA as to Parker H. Petit, William Taylor. (Tracer, Daniel) (Entered: 04/30/2021) |
| 05/20/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference as to Parker H. Petit held on 5/20/2021. A telephone conference was held May 20, 2021, without transcription or recording. Present for the Government was Scott Hartman, AUSA; for defendant Taylor was Michael Packard; for defendant Petit was Alexandra Shapiro + Dan O'Neill; and for MiMedx was Dave Rody and Brendan Smith. (ap) (Entered: 05/20/2021) |
| 05/23/2021 | 204 | MEMORANDUM ORDER as to Parker H. Petit, William Taylor. For the foregoing reasons, the Court finds that MiMedx is not entitled to restitution as a victim under the MVRA or the VWPA. Accordingly, its request for restitution is denied. SO ORDERED (Signed by Judge Jed S. Rakoff on 5/23/21)(jw) (Entered: 05/24/2021) |
| 05/28/2021 | 205 | AMENDED JUDGMENT IN A CRIMINAL CASE as to William Taylor (2). The defendant was found guilty on Count(s) 1. IMPRISONMENT: Twelve (12) months jail. The defendant has been found not guilty on count(s) 2. The court makes the following recommendations to the Bureau of Prisons: Incarceration in Federal Prison Camp - Montgomery, Alabama. The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons: before 2 p.m. on 9/21/2021. Fine: $250,000.00. Assessment: $100.00 due immediately. Special instructions regarding the payment of criminal monetary penalties: The fine of $250,000.00 shall be paid within one year of the original sentencing date of 2-24-2021. (Signed by Judge Jed S. Rakoff on 5/28/21)(jbo) (Entered: 05/28/2021) |
| 06/03/2021 | 206 | AMENDED JUDGMENT IN A CRIMINAL CASE as to Parker H. Petit (1). Date of Original Judgment: 2/23/2021. SCHEDULE OF PAYMENTS: Special instructions regarding the payment of criminal monetary penalties: The fine of $1,000,000.00 shall be paid within one year of the sentencing date of 2-23-2021. (Signed by Judge Jed S. Rakoff on 5/28/21) (ap) (Entered: 06/03/2021) |
| 06/24/2021 | | Minute Entry for proceedings held before Judge Jed S. Rakoff: Telephone Conference without transcription or recording as to Parker H. Petit, William Taylor held on 6/24/2021. Present for the Government was Scott Hartman, AUSA; for defendant Petit was Dan O'Neill; for defendant Taylor was Michael Packard. (jbo) (Entered: 06/24/2021) |
| 06/25/2021 | 207 | ORDER MODIFYING CONDITIONS OF RELEASE as to Parker H. Petit. Defendant Parker H. Petit's consent motion to modify the conditions of his release is hereby GRANTED. Accordingly: 1. Mr. Petit's conditions of release and bail are hereby modified so that his home at 3005 Evelyn Lane, Milton, Georgia 30004 is now the security for his $1,000,000 bond. 2. In light of that modification, Mr. Petit is released from the Agreement to Forfeit Property regarding his property in Roswell, Georgia, which Agreement was filed in the United States District Court for the Northern District of |

| | Georgia on May 5, 2020 (ECF No. 12, 1:19-MJ-1031-LTW). SO ORDERED. (Signed by Judge Jed S. Rakoff on 6/24/2021)(bw) (Entered: 06/25/2021) |
| --- | --- |

|  PACER Service Center  | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 07/15/2021 10:20:45 | | |
| **PACER Login:** | SAILLP2014 | **Client Code:** | Petit |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cr-00850-JSR |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

JUDGE RAKOFF

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :    **SEALED INDICTMENT**
                                  :
          - v. -                  :    19 Cr. ___
                                  :
PARKER H. PETIT and               :    **19 CRIM 850**
WILLIAM TAYLOR,                   :
                                  :
          Defendants.             :    JUDGE RAKOFF
                                  :
- - - - - - - - - - - - - - - - - x

**COUNT ONE**
**(Conspiracy to Commit Securities Fraud,**
**to Make False Filings with the SEC, and**
**to Improperly Influence the Conduct of Audits)**

The Grand Jury charges:

**Relevant Individuals and Entities**

1.   At all times relevant to this Indictment, MiMedx Group
Inc. ("MiMedx") was a publicly traded biopharmaceutical company
headquartered in Marietta, Georgia.  MiMedx's securities traded
under the symbol "MDXG" on the NASDAQ.  MiMedx sold regenerative
biologic products, such as skin grafts and amniotic fluid.
MiMedx sold its products both directly to end users such as
public and private hospitals and to various stocking
distributors, which, in turn, resold the product to medical
professionals.

2.   At all times relevant to this Indictment, PARKER H.
PETIT, the defendant, known as "Pete," was the Chief Executive
Officer ("CEO") of MiMedx.

3.    At all times relevant to this Indictment, WILLIAM TAYLOR, the defendant, was the Chief Operating Officer ("COO") of MiMedx.

**Public Company Reporting Requirements**

4.    At all times relevant to this Indictment, MiMedx was required to comply with the federal securities laws, which are designed to ensure that a publicly traded company's financial information is accurately recorded and disclosed to the investing public.  Specifically, pursuant to the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, MiMedx was required to: (a) file with the United States Securities and Exchange Commission (the "SEC") annual financial statements (on SEC Form 10-K); (b) file with the SEC quarterly financial reports (on SEC Form 10-Q); and (c) make and keep books, records and accounts that accurately and fairly reflected MiMedx's business transactions.

5.    At all times relevant to this Indictment, PARKER H. PETIT, the defendant, signed MiMedx's quarterly and annual financial reports.  Additionally, MiMedx filed with each of its quarterly and annual financial reports certifications entitled "Certification of Periodic Report Under Section 302 of the Sarbanes-Oxley Act of 2002" in which PETIT certified, in part:

1.    I have reviewed this [quarterly or annual report] of MiMedx Group, Inc.;

2

2.   Based on my knowledge, this report does not contain any
untrue statement of a material fact or omit to state a
material fact necessary to make the statements made, in
light of the circumstances under which such statements were
made, not misleading with respect to the period covered by
this report;

3.   Based on my knowledge, the financial statements, and
other financial information included in this report, fairly
present in all material respects the financial condition,
results of operations and cash flows of the registrant as
of, and for, the periods presented in this report; . . .

In these certifications, PETIT also certified that he had

disclosed to MiMedx's auditor and the Audit Committee of its

Board of Directors (or persons performing the equivalent

functions):  "Any fraud, whether or not material, that involves

management or other employees who have a significant role in the

registrant's internal control over financial reporting."

6.   In conjunction with each of its quarterly and annual

financial reports, MiMedx included a second set of

certifications entitled "Certification Pursuant to 18 U.S.C.

Section 1350 As Adopted Pursuant to Section 906 of the Sarbanes-

Oxley Act of 2002," in which PARKER H. PETIT, the defendant,

further certified, in part, that the quarterly or annual

financial report:

[F]ully complies with the requirements of Section 13(a) or
15(d) of the Securities Exchange Act of 1934; . . . [T]he
information contained in this [quarterly or annual] report
fairly presents, in all material respects, the financial
condition and results of operations of the Company.

3

7.    Federal securities law further required that MiMedx's annual financial statements be audited by independent certified public accountants.

8.    As set forth below, one of the most critical financial metrics disclosed in MiMedx's public filings with the SEC, and touted in MiMedx's accompanying press releases, was MiMedx's quarterly and annual sales revenue.

**Revenue Recognition Requirements**

9.    Under Generally Accepted Accounting Principles (GAAP) and SEC guidance, a company like MiMedx that engages in the sale of products through a distributor may recognize revenue upon transfer of the product to a distributor if each of the following criteria is satisfied: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4) collectability (i.e., payment) is reasonably assured.  *See* SEC Staff Accounting Bulletin No. 104 (Topic 13, Revenue Recognition, Dec. 17, 2003).

10.   When the distributor has a right of return (i.e., the ability to return the product without having to pay for it, either implicitly or as set forth in a written agreement), revenue cannot be properly recognized unless all of the following criteria are met: (1) the seller's price to the buyer is fixed or determinable at the date of sale; (2) the buyer's

4

obligation to pay the seller is not contingent on the resale of
the product; (3) the buyer's obligation to pay the seller is not
excused in the event that the product is damaged or lost; (4)
the buyer has economic substance separate from the seller; (5)
the seller does not have significant obligations for future
performance to directly bring about the resale of the product by
the buyer; and (6) the amount of future returns can be
reasonably estimated.  *See, e.g.*, Accounting Standards
Codification, Subtopic 605-15-25-1.

11.   In its 2015 quarterly and annual reports, MiMedx
included the following discussion of revenue recognition:

> The Company sells its products primarily through a
> combination of a direct sales force, independent
> stocking distributors and third-party representatives
> in the U.S. and independent distributors in
> international markets.  The Company recognizes revenue
> when title to the goods and risk of loss transfers to
> customers, provided there are no material remaining
> performance obligations required of the Company or any
> matters of customer acceptance.  In cases where the
> Company utilizes distributors or ships products
> directly to the end user, it recognizes revenue
> according to the shipping terms of the agreement
> provided all revenue recognition criteria have been
> met.  A portion of the Company's revenue is generated
> from inventory maintained at hospitals or with field
> representatives.  For these products, revenue is
> recognized at the time the product has been used or
> implanted.

12.   PARKER H. PETIT and WILLIAM TAYLOR, the defendants,
repeatedly touted their understanding of these rules governing
revenue recognition both within MiMedx and to the investing

public.  For example, on or about March 29, 2016, in response to
public reporting concerning the inappropriate revenue
recognition practices of a MiMedx competitor, TAYLOR circulated
a memorandum to the MiMedx sales force, which both PETIT and
TAYLOR had edited.  In the memorandum, TAYLOR explained: "The
key accounting question related to revenue recognition is when
revenue can be recognized, at shipment or at payment."  TAYLOR
noted the requirements for revenue recognition at the time of
shipment, including that the price be "fixed and determinable,
and the invoice is collectable."  TAYLOR stated: "This means
that the customer does not have a right to return the product
and there is a reasonable expectation that we will be paid
within a determinable period of time."  Similarly, PETIT and
TAYLOR participated in sending an email to MiMedx's auditors, in
or about February 2016, which addressed a MiMedx employee's
concerns about revenue recognition issues at MiMedx.  The email
noted: "Company leadership has been managing public companies
for 34 years with an impeccable track record of building strong
internal controls.  Management is fully aware of the rules
regarding revenue recognition."

13.  On a quarterly basis, PARKER H. PETIT, the defendant,
signed and caused to be submitted to the independent certified
public accountants who were retained to audit MiMedx's SEC
filings (the "Audit Firm") a management representation letter,

6

in which PETIT represented, among other things, that "[r]elated-
party transactions, including sales, purchases, loans,
transfers, leasing arrangements, guarantees, and amounts
receivable from or payable to related parties" had "been
properly accounted for and adequately disclosed" and that
"[t]here are no material transactions that have not been
properly recorded in the accounting records" of MiMedx. In an
annual management representation letter for year-end 2015, which
MiMedx submitted to the Audit Firm on or about February 29,
2016, PETIT represented that "[t]here are no . . . [s]ide
agreements or other arrangements (either written or oral) that
have not been disclosed to [the Audit Firm]."

### MiMedx's Disclosure of Revenue Guidance
### and Results to the Investing Public

14.   MiMedx's public filings with the SEC included its
sales revenue for the relevant reporting period, i.e., quarter
or full year.  In press releases accompanying MiMedx's filings,
MiMedx provided guidance on its expected revenue for the
upcoming quarter and full year, and in some cases tightened, or
narrowed, that guidance over time.  For example, MiMedx provided
the following quarterly and annual revenue guidance for 2015:

| February 26, 2015 Revenue Guidance | |
|---|---|
| Q1 2015 Guidance | Full Year 2015 Guidance |
| $40 - 41 million | $175 - 190 million |

| April 27, 2015 Revenue Guidance | |
| --- | --- |
| **Q2 2015 Guidance** | **Full Year 2015 Guidance** |
| $44 – 46 million | $180 – 190 million |

| July 30, 2015 Revenue Guidance | |
| --- | --- |
| **Q3 2015 Guidance** | **Full Year 2015 Guidance** |
| $47 – 50 million | Reiterated $180 – 190 million |

| October 12, 2015 Revenue Guidance | |
| --- | --- |
| **Q4 2015 Guidance** | **Full Year 2015 Guidance** |
| $49.5 – 52.5 million | $185 – 188 million |

15.   MiMedx's press releases accompanying its quarterly filings also included the actual revenue for the quarter and year-to-date, as reflected in MiMedx's SEC filings.

**MiMedx Touted Its Revenue Growth and the Fact That It Had Met Revenue Guidance Quarter After Quarter**

16.   MiMedx executives, including PARKER H. PETIT and WILLIAM TAYLOR, the defendants, publicly identified revenue as the principal metric demonstrating MiMedx's growth and touted MiMedx's consistent record of quarter-over-quarter revenue growth and meeting or exceeding revenue guidance, which itself typically increased quarter-over-quarter.   In fact, MiMedx press releases touted that MiMedx met or exceeded its revenue guidance for 17 quarters in a row, through the fourth quarter of 2015. The following are excerpts of MiMedx's press releases accompanying its public filings in 2015:

8

| April 27, 2015 Press Release | |
|---|---|
| Headline | *Company Records Revenue of $40.8 million and Net Income of $4.1 million* |
| Q1 2015 "Highlights" | • Q1 2015 revenue of $40.8 million increases 108% over Q1 2014<br>• Q1 2015 is 14th consecutive quarter of meeting or exceeding revenue guidance<br>• Company increases full year guidance range from $175-$190 million to $180-$190 million |

| July 30, 2015 Press Release | |
|---|---|
| Headline | *MiMedx Announces Record Results for Second Quarter of 2015; Company Records Revenue of $45.7 million and Net Income of $5.4 million* |
| Q2 2015 "Highlights" | • Q2 2015 is 15th consecutive quarter of meeting or exceeding Company revenue guidance<br>• Q2 2015 revenue of $45.7 million increased 79% over Q2 2014<br>• Revenue is at the upper end of Company Q2 guidance |

| October 29, 2015 Press Release | |
|---|---|
| Headline | *MiMedx Announces Record Results For Third Quarter Of 2015; Company Records Revenue of $49 Million, Net Income of $6.6 million and EPS of $0.06* |
| Q3 2015 "Highlights" | • Q3 is 16th consecutive quarter of meeting or exceeding revenue guidance<br>• YTD 2015 revenue of $135.5 million increased by 72% over same period of 2014<br>• Q3 revenue of $49 million increased by 46% over Q3 2014<br>• Q3 revenue is at upper end of $47 to $50 million guidance range |

| January 10, 2016 Press Release | |
|---|---|
| Headline | *MiMedx Exceeds Fourth Quarter and Full Year 2015 Revenue Consensus: $187.3 Million Full Year 2015 Revenue is 58% Increase Over 2014 and $51.8 Million Q4 2015 Revenue is 31% Increase over Q4 2014* |
| Q4 2015 "Highlights" | • Q4 2015 is the 17th consecutive quarter of meeting or exceeding revenue guidance<br>• Q4 2015 revenue of $51.8 million in upper range of MiMedx Q4 2015 guidance<br>• Full Year 2015 revenue of $187.3 million nears upper end of MiMedx guidance range<br>• 2015 is the 4th consecutive fiscal year of meeting or exceeding revenue guidance |

Each of these press releases was filed with the SEC as an exhibit to a Form 8-K, which is a report companies must file with the SEC to inform the investing public about major corporate events or announcements.

17.   In public remarks, PARKER H. PETIT and WILLIAM TAYLOR, the defendants, touted the consistency and stability of MiMedx's revenue growth.  They highlighted in each quarter that the company's revenue figures were in line with previously provided quarterly and annual guidance and that MiMedx anticipated continued revenue growth.  For example:

a.    During an earnings call on or about April 28, 2015, announcing MiMedx's first quarter 2015 results, PETIT stated: "Let me begin by making a statement that has become very

10

routine.  The first quarter of 2015 was the 14th consecutive quarter of MiMedx meeting or exceeding our revenue guidance." In the same call, TAYLOR stated: "We anticipate our quarter-over-quarter growth will replicate the pattern established last year . . . .  And for 3.5 years, we've shown that we can accurately project our performance quite well . . . .  And then if things go the right way and you did a very good job planning and those negative things don't happen, then you exceed your guidance. It's really just that simple."

       b.   During a presentation to investors and analysts on or about June 3, 2015, in New York, New York, TAYLOR stated: "We've got 3 1/2 years of meeting or exceeding our revenue guidance."

       c.   During an earnings call on or about July 30, 2015, announcing MiMedx's results for the second quarter of 2015, PETIT noted that the "second quarter was our 15th consecutive quarter of meeting or exceeding our revenue guidance. Our second quarter revenues were almost 80% higher than our second quarter a year ago."

       d.   During an "analyst day" presentation on or about October 13, 2015, in New York, New York, PETIT delivered a presentation touting "16 consecutive quarters of meeting or exceeding quarterly guidance."

11

c.    During an earnings call on or about February 23, 2016, announcing MiMedx's year-end 2015 results, PETIT stated: "Our fourth quarter results represent the 17th consecutive quarter of meeting or exceeding revenue guidance. Again, very few young companies can match that type of stable forecasting." During the same call, TAYLOR boasted: "After a 24% average price decrease in our biggest product line, we were still able to grow our market share in terms of revenue dollars, take business from competitors, grow the market and increase our year-over-year revenue in this business area by over 50%. We managed this transition, as we told investors we would, and the results were as we anticipated."

18.    By 2015 and 2016, it was increasingly difficult for MiMedx to reach its revenue guidance due to decreased demand from certain distributors and the increasingly aggressive revenue targets MiMedx had publicly announced.  In fact, MiMedx did not meet the low end of its revenue guidance until the very last day of the quarter in each of the four quarters of 2015. In the first quarter 2016, MiMedx missed its revenue guidance for the first time in 18 quarters.

### Overview of the Accounting Fraud Scheme

19.    Confronted with the difficulties faced by MiMedx in meeting its quarterly and annual revenue guidance, from at least in or about 2015 through at least in or about 2016, PARKER H.

12

PETIT and WILLIAM TAYLOR, the defendants, engaged in a scheme to falsely recognize revenue from four distributors: a Texas-based distributor ("Distributor-1") in the second quarter of 2015, a second Texas-based distributor ("Distributor-2") in the third quarter of 2015, a Tennessee-based distributor that MiMedx later acquired ("Distributor-3") in the third and fourth quarters of 2015, and a Saudi Arabia-based distributor ("Distributor-4") in the fourth quarter of 2015. Through the scheme, PETIT, TAYLOR, and others caused MiMedx to report fraudulently inflated revenue figures to the investing public in the second, third, and fourth quarters of 2015 (together, the "Implicated Quarters") and in MiMedx's 2015 annual filings. PETIT, TAYLOR, and others caused MiMedx to report these fraudulently inflated revenue figures to the investing public in order to ensure that the reported figures fell within MiMedx's publicly announced revenue guidance, and to fraudulently convey to the investing public that MiMedx was accomplishing consistent growth quarter after quarter, as PETIT and TAYLOR had falsely touted to the investing public.

### MiMedx's Fraudulent Recognition of Revenue from Distributor-1 in the Second Quarter of 2015

20.  By early 2015, Distributor-1 was a significant MiMedx distributor whose purchases helped MiMedx reach its quarterly revenue guidance. For example, if Distributor-1 had not

13

purchased approximately $3 million of MiMedx product during the
first quarter of 2015, MiMedx would not have reached its revenue
guidance that quarter of $40 million to $41 million.

21. As the end of the second quarter of 2015 approached,
MiMedx had not yet hit its revenue guidance and MiMedx
salespeople were not anticipating the ability to generate
substantial additional sales revenue from Distributor-1. On or
about May 31, 2015, a MiMedx sales representative sent an email
to other sales representatives in which he acknowledged that
Distributor-1 had "ordered way more than they needed last
quarter and will be fine with minimal or nothing this quarter."

22. To meet MiMedx's revenue guidance for the second
quarter of 2015, PARKER H. PETIT and WILLIAM TAYLOR, the
defendants, took steps to fraudulently inflate MiMedx's sales to
Distributor-1. Specifically, PETIT and TAYLOR, through two
fraudulent means, caused MiMedx to improperly recognize
approximately $1.4 million of revenue in the second quarter of
2015.

23. First, PARKER H. PETIT and WILLIAM TAYLOR, the
defendants, agreed to give the owner of Distributor-1 (the
"Distributor-1 Owner") $200,000 as an inducement to purchase
approximately $2.1 million of MiMedx product by the end of June
2015. To hide the fact that the $200,000 payment was a quid pro
quo exchange for Distributor-1's purchase of MiMedx product in

14

the second quarter of 2015 (which would have reduced the revenue that MiMedx could recognize from the sale), PETIT and TAYLOR falsely characterized the $200,000 as payment for purported consulting services provided by the Distributor-1 Owner.  On or about June 30, 2015, the last day of the second quarter of 2015, MiMedx and the Distributor-1 Owner entered into this purported "consulting agreement," which was signed by PETIT, and which provided for an up-front payment of $200,000 to the Distributor-1 Owner, in his personal capacity, and four additional monthly $5,000 payments for purported monthly consulting meetings.  The agreement provided that the Distributor-1 Owner "shall provide reasonable and mutually agreed upon market intelligence and other reasonable sales consulting as requested by [MiMedx] from time to time."  The consulting agreement also awarded the Distributor-1 Owner a total of 17,455 shares of restricted MiMedx stock "as compensation for [consulting] services performed under this Agreement."

24.   In truth and in fact, as PARKER H. PETIT and WILLIAM TAYLOR, the defendants, well knew, the purported "consulting agreement" was a sham.  At no time did the Distributor-1 Owner perform any consulting work (or contemplate doing so) in return for the cash payment or restricted stock, and MiMedx expected no such services from him.  As PETIT and TAYLOR well knew, the $200,000 personal payment was instead an undisclosed inducement

to purchase product, and accordingly, as discussed, it should have reduced the revenue that MiMedx could legitimately recognize from its second quarter 2015 sale to Distributor-1.

25.   Second, when MiMedx management realized that they did not have in stock the particular MiMedx products that Distributor-1 agreed to order, PARKER H. PETIT and WILLIAM TAYLOR, the defendants, agreed with the Distributor-1 Owner that (1) as part of Distributor-1's approximately $2.1 million order, Distributor-1 would purchase approximately $1.2 million of MiMedx product that Distributor-1 neither wanted nor intended to sell, and (2) in a subsequent quarter, Distributor-1 could return the unwanted product and exchange it for product of equal value that Distributor-1 actually wanted and intended to sell. PETIT and TAYLOR reached this agreement with the Distributor-1 Owner in an effort to finalize MiMedx's $2.1 million sale to Distributor-1 during the second quarter of 2015 and thereby falsely inflate MiMedx's revenue that quarter.  As PETIT and TAYLOR well knew, however, it was improper for MiMedx to recognize any revenue in the second quarter of 2015 for the approximately $1.2 million of product that PETIT and TAYLOR understood Distributor-1 would not sell and would swap for a different product in a subsequent quarter.

26.   To carry out their fraudulent scheme, PETIT and TAYLOR enlisted the assistance of a vice president of sales at MiMedx

16

(the "Sales Vice President").   On or about June 29, 2015, when
MiMedx management learned that the products Distributor-1 was
willing to purchase were not in stock, the Sales Vice President
stated in an email to members of the MiMedx sales team, that was
also received by PARKER H. PETIT and WILLIAM TAYLOR, the
defendants: "Ship to the amount of the total dollar amount.
Fill what you can that he wants and then send the rest of the
product we have in stock and we will exchange it in July."   On
or about that same date, the Sales Vice President emailed the
Distributor-1 Owner, copying PETIT, among others, asking the
Distributor-1 Owner to change his purchase order to reflect what
MiMedx had in stock (but not the products the Distributor-1
Owner had been willing to order).   The Sales Vice President
stated in the email to the Distributor-1 Owner: "Can we please
get a change order from you so we can ship what we have now in
stock and I will physically come to Dallas to make the changes
in early July[.]"   After the Distributor-1 Owner agreed to the
product swap, PETIT signed the purported "consulting agreement."

   27.   At no time following this sale to Distributor-1, did
PARKER H. PETIT and WILLIAM TAYLOR, the defendants, disclose to
the Audit Firm (1) the existence of the $200,000 "consulting
agreement" with the Distributor-1 Owner or (2) that MiMedx and
the Distributor-1 Owner had reached a side agreement that
Distributor-1 would purchase approximately $1.2 million of

product that it would swap for different product in a subsequent quarter.

28.   Based upon the secret agreement between MiMedx and the Distributor-1 Owner to swap the product, on or about June 29, 2015, Distributor-1 sent MiMedx a purchase order for approximately $2.1 million that reflected the products that MiMedx had in stock and wanted to sell to Distributor-1.   MiMedx recognized all of that revenue in the second quarter of 2015.

29.   In or about early July 2015, MiMedx sent the Distributor-1 Owner a $200,000 check, which the Distributor-1 Owner deposited into his personal bank account.   The Distributor-1 Owner then used those funds in part to repay the money Distributor-1 owed to MiMedx for its purchase of MiMedx product in the second quarter of 2015.   In or about September 2015, the Distributor-1 Owner submitted to MiMedx phony consulting invoices, which PARKER H. PETIT, the defendant, had agreed to pay pursuant to the purported consulting agreement. As PETIT well knew, the Distributor-1 Owner had not, in fact, performed any consulting services.   MiMedx paid two of the invoices, totaling approximately $10,000.

30.   In or about July 2015, MiMedx sales executives discussed how to provide Distributor-1 the product that PARKER H. PETIT and WILLIAM TAYLOR, the defendants, had agreed to swap for the product Distributor-1 had agreed to receive the previous

18

quarter but did not want.  On or about July 10, 2015, a senior MiMedx operations executive emailed a MiMedx executive vice president ("the Executive Vice President"), in relevant part: "Has it been discussed how the [Distributor-1] returns will be managed?"  The Executive Vice President responded, in relevant part: "We have to manage timing for 2 reasons; our inventory rebuild and revenue recognition issue.  Bill [TAYLOR] wants to ship the [Distributor-1] replacement product in August over a 2-3 week period in 4 shipments.  We have auditors here in the end of July looking at the books.  No more emails on this."

### MiMedx's Fraudulent Recognition of Revenue from Distributor-2 in the Third Quarter of 2015

31.  By the third quarter of 2015, MiMedx sought to sell product to a new Texas-based distributor that could make up for the revenue shortfall resulting from the winding down of MiMedx's relationship with Distributor-1.  To make up that revenue, MiMedx first turned to Distributor-2, a small Texas-based distributor that was owned and operated by a former MiMedx employee (the "Distributor-2 Owner").

32.  On or about September 15, 2015, approximately two weeks before the end of the third quarter of 2015, MiMedx and Distributor-2 entered into a written "Domestic Distributor Agreement," which made Distributor-2 MiMedx's exclusive distributor in Texas and provided that Distributor-2 would make

payment for any product that Distributor-2 purchased from MiMedx
within 30 days of purchase.  On or about September 30, 2015, the
final day of the third quarter 2015, following negotiations with
PARKER H. PETIT and WILLIAM TAYLOR, the defendants, Distributor-
2 agreed to purchase approximately $4.6 million of OrthoFlo
product, MiMedx's new amniotic-fluid based product. This was the
second largest quarterly order in MiMedx's history.  The timing
and size of the order were dictated by PETIT and TAYLOR as a
condition of Distributor-2's being made MiMedx's exclusive
distributor in Texas.  MiMedx, in turn, recognized approximately
$4.6 million of revenue upon shipment of the product to
Distributor-2 in the third quarter of 2015.

### *PETIT and TAYLOR Understood that Distributor-2 Would Not Pay Within the Specified Time Frame and Entered Into a Side Agreement with the Distributor-2 Owner*

33.  At the time that MiMedx recognized revenue for the
September 2015 sale to Distributor-2, PARKER H. PETIT and
WILLIAM TAYLOR, the defendants, fully understood that
Distributor-2 would not make a timely payment of $4.6 million
for the product, and certainly would not do so within
contractual terms.  As noted above, Distributor-2's $4.6 million
order was, at that point, the second largest quarterly order
that MiMedx had ever received from any customer.  Yet
Distributor-2, a company in its infancy, had never ordered from
MiMedx before and had no record of making payments.  MiMedx

20

likewise had no record of selling OrthoFlo, a new MiMedx
product, to any customer. Moreover, as PETIT and TAYLOR well
knew, the $4.6 million order was nearly ten times larger than
Distributor-2's annual revenue.

34.   Notwithstanding the terms of the written distribution
agreement between MiMedx and Distributor-2, PARKER H. PETIT and
WILLIAM TAYLOR, the defendants, reached a secret side agreement
with the Distributor-2 Owner that Distributor-2 did not need to
pay within the contractual 30-day terms and that MiMedx would be
flexible as to when Distributor-2 paid.

35.   PARKER H. PETIT and WILLIAM TAYLOR, the defendants,
further understood that Distributor-2 lacked the means to store
and distribute OrthoFlo, a product that needed to be kept
frozen.   Before the end of the third quarter of 2015, at the
direction of PETIT and TAYLOR, MiMedx purchased freezers, which
it provided to Distributor-2 so that Distributor-2 could
purchase and store the quantity of OrthoFlo that MiMedx needed
Distributor-2 to buy in order for MiMedx to meet its quarterly
revenue guidance.   On or about August 22, 2015, PETIT emailed
TAYLOR and others: "We have to find freezers for a number of
people . . . can we use our purchasing power to expedite some of
the shipments to our new distributors?"   On or about September
17, 2015, PETIT sent additional emails to TAYLOR, the Executive
Vice President, and others, stating: "I believe we need to get

21

[the Distributor-2 Owner] additional freezers."  In one email,
PETIT asked "[h]ow many dollars" of product could fit in the
freezers.

### *PETIT Orchestrated a Secret Loan to Distributor-2*
### *Through His Children*

36.   To hide from MiMedx's auditors that the collectability
of receivables from Distributor-2 was questionable, PARKER H.
PETIT, the defendant, in or about the fourth quarter of 2015,
arranged for his adult children to loan money to Distributor-2
through a shell company, which was funded with money from a
trust fund established by PETIT for his family.

37.   Although Distributor-2's payment to MiMedx for the
product it had purchased during the third quarter of 2015 was
due on or about October 30, 2015 (i.e., within 30 days of
shipment), by the end of November 2015 Distributor-2 had paid
only approximately $10,000 of the $4.6 million it owed.
Additionally, in or about the fall of 2015, the Distributor-2
Owner advised PARKER H. PETIT, the defendant, that Distributor-2
was having trouble distributing the OrthoFlo and that it needed
an infusion of capital to pay MiMedx.  The Distributor-2 Owner
informed PETIT that he had attempted to secure a loan from a
bank, but had been unsuccessful.

38.   As PARKER H. PETIT, the defendant, well knew,
Distributor-2's failure to pay down a significant amount of the

22

money it owed to MiMedx before the end of 2015 made it more likely that the Audit Firm would challenge Distributor-2's creditworthiness, which could lead to a restatement of MiMedx's third quarter revenue figures or a reduction in the revenue that MiMedx could recognize in its annual SEC filing. PETIT, therefore, arranged for the Distributor-2 Owner to speak with PETIT's son-in-law ("Individual-1") about obtaining a loan.

39.   In or about late November 2015, the three adult children of PARKER H. PETIT, the defendant, and their spouses (including Individual-1) incorporated a shell company (the "Shell Company") in order to issue a loan from the Shell Company to Distributor-2. Individual-1 set up a bank account in the name of the Shell Company and arranged for funds to be transferred from a generation-skipping trust that PETIT had established for his family into the Shell Company's bank account in order to fund the loan to Distributor-2. PETIT personally reviewed a promissory note between the Shell Company and Distributor-2, which PETIT sent to the Distributor-2 Owner. Individual-1, however, privately expressed to PETIT that Individual-1 was not comfortable with the terms of the loan and told PETIT in an email: "In general, [I am] not a huge fan of loaning money. I think that is what banks are for."

40.   At the time the loan was issued, PARKER H. PETIT, the defendant, understood that the loan proceeds would be used, in

23

substantial part, by Distributor-2 to pay down its debt to
MiMedx for product that Distributor-2 had purchased.   On or
about December 21, 2015, pursuant to the promissory note, the
Shell Company wired approximately $1.5 million to Distributor-2.
Within approximately the next week, Distributor-2 used the loan
proceeds in substantial part to make payments to MiMedx totaling
approximately $1.2 million.

41.   PARKER H. PETIT, the defendant, hid from MiMedx's
internal accountants and the Audit Firm that Distributor-2 had
received a loan from PETIT's adult children.   With knowledge
that Distributor-2 had used the loan proceeds in substantial
part to pay down its debt to MiMedx for product it had purchased
in the third quarter of 2015, PETIT made false and misleading
statements to MiMedx's accountants and the Audit Firm about the
collectability of payment from Distributor-2.

42.   For example, on or about February 4, 2016, in response
to concerns raised by a member of MiMedx's accounting department
about the propriety of recognizing revenue from Distributor-2,
PARKER H. PETIT, the defendant, approved the submission of a
response to the Audit Firm, which, in relevant part, touted that
Distributor-2 "has paid over $1.4M since the first shipments had
been made.   Their payment history to date is very similar to
that of other distributors."   PETIT hid from the Audit Firm that
Distributor-2's payments of $1.2 million to MiMedx had been

24

funded in large part by the Shell Company loan orchestrated by
PETIT and his children and funded from a trust fund that PETIT
himself had established.  Based in large part on Distributor-2's
payments to MiMedx that were funded by the Shell Company loan,
the Audit Firm's concerns about collectability were assuaged and
the Audit Firm continued to allow MiMedx to recognize revenue
from the sale to Distributor-2.

### MiMedx's Fraudulent Recognition of Revenue from Distributor-3 in the Third and Fourth Quarters of 2015

43.   By the third quarter of 2015, MiMedx also sought to
sell product to Tennessee-based Distributor-3 to help make up
for the revenue shortfall resulting from, among other things,
the winding down of MiMedx's relationship with Distributor-1.
For example, on or about September 18, 2015, a MiMedx senior
vice president of sales (the "Senior Sales Vice President")
emailed PARKER H. PETIT and WILLIAM TAYLOR, the defendants, and
others stating that he had just spoken with an employee of
Distributor-3 and "[t]hey are excited to work with us and he
asked me 'what can I personally do for you'. I told him we will
need to move a significant amount of liquid into his freezer and
he said 'it's done'.  This couldn't have happened at a better
time."

44.   At approximately the same time, during the third and
fourth quarters of 2015, PARKER H. PETIT, the defendant, and the

25

chief executive officer and part-owner of Distributor-3 (the
"Distributor-3 Owner") engaged in negotiations over MiMedx's
acquisition of Distributor-3.  These negotiations ultimately
resulted in MiMedx's acquisition of Distributor-3 on or about
January 13, 2016 (the "Acquisition").

45.  Prior to the Acquisition, and while the negotiations
were ongoing, MiMedx sold product to Distributor-3 in both the
third and fourth quarters of 2015.  On or about September 29 and
30, 2015, the last two days of the third quarter, MiMedx sold
approximately $2.2 million of product to Distributor-3 and
recognized all of that revenue upon shipment.  This purchase,
the first ever made by Distributor-3 from MiMedx and consisting
primarily of OrthFlo product, was made at the request of PARKER
H. PETIT, the defendant.  After Distributor-3 agreed to make the
purchases, sales employees at MiMedx informed Distributor-3 as
to which MiMedx products were immediately available for
shipment, so that Distributor-3 could order those products
before the end of the quarter.

46.  On or about December 31, 2015, the last day of the
fourth quarter, PARKER H. PETIT, the defendant, asked
Distributor-3 to purchase an additional MiMedx product at a cost
of approximately $450,000.  At the time he made the request,
PETIT had already determined to recommend that MiMedx make the
Acquisition.  The Distributor-3 Owner agreed to PETIT's request.

26

MiMedx recognized all of the revenue from that sale upon
shipment.  On the same day, after members of MiMedx's accounting
department expressed concern that Distributor-3 had not yet paid
any of the approximately $2.2 million it owed for the purchase
in the prior quarter, PETIT asked the Distributor-3 Owner to
make a partial payment.  Accordingly, Distributor-3 paid MiMedx
approximately $225,000 on or about December 31, 2015.  This was
the only payment that Distributor-3 ever made for MiMedx
product.

    47.  These sales to Distributor-3 should not have been
recognized as revenue by MiMedx in the third and fourth quarters
of 2015, as PARKER H. PETIT and WILLIAM TAYLOR, the defendants,
well knew, for at least three reasons.  First, MiMedx and
Distributor-3 had not agreed upon the essential terms of the
sale, including when payment was due.  In fact, substantial
disagreements between Distributor-3 and MiMedx over payment
terms remained unresolved well after MiMedx booked revenue for
sales to Distributor-3.  Because of these outstanding
disagreements, the Distributor-3 Owner refused to sign a
distribution agreement with MiMedx.  For example, as late as on
or about November 4, 2015, over a month after recognizing
revenue from sales to Distributor-3, PETIT emailed the
Distributor-3 Owner, "[o]n the distribution agreement, please
let me know the specific concerns. I understand the general

27

concerns, but I would like to try to complete this document."
The Distributor-3 Owner responded a few hours later with certain
concerns and PETIT forwarded the email to TAYLOR. Ultimately, a
distribution agreement, which established standard payment
terms, was not signed until sometime in 2016. The signed
distribution agreement was undated.

48.   Second, PARKER H. PETIT and WILLIAM TAYLOR, the
defendants, reached a secret side understanding with the
Distributor-3 Owner that Distributor-3 would buy product in the
third quarter that it did not want and would not sell, and that
Distributor-3 could either swap that product for different
product or return the unwanted product to MiMedx in a subsequent
quarter for a refund or credit.

49.   For example, on or about September 29 and 30, 2015,
the last two days of the third quarter, when MiMedx management
realized that they did not have in stock the particular MiMedx
products that Distributor-3 agreed to purchase and planned to
sell, PARKER H. PETIT and WILLIAM TAYLOR, the defendants, agreed
with the Distributor-3 Owner that (1) as part of Distributor-3's
approximately $2.2 million order, Distributor-3 would purchase
approximately $2 million of MiMedx products that Distribtor-3
neither wanted nor intended to sell, and (2) in a subsequent
quarter, Distributor-3 could return the unwanted product and
swap it for product of equal value that Distributor-3 could

sell.  PETIT and TAYLOR reached this agreement with the Distributor-3 Owner in an effort to finalize MiMedx's $2.2 million sale to Distributor-3 during the third quarter of 2015 and thereby falsely inflate MiMedx's revenue in order to meet the company's quarterly revenue guidance.

50.  Moreover, toward the end of 2015, in an effort to induce the Distributor-3 Owner to purchase additional MiMedx product in the fourth quarter and sign a distribution agreement, PARKER H. PETIT, the defendant, gave the Distributor-3 Owner a secret letter granting Distributor-3 the right to return any and all MiMedx product that it had been previously purchased.  On or about December 31, 2015, PETIT provided the secret letter to the Distributor-3 Owner, stating that if the Acquisition did not proceed, MiMedx would "commit to exchange or take back any of our amniotic related products so you may proceed on your own." PETIT back-dated the letter to September 25, a date immediately prior to Distributor-3's first purchase of MiMedx product, and hid the letter from MiMedx's internal accountants and the Audit Firm.  After receiving this letter, the Distributor-3 Owner emailed an employee of Distributor-3: "I told [PETIT] I would not sign the distribution agreement unless we could return the product! :-)."  Accordingly, as PETIT well knew, the sales to Distributor-3 were not final because Distributor-3 had the right to return the product to MiMedx at any time and the amount of

29

any return could not be reasonably estimated.  Ultimately,
Distibutor-3 returned more than half of the product that it had
purchased from MiMedx and exchanged some of it for other
products.

51.   Third, based upon, among other things, discussions
with the Distributor-3 Owner, PARKER H. PETIT and WILLIAM
TAYLOR, the defendants, understood that Distributor-3 could not
and would not pay for the product in a timely fashion.  As noted
above, Distributor-3 ultimately paid MiMedx only approximately
$225,000, less than ten percent of the value of product that it
purchased during the third and fourth quarters of 2015.

52.   In or about early 2016, as part of its annual audit,
the Audit Firm questioned MiMedx's senior management about the
propriety of revenue recognized from sales to Distributor-3.  In
response, PARKER H. PETIT and WILLIAM TAYLOR, the defendants,
made false and misleading statements to the Audit Firm about
MiMedx's arrangement with Distributor-3.  For example, in a
written summary prepared for the Audit Firm on or about February
4, 2016, PETIT and TAYLOR asserted that "[t]he MiMedx products
were sold to [Distributor-3] under a signed distributor
agreement similar to agreements signed with other distributors
such as [Distributor-1]."  As set forth above, however, PETIT
and TAYLOR knew that statement was false, because there was no
such distribution agreement at the time the products were sold

30

in the third quarter of 2015.  In reality, the distribution agreement was not actually signed until in or about 2016, but was undated in order to conceal when it was actually executed. Similarly, PETIT and TAYLOR asserted in the written summary that Distributor-3's sales of MiMedx product in the fourth quarter were "minimal" because the Distributor-3 Owner was "preoccupied during the fourth quarter," and that Distributor-3 made an additional order in the fourth quarter "as they wanted to be assured they could continue to supply their customers if the merger agreement negotiations slowed down or were discontinued." In truth and in fact, as PETIT and TAYLOR well knew, Distributor-3 never intended to sell most of the product it had purchased in the third quarter, let alone within the following three months, and Distributor-3 purchased additional product in the fourth quarter only because PETIT had requested that Distributor-3 do so as part of the Acquisition negotiations.

### MiMedx's Fraudulent Recognition of Revenue from Distributor-4 in the Fourth Quarter of 2015

53.  As the end of the fourth quarter of 2015 approached, in order to reach its quarterly and annual revenue guidance, MiMedx sought to sell product to Distributor-4, a Saudi Arabia-based distributor that sold medical products to hospitals in the Middle East.  At the time, Distributor-4 was attempting to

31

obtain a "tender" (or contract) to sell products to state-
sponsored hospitals in Saudi Arabia.

54.   During negotiations between MiMedx and Distributor-4,
a principal of Distributor-4 (the "Distributor-4 Principal")
made clear to WILLIAM TAYLOR, the defendant, that there was a
risk that the Saudi government would not award the tender to
Distributor-4 and that Distributor-4 therefore could not assume
the risk of purchasing MiMedx product if the tender was not
awarded.   Accordingly, TAYLOR agreed with the Distributor-4
Principal, in substance, that (1) MiMedx sales representatives
would assist Distributor-4 in selling product to Saudi
hospitals, (2) MiMedx would take back the product if the tender
were not awarded, and (3) MiMedx would not leave Distributor-4
with any losses.

55.   Distributor-4 ultimately agreed to purchase
approximately $2.54 million of MiMedx's EpiFix product in or
about late December 2015, and MiMedx recognized revenue from the
sale upon shipment.   WILLIAM TAYLOR, the defendant, well knew
that it was improper for MiMedx to recognize any revenue upon
shipment of the product to Distributor-4 based upon the terms he
had negotiated with Distributor-4.   Accordingly, TAYLOR crafted
a false cover story to mislead MiMedx's internal accountants and

the Audit Firm about the true terms of MiMedx's arrangement with
Distributor-4.

56.   On or about December 21, 2015 at approximately 2:30:02
p.m., WILLIAM TAYLOR, the defendant, sent an email, entitled
"Purchase Order," (the "Cover Email") to the Distributor-4
Principal, copying the Senior Sales Vice President, stating:

> Thank you very much for the EpiFix order placed earlier
> today.   It is very much appreciated.   Our accountants
> have asked for a clarification on the Payment Terms.
> Because the email referenced was related to the 2015
> tender   and   the   July   order,   they   wish   to   have   a
> clarification.   I know this order is for 2016 sales by
> [Distributor-4].   I have clarified below their proposal.
>
> Payment terms:   180 days from receipt of product by
> [Distributor-4].
>
> Thank you for your consideration.   Please advise if this
> will be acceptable.

57.   Just four seconds later, on or about December 21, 2015
at approximately 2:30:06 p.m., WILLIAM TAYLOR, the defendant,
sent a second email to the Distributor-4 Principal, entitled
"Purchase Order - Clarification" (the "Clarification Email").
The Clarification Email did not copy anyone at MiMedx and
memorialized terms that differed materially from those set forth
in the Cover Email.   TAYLOR's Clarification Email stated:

> Further to my email that I just sent relative to the
> Purchase order 212-2015.   We understand that it is
> expected that the 2016 tender will be issued in March
> 2016, and it is expected to be as big, or bigger than
> the tender that was issued to [Distributor-4] in 2015.
> In the event the tender is delayed, or for some unlikely

event does not occur, MiMedx will give [Distributor-4]
additional extended payment terms if request[ed] and
will assist [Distributor-4] in selling the product or
another option would be to repurchase the product.  We
will continue supporting sales efforts in the territory
by continued training . . . . Thank you again for a
strong partnership with MiMedx. Please feel free to
contact me at any time with any questions. Best regards,
Bill.

58.   WILLIAM TAYLOR, the defendant, subsequently arranged
for the Cover Email, but not the Clarification Email, to be
circulated to MiMedx's accounting department. As TAYLOR well
knew, the Clarification Email memorialized the true terms of
Distributor-4's purchase, and the Cover Email was a cover story
designed to mislead MiMedx's internal accountants and the Audit
Firm into believing that Distributor-4 was required to make
payment to MiMedx within 180 days and that, accordingly, MiMedx
could immediately recognize revenue from the sale.

59.   In or about early 2016, in connection with its annual
audit, the Audit Firm sought written confirmation from
Distributor-4 that it had purchased MiMedx product in or about
December 2015 subject to specified payment terms.  WILLIAM
TAYLOR, the defendant, thereafter arranged for the Distributor-4
Principal to receive and sign an audit confirmation that falsely
indicated that Distributor-4 had agreed to pay within 180-day
terms and omitted the true terms of Distributor-4's arrangement
with MiMedx as reflected in the Clarification Email.  TAYLOR hid

34

the Clarification Email and the true terms of the deal from
MiMedx's internal accountants and the Audit Firm.

**Impact of the Fraudulent Recognition of Revenue**

60.    The efforts of PARKER H. PETIT and WILLIAM TAYLOR, the
defendants, to manipulate MiMedx's revenue caused MiMedx to
report fraudulently inflated revenue in the second, third and
fourth quarters of 2015 and for the full year 2015, as follows:

a.    MiMedx's fraudulent recognition of a total of
approximately $1.4 million in revenue in the second quarter of
2015 from Distributor-1 resulted in the false inflation of
MiMedx's revenue by approximately 3 percent that
quarter.    Absent this fraudulent recognition of revenue,
MiMedx's revenue would have been near the bottom of its revenue
guidance range for the quarter rather than near the top of the
range, as MiMedx reported, and MiMedx would have missed Wall
Street analyst revenue consensus.

b.    MiMedx's fraudulent recognition of a total of
approximately $6.8 million in revenue in the third quarter of
2015 from Distributor-2 and Distributor-3 resulted in the false
inflation of MiMedx's revenue by approximately 13.9 percent that
quarter.    Absent this fraudulent recognition of revenue, MiMedx
would have missed both (1) its revenue guidance in the third

35

quarter of 2015 for the first time in approximately 15 quarters
and (2) analyst revenue consensus.

c.    MiMedx's fraudulent recognition of a total of
approximately $2.95 million in revenue in the fourth quarter of
2015 from Distributor-3 and Distributor-4 resulted in the false
inflation of MiMedx's revenue by approximately 5.7 percent that
quarter.  Absent this fraudulent recognition of revenue, MiMedx
would have missed both (1) its revenue guidance in the fourth
quarter of 2015 for the first time in approximately 16 quarters
and (2) analyst revenue consensus.

d.    In its 2015 10-K, MiMedx reported annual revenue
for 2015 of approximately $187.3 million.  In truth, the annual
revenue that MiMedx disclosed for 2015 was fraudulently inflated
by approximately $9.5 million, or approximately 5 percent.
Absent this fraudulent inflation of revenue, MiMedx would have
missed both (1) its annual revenue guidance for 2015 and (2)
analyst revenue consensus for 2015.

61.    In MiMedx's annual management representation letter
for 2015, which MiMedx submitted to the Audit Firm on or about
February 29, 2016, PARKER H. PETIT, the defendant, falsely
represented that "all sales recorded by the Company to new
distributors in 2015 ([Distributor-2], [Distributor-3], and

36

[Distributor-4]) have met the four criteria for revenue
recognition pursuant to ASC 605, *Revenue Recognition*."

### Statutory Allegations

62.   From at least in or about 2015 through at least in or
about 2016, in the Southern District of New York and elsewhere,
PARKER H. PETIT and WILLIAM TAYLOR, the defendants, and others
known and unknown, willfully and knowingly did combine,
conspire, confederate and agree together and with each other to
commit offenses against the United States, to wit, securities
fraud, in violation of Title 15, United States Code, Sections
78j(b) and 78ff, and Title 17, Code of Federal Regulations,
Section 240.10b-5; making false and misleading statements of
material fact in applications, reports and documents required to
be filed with the SEC under the Securities Exchange Act of 1934
and the rules and regulations promulgated thereunder, in
violation of Title 15, United States Code, Sections 78m(a) and
78ff, and Title 17, Code of Federal Regulations, Sections
240.12b-20, 240.13a-1, 240.13a-11 and 240.13a-13; and improperly
influencing the conduct of audits, in violation of Title 15,
United States Code, Sections 7202, 7242, and 78ff, and Title 17,
Code of Federal Regulations, Section 240.13b2-2.

### Objects of the Conspiracy

63.   It was a part and an object of the conspiracy that
PARKER H. PETIT and WILLIAM TAYLOR, the defendants, and others

known and unknown, willfully and knowingly, directly and
indirectly, by use of the means and instrumentalities of
interstate commerce, and of the mails and of the facilities of
national securities exchanges, would and did use and employ, in
connection with the purchase and sale of securities,
manipulative and deceptive devices and contrivances, in
violation of Title 17, Code of Federal Regulations, Section
240.10b-5 by: (a) employing devices, schemes, and artifices to
defraud; (b) engaging in acts, practices, and courses of
business which operated and would operate as a fraud and deceit
upon persons; and (c) making untrue statements of material fact
and omitting to state material facts necessary in order to make
the statements made, in the light of the circumstances under
which they were made, not misleading, in violation of Title 15,
United States Code, Sections 78j(b) and 78ff.

64.   It was a further part and an object of the conspiracy
that PARKER H. PETIT and WILLIAM TAYLOR, the defendants, and
others known and unknown, willfully and knowingly would and did
make and cause to be made statements in reports and documents
required to be filed with the SEC under the Securities Exchange
Act of 1934 and the rules and regulations promulgated
thereunder, which statements were false and misleading with
respect to material facts, in violation of Title 15, United
States Code, Sections 78m(a) and 78ff, and Title 17, Code of

Federal Regulations, Sections 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13.

65.   It was a further part and an object of the conspiracy that PARKER H. PETIT and WILLIAM TAYLOR, the defendants, and others known and unknown, willfully and knowingly would and did take actions to fraudulently influence, coerce, manipulate, and mislead independent public and certified accountants engaged in the performance of audits of the financial statements of an issuer for the purpose of rendering such financial statements materially misleading, and did so by, as officers of a company issuing publicly traded securities, (a) making, and causing to be made, materially false or misleading statements to an accountant, and (b) omitting to state, and causing another person to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant; with these false statements and omissions being in connection with audits, reviews and examinations of required financial statements of the company and the preparation and filing of documents and reports required to be filed with the SEC, in violation of Title 15, United States Code, Sections 7202, 7242, and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-2.

Overt Acts

66.   In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about June 3, 2015, WILLIAM TAYLOR, the defendant, stated during a presentation to investors and analysts in the Southern District of New York: "We've got 3 1/2 years of meeting or exceeding our revenue guidance."

b.   On or about June 30, 2015, PARKER H. PETIT, the defendant, entered into a purported consulting agreement with the Distributor-1 Owner, which was designed to disguise the undisclosed financial inducement paid to the Distributor-1 Owner in exchange for Distributor-1 purchasing MiMedx product.

c.   On or about October 13, 2015, PETIT, during an "analyst day" presentation in the Southern District of New York, delivered a presentation touting "16 consecutive quarters of meeting or exceeding quarterly guidance."

d.   On or about October 28, 2015, MiMedx transmitted its third quarter 2015 earnings release to a New York, New York-based publicity firm, which disseminated the earnings release to the market.

40

e.   On or about December 7, 2015, PETIT sent the Distributor-2 Owner a copy of the promissory note between the Shell Company and Distributor-2.

f.   On or about December 21, 2015, at 2:30:02 p.m., TAYLOR sent the Cover Email to the Distributor-4 Principal.

g.   On or about December 21, 2015, at 2:30:06 p.m., TAYLOR sent the Clarification Email to the Distributor-4 Principal.

h.   On or about December 31, 2015, PETIT granted the Distributor-3 Owner a written right of return for all products that Distributor-3 had purchased from MiMedx.

(Title 18, United States Code, Section 371.)

### COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

67.   The allegations contained in paragraphs 1 through 61 and paragraph 66 of this Indictment are repeated and realleged as if fully set forth herein.

68.   From at least in or about 2015 through at least in or about 2016, in the Southern District of New York and elsewhere, PARKER H. PETIT and WILLIAM TAYLOR, the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and

employed, in connection with the purchase and sale of

securities, manipulative and deceptive devices and contrivances,

in violation of Title 17, Code of Federal Regulations, Section

240.10b-5, by: (a) employing devices, schemes, and artifices to

defraud; (b) engaging in acts, practices, and courses of

business which operated and would operate as a fraud and deceit

upon persons; and (c) making untrue statements of material fact

and omitting to state material facts necessary in order to make

the statements made, in the light of the circumstances under

which they were made, not misleading, to wit, PETIT and TAYLOR

engaged in a scheme to mislead the shareholders of MiMedx and

the investing public by fraudulently inflating MiMedx's reported

revenue.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17,
Code of Federal Regulations, Section 240.10b-5; and Title 18,
United States Code, Section 2.)

### FORFEITURE ALLEGATION

69.   As a result of committing one or more of the offenses

charged in Counts One and Two of this Indictment, PARKER H.

PETIT and WILLIAM TAYLOR, the defendants, shall forfeit to the

United States, pursuant to Title 18, United States Code, Section

981(a)(1)(C) and Title 28, United States Code, Section 2461, all

property, real and personal, that constitutes or is derived from

proceeds traceable to the commission of said offenses, including

but not limited to a sum of money in United States currency

representing the amount of proceeds traceable to the commission of said offenses that the defendants personally obtained.

### Substitute Assets Provision

70.  If any of the above-described forfeitable property, as a result of any act or omission by either of the defendants:

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third party;

      c.   has been placed beyond the jurisdiction of the court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code Section 2461, to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

         (Title 18, United States Code, Section 981(a)(1)(C);
           Title 21, United States Code, Section 853(p);
           Title 28, United States Code, Section 2461.)

_____
GRAND JURY FOREPERSON

Geoffrey S. Berman
_____
GEOFFREY S. BERMAN
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

PARKER H. PETIT and
WILLIAM TAYLOR,

Defendants.

### SEALED INDICTMENT

19 Cr.  ___

(Title 15, United States Code, Sections
78j(b) and 78ff; Title 17, Code of Federal
Regulations, Section 240.10b-5; Title 18,
United States Code, Sections 2 and 371.)

GEOFFREY S. BERMAN
_____          United States
Foreperson               Attorney

_TRUE BILL, & SEALED INDICTMENT & ARREST WARRANTS_
_MAG 8 RISONT W LEHRBOVERN - 11-25-19_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES OF AMERICA,         :

                    :

        - v.-             :       19 Cr. 850 (JSR)

                    :

PARKER H. PETIT and        :
WILLIAM TAYLOR,          :

                    :

        Defendants.      :
-------------------------------------------------------------x


## GOVERNMENT'S REQUESTS TO CHARGE


                                     AUDREY STRAUSS
                                       Acting United States Attorney for the
                                       Southern District of New York
                                       Attorney for the United States of America

Edward Imperatore
Scott Hartman
Daniel Tracer
Assistant United States Attorneys
      - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UNITED STATES OF AMERICA,         :

                                        :

                 - v.–               :      19 Cr. 850 (JSR)

                                          :

PARKER H. PETIT and           :
WILLIAM TAYLOR,             :

                                          :

               Defendants.       :

------------------------------------------------------------x

### GOVERNMENT'S REQUESTS TO CHARGE

Pursuant to Rule 30 of the Federal Rules of Criminal Procedure, the Government

respectfully requests the Court to include the following in its charge to the jury.

**TABLE OF CONTENTS**

Page

General Requests ................................................................................................................. 1

The Indictment .................................................................................................................... 2

Summary of Indictment ...................................................................................................... 3

Count One: The Indictment and the Statute........................................................................ 5

Count One: Conspiracy – Elements of the Conspiracy ...................................................... 7

Count One: Conspiracy – First Element – Existence of the Conspiracy ...................... 8

Count One: Conspiracy – Objects of the Conspiracy ....................................................... 12

First Object – Securities Fraud .......................................................................................... 13

Second Object – Making False Statements in SEC Filings ........................................... 14

Elements............................................................................................................................. 14

First Element – Required Filings ....................................................................................... 15

Second Element – Material Falsity .................................................................................... 15

Third Object – Misleading the Conduct of Audits............................................................ 17

Count One: Conspiracy – Second Element – Membership in the Conspiracy ............. 18

Count One: Conspiracy – Third Element – Overt Acts .................................................... 21

Count One: Conspiracy – Time of Conspiracy.................................................................. 23

Count Two: Securities Fraud – The Indictment and the Statute........................................ 24

Count Two: Securities Fraud – Statutory Purpose............................................................ 26

Count Two: Securities Fraud – Elements of the Offense ............................................... 28

Count Two: First Element – Fraudulent Act...................................................................... 29

Count Two: Second Element – Knowledge, Intent and Willfulness ............................... 35

Count Two: Third Element – Instrumentality of Interstate Commerce ....................... 37

Conscious Avoidance......................................................................................................... 39

Aiding and Abetting........................................................................................................... 41

Willfully Causing a Crime ................................................................................................. 44

Venue ................................................................................................................................. 46

Accomplice Witnesses ....................................................................................................... 47

Law Enforcement and Government Employee Witnesses........................................ 50

Expert Witnesses........................................................................................................ 51

Character Testimony.................................................................................................. 52

Defendant's Testimony.............................................................................................. 53

Defendant's Right Not to Testify.............................................................................. 54

Statements of the Defendants.................................................................................... 55

Uncalled Witnesses – Equally Available to Both Sides .......................................... 56

Particular Investigative Techniques Not Required .................................................. 57

Persons Not on Trial ................................................................................................. 58

Preparation of Witnesses........................................................................................... 59

Charts and Summaries – Not Admitted As Evidence .............................................. 60

Charts and Summaries – Admitted as Evidence ...................................................... 61

Use of Audio Recordings and Transcripts ............................................................... 62

Stipulations ............................................................................................................... 63

Conclusion ................................................................................................................ 64

**REQUEST NO. 1**

**General Requests**

The Government respectfully requests that the Court give its usual instructions to the jury on the following matters:

a.      Function of Court and Jury.

b.      Indictment Not Evidence.

c.      Statements of Court and Counsel Not Evidence.

d.      Burden of Proof and Presumption of Innocence.

e.      Reasonable Doubt.

f.      Government Treated Like Any Other Party.

g.      Definitions, Explanations, and Example of Direct and Circumstantial Evidence.

h.      Inferences.

i.      Credibility of Witnesses.

j.      Right to See Exhibits and Have Testimony Read During Deliberations.

k.      Sympathy: Oath of Jurors.

l.      Punishment is Not to Be Considered by the Jury.

m.      Verdict of Guilt Must Be Unanimous.

**REQUEST NO. 2**

**The Indictment**

The defendants, PARKER H. PETIT and WILLIAM TAYLOR, have been formally

charged in what is called an Indictment.  An Indictment is simply an accusation.  It is no more

than the means by which a criminal case is started.  It is not evidence.  It is not proof of the

defendant's guilt.  It creates no presumption, and it permits no inference that the defendant is

guilty.  You are to give no weight to the fact that an Indictment has been returned against the

defendants.

[*Before you begin your deliberations, you will be provided with a copy of the Indictment.*]

I will not read the entire Indictment to you at this time.  Rather, I will first summarize the

offenses charged in the Indictment and then explain in detail the elements of the charged

offenses.

**A-86**

### REQUEST NO. 3

#### Summary of Indictment

The Indictment contains two counts or "charges."  You should know that there is no significance to the order of these numbers or the specific number of counts charged.

Count One of the Indictment charges that, from at least in or about 2015 through in or about 2016, PARKER H. PETIT and WILLIAM TAYLOR, the defendants, conspired or agreed with others to (1) commit securities fraud, (2) make false filings with the U.S. Securities and Exchange Commission (the "SEC"), and (3) to mislead the conduct of audits.  As I will explain in more detail later, a conspiracy, such as the one charged in Count One, is a criminal agreement to violate the law.  The other charge in the Indictment, which is set forth in Count Two, alleges what is called a "substantive" violation.  Unlike a conspiracy charge, which is a charge of agreeing to commit certain offenses, the substantive count allege the actual commission of a criminal offense.  Later on, I will explain to you the differences between a conspiracy count and a substantive count.

Count Two of the Indictment charges that, from in or about 2015 through in or about 2016, the defendants committed the substantive offense of securities fraud.

The Indictment alleges that the conspiracy charged in Count One and the substantive securities fraud offense charged in Count Two relate to a scheme in which the defendants and others caused MiMedx to report, in public filings with the SEC and to the investing public, falsely inflated revenue for the second through fourth quarters of 2015 and the full year 2015.

That is a brief summary of both counts in the Indictment.  In a moment, I will instruct you on each of these charges in more detail.  At the outset, however, let me instruct you that you must consider each defendant and each count separately and you must return a separate verdict of guilty or not guilty for each defendant on each count.  Whether you find a defendant guilty or

3

not guilty as to one offense should not affect your verdict as to any other defendant or any other offense charged.

  With that summary of the Indictment as background, I will now give you detailed instructions that relate to the crime charged in Count One.

    Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 3-6.

**REQUEST NO. 4**

**Count One: The Indictment and the Statute**

Now, let's turn to Count One, the conspiracy charge.  Count One of the Indictment charges PARKER H. PETIT and WILLIAM TAYLOR, the defendants, with participating in a securities fraud "conspiracy," in violation of Title 18, United States Code, Section 371.  That section provides in relevant part: "If two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each. . ." is guilty of a crime.

The defendant are charged in this count with participating in a conspiracy to violate several federal statutes.  Specifically, Count One charges that:

[The Court is respectfully requested to read Count One of the Indictment, including the overt acts.]

In summary, the Indictment charges the defendant with agreeing with others to (1) commit securities fraud, (2) make false statements in filings with the SEC, and (3) mislead the conduct of audits.  The Indictment lists the overt acts – which I'll explain to you later – that are alleged to have been committed in furtherance of the conspiracy charged in Count One.

A conspiracy is a kind of criminal partnership – an agreement of two or more people to join together to accomplish some unlawful purpose.  The essence of the crime of conspiracy is an agreement or understanding to violate other laws.  If a conspiracy exists, even if it should fail in its purpose, it is still punishable as a crime.

The crime of conspiracy – or agreement – to violate a federal law, as charged in the Indictment, is an independent offense.  It is separate and distinct from the actual violation of the underlying crimes.  Therefore, you may find the defendants guilty of the crime of conspiracy – in other words, *agreeing* to commit one or more offenses – even if you find that the underlying

5

crimes that were the object of the conspiracy – that is, securities fraud; false statements in filings

to the SEC; and misleading the conduct of audits – were never actually committed. Congress has

deemed it appropriate to make conspiracy, standing alone, a separate crime, even if the

conspiracy is not successful and no substantive crime is actually committed.

> Adapted from the charge of the Honorable Loretta A.
> Preska in <u>United States</u> v. <u>Collins</u>, 07 Cr. 1170 (LAP) (the
> "<u>Collins</u> Charge"); Adapted from the charge of the charge
> of the Honorable Paul A. Crotty in <u>United States</u> v.
> <u>Tomasetta</u>, 10 Cr. 1205 (PAC) (the <u>Tomasetta</u> Charge);
> Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 19-2;
> <u>see also</u> <u>United States</u> v. <u>Labat</u>, 905 F.2d 18, 21 (2d Cir.
> 1990) ("Since the essence of conspiracy is the agreement
> and not the commission of the substantive offense that is
> its objective, the offense of conspiracy may be established
> even if the collaborators do not reach their goal.").

**REQUEST NO. 5**

**Count One: Conspiracy – Elements of the Conspiracy**

In order to sustain its burden of proof with respect to the charge of conspiracy, the Government must prove beyond a reasonable doubt each of the following three elements:

First, the existence of the conspiracy charged in the Indictment; in other words, that there was, in fact, an agreement or understanding to commit at least one of the object crimes charged in the Indictment;

Second, that a defendant knowingly and willfully became a member of the conspiracy, with intent to further its illegal purpose; and

Third, that any one of the conspirators – not necessarily the defendants, but any one of the parties involved in the conspiracy – knowingly committed at least one overt act in furtherance of the conspiracy.

Now let us separately consider the three elements.

Adapted from the Collins Charge; Sand, et al., Modern Federal Jury Instructions, Instr. 19-3.

REQUEST NO. 6

**Count One: Conspiracy – First Element – Existence of the Conspiracy**

Starting with the first element, what is a conspiracy?  A conspiracy is an agreement or an understanding, between two or more persons, to accomplish by joint action a criminal or unlawful purpose.

The gist, or the essence, of the crime of conspiracy is the unlawful agreement between two or more people to violate the law.  As I mentioned earlier, the ultimate success of the conspiracy, meaning the actual commission of one or more of the crimes that are the object of the conspiracy, is not required.

Now, to show a conspiracy, the Government is not required to show that two or more people sat around a table and entered into a solemn pact, orally or in writing, stating that they had formed a conspiracy to violate the law and spelling out all the details.  Common sense tells you that when people, in fact, agree to enter into a criminal conspiracy, much is left to the unexpressed understanding.  It is rare that a conspiracy can be proven by direct evidence of an explicit agreement.  Conspirators do not usually reduce their agreements to writing or acknowledge them before a notary public, nor do they publicly broadcast their plans.  From its very nature, a conspiracy is almost invariably secret in its origin and execution.

To show that a conspiracy existed, the evidence must show that two or more persons, in some way or manner, either explicitly or implicitly, came to an understanding to violate the law and to accomplish an unlawful plan.  Express language or specific words are not required to indicate assent or attachment to a conspiracy.  Nor is it required that you find that any particular number of alleged co-conspirators joined in the conspiracy in order to find that a conspiracy existed.  You need only find that a defendant entered into the unlawful agreement alleged in the Indictment with one or more other persons in order to find that a conspiracy existed.

In determining whether there has been an unlawful agreement as alleged in the Indictment, you may consider the actions of all of the alleged co-conspirators that were taken to carry out the apparent criminal purpose.  The old adage, "actions speak louder than words," applies here.  Often, the only evidence that is available with respect to the existence of a conspiracy is that of disconnected acts and conduct on the part of the alleged individual coconspirators.  When taken all together and considered as a whole, however, those acts and conduct may warrant the inference that a conspiracy existed just as conclusively as more direct proof, such as evidence of an express agreement.

So, in considering the first element of the crime of conspiracy as charged in Count One – whether the conspiracy actually existed – you should consider all the evidence that has been admitted with respect to the acts, conduct, and statements of each alleged coconspirator, and any inferences that may be reasonably drawn from them.  It is sufficient to establish the existence of the conspiracy, as I've already said, if, from the proof of all the relevant facts and circumstances, you find beyond a reasonable doubt that the minds of at least two alleged co-conspirators met in an understanding way to accomplish, by the means alleged, at least one object of the conspiracy.

In short, as far as the first element of the conspiracy is concerned, the Government must prove beyond a reasonable doubt that at least two alleged conspirators came to a mutual understanding, either spoken or unspoken, to violate the law in the manner charged in Count One of the Indictment.

<u>Liability for Acts and Declarations of Co-Conspirators</u>

You will recall that I have admitted into evidence against the defendants the acts and statements of others because these acts and statements were committed or made by persons who, the Government charges, were also confederates or co-conspirators of the defendants.

The reason for allowing this evidence to be received against the defendants has to do in part with the nature of the crime of conspiracy. As I have said, a conspiracy is often referred to as a partnership in crime: as in other types of partnerships, when people enter into a conspiracy to accomplish an unlawful end, each and every member becomes an agent for the other conspirators in carrying out the conspiracy.

Therefore, the reasonably foreseeable acts or statements of any member of the conspiracy, committed in furtherance of the common purpose of the conspiracy, are deemed, under the law, to be the acts or statements of all of the members, and all of the members are responsible for such acts or statements.

If you find, beyond a reasonable doubt, that a defendant was a member of the conspiracy charged in the Indictment, then any acts done or statements made in furtherance of the conspiracy by a person also found by you to have been a member of the same conspiracy may be considered against that defendant. This is so even if such acts were committed or such statements were made in that defendant's absence, and without his knowledge.

However, before you may consider the acts or statements of a co-conspirator in deciding the guilt of a defendant, you must first determine that the acts were committed or statements were made during the existence, and in furtherance, of the unlawful scheme. If the acts were done or the statements were made by someone whom you do not find to have been a member of

10

the conspiracy, or if they were not in furtherance of the conspiracy, they may not be considered

by you in deciding whether a defendant is guilty or not guilty.

> Adapted from the <u>Collins</u> Charge; the <u>Tomasetta</u> Charge;
> Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 19-4,
> 19-9.

**REQUEST NO. 7**

**Count One: Conspiracy – Objects of the Conspiracy**

The objects of a conspiracy are the illegal goal or goals the co-conspirators agree or hope to achieve.  The Indictment charges three such unlawful purposes – also referred to as "objects" of the conspiracy.  You should keep in mind that you need not find that the conspirators agreed to accomplish each one of these objects.  An agreement to accomplish any one of these objects is sufficient.  Here, the objects of the conspiracy are (a) securities fraud, (b) making false statements in SEC filings, and (c) misleading the conduct of audits.

Although the finding of one unlawful objective is sufficient to satisfy the illegal purpose element, I instruct you that you, the jury, must unanimously agree on which object, if any, was the specific object or objects of the alleged conspiracy.  If the Government fails to prove beyond a reasonable doubt that at least one of the unlawful objectives alleged in Count One was in fact an objective of the conspiracy, or if you cannot unanimously agree as to which of the unlawful objects alleged in the Indictment have been proven beyond a reasonable doubt, then you must find the defendant you are considering not guilty as to the conspiracy charge.

Adapted from the <u>Collins</u> Charge and the <u>Tomasetta</u> Charge.

**A-96**

**REQUEST NO. 8**

**First Object – Securities Fraud**

The first object of the conspiracy charged in Count One of the Indictment is to commit securities fraud.

Wholly apart from its inclusion as part of the conspiracy charged in Count One, the objective of the securities fraud is charged as a separate substantive offense in Count Two.  I instruct you that this is permissible.  A crime may be punished for its own sake and it may also be an object of a conspiracy — which requires proof of additional elements and which Congress has elected to make a separate and distinct crime.  Because the object of the conspiracy – securities fraud – is charged as a substantive offense in Count Two, I will instruct you in a moment with regard to Count Two on the law that applies to securities fraud and ask you to apply the same law to the object of the conspiracy as charged in Count One of the Indictment.

**A-97**

**REQUEST NO. 9**

**Second Object – Making False Statements in SEC Filings**

The second object of the conspiracy charged in Count One of the Indictment is making, or causing to be made, false statements in reports and documents required to be filed under the Securities Exchange Act of 1934.  Section 32 of the Securities Exchange Act of 1934, Title 15, United States Code, Section 78ff.  Section 78ff provides in relevant part:

> [A]ny person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed under this title or any rule or regulation thereunder . . . which statement was false or misleading with respect to any material fact [shall be guilty of a crime].

This section is the general provision of the federal securities laws that makes it unlawful to willfully violate any provision of the Securities Exchange Act of 1934, or any rule or regulation thereunder, by making materially false and misleading statements in applications, reports, and documents required to be filed with the SEC.

The SEC requires public companies to file quarterly reports, or Form 10-Qs, for each of the first three quarters of every fiscal year, and an annual report, or Form 10-K, for the full fiscal year.  The SEC also requires public companies to file a current report on a form called a Form 8-K for, among other reasons, any public announcement or release that discloses material non-public information regarding that company's results of operations or financial condition for a completed quarterly or annual fiscal period.

**<u>Elements</u>**

To establish a violation of Title 15, United States Code, Section 78ff, the Government must prove each of the following elements:

<u>First</u>, that MiMedx was required by the Securities Exchange Act of 1934 to file the document charged in that Count; and

14

<u>Second</u>, that a defendant knowingly and willfully made, or caused to be made, a materially false or misleading statement in that document.

Now I will explain these two elements in more detail.

### **First Element – Required Filings**

First, the Government must show that MiMedx was required by the Securities Exchange Act of 1934 to file reports and document.  I have already instructed you that public companies are required to file documents and reports as prescribed by the SEC.  These include quarterly reports on Form 10-Q, annual reports on Form 10-K, and current reports on Form 8-K for, among other reasons, any public announcement or release that discloses material non-public information regarding the company's results of operations or financial condition for a completed quarterly or annual fiscal period.  If you find that MiMedx was a public company, it was required to file these reports.

### **Second Element – Material Falsity**

The Government next must prove that the defendant made, or caused to be made, materially false and misleading statements in the filing you are considering.

A statement or representation is "false" if it was untrue when made, and known at the time to be untrue by the person making it or causing it to be made.  A statement is misleading if it is either an untrue statement as to a material fact or if it omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

The word "material" here refers to the nature of the false or misleading statements.  We use the word "material" to distinguish between the kinds of statements we care about and those that are of no real importance.  Matters that are "material" may also include fraudulent half-truths or omissions of material fact.  A material fact is one that a reasonable person would have

15

considered important in making his or her investment decision.  That means that if you find a particular statement of fact or omission to have been untruthful or misleading, before you can find that statement or omission to be material, you must also find that the statement or omission was one that would have mattered to a reasonable person in making such an investment decision.

"Knowingly" means to act voluntarily and deliberately, rather than mistakenly or inadvertently.

"Willfully" means to act knowingly and purposely, with an intent to do something the law forbids, that is to say, with bad purpose either to disobey or disregard the law.  However, to show that the defendant acted willfully, the Government does not need to prove that the defendant knew he was breaking any particular law; rather, it is sufficient in this context for the Government to prove that the defendant was aware of the generally illegal nature of his acts.

The Government need not prove that the defendant himself physically made or otherwise personally prepared the statements in question.  It is sufficient if the Government has proved that a defendant caused materially false information to be filed by some person.

> Adapted from the charge of the charge of the Honorable Paul A. Crotty in
> United States v. Tomasetta, 10 Cr. 1205 (PAC); Title 15, United States
> Code, Sections 78m(a) and 78o(d); and Title 17, Code of Federal
> Regulations, Section 240.13a-11 and 13a-13; Form 8-K, Section 2, Item
> 2.02; Sand, et al., Modern Federal Jury Instructions, Instr. 36-9 and 36-10

**REQUEST NO. 10**

**Third Object – Misleading the Conduct of Audits**

The third object of the securities fraud conspiracy charged in Count One of the
Indictment is misleading the conduct of audits.  The law prohibits directors or officers of a
corporation that has publicly traded securities from making or causing to be made false or
misleading statements to an accountant either in connection with an audit or examination of the
company's financial statements or in connection with the preparation and filing of documents
with the SEC.

To establish this object, the Government must prove that two or more persons agreed that
the directors or officers of a public company would, directly or indirectly, make or cause to be
made a materially false or misleading statements; or that those officers or directors would,
directly or indirectly, omit to state, or cause another person to omit to state, a material fact
necessary in order to make the statements made, in light of the circumstances under which such
statements were made, not misleading. Such material false statements or omissions must be
made to an accountant in connection with (1) an audit or examination of the financial statements
of the company, or (2) the preparation or filing of any document or report required to be filed
with the SEC.  Finally, the defendant must have acted willfully.

I have explained that a public company is required to file financial statements with the
SEC.  I have already described the concepts of willfulness, falsity and materiality.  You should
apply those same instructions here.

Adapted from the charge of the Honorable Barbara S. Jones in <u>United States</u> v.
<u>Weissman</u>, 01 Cr. 529 (BSJ)

**REQUEST NO. 11**

**Count One: Conspiracy – Second Element – Membership in the Conspiracy**

If you conclude that the Government has proven beyond a reasonable doubt that the conspiracy charged in Count One of the Indictment existed, then you must next consider the second element: namely, whether a defendant participated in the conspiracy with knowledge of its unlawful purpose and in furtherance of its unlawful objectives.

In order to satisfy the second element of Count One, the Government must prove beyond a reasonable doubt that a defendant knowingly and willfully entered into the conspiracy with a criminal intent – that is, with a purpose to violate the law – and that he agreed to take part in the conspiracy to further promote and cooperate in its unlawful objectives.

**"Unlawful," "Willfully" and "Knowingly" Defined**

I have already defined the words "knowingly" and "willfully," and you should apply those definitions here. "Unlawful" simply means contrary to law. A defendant need not have known that he was breaking any particular law or any particular rule. A defendant need only have been aware of the generally unlawful nature of his acts.

Now, as I've mentioned before, knowledge is often a matter of inference from the proven facts. Science has not yet devised a manner of looking into a person's mind and knowing what that person is thinking. You do, however, have before you the evidence of certain acts and conversations alleged to have taken place with the defendant or in his presence. The Government contends that these acts and conversations show beyond a reasonable doubt the defendants' knowledge of the unlawful purposes of the conspiracy. It is for you to determine whether the Government has established to your satisfaction, beyond a reasonable doubt, that such knowledge and intent on the part of the defendant existed.

18

It is not necessary for the Government to show that a defendant was fully informed as to all the details of the conspiracy in order for you to infer knowledge on his part.  To have guilty knowledge, the defendant need not have known the full extent of the conspiracy or all of the activities of all of its participants.  It is not even necessary for a defendant to know every other member of the conspiracy.  In fact, a defendant may know only one other member of the conspiracy and still be a co-conspirator.  Nor is it necessary for a defendant to receive any monetary benefit from participating in the conspiracy, or to have a financial stake in the outcome.

It is enough if a defendant participated in the conspiracy unlawfully, intentionally and knowingly, as I have defined those terms.  However, while proof of a financial interest in the outcome of a scheme is not essential, if you find that a defendant had such an interest, that is a factor that you may properly consider in determining whether or not the defendant was a knowing member of the conspiracy charged in the Indictment.

The duration and extent of a defendant's participation has no bearing on the issue of the defendant's guilt.  A defendant need not have joined the conspiracy at the outset.  A defendant may have joined it at any time in its progress, and the defendant still will be held responsible for all that was done before he joined and all that was done during the conspiracy's existence while the defendant was a member.  Each member of a conspiracy may perform separate and distinct acts and may perform them at different times.  Some conspirators play major roles, while others play minor roles in the scheme.  An equal role is not what the law requires.  In fact, even a single act may be sufficient to draw a defendant within the scope of the conspiracy.

I want to caution you, however, that a person's mere association with a member of the conspiracy does not make that person a member of the conspiracy, even when that association is

19

**A-103**

coupled with knowledge that a conspiracy is taking place.  Mere presence at the scene of a crime, even coupled with knowledge that a crime is taking place, is not sufficient to support a conviction.  In other words, knowledge without participation is not sufficient.  What is necessary is that the defendant has participated in the conspiracy with knowledge of its unlawful purpose and with an intent to aid in the accomplishment of its unlawful objective.

In sum, a defendant, with an understanding of the unlawful nature of the conspiracy, must have intentionally engaged, advised or assisted in the conspiracy for the purpose of furthering an illegal undertaking.  A defendant thereby becomes a knowing and willing participant in the unlawful agreement – that is to say, a conspirator.

A conspiracy, once formed, is presumed to continue until either its objectives are accomplished or there is some affirmative act of termination by its members.  So, too, once a person is found to be a member of a conspiracy, he is presumed to continue his membership in the venture until its termination, unless it is shown by some affirmative proof that he withdrew and disassociated himself from it.

Adapted from the Collins Charge; the Tomasetta Charge;
Modern Federal Jury Instructions, Instr. 19-6.

**A-104**

**REQUEST NO. 12**

**Count One: Conspiracy – Third Element – Overt Acts**

The third element of Count One that the Government must prove is the commission of an overt act. In particular, the Government must show beyond a reasonable doubt that at least one overt act was committed in furtherance of the conspiracy charged in Count One by at least one of the co-conspirators – not necessarily a defendant.

The purpose of the overt act requirement is clear. There must have been something more than mere agreement; some overt step or action must have been taken by at least one of the conspirators in furtherance of the conspiracy.

Let me put it colloquially. The overt act element is a requirement that the agreement went beyond the mere talking stage, the mere agreement stage. The requirement of an overt act is a requirement that some action be taken during the life of the conspiracy by one of the co-conspirators to further the conspiracy.

For the Government to satisfy the overt act requirement, it is not necessary for the Government to prove all of the overt acts alleged in the Indictment or even <u>any</u> of the overt acts contained in the Indictment. Indeed, you may find that overt acts were committed that were <u>not</u> alleged at all in the Indictment. In short, it is sufficient for the Government to show that the defendant <u>or</u> one of his alleged co-conspirators knowingly committed an overt act – whether specifically charged in the Indictment or not – in furtherance of the conspiracy. You must be unanimous on at least one such overt act.

You are further instructed that the overt act need not have been committed at precisely the time alleged in the Indictment. It is sufficient if you are convinced beyond a reasonable doubt that an overt act occurred while the conspiracy was in existence.

21

In considering this element, you should bear in mind that an overt act, standing alone, may be an innocent, lawful act.  Frequently, however, an apparently innocent act sheds its harmless character if it is a step in carrying out, promoting, aiding or assisting the conspiratorial scheme.  You are therefore instructed that the overt act does not have to be an act that in and of itself is criminal or constitutes an object of the conspiracy.

> Adapted from the <u>Collins</u> Charge; the <u>Tomasetta</u> Charge; and Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 19-7.

**REQUEST NO. 13**

**Count One: Conspiracy – Time of Conspiracy**

The Indictment charges that the conspiracy set forth in Count One existed from at least in or about 2015 through at least in or about 2016.  It is not essential that the Government prove that the conspiracy started and ended on those specific dates.  Indeed, it is sufficient if you find that in fact the charged conspiracy was formed and that it existed for some time within the period set forth in the Indictment, and that at least one overt act was committed in furtherance of the charged conspiracy within that period.

More generally with respect to the timing of events and the amounts of particular transactions, it does not matter if a specific transaction is alleged to have occurred on or about a certain date or that it involved a specific number of shares or amount of money but the testimony indicates that in fact it was a different date or amount.  The law only requires a substantial similarity between the dates and amounts alleged in the Indictment and the dates and amounts established by the testimony or other evidence.  The same goes for most of the other factual contentions in the Indictment.

Adapted from the Tomasetta Charge; Sand et al., Modern Federal Jury Instructions, Instr. 3-12.

REQUEST NO. 14

**Count Two: Securities Fraud – The Indictment and the Statute**

I've just instructed you on the elements of the conspiracy charged in Count One.  Let us

turn to Count Two, which charges PARKER H. PETIT and WILLIAM TAYLOR, the

defendants, with committing the substantive crime of securities fraud.

Count Two alleges as follows:

[The Court is respectfully requested to read Count Two of the Indictment.]

The relevant law here is Section 10(b) of the Securities Exchange Act of 1934, which is

set forth in 15 U.S.C. § 78j(b).  Section 10(b) provides, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means
> or instrumentality of interstate commerce or of the mails, or of any facility of any
> national securities exchange . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security
> registered on a national securities exchange or any security not so registered, . . .
> any manipulative or deceptive device or contrivance in contravention of such
> rules and regulations as the [SEC] may prescribe as necessary or appropriate in
> the public interest or for the protection of investors.

Based on its authority under this statute, the SEC has created a number of rules and

regulations, one of which, known as Rule 10b-5 is relevant here.  Rule 10b-5 reads as follows:

> **Employment of manipulative and deceptive devices.** It shall be unlawful for
> any person, directly or indirectly, by the use of any means or instrumentality of
> interstate commerce, or of the mails, or of any facility of any national securities
> exchange,
>
> (a) to employ any device, scheme, or artifice to defraud,
>
> (b) to make any untrue statement of a material fact or to omit to state a material
> fact necessary in order to make the statements made, in light of the circumstances
> under which they were made, not misleading, or
>
> (c) to engage in any act, practice, or course of business which operates or would
> operate as a fraud or deceit upon any person, in connection with the purchase or
> sale of any security.

24

**A-108**

Adapted from the charge of the Honorable Loretta A. Preska in <u>United States</u> v. <u>Collins</u>, 07 Cr. 1170 (LAP) (the "<u>Collins</u> Charge"); Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 57-18.

**A-109**

**REQUEST NO. 15**

**Count Two: Securities Fraud – Statutory Purpose**

The 1934 Securities Exchange Act was the second of two laws passed by Congress to provide a comprehensive plan to protect the investing public in the purchase and sale of securities that are publicly distributed.

The stock market crash of 1929 led to much legislation in the area of securities regulation. Included in this legislation was the Securities Act of 1933, and the creation of the Securities and Exchange Commission ("SEC"). The Securities Act was enacted to protect the investing public in the purchase of stock that is publicly distributed. The Act provides a comprehensive plan requiring full and fair disclosure of all important facts in connection with a distribution of securities. Such disclosures are designed to enable the investing public to make realistic appraisals of the merits of securities so that investors can make informed investment decisions.

When it enacted the Securities Act, Congress recognized that the purchase of a stock is different from the purchase of a vegetable bought in a grocery store, in that the average investor is not in a position to make a personal investigation to determine the worth, quality, and value of securities.

Following enactment of the Securities Act of 1933, which requires full and fair disclosures relating to the offering of stock to the investing public, Congress enacted the Securities Exchange Act of 1934 to ensure fair dealing and outlaw deceptive and inequitable practices by those selling or buying securities on the securities exchanges, in over-the-counter markets, or in face-to-face transactions. Among the primary objectives of the Exchange Act are the maintenance of fair and honest security markets and the elimination of manipulative practices that tend to distort the fair and just price of stock. Congress recognized that any deceptive or

26

manipulative practice that influenced or related to trading activity undermined the function and

purpose of a free market.

> Adapted from the <u>Collins</u> Charge; Sand, et al., <u>Modern</u>
> <u>Federal Jury Instructions</u>, Instr. 57-19.

**A-111**

REQUEST NO. 16

**Count Two: Securities Fraud – Elements of the Offense**

To establish a violation of Section 10(b), as charged in Count Two of the Indictment, the Government must prove each of the following elements beyond a reasonable doubt:

<u>First</u>, that in connection with the purchase or sale of stock, or shares in a company, the defendant did <u>any</u> <u>one</u> or more of the following:

(1) employed a device, scheme or artifice to defraud, or

(2) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or

(3) engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller;

<u>Second</u>, that the defendant acted knowingly, willfully, and with the intent to defraud; and

<u>Third</u>, that the defendant used or caused to be used, any means or instruments of transportation or communication in interstate commerce or the use of the mails in furtherance of the fraudulent conduct.

I will discuss each element in turn.

> Adapted the <u>Collins</u> Charge; Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 57-20; <u>see</u> <u>United States</u> v. <u>Litvak</u>, 808 F.3d 160, 178 (2d Cir. 2015) (noting that scienter for securities fraud is "intent to deceive, manipulate or defraud" and does not require an intent to harm); <u>United States</u> v. <u>Gleason</u>, 616 F.2d 2 (2d Cir. 1979).

28

**REQUEST NO. 17**

**Count Two: First Element – Fraudulent Act**

The first element that the Government must prove beyond a reasonable doubt is that, in connection with the purchase or sale of securities, such as shares of MiMedx, the defendant did any one of the following:

(1) employed a device, scheme or artifice to defraud, or

(2) made an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading, or

(3) engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller.

To prove this element, it is not necessary for the Government to prove all three types of unlawful conduct in connection with the purchase or sale of securities.  Any one will suffice. You must, however, be unanimous as to which type of unlawful conduct, if any, the defendant committed.

Let me now explain some of these terms.

**"Device, Scheme, or Artifice to Defraud"**

A device, scheme or artifice is merely a plan for the accomplishment of any objective. Fraud is a general term that embraces all ingenious efforts and means that individuals devise to take advantage of others.  It includes all kinds of manipulative and deceptive acts.  The fraud or deceit need not relate to the investment value of the securities involved in this case.

**False Statements and Omissions**

A statement, representation, claim, or document is false if it is untrue when made and was then known to be untrue by the person making it or causing it to be made.  A representation or statement is fraudulent if it was made with the intention to deceive.  The concealment of material

29

facts in a manner that makes what is said or represented deliberately misleading may also constitute false or fraudulent statements under the statute.

The deception need not be based upon spoken or written words alone.  The arrangement of the words, or the circumstances in which they are used, may convey the false and deceptive appearance.  If there is deception, the manner in which it is accomplished does not matter.

### **"In Connection With"**

You cannot find that the Government has proven the first element unless you find that the defendant participated, or agreed to participate, in fraudulent conduct that was "in connection with" a purchase or sale of securities.  The requirement that the fraudulent conduct be "in connection with" a purchase or sale of securities is satisfied so long as there was some nexus or relation between the allegedly fraudulent conduct and the sale or purchase of securities.  Fraudulent conduct may be "in connection with" the purchase or sale of securities if you find that the alleged fraudulent conduct "touched upon" a securities transaction.  You need not find that the defendant actually participated in any specific purchase or sale of a security if you find that the defendant participated, or agreed to participate, in fraudulent conduct that was "in connection with" a "purchase or sale" of securities.

It is no defense to an overall scheme to defraud that the defendant was not involved in the scheme from its inception or played only a minor role with no contact with the investors and purchasers of the securities in question.  A person who comes in at a later point with knowledge of the scheme's general operation, although not necessarily all of its details, and intentionally acts in a way to further the unlawful goals, becomes a member of the scheme and is legally responsible for all that may have been done in the past, in furtherance of the criminal objective, and all that is done thereafter.

**A-114**

Even if a defendant participated in the scheme to a lesser degree than others, he is, nevertheless, equally guilty so long as the defendant became a member of the scheme to defraud with knowledge of its general scope and purpose.

Nor is it necessary for you to find that a defendant was or would be the actual seller of the securities.  It is sufficient if the misrepresentation or omission of material fact involved the purchase or sale of stock.  By the same token, the Government need not prove that a defendant personally made the misrepresentation or that he omitted the material fact.  It is sufficient if the Government establishes that a defendant caused the statement to be made or the fact to be omitted.  With regard to the alleged misrepresentations and omissions, you must determine whether the statements were true or false when made, and, in the case of alleged omissions, whether the omissions were misleading.

### **"Material Fact"**

If you find that the Government has established beyond a reasonable doubt that a statement was false or a statement was omitted rendering the statements that were made misleading, you must next determine whether the statement or omission was material under the circumstances.  The word "material" here refers to the nature of the false or misleading statements.  As I instructed you previously, we use the word "material" to distinguish between the kinds of statements we care about and those that are of no real importance.  Matters that are "material" may also include fraudulent half-truths or omissions of material fact.  A material fact is one that a reasonable person would have considered important in making his or her investment decision.  That means that if you find a particular statement of fact or omission to have been untruthful or misleading, before you can find that statement or omission to be material, you must

also find that the statement or omission was one that would have mattered to a reasonable person in making such an investment decision.

Any testimony that you may have heard from any witness with respect to whether a particular fact would or would not have been important to him or to investors in general reflect that witness's individual views.  Although you may consider such testimony, it is not controlling. It is for you to determine whether a particular fact would have been significant to a reasonable investor in making an investment decision.

In considering whether a statement or omission was material, let me caution you that it is not a defense if the material misrepresentation or omission would not have deceived a person of ordinary intelligence.  Once you find that the offense involved the making of material misrepresentations or omissions of material facts, it does not matter whether the intended victims were gullible buyers or sophisticated investors, because the securities laws protect the gullible and unsophisticated as well as the experienced investor.

Nor does it matter whether the alleged unlawful conduct was or would have been successful, or whether the defendant profited or would have profited as a result of the alleged scheme.  Success is not an element of a violation of Section 10(b) or Rule 10b-5.  If, however, you find that the defendant expected to or did profit from the alleged scheme, you may consider that in relation to the element of intent, which I will discuss in a moment.

In assessing whether a misstatement or omission is material, both quantitative and qualitative factors should be considered.  In assessing whether a stated or omitted fact is quantitatively material, you should consider the financial magnitude of the misstatement or omission.  Under this inquiry, an omission or misstatement of an item in a financial report is quantitatively material if, in light of surrounding circumstances, the magnitude of the item is

such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.  However, the magnitude of a misstatement is only the beginning of an analysis of materiality.  You should also consider whether qualitative factors make a misstatement or omission material.  With respect to financial statements, qualitative factors may cause misstatements of quantitatively small amounts to be material.

In assessing whether a misstatement or omission is qualitatively material, you may consider, among other factors:

•   whether the misstatement masks a change in earnings or other trends;

•   whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise;

•   whether the misstatement changes a loss into income or vice versa;

•   whether the misstatement concerns a segment or other portion of the company's business that has been identified as playing a significant role in the company's operations or profitability;

•   whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation;

•   whether the misstatement involves concealment of an unlawful transaction.

This is not an exhaustive list of the circumstances that may render material a misstatement that is quantitatively small.  Among other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material.  When

management expects (based, for example, on a pattern of market performance) that a known

misstatement may result in a significant positive or negative market reaction, that expected

reaction should be taken into account when considering whether a misstatement is material.

You should not assume that even small intentional misstatements in financial statements,

for example those pursuant to actions to "manage" earnings, are immaterial.  While the intent of

management does not render a misstatement material, it may provide significant evidence of

materiality.  The evidence may be particularly compelling where management has intentionally

misstated items in the financial statements to "manage" reported earnings.  In that instance, it

presumably has done so believing that the resulting amounts and trends would be significant to

users of the registrant's financial statements.

Remember, in assessing materiality, you should consider all the relevant facts and

circumstances, both quantitative and qualitative.  Furthermore, you should consider both the

individual misstatements or omissions, and their aggregate effect, in determining materiality.

> Adapted from the Collins Charge; Sand, et al., Modern
> Federal Jury Instructions, Instr. 57-20, 57-21; SEC Staff
> Accounting Bulletin ("SAB") 99; see also United States v.
> Skelly, 442 F.3d 94, 98 (2d Cir. 2006); United States v.
> Santoro, 302 F.3d 76, 80-81 (2d Cir. 2002) ("Unlike
> customers who independently find their stocks and whose
> brokers merely execute trades at their command, customers
> who rely on investment recommendations reasonably trust
> their brokers to fully disclose all information pertinent to
> the recommendation and quality of the investment.");
> United States v. Szur, 289 F.3d 200, 210 (2d Cir. 2002);
> Ganino v. Citizens Utilities Co., 228 F.3d 154, 163 (2d Cir.
> 2000) ("SAB No. 99 is thoroughly reasoned and consistent
> with existing law – its non-exhaustive list of factors is
> simply an application of the well-established *Basic*
> analysis to misrepresentations of financial results – we find
> it persuasive guidance for evaluating the materiality of an
> alleged misrepresentation.").

## REQUEST NO. 18

### Count Two: Second Element – Knowledge, Intent and Willfulness

The second element of Count Two that the Government must establish is that the defendant acted knowingly, willfully and with intent to defraud.

I previously instructed you on the meaning of "knowingly and "willfully" and you should apply those same instructions here.

"Intent to defraud" in the context of the securities laws means to act knowingly and with intent to manipulate or deceive.

The question of whether a person acted knowingly, willfully and with intent to defraud is a question of fact for you to determine, like any other fact question.  This question involves one's state of mind.

Direct proof of knowledge and fraudulent intent is almost never available.  It would be a rare case where it could be shown that a person wrote or stated that as of a given time in the past he committed an act with fraudulent intent.  Such direct proof is not required.

The ultimate facts of knowledge and criminal intent, though subjective, may be established by circumstantial evidence, based upon a person's outward manifestations, his words, his conduct, his acts and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn therefrom.

What is referred to as drawing inferences from circumstantial evidence is no different from what people normally mean when they say, "use your common sense."  Using your common sense means that, when you come to decide whether a defendant possessed or lacked an intent to defraud, you do not limit yourself to what a defendant said, but you also look at what he did and what others did in relation to a defendant and, in general, everything that occurred.

As I have previously explained, circumstantial evidence, if believed, is of no less value than direct evidence.  In either case, the essential elements of the crime charged must be established beyond a reasonable doubt.

Because an essential element of the crime charged is intent to deceive, good faith on the part of the defendant is a complete defense to the charge of securities fraud.  That is, the law is not violated if the defendant held an honest belief that his actions were proper and not in furtherance of any unlawful scheme.  An honest belief in the truth of the representations made by a defendant is a complete defense, however inaccurate the statements may turn out to be.  A defendant, however, has no burden to establish a defense of good faith; it remains the Government's burden to prove, beyond a reasonable doubt, that the defendant acted knowingly, willfully, and with intent to deceive.

In considering whether or not a defendant acted in good faith, however, you are instructed that a belief by the defendant, if such belief existed, that ultimately everything would work out so that no investors would lose any money does not necessarily constitute good faith. No amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for the investors will excuse fraudulent actions or false representations by him.

As a practical matter, then, to prove the charge against a defendant, the Government must establish beyond a reasonable doubt that the defendant knew that his conduct was calculated to deceive and that he nevertheless associated himself with the alleged fraudulent scheme.

> Adapted from the Collins Charge; Sand, et al., Modern Federal Jury Instructions, Instr. 57-16; United States v. Litvak, 808 F.3d 160, 178 (2d Cir. 2015) (intent element for securities fraud is "intent to deceive, manipulate or defraud" not "intent to harm").

**A-120**

**REQUEST NO. 19**

**Count Two: Third Element – Instrumentality of Interstate Commerce**

The third and final element of Count Two — the substantive securities fraud count —
that the Government must prove beyond a reasonable doubt is that the defendant knowingly
used, or caused to be used, the mails or the instrumentalities of interstate commerce in
furtherance of the scheme to defraud.

Let me first note that it is unnecessary for the Government to prove both the mails and an
instrumentality of interstate commerce were used in furtherance of the fraudulent scheme.  Only
one of the above – either the mails <u>or</u> an instrumentality of interstate commerce – is enough.  But
you must be unanimous as to at least one.

In considering this element, it is not necessary for you to find that the defendant was or
would have been directly or personally involved in any mailing or the use of an instrumentality
of interstate commerce.  If the conduct alleged would naturally and probably result in the use of
the mails or an instrumentality of interstate commerce, this element would be satisfied.

Nor is it necessary that the items sent through the mails or communicated through an
instrumentality of interstate commerce did or would contain the fraudulent material, or anything
criminal or objectionable.  The matter mailed or communicated may be entirely innocent so long
as it is in furtherance of the scheme to defraud or fraudulent conduct.

The use of the mails or instrumentality of interstate commerce need not be central to the
execution of the scheme or even be incidental to it.  All that is required is that the use of the
mails or instrumentality of interstate commerce bear some relation to the object of the scheme or
fraudulent conduct.

In fact, the actual purchase or sale of a security need not be accompanied by the use of
the mails or instrumentality of interstate commerce, so long as the mails or instrumentality of

interstate commerce are used in furtherance of the scheme and the defendant is still engaged in

actions that are part of a fraudulent scheme when the mails or the instrumentalities of interstate

commerce are used.

The use of the term "mails" is self-explanatory, and includes the U.S. Mail and Federal

Express.  Examples of instrumentalities of interstate commerce include an interstate telephone

call or email, or use of a facility of a national securities exchange, such as a stock or options

trade made on the NASDAQ.

> Adapted from the <u>Collins</u> Charge; Sand, et al., <u>Modern
> Federal Jury Instructions</u>, Instr. 57-20, 57-25; <u>United States</u>
> v. <u>Giordano</u>, 442 F.3d 30, 40 & n.11 (2d Cir. 2006)
> (defining "instrumentality of interstate commerce").

**REQUEST NO. 20**

**Conscious Avoidance**

As I have explained, each of the counts charged in the Indictment requires the Government to prove that the defendant you are considering acted knowingly, as I have already defined that term.

As you all know, if a person is actually aware of a fact, then he knows that fact. But the law also allows you to find that a defendant had knowledge of a fact when the evidence shows that he was aware of a high probability of that fact, but intentionally avoided confirming that fact. The law calls this "conscious avoidance" or "willful blindness."

In determining whether the Government has proven beyond a reasonable doubt that a defendant acted knowingly with respect to either of the counts charged in the Indictment, you may consider whether the defendant deliberately closed his eyes to what would otherwise have been obvious to him. One may not willfully and intentionally remain ignorant of a fact important to his conduct in order to escape the consequences of criminal law.

Thus, if you find beyond a reasonable doubt that the defendant acted with a conscious purpose to avoid learning some relevant fact – for example, that certain statements were false or misleading without additional information – then you may treat the defendant as though he knew that the fact existed. However, guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish, or mistaken, and you may not rely on willful blindness as the basis for treating the defendant as though he was aware of the existence of a fact if you find that the defendant actually believed that the fact did not exist. It is entirely up to you whether you find that the defendant deliberately closed his eyes and any inferences to be drawn from the evidence on this issue.

**A-123**

Let me explain further what the concept of willful blindness or conscious avoidance means with respect to the conspiracy charge, Count One of the Indictment.

First, there is a difference between knowingly participating in a joint undertaking and knowing the object of that undertaking.  "Conscious avoidance," as I have described it, cannot be used as a substitute for a finding that the defendant knowingly agreed to a joint undertaking.  It is logically impossible for a defendant to agree to join another person unless he knows that he has made such an agreement.

However, if you find beyond a reasonable doubt that the defendant entered into such an agreement, in considering whether the defendant knew that the objective or goal of that agreement was to engage in securities fraud, to make false filings with the SEC and mislead the conduct of audits, you may consider whether the defendant deliberately avoided confirming otherwise obvious facts about the purpose of the agreement, that is, whether he deliberately closed his eyes to what would otherwise have been obvious.

Adapted from the <u>Collins</u> Charge; Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 3A-2, 57-24.

40

**REQUEST NO. 21**

**Aiding and Abetting**

The substantive count – Count Two – charges the defendants with violating 18 U.S.C. §
2, the "aiding and abetting" statute.  That is, the defendants are charged not only as principals
who committed the crime, but also aider and abettors and with having willfully caused the crime.
As a result, under 18 U.S.C. § 2, there are two additional ways that the Government may
establish a defendant's guilt on Count Two.  One way is called "aiding and abetting," and the
other is called "willfully causing a crime."  Let me explain each of these.

"Aiding and abetting" is set forth in Section 2(a) of the statute.  That section reads, in
part, as follows:

> Whoever commits an offense against the United States or aids or abets or
> counsels, commands or induces, or procures its commission, is punishable as a
> principal.

Under the aiding and abetting statute, it is not necessary for the Government to show that
a defendant himself physically committed the crime with which he is charged in order for you to
find the defendant guilty.  Thus, even if you do not find beyond a reasonable doubt that the
defendant himself committed the crime charged, you may, under certain circumstances, still find
the defendant guilty of that crime as an aider or abettor.

A person who aids or abets another to commit an offense is just as guilty of that offense
as if he committed it himself.  Accordingly, you may find a defendant guilty of the substantive
crime if you find beyond a reasonable doubt that the Government has proved that another person
actually committed the crime, and that the defendant aided and abetted that person in the
commission of the offense.

As you can see, the first requirement is that another person has committed the crime
charged.  Obviously, no one can be convicted of aiding and abetting the criminal acts of another

41

if no crime was committed by the other person in the first place.  But if you do find that a crime was committed, then you must consider whether the defendant aided or abetted the commission of the crime.

In order to aid or abet another to commit a crime, it is necessary that a defendant willfully and knowingly associate himself in some way with the crime, and that he willfully and knowingly seek by some act to help make the crime succeed.

Participation in a crime is willful if action is taken voluntarily and intentionally, or, in the case of a failure to act, with the specific intent to fail to do something the law requires to be done; that is to say, with a bad purpose either to disobey or to disregard the law.

The mere presence of a defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or the mere acquiescence by a defendant in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting.  An aider and abettor must have some interest in the criminal venture.

To determine whether a defendant aided or abetted the commission of the crime with which he is charged, ask yourself these questions:

-- Did he participate in the crime charged as something he wished to bring about?

-- Did he associate himself with the criminal venture knowingly and willfully?

-- Did he seek by his actions to make the criminal venture succeed?

If he did, then the defendant is an aider and abettor, and therefore guilty of the offense.  If he did not, then the defendant is not an aider and abettor, and is not guilty as an aider and abettor of that offense.

> Adapted from Sand, et al., <u>Modern Federal Jury
> Instructions</u>, Instr. 11-1 and 11-2, and from the charge

42

**A-126**

approved in United States v. Stanchich, 550 F.2d 1294 (2d Cir. 1977); see United States v. Labat, 905 F.2d 18, 23 (2d Cir. 1990) (discussing requirements of aiding and abetting liability); United States v. Clemente, 640 F.2d 1069 (2d Cir.) (same).

**REQUEST NO. 22**

**Willfully Causing a Crime**

The second way in which the Government can prove a defendant's guilt under 18 U.S.C. § 2 on Counts Two is through a finding beyond a reasonable doubt that the defendant willfully caused a crime.  Section 2(b) of the aiding and abetting statute, which relates to willfully causing a crime, reads as follows:

> Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States [shall be guilty of a federal crime].

What does the term "willfully caused" mean? It means that the defendant himself need not have physically committed the crime or supervised or participated in the actual criminal conduct charged in the Indictment.

The meaning of the term "willfully caused" can be found in the answers to the following questions:

First, did the defendant did the defendant have the mental state necessary to commit the offenses you are considering; and

Second, did the defendant intentionally cause another person to commit the action or actions that constituted the crime?

If you are persuaded beyond a reasonable doubt that the answer to both of these questions is "yes" then the defendant is guilty of the crime charged just as if the defendant himself had actually committed it.  To find the defendant liable under this provision of the statute, the Government need not prove that he acted through a guilty intermediary.

> Adapted from Sand, et al., Modern Federal Jury Instructions, Instr. 11-3; see United States v. Gabriel, 125 F.3d 89, 99 (2d Cir. 1997) ("Generally, to establish a conviction through the use of section 2(b), the government

44

must prove that the defendant had the mental state necessary to violate the underlying criminal statute and that the defendant 'willfully caused' another to commit the necessary act."); United States v. Margiotta, 688 F.2d 108, 131 (2d Cir. 1982) (defendant may be found guilty even if he acts through "innocent intermediaries" to "cause[] the commission of an indispensable element of the offense"); United States v. Ordner, 554 F.2d 24, 29 (2d Cir. 1977), cert. denied, 434 U.S. 824 (1978) (under the "willfully causes an act to be done" provision "the guilt or innocence of the intermediary is irrelevant").

**REQUEST NO. 23**

**Venue**

Now, in addition to dealing with the elements of each of the offenses, you must also consider the issue of venue as to each offense, namely, whether any act in furtherance of the unlawful activity occurred within the Southern District of New York.  The Southern District of New York includes Manhattan, the Bronx, as well as several other counties, so anything that occurs in Manhattan occurs in the Southern District of New York.

It is sufficient to satisfy the venue requirement if any act by anyone in furtherance of the crime charged occurred within the Southern District of New York.  To satisfy this venue requirement <u>only</u>, the Government need not meet the burden of proof beyond a reasonable doubt. The Government meets its burden of proof for venue if it establishes by a preponderance of the evidence that an act in furtherance of the crime occurred within the Southern District of New York.  A preponderance of the evidence means that something is more likely than not.

> Adapted from Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 3-11.; the <u>Collins</u> Charge; the <u>Tomasetta</u> Charge; <u>see also United States</u> v. <u>Gonzalez</u>, 922 F.2d 1044, 1054-55 (2d Cir.) (affirming that venue is governed by a preponderance standard).

**REQUEST NO. 24**

**Accomplice Witnesses**

You have heard witnesses who testified that they were actually involved in the crimes charged in the Indictment.

Experience will tell you that the Government frequently must rely on the testimony of witnesses who participated in the alleged crimes at issue. The Government must take its witnesses as it finds them and frequently must use such testimony in a criminal prosecution because otherwise it would be difficult or impossible to detect and prosecute wrongdoers.

The testimony of such accomplices and cooperating witnesses is properly considered by the jury. If accomplices could not be used, there would be many cases in which there was real guilt and conviction should be had, but in which convictions would be unobtainable.

For these very reasons, the law allows the use of accomplice testimony. Indeed, it is the law in federal courts that the testimony of an accomplice may be enough in itself for conviction, if the jury believes that the testimony establishes guilt beyond a reasonable doubt.

Because of the possible interest an accomplice may have in testifying, the accomplice's testimony should be scrutinized with special care and caution. The fact that a witness is an accomplice can be considered by you as bearing upon his credibility. However, it does not follow that simply because a person has admitted to participating in one or more crimes, that he is incapable of giving a truthful version of what happened.

Like the testimony of any other witness, accomplice witness testimony should be given such weight as it deserves in light of the facts and circumstances before you, taking into account the witness's demeanor, candor, the strength and accuracy of a witness's recollection, his background, and the extent to which his testimony is or is not corroborated by other evidence.

47

**A-131**

You may consider whether accomplice witnesses—like any other witnesses called in this case—have an interest in the outcome of the case, and if so, whether it has affected their testimony.

You heard testimony about agreements between the Government and one or more witnesses. I must caution you that it is no concern of yours why the Government made an agreement with a witness. Your sole concern is whether a witness has given truthful testimony here in this courtroom before you.

In evaluating the testimony of accomplice witnesses, you should ask yourselves whether the accomplices would benefit more by lying, or by telling the truth. Was his testimony made up in any way because he believed or hoped that he would somehow receive favorable treatment by testifying falsely? Or did he believe that his interests would be best served by testifying truthfully? If you believe that the witness was motivated by hopes of personal gain, was the motivation one which would cause him to lie, or was it one which would cause him to tell the truth? Did this motivation color his testimony?

If you find that the testimony was false, you should reject it. However, if, after a cautious and careful examination of the accomplice witness's testimony and demeanor upon the witness stand, you are satisfied that the witness told the truth, you should accept it as credible and act upon it accordingly.

As with any witness, let me emphasize that the issue of credibility need not be decided in an all-or-nothing fashion. Even if you find that a witness testified falsely in one part, you still may accept his or her testimony in other parts, or may disregard all of it. That is a determination entirely for you, the jury.

> Adapted from Sand, Modern Federal Jury Instructions, Instr. 7-5;
> from the charge of the Honorable John F. Keenan in United States
> v. Carrero, 91 Cr. 365 (JFK) (1991); and from the charge in United
> States v. Projansky, 465 F.2d 123, 136-37 n.25 (2d Cir. 1972)

(specifically approving charge set forth in footnote). <u>See</u> <u>United States</u> v. <u>Gleason,</u> 616 F.2d 2, 15 (2d Cir. 1979) ("Where the court points out that testimony of certain types of witnesses may be suspect and should therefore be scrutinized and weighed with care, such as that of accomplices or coconspirators . . . it must also direct the jury's attention to the fact that it may well find these witnesses to be truthful, in whole or in part.") (citations omitted), and <u>United States</u> v. <u>Cheung Kin Ping,</u> 555 F.2d 1069, 1073 (2d Cir. 1977) (same). <u>See also</u> <u>United States</u> v. <u>Swiderski,</u> 539 F.2d 854, 860 (2d Cir. 1976) (can be reversible error not to give accomplice witness charge if requested by defense).

**REQUEST NO. 25**

**Law Enforcement and Government Employee Witnesses**

**[If Applicable]**

You have heard testimony from law enforcement officials and employees of the Government.  The fact that a witness may be employed by the Federal Government as a law enforcement official or employee does not mean that his or her testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.

In this context, defense counsel is allowed to try to attack the credibility of such a witness on the ground that his or her testimony may be colored by a personal or professional interest in the outcome of the case.

It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement or Government employee witness and to give to that testimony the weight you find it deserves.

Adapted from Sand et al., <u>Modern Federal Jury Instructions</u>, Instr. 7-16.

**REQUEST NO. 26**

**Expert Witnesses**

**[If Applicable]**

You have heard testimony from what we call an expert witness [or witnesses].  An expert is a witness who by education or experience has acquired learning or experience in a specialized area of knowledge.  Such witnesses are permitted to give their opinions as to relevant matters in which they profess to be an expert and give their reasons for their opinions.  Expert testimony is presented to you on the theory that someone who is experienced in the field can assist you in understanding the evidence or in reaching an independent decision on the facts.

Now, your role in judging credibility applies to experts as well as to other witnesses.  You should consider the expert opinions that were received in evidence in this case and give them as much or as little weight as you think they deserve.  If you should decide that the opinion of an expert was not based on sufficient education or experience or on sufficient data, or if you should conclude that the trustworthiness or credibility of an expert is questionable for any reason, of if the opinion of the expert was outweighed, in your judgment, by other evidence in the case, then you might disregard the opinion of the expert entirely or in part.

On the other hand, if you find the opinion of an expert is based on sufficient data, education and experience, and the other evidence does not give you reason to doubt his conclusions, you would be justified in placing reliance on his testimony.

Adapted   from   Sand,   et   al.,   Modern   Federal   Jury Instructions, Instr. 7-21.

51

**REQUEST NO. 27**

**Character Testimony**

**[If Applicable]**

You have heard testimony that the defendant has a good reputation for [to be completed as appropriate].

Along with all the other evidence you have heard, you may take into consideration what you believe about a defendant's reputation for [to be completed as appropriate] when you decide whether the Government has proven, beyond a reasonable doubt, that the defendant committed the crime.

**A-136**

**REQUEST NO. 28**

**Defendant's Testimony**

**[Requested only if the defendant testifies]**

[The Government respectfully requests that the Court include the following instruction in its general instruction on witness credibility, rather than as a separate instruction:]

The defendant testified at trial and was subject to cross-examination.  You should examine and evaluate this testimony just as you would the testimony of any witness with an interest in the outcome of the case.

**REQUEST NO. 29**

**Defendant's Right Not to Testify**

**[If requested by defense]**

The defendants did not testify in this case.  Under our Constitution, a defendant has no obligation to testify or to present any evidence, because it is the Government's burden to prove a defendant guilty beyond a reasonable doubt.  That burden remains with the Government throughout the entire trial and never shifts to a defendant.  A defendant is never required to prove that he or she is innocent.

You may not attach any significance to the fact that the defendant did not testify.  No adverse inference against him may be drawn by you because he did not take the witness stand.  You may not consider this against the defendant in any way in your deliberations in the jury room.

Adapted from Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 5-21.

**A-138**

**REQUEST NO. 30**

**Statements of the Defendants**

There has been evidence that the defendants made certain statements in which the Government claims he made admissions or denials relevant to the charges in the Indictment.

Evidence of these statements was properly admitted in this case, and may be properly considered by you.  You are to give the statements such weight as you feel they deserve in light of all the evidence.

Whether you approve or disapprove of the use of these statements may not enter your deliberations.  I instruct you that no one's rights were violated, and the Government's use of this evidence is entirely lawful.

> Adapted from Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 5-19.

55

**REQUEST NO. 31**

**Uncalled Witnesses – Equally Available to Both Sides**

There are people whose names you heard during the course of the trial but did not appear to testify.  [If applicable: One or more of the attorneys has referred to their absence from the trial.]  I instruct you that each party had an equal opportunity or lack of opportunity to call any of these witnesses.  Therefore, you should not draw any inferences or reach any conclusions as to what they would have testified to had they been called.  Their absence should not affect your judgment in any way.

You should remember my instruction, however, that the law does not impose on the defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

Adapted from Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 6-7.

**A-140**

**REQUEST NO. 32**

**Particular Investigative Techniques Not Required**

**[If Applicable]**

You have heard reference, in the arguments of defense counsel in this case, to the fact that certain investigative techniques were not used by the Government.  There is no legal requirement, however, that the Government prove its case through any particular means.  While you are to carefully consider the evidence adduced by the Government, you are not to speculate as to why they used the techniques they did or why they did not use other techniques.  The Government is not on trial.  Law enforcement techniques are not your concern.

Your concern is to determine whether or not, on the evidence or lack of evidence, the defendant's guilt has been proved beyond a reasonable doubt.

Adapted from Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 4-4.

57

**REQUEST NO. 33**

**Persons Not on Trial**

You may not draw any inference, favorable or unfavorable, towards the Government or the defendant on trial from the fact that any person in addition to the defendant is not on trial here.  You also may not speculate as to the reasons why other persons are not on trial.  Those matters are wholly outside your concern and have no bearing on your function as jurors.

**A-142**

**REQUEST NO. 34**

**Preparation of Witnesses**

You have heard evidence during the trial that witnesses have discussed the facts of the case and their testimony with the lawyers before the witnesses appeared in court.

Although you may consider that fact when you are evaluating a witness's credibility, I should tell you that there is nothing either unusual or improper about a witness meeting with lawyers before testifying so that the witness can be aware of the subjects he or she will be questioned about, focus on those subjects and have the opportunity to review relevant exhibits before being questioned about them.  Such consultation helps conserve your time and the Court's time.  In fact, it would be unusual for a lawyer to call a witness without such consultation.

Again, the weight you give to the fact or the nature of the witness's preparation for his or her testimony and what inferences you draw from such preparation are matters completely within your discretion.

**A-143**

**REQUEST NO. 35**

**Charts and Summaries – Not Admitted As Evidence**

**[If Applicable]**

There have been a number of summary charts and exhibits that were shown to you but not admitted into evidence.  At the time they were shown to you, I have noted this fact to you.  For these charts and exhibits that were not admitted into evidence, they serve merely as summaries and analyses of testimony and documents in the case and are here to act as visual aids for you.  It is the underlying evidence and the weight which you attribute to it that gives value and significance to these charts.  To the extent that the charts conform to what you determine the underlying facts to be, you should accept them.  To the extent that the charts differ from what you determine the underlying evidence to be, you may reject them.

Adapted from Sand, et al., Modern Federal Jury Instructions, Instr. 5-13.

60

**A-144**

**REQUEST NO. 36**

**Charts and Summaries – Admitted as Evidence**

**[If Applicable]**

Now, some of the exhibits that were admitted into evidence were in the form of charts

and summaries.  For these charts and summaries that were admitted into evidence, you should

consider them as you would any other evidence.

> Sand, et al., <u>Modern Federal Jury Instructions</u>, Instr. 5-12;
> <u>see also</u> Fed. R. Evid. 1006.

61

**REQUEST NO. 37**

**Use of Audio Recordings and Transcripts**

Audio recordings have been admitted into evidence in this case.  This evidence was lawfully obtained, and properly admitted in this case.  Whether you approve or disapprove of the recording of these conversations may not enter your deliberations.  I instruct you that these recordings were made in a lawful manner and that no one's rights were violated, and that the Government's use of this evidence is entirely lawful.

You must, therefore, regardless of any personal opinions, give this evidence full consideration along with all the other evidence in the case in determining whether the Government has proved beyond a reasonable doubt the guilt of the defendant.

To help your listening, transcripts have also been prepared.  However, the transcripts were not admitted into evidence; only the audio recordings were.  You are not to regard the transcripts as anything more than as an aid to you.  It is what you hear on the recordings that controls.  Nonetheless, if you wish to view the transcripts, they will be made available to you during your deliberations.

> Adapted from the charge of the Honorable Pierre N. Leval in United States v. Mucciante, 91 Cr. 403 (PNL) (S.D.N.Y. 1992); see also Sand, et al., Modern Federal Jury Instructions, Instr. 5-9, 5-10.

**A-146**

**REQUEST NO. 38**

**Stipulations**

In this case you have heard evidence in the form of stipulations.

You have heard evidence in the form of stipulations that contain facts that were agreed to

be true.  In such cases, you must accept those facts as true.

A stipulation of testimony is an agreement among the parties that, if called, a witness

would have given certain testimony.  You must accept as true the fact that the witness would

have given the testimony.  However, it is for you to determine the effect to be given that

testimony.

Adapted from Sand, et al., Modern Federal Jury
Instructions, Instr. 5-6 and 5-7.

**A-147**

**Conclusion**

Members of the jury, that about concludes my instructions to you.  You are about to go into the jury room to begin your deliberations.  If during those deliberations you want to see any of the exhibits, you may request to see them and we will either send them into the jury room or we will bring you back out to the courtroom to see them.  If you want any of the testimony read or any of the tapes played again, you may also request that.  Please remember that it is not always easy to locate what you might want, so be as specific as you possibly can in requesting exhibits or portions of the testimony.  If you want any further explanation of the law as I have explained it to you, you may also request that from the Court.  If there is any doubt or question about the meaning of any part of this charge, you should send me a note asking for clarification or for a further explanation.  Your requests for exhibits or testimony – in fact any communications with the Court – should be made to me in writing, signed by your foreperson, and given to one of the marshals.  In any event, do not tell me or anyone else how the jury stands on any issue until after a unanimous verdict is reached.

Many of you have taken notes periodically throughout this trial.  I want to emphasize to you, as you are about to begin your deliberations, that notes are simply an aid to memory.  Notes that any of you may have made may not be given any greater weight or influence in determination of the case than the recollections or impressions of other jurors, whether from notes or memory, with respect to the evidence presented or what conclusions, if any, should be drawn from such evidence.  Any difference between a juror's recollections and another juror's notes should be settled by asking to have the court reporter read back the transcript, for it is the court record rather than any juror's notes upon which the jury must base its determination of the facts and its verdict.

Your verdict must be based solely upon the evidence developed at trial or the lack of evidence.  It would be improper for you to consider, in reaching your decision as to whether the Government sustained its burden of proof, any personal feelings you may have about any defendant's race, religion, national origin, sex, or age.  The parties in this case are entitled to a trial free from prejudice and our judicial system cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

Your function now is to weigh the evidence in this case and to determine the guilt or innocence of the defendant with respect to each count of the Indictment.

You must base your verdict solely on the basis of the evidence and these instructions as to the law, and you are obliged on your oath as jurors to follow the law as I instruct you, whether you agree or disagree with the particular law in question.

The verdict must represent the considered judgment of each juror.  In order to return a verdict, it is necessary that each juror agree thereto.  Your verdict must be unanimous.  It is your duty, as jurors, however, to consult with one another, and to deliberate with a view to reaching an agreement, if you can possibly do so without violence to individual judgment.  Each of you must decide the case for him or herself, but do so only after an impartial discussion and consideration of all the evidence in the case with your fellow jurors.  In the course of your deliberations, do not hesitate to re-examine your own views, and change an opinion if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence, solely because of the opinion of your fellow jurors.

Remember at all times, you are not partisans.  You are judges – judges of the facts.  Your sole interest is to seek the truth from the evidence in the case.

**A-149**

You should by your own vote select one of you to sit as your foreperson.  The foreperson will send out any notes, and when the jury has reached a verdict, he or she will notify the marshal that the jury has reached a verdict, and when you come into open court, the foreperson will be asked to state what the verdict is.

We have prepared a verdict form for you to use in recording your decisions.  After you have reached a verdict, the foreperson should fill in the verdict sheet, sign and date it, and then give a note to the marshal outside your door stating that you have reached a verdict.  Do not specify what the verdict is in your note.  Instead, the foreperson should retain the verdict sheet, and hand it to us in open court when you are all called in.  If you are divided, do not report how the vote stands.

I will stress again that each of you must be in agreement with the verdict that is announced in court.  Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

In conclusion, Ladies and Gentlemen, I am sure that if you listen to the views of your

fellow jurors and if you apply your own common sense you will reach a fair verdict here.

Remember that your verdict must be rendered without fear, without favor, and without prejudice

or sympathy.

Dated: October 19, 2020
       New York, New York

                              Respectfully submitted,

                              AUDREY STRAUSS
                              Acting United States Attorney

              By:   _____/s/_____
                              Edward Imperatore/Scott Hartman/Daniel Tracer
                              Assistant United States Attorneys
                              Tel: (212) 637-2327/2357/2329

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------- x
UNITED STATES OF AMERICA                     :
                                             :
           – v. –                            :
                                             :   19 Cr. 850 (JSR)
PARKER H. PETIT and WILLIAM TAYLOR,          :
                                             :
                    Defendants.              :
------------------------------------------------------------- x
```

## DEFENDANTS' REQUESTS TO CHARGE

Pursuant to Federal Rule of Criminal Procedure 30(a), defendants Parker H. Petit and William C. Taylor respectfully request that the Court include the following instructions in its charge to the jury.

**TABLE OF CONTENTS**

I.   **General Instructions** ................................................................... **1**

REQUEST A.   Duty of the Court ...................................................... 1

REQUEST B.   Duty of the Jury ........................................................ 1

REQUEST C.   Duty of Impartiality .................................................. 3

REQUEST D.   Presumption of Innocence and Burden of Proof............. 4

REQUEST E.   Reasonable Doubt ..................................................... 4

REQUEST F.   Direct and Circumstantial Evidence ............................ 5

REQUEST G.   Witness Credibility ................................................... 6

     *1.   Cooperating Witnesses* .............................................. 7

     *2.   Immunized Witnesses* [if applicable] ........................... 8

     *3.   Character/Opinion Witnesses* [if applicable] ................. 9

REQUEST H.   Defendant's Right Not to Testify................................ 10

REQUEST I.   Multiple Defendants.................................................. 10

II.  **Substantive Instructions** ........................................................ **11**

REQUEST A.   Multiple Counts ...................................................... 11

REQUEST B.   Count Two:  Securities Fraud Elements ...................... 11

REQUEST C.   Count Two:  First Element (Fraudulent Act)................ 12

REQUEST D.   Count Two: Second Element (Knowledge, Intent, and Willfulness).............. 15

REQUEST E.   Count Two: Third Element (Interstate Commerce) ........ 16

REQUEST F.   Count One: Conspiracy Elements................................ 17

REQUEST G.   Count One:  First Objective of the Conspiracy (Securities Fraud)................ 20

REQUEST H.   Count One: Second Objective of Conspiracy (False SEC Statements)........... 21

REQUEST I.   Count One: Third Objective of Conspiracy (Improperly Influencing Audits)........ 22

REQUEST J.   Consider Only The Charges........................................ 23

REQUEST K.   Good Faith ............................................................. 24

REQUEST L.   Sales Practices........................................................ 26

REQUEST M.   Generally Accepted Accounting Principles ................... 26

REQUEST N.   Venue .................................................................... 28

III. **Concluding Instructions** ....................................................... **30**

REQUEST A.   Selection of Foreperson; Right to See Exhibits and Hear Testimony; Communications with Court ....................................... **30**

i

REQUEST B.   Verdict; Need for Unanimity; Duty to Consult**................................................ 31**

I.      **GENERAL INSTRUCTIONS[1]**

### REQUEST A. DUTY OF THE COURT

We are now approaching the most important part of this case, your deliberations.  You have heard all of the evidence in the case, as well as the final arguments of the lawyers for the parties.  Before you retire to deliberate, it is my duty to instruct you as to the law that will govern your deliberations.  These are the final and binding instructions, which entirely replace the preliminary instructions I gave you earlier.  As I told you at the start of this case, and as you agreed, it is your duty to accept my instructions of law and apply them to the facts as you determine them.

Regardless of any opinion that you may have as to what the law may be or ought to be, it is your sworn duty to follow the law as I give it to you.  Also, if any attorney or other person has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

Because my instructions cover many points, I have provided each of you with a copy of them not only so that you can follow them as I read them to you now, but also so that you can have them with you for reference throughout your deliberations.  In listening to them now and reviewing them later, you should not single out any particular instruction as alone stating the law, but you should instead consider my instructions as a whole.

### REQUEST B. DUTY OF THE JURY

Your duty is to decide the fact issues in the case and arrive, if you can, at a verdict.  You, the members of the jury, are the sole and exclusive judges of the facts.  You pass upon the weight

---

[1] Unless otherwise noted, all General Instructions are adapted from The Court's Instructions of Law to the Jury in *United States v. Lumiere*, No. 1:16-CR-483-JSR (S.D.N.Y. January 19, 2017), ECF No. 80 at 103–14; *United States v. Margulies*, 1:17-CR-638-JSR (S.D.N.Y. August 13, 2019), ECF No. 203 at 91–100; *United States v. Gupta,* No. 1:11-CR-907-JSR (S.D.N.Y. June 18, 2012), ECF No. 102 at 2–14.

of the evidence; you determine the credibility of the witnesses; you resolve such conflicts as there may be in the testimony; and you draw whatever reasonable inferences you decide to draw from the facts as you determine them.

In determining the facts, you must rely upon your own recollection of the evidence.  To aid your recollection, we will send you at the start of your deliberations all the exhibits received in evidence, plus an index to help you locate particular exhibits.  Finally, if you need to review particular items of testimony, we can arrange to provide them to you in transcript or read-back form.

Please remember, however, that none of what the lawyers have said in their opening statements, in their closing arguments, in their objections, or in their questions, is evidence.  Nor is anything I said during the trial evidence.  The evidence before you consists of just three things: the testimony given by witnesses that was received in evidence, the exhibits that were received in evidence, and the stipulations of the parties that were received in evidence.

Testimony consists of the answers that were given by the witnesses to the questions that were permitted.  Please remember that questions, although they may provide the context for answers, are not themselves evidence; only answers are evidence, and you should therefore disregard any question to which I sustained an objection.  Also, you may not consider any answer that I directed you to disregard or that I directed be stricken from the record.  Likewise, you may not consider anything you heard about the contents of any exhibit that was not received in evidence.

Furthermore, you should be careful not to speculate about matters not in evidence.  For example, there is no legal requirement that the government prove its case through a particular witness or particular kind of evidence, or by use of a particular law enforcement technique.  Nor

2

should you speculate about why one or another person whose name may have figured in the evidence is not part of this trial or what his or her situation may be.  Also, as I previously instructed you, you should continue to turn away from any media article or report about this case or about the people, companies, or issues referred to during this trial, and not be affected by any outside information from any source whatsoever.  In other words, your focus should be entirely on assessing the evidence that was presented here for your consideration, and on nothing else.

It is the duty of the attorney for each side of a case to object when the other side offers testimony or other evidence that the attorney believes is not properly admissible.  Counsel also have the right and duty to ask the Court to make rulings of law and to request conferences at the side bar out of the hearing of the jury.  You should not show any prejudice against any attorney or party because the attorney objected to the admissibility of evidence, asked for a conference out of the hearing of the jury, or asked me for a ruling on the law.

I also ask you to draw no inference from my rulings or from the fact that upon occasion I asked questions of certain witnesses.  My rulings were no more than applications of the law and my questions were only intended for clarification or to expedite matters.  You are expressly to understand that I have no opinion as to the verdict you should render in this case.

### REQUEST C. DUTY OF IMPARTIALITY

You are to perform your duty of finding the facts without bias or prejudice as to any party. You are to perform your final duty in an attitude of complete fairness and impartiality.  You are not to be swayed by rhetoric or emotional appeals.

The fact that the prosecution is brought in the name of the United States of America entitles the government to no greater consideration than that accorded any other party.  By the same token, it is entitled to no less consideration.  All parties, whether the government or individuals, stand as equals at the bar of justice.

3

Please also be aware that the question of possible punishment is the province of the judge, not the jury, and therefore it should not in any way enter into or influence your deliberations.  Your duty is to weigh the evidence and not be affected by extraneous considerations.

It must be clear to you that if you were to let bias, or prejudice, or fear, or sympathy, or any other irrelevant consideration interfere with your thinking, there would be a risk that you would not arrive at a true and just verdict.  So do not be guided by anything except clear thinking and calm analysis of the evidence.

### REQUEST D. PRESUMPTION OF INNOCENCE AND BURDEN OF PROOF

The defendants here, Parker (or Pete) Petit and William Taylor, are charged with the federal crimes about which I will instruct you shortly.  Please bear in mind, however, that the charges, or "counts" as they are called, are not themselves evidence of anything.

The defendants have pled not guilty.  To prevail against the defendants on a given charge, the government must prove each essential element of that charge beyond a reasonable doubt.  If the government succeeds in meeting its burden, your verdict should be guilty on that charge; if it fails, your verdict must be not guilty on that charge.  This burden never shifts to the defendants, for the simple reason that the law presumes a defendant to be innocent until proven guilty and never imposes upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence.

In other words, as to each charge, each defendant starts with a clean slate and is presumed innocent until such time, if ever, that you as a jury are satisfied that the government has proven that he is guilty of that charge beyond a reasonable doubt.

### REQUEST E. REASONABLE DOUBT

In order to convict a defendant of a given charge, the government is required to prove that charge beyond a reasonable doubt, so the question then is: what is a reasonable doubt?  The words

4

almost define themselves.  A reasonable doubt is a doubt based upon reason.  It is a doubt that a reasonable person has after carefully weighing all of the evidence.  It is a doubt that would cause a reasonable person to hesitate to act in a matter of importance in his or her personal life.  Proof beyond a reasonable doubt must, therefore, be proof of a convincing character that a reasonable person would not hesitate to rely upon in making an important decision.

A reasonable doubt is not caprice or whim.  It is not speculation or suspicion.  It is not an excuse to avoid the performance of an unpleasant duty.  The law does not require that the government prove guilt beyond all possible doubt: proof beyond a reasonable doubt is sufficient to convict.

If, after fair and impartial consideration of the evidence, you have a reasonable doubt as to the either of the defendants' guilt with respect to a particular charge against him, you must find the defendant not guilty of that charge.  On the other hand, if after fair and impartial consideration of all the evidence, you are satisfied beyond a reasonable doubt of a defendant's guilt with respect to a particular charge against him, you should not hesitate to find that defendant guilty of that charge.

### REQUEST F. DIRECT AND CIRCUMSTANTIAL EVIDENCE

In deciding whether or not the government has met its burden of proof, you may consider both direct evidence and circumstantial evidence.

Direct evidence is evidence that proves a disputed fact directly.  For example, where a witness testifies to what he or she saw, heard or observed, that is called direct evidence.

Circumstantial evidence is evidence that tends to prove a disputed fact by proof of other facts.  To give a simple example, suppose that when you came into the courthouse today the sun was shining and it was a nice day, but the courtroom blinds were drawn and you could not look outside.  Then later, as you were sitting here, someone walked in with a dripping wet umbrella

5

and, soon after, somebody else walked in with a dripping wet raincoat.  Now, on our assumed

facts, you cannot look outside of the courtroom and you cannot see whether or not it is raining.  So

you have no direct evidence of that fact.  But, on the combination of the facts about the umbrella

and the raincoat, it would be reasonable for you to infer that it had begun raining.

That is all there is to circumstantial evidence.  Using your reason and experience, you infer

from established facts the existence or the nonexistence of some other fact.  Please note, however,

that it is not a matter of speculation or guess: it is a matter of logical inference.

The law makes no distinction between direct and circumstantial evidence.  Circumstantial

evidence is of no less value than direct evidence, and you may consider either or both, and may

give them such weight as you conclude is warranted.

### REQUEST G. WITNESS CREDIBILITY

It must be clear to you by now that counsel for the government and counsel for the

defendants are asking you to draw very different conclusions about various factual issues in the

case.  Deciding these issues will involve making judgments about the testimony of the witnesses

you have listened to and observed.  In making these judgments, you should carefully scrutinize all

of the testimony of each witness, the circumstances under which each witness testified, and any

other matter in evidence that may help you to decide the truth and the importance of each witness's

testimony.

Your decision whether or not to believe a witness may depend on how that witness

impressed you.  How did the witness appear?  Was the witness candid, frank, and forthright; or,

did the witness seem to be evasive or suspect in some way?  How did the way the witness testified

on direct examination compare with how the witness testified on cross-examination?  Was the

witness consistent, or contradictory?  Did the witness appear to know what he or she was talking

about?  Did the witness strike you as someone who was trying to report his or her knowledge

accurately?   These are examples of the kinds of common sense questions you should ask yourselves in deciding whether a witness is, or is not, truthful.

How much you choose to believe a witness may also be influenced by the witness's bias. Does the witness have a relationship with the government or the defendant that may affect how he or she testified?  Does the witness have some incentive, loyalty, or motive that might cause him or her to shade the truth?  Does the witness have some bias, prejudice, or hostility that may cause the witness to give you something other than a completely accurate account of the facts he or she testified to?

Please bear in mind, however, that the fact that certain witnesses met with the government in preparation for their testimony, while declining to meet with the defense, is not necessarily evidence of any bias.  While any witness can be subpoenaed to testify by either side, no witness is required to meet with either side in advance of testifying.  Also, it is routine for a witness to meet with counsel for the party that is calling that witness in advance.  Nonetheless, you may, if you wish, consider any and all circumstances of a witness's preparation as bearing on bias, or not, as you choose.

### 1.    *Cooperating Witnesses*

You have heard testimony from witnesses—[___] and [___]—who have entered into agreements to cooperate with the government in the hope of obtaining benefits, or have immunity from prosecution.   You may not draw any conclusions or inferences about the guilt of the defendants from the fact that a cooperating witness admitted guilt to crimes that may be similar or related to the crimes charged against the defendants, as a witness's decision to admit guilt was a personal decision about his own guilt and not anyone else's.  The law does not permit a defendant to be found guilty simply based on his association with some guilty party.

**A-161**

In all other respects, however, the law permits the use of testimony from such witnesses. Indeed, such testimony, if found truthful by you, may be sufficient in itself to warrant conviction if it convinces you of a defendant's guilt beyond a reasonable doubt. However, the law requires that the testimony and motives of cooperating witnesses be scrutinized with particular care and caution. After carefully scrutinizing the testimony of a cooperating witness and taking account of its special features, you may give it as little or as much weight as you deem appropriate.

### 2.   *Immunized Witnesses*[2] [if applicable]

You have heard the testimony of [a witness/witnesses] who [has/have] testified under a grant of immunity from this court. What this means is that the testimony of the witness may not be used against him in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the immunity order of this court.

Although it is the Court that confers immunity upon a witness, it may only do so if the government makes a request for such immunity for a witness. The Court may not confer immunity on a person in response to a request from a defendant. The ability to give immunity to one witness but not another is a potentially powerful tool for a prosecutor, particularly in light of the prosecutor's ability to create incentives for witnesses to invoke the privilege against self-incrimination.

It is the law in the federal courts that such testimony may be enough, standing alone, for conviction if the jury finds that the testimony establishes guilt beyond a reasonable doubt. However, the testimony of a witness who has been granted immunity should be examined by you with greater care than the testimony of an ordinary witness. You should scrutinize it closely to determine whether it is colored in such a way as to place guilt on the defendant you are considering

---

[2] Adapted from *United States v. Ebbers*, 458 F.3d 110, 118–19 (2d Cir. 2006).

8

in order to further the witness' own interests; because such a witness, confronted with the realization that he can win his own freedom by helping to convict another, has a motive to falsify his testimony.  If you believe the testimony to be true, and determine to accept the testimony, you may give it such weight, if any, as you believe it deserves.

       *3.     Character/Opinion Witnesses[3]* [if applicable]

The defendant has called several witnesses who, although having no personal knowledge of the transactions at issue in this case, gave their opinions of the defendant's general character. This testimony is not to be taken by you as the witnesses' opinion as to whether the defendant is guilty or not guilty of the crimes charged; but you may consider this character evidence, together with all the other facts and all the other evidence in the case, and give it such weight as you deem appropriate.

Accordingly, if, after considering the evidence including testimony about the defendant's character, you find that a reasonable doubt has been created, you must acquit the defendant of the charges.

                        ***

Going back to witnesses generally, you should also consider whether a witness had an opportunity to observe the facts he testified about.  Also, as to all witnesses, you should consider whether the witness's recollection of the facts stands up in light of the other evidence in the case.

In other words, what you must try to do in deciding credibility is to size up a person just as you would in any important matter where you are trying to decide if a person is truthful, straightforward, and accurate in his or her recollection.

---

[3] Adapted from *Gupta,* No. 1:11-CR-907-JSR, ECF No. 102 at 11–12, and 1 Sand et al., *supra*, ¶ 5.06, Instr. 5-14.

### REQUEST H. DEFENDANT'S RIGHT NOT TO TESTIFY

Under our Constitution, a defendant has no obligation to testify or to present any evidence, because it is the government's burden to prove a defendant guilty beyond a reasonable doubt. A defendant is never required to prove that he or she is innocent.

Therefore, you must not attach any significance to the fact that the defendant did not testify. No adverse inference against the defendant may be drawn by you because he did not take the witness stand, and you may not consider it against the defendant in any way in your deliberations in the jury room.

### REQUEST I. MULTIPLE DEFENDANTS[4]

There are two defendants on trial before you.  Each has been charged with the same crimes. You must return a separate verdict of guilty or not guilty for each defendant.

In reaching your verdict, bear in mind that guilt is personal and is individual. Your verdict must be based solely on the evidence about each defendant. The case against each defendant stands or falls upon the proof or lack of proof against that defendant alone and your verdict as to one defendant should not influence your decision as to the other defendant.

In addition, some of the evidence in this case was limited to one defendant.  Let me emphasize that any evidence admitted solely against one defendant may be considered only as against that defendant and may not in any respect enter into your deliberations on the other defendant.

---

[4]   Adapted from 1 Sand et al., *supra*, ¶ 3.01, Instr. 3-7.

II.       **SUBSTANTIVE INSTRUCTIONS**

**REQUEST A. MULTIPLE COUNTS**[5]

With these general instructions in mind, let us turn to the specific charges against Mr. Petit and Mr. Taylor.  These charges were originally set forth in what is called an indictment, which is simply a charging instrument and is not itself evidence, so it will not be presented to you.

The indictment in this case contains two counts, and each count charges a different crime. You must consider each count separately and return a separate verdict of guilty or not guilty for each.  Whether you find the defendant you are considering guilty or not guilty as to one offense should not affect your verdict as to any other offense charged.

I will, for convenience, refer to each count by the number assigned to it in the indictment, but there is no significance to the order of these numbers, and my instructions will follow a different order than the order in which the various counts appear in the indictment.

Specifically, we will first consider Count Two, which charges the defendants with securities fraud; then Count One, which charges the defendants with conspiracy to commit securities fraud, make false filings with the SEC, and improperly influence the conduct of audits.

**REQUEST B. COUNT TWO:  SECURITIES FRAUD ELEMENTS**[6]

I will start by instructing you on Count Two, which charges the defendants with securities fraud in connection with the sale or purchase of MiMedx stock.  Before a defendant can be convicted of securities fraud, the government must prove the following three elements beyond a reasonable doubt:

---

[5]   Adapted from The Court's Instructions of Law to the Jury in *Lumiere*, No. 1:16-CR-483-JSR, ECF No. 80 at 114-15; *United States v. Whitman*, No. 1:12-cr-125-JSR (S.D.N.Y. Aug. 17, 2012), ECF No. 102 at 14; *Gupta,* No. 1:11-CR-907-JSR, ECF No. 102 at 14.
[6]   Adapted from The Court's Instructions of Law to the Jury in *Lumiere*, No. 1:16-CR-483-JSR, ECF No. 80 at 119; 2 Sand, *supra*, ¶ 57.03, Instr. 57-18, 57-20.

***First***, that in connection with the purchase or sale of MiMedx stock the defendant 1) participated in the scheme or artifice to defraud, or 2) engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller, or 3) made an untrue or misleading statement of a material fact or omitted to state a material fact that made what was said, under the circumstances, misleading.[7]

***Second***, that the defendant acted willfully, knowingly, and with the intent to defraud.

***Third***, that the defendant knowingly used, or caused to be used, any means or instruments of transportation or interstate communication in interstate commerce or the use of the mails.

We will now discuss each of these elements in more detail.

### REQUEST C. COUNT TWO:  FIRST ELEMENT (FRAUDULENT ACT)[8]

The first element that the government must prove beyond a reasonable doubt is that, in connection with the purchase or sale of MiMedx stock, the defendant did any one of the following: 1) participated in the scheme or artifice to defraud, or 2) engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller, or 3) made an untrue or misleading statement of a material fact or omitted to state a material fact that made what was said, under the circumstances, misleading.  Any one will be sufficient to satisfy the first element, so long as you are unanimous as to which type of unlawful conduct you find to have been proven, and provided further that you find that the misconduct occurred in connection with the purchase or sale of a security, beyond a reasonable doubt.

I will now explain a number of the terms used in this provision.

---

[7] Indictment ¶ 68.
[8] Adapted from The Court's Instructions of Law to the Jury in *Lumiere*, No. 1:16-CR-483-JSR, ECF No. 80 at 115-16, 120-21; *United States v. Korchevsky*, 15-CR-381-RJD (E.D.N.Y. 2018), ECF No. 337 at 21-22; Jury Charge, *United States v. Block*, No. 1:16-cr-595-JPO (S.D.N.Y. June 29, 2017); 3 Sand et al., *supra*, ¶ 57.03, Instr. 57-21.

As to the first element, a "scheme to defraud" is a plan or design to obtain money or property by means of false or fraudulent pretenses, representations or promises. Fraudulent pretenses, representations or promises can take the form of outright lies, but they can also consist of misleading half-truths.

A statement, representation, claim, or document is false if it is untrue when made and was then known to be untrue by the person making it or causing it to be made. A representation or statement is fraudulent if it was made with the intention to deceive. The concealment of material facts in a manner that makes what is said or represented deliberately misleading may also be false or fraudulent statements under the statute. The failure to disclose information may also be a fraudulent representation if the defendants were under a legal, professional, or contractual duty to make such a disclosure; they actually knew they were required to make such disclosure; and they failed to make such disclosure with the intent to defraud. With regard to the misrepresentations and omissions that the government alleges, you must determine whether the statements were true or false when made, and, in the case of alleged omissions, whether the omissions were misleading.

However, the lies or misrepresentations must relate to a material fact, that is, information that a reasonably prudent investor would consider important in making an investment decision. Practically this means that if you find a particular statement of fact or omission to have been untruthful or misleading, before you can find that statement or omission to be material, you must also find that the statement or omission was one that would have mattered to a reasonable person in making such an investment decision.

The securities fraud statute does not prohibit misstatements that would be minor, trivial, obvious, or unimportant to a reasonable investor. The word "material" is used to distinguish the kinds of statements that are important enough that there is a substantial likelihood that a reasonable

investor would have found the truth significant in making an investment decision from those that would be of no real importance to that investor.  The government must prove beyond a reasonable doubt that the false statement was of such importance that it could reasonably be expected to cause or induce a reasonable investor to act or not act with respect to the transaction at issue.

The requirement that a defendant's alleged fraud or false statement be in connection with the purchase or sale of a security is satisfied if you find that the misconduct had some relation to or nexus with a securities transaction.  You need not find that the defendants personally participated in any securities transaction.[9]

It is no defense to an overall scheme to defraud that the defendants were not involved in the scheme from its inception, did not know all of the scheme's details or played only a minor role with no contact with the investors and purchasers of the securities in question.  Even if a defendant participated in the scheme to a lesser degree than others, he is equally guilty so long as that defendant became a member of the scheme to defraud with knowledge of its scope and purpose.

Similarly, the government need not prove that the defendants personally made any false statements or misrepresentations or that they omitted the material fact.  It is sufficient if the government establishes that the defendants caused the statement to be made or the fact to be omitted, and it was material.

It is not a defense to say that the misrepresentation or omission would not have deceived sophisticated investors.  Nor does it matter whether the alleged unlawful conduct was successful

---

[9] This paragraph omits the following language from 3 Sand et al., *supra*, ¶ 57.03, Instr. 57-21: "Fraudulent conduct may be 'in connection with' the purchase or sale of securities if you find that the alleged fraudulent conduct 'touched upon' a securities transaction."  The Second Circuit has explained that this formulation has caused "difficulty," was simply "a matter of literary style," and was synonymous with the phrase "in connection with," in any event.  *See Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 942 (2d Cir. 1984).

or not, or that the defendant profited or received any benefits as a result of the alleged scheme. Success is not an element of the crime charged. However, if you find that the defendant did profit from the alleged scheme, you may consider that in relation to the second element of intent, which I will discuss in a moment.

### REQUEST D. COUNT TWO: SECOND ELEMENT (KNOWLEDGE, INTENT, AND WILLFULNESS)[10]

The second element that the government must establish beyond a reasonable doubt is that the defendant participated in the scheme to defraud knowingly, willfully, and with intent to defraud.

To act "knowingly" means to act consciously and voluntarily, rather than by mistake or accident or mere inadvertence. This includes, among other things, a requirement that the defendant had knowledge that he was engaged in a fraudulent scheme. It is not enough if the defendant acted out of mere negligence, foolishness or mistake. The defendant must have had a conscious purpose to avoid learning the truth.

To act "willfully" means to act deliberately and purposely, with an intent to do something the law forbids; that is to say, with a bad purpose either to disobey or to disregard the law. To act with a specific "intent to defraud" goes further and requires that the defendant intended to deceive investors or potential investors.

Since an essential element of the crime charged is intent to defraud, it follows that a defendant's good faith is a complete defense to a charge of securities fraud and the conspiracy charge I will describe to you later. This includes good faith reliance on the advice of accountants. If a defendant believed in good faith that he was acting properly, even if he was mistaken in that

---

[10] Adapted from The Court's Instructions of Law to the Jury in *Lumiere*, No. 1:16-CR-483-JSR, ECF No. 80 at 115-16, 117-18, 121; 3 Sand et al., *supra*, ¶ 57.03, Instr. 57-24.

belief, and even if others were injured by his conduct, there would be no crime.  A defendant, moreover, has no burden to establish a defense of good faith.  The burden is on the government to prove criminal intent and lack of good faith beyond a reasonable doubt.  I will instruct you further on good faith shortly.

To conclude on this element, if you find that a defendant was not a knowing participant in the alleged scheme or lacked the intent to deceive, you must acquit that defendant.  On the other hand, if you find that the government has established beyond a reasonable doubt not only the first element, namely, the existence of a scheme to defraud, but also this second element, that a defendant was a knowing participant and acted with intent to defraud, then you must consider whether the government has established the third element, on which I will instruct you now.

### REQUEST E. COUNT TWO: THIRD ELEMENT (INTERSTATE COMMERCE)[11]

With respect to the third element of securities fraud, the government must prove beyond a reasonable doubt that the defendant knowingly used, or caused to be used, at least one instrumentality of interstate commerce, such as an interstate telephone call or a use of the mails or use of a facility of the National Securities Exchange in furtherance of the scheme to defraud or the fraudulent conduct.

It is not necessary that the communication itself contain a fraudulent representation. Moreover, the use of the mails need not be central to the execution of the scheme and may even be incidental to it, as long as the communications have some relation to the object of the scheme. Also, it is not necessary for a given defendant to be directly or personally involved in sending the communication, as long as the communication was reasonably foreseeable in the execution of the scheme to defraud.

---

[11] Adapted from The Court's Instructions of Law to the Jury in *Lumiere*, No. 1:16-CR-483-JSR, ECF No. 80 at 122; 3 Sand et al., *supra*, ¶ 57.03, Instr. 57-25.

The government need not prove every use of an instrumentality of interstate commerce alleged in the indictment.  You must, however, be unanimous as to at least one.

### REQUEST F. COUNT ONE: CONSPIRACY ELEMENTS[12]

Let us now turn to Count One of the indictment, which alleges that between 2015 and 2016, Mr. Petit, Mr. Taylor and others willfully and knowingly conspired to commit three offenses, specifically:  1) securities fraud; 2) making false and misleading statements of material facts in documents required to be filed with the SEC under federal law and regulations; and 3) improperly influencing the conduct of audits.[13]

In order for the government to sustain its burden of proof with respect to conspiracy, it must prove beyond a reasonable doubt each of the following three elements: first, that such a conspiracy existed; second, that each defendant knowingly and willfully joined and participated in the conspiracy; and third, that at least one of the co-conspirators committed an overt act in furtherance of the conspiracy.

With respect to the ***first element***, a "conspiracy" is an agreement or an understanding, explicit or implicit, of two or more persons to accomplish by concerted action one or more unlawful purposes.  In this case, the unlawful purposes alleged to be the objects of the conspiracy are securities fraud, making false and misleading statements of material facts in documents required to be filed with the SEC, and improperly influencing the conduct of audits.  The conspiracy alleged here is, therefore, an agreement to commit any one of these three objectives.  You need not find beyond a reasonable doubt that the defendants conspired to achieve all three

---

[12] Adapted from The Court's Instructions of Law to the Jury in *Lumiere*, No. 1:16-CR-483-JSR, ECF No. 80 at 123-28; 1 Sand et al., *supra*, Instr. ¶ 19.01, 19-3S (adapted from the charge of Judge Rakoff in *United States v. Rodin*, No. 1:03-cr-1499-JSR (S.D.N.Y. July 15, 2005)); *Gupta,* No. 1:11-CR-907-JSR, ECF No. 102 at 20-22.
[13] Indictment §§ 62–65.

objectives, but you must nonetheless unanimously agree on which specific objective or objectives the conspirators agreed to accomplish.

Please bear in mind that conspiracy is an entirely distinct and separate offense from securities fraud.  The actual commission of the object of a conspiracy is not an essential element of the crime of conspiracy.  Rather, the government is required to prove beyond a reasonable doubt only that two or more persons, in some way or manner, explicitly or implicitly, came to an understanding to accomplish the unlawful objectives I just described.

Further, while it is charged in the indictment that the alleged conspiracy began in 2015 and continued through 2016, it is not necessary for the government to prove that the conspiracy started and ended on those specific dates, or that it existed throughout that period.  Rather, it is sufficient to satisfy the first element that you find that a conspiracy was formed, and that it existed for any time within the charged period.

If you conclude that the government has proved beyond a reasonable doubt that the charged conspiracy existed, you must then consider the ***second element***, which is that the defendant knowingly and willfully joined and participated in the conspiracy.  To prove the second element, the government must prove beyond a reasonable doubt that the defendant entered into a conspiracy and did so "knowingly" and "willfully."

To act "knowingly" means to act consciously and deliberately rather than mistakenly or inadvertently, and to act "willfully" means to act voluntarily, purposely and with an intent to defraud.  Thus, a defendant enters into a conspiracy "knowingly and willfully" if he joins the conspiracy deliberately, purposefully and with an intent to defraud, rather than in good faith.  If you find beyond a reasonable doubt that a defendant joined in a conspiracy, and did so knowingly and willfully, then this second element is satisfied.

18

It is not necessary, however, that a defendant be fully informed of all the details of the conspiracy, in order to justify an inference of participation on his part.  Nor does a given defendant need to know the full extent of the conspiracy or all of its participants.

It is not necessary that a defendant receive any monetary benefit from participating in the conspiracy.  All that is necessary is proof beyond a reasonable doubt that a defendant knowingly and willfully joined in the conspiracy for purposes of furthering one or both of its unlawful objects.

A defendant also need not have joined the conspiracy at the outset.  A defendant may have joined it at any time in its progress, and he will still be held responsible for what was done before joined, as well as what was done during his participation in the conspiracy.  The law does not require that each conspirator have an equal role in the conspiracy.  Even a single act may be sufficient to draw a defendant within the ambit of the conspiracy, if it meets the essential requirements I have described.

However, I want to caution that a defendant's mere association with another person does not make the defendant a member of the conspiracy even if the defendant knows that the other person is taking part in the conspiracy.  In other words, knowledge without participation is not enough.  What is necessary is that a defendant participated in the conspiracy with knowledge of its unlawful purpose and with intent to aid in the accomplishment of its unlawful purpose.

Finally, with respect to the ***third element***, the government must show beyond a reasonable doubt that at least one of the co-conspirators perform at least one overt act in furtherance of the conspiracy.  An overt act in furtherance of the conspiracy may be any act of any kind taken toward effectuating the conspiracy in any respect.  Thus, for example, if two persons conspire to commit a fraud and one of them makes a telephone call to get the fraud going, the overt act requirement is

met even if the fraud is never otherwise carried out.[14]  Although the government need not prove

every overt act alleged in the indictment, you must unanimously agree on which specific act or

acts the government has proved beyond a reasonable doubt.

As I have mentioned, the government alleged three different objectives of the conspiracy,

each of which is a crime defined under federal law.  I will now explain the elements of each of

these alleged objectives of the conspiracy to you.  I will remind you that conspiracy is an entirely

distinct and separate offense from the underlying substantive offenses, and the actual commission

of the objective of the conspiracy is not an essential element of the crime of conspiracy.  Rather,

you must find beyond a reasonable doubt that the conspirators agreed to undertake a course of

conduct that meets all of the essential elements of the underlying substantive offense.

**REQUEST G. COUNT ONE:  FIRST OBJECTIVE OF THE CONSPIRACY
(SECURITIES FRAUD)[15]**

The first alleged objective of the conspiracy is to commit securities fraud.  I have already

instructed you on the substantive crime of securities fraud.  The securities fraud that is alleged to

be the objective of the conspiracy is the scheme to mislead MiMedx investors by reporting inflated

revenue that is alleged in Count Two of the indictment.

To prove that this was an objective of the conspiracy, the government must prove beyond

a reasonable doubt that the purpose of the conspiracy was to commit securities fraud, and that the

defendants knowingly and willfully joined that conspiracy.  Again, with respect to this conspiracy

count, as with all conspiracy counts, the government need not prove that the object offense or

offenses were committed, but only that the defendant conspired to commit the offense.

---

[14] The example in this sentence is taken from The Court's Instructions of Law to the Jury in *United States v. Pinto-Thomaz*, 1:18-CR-579-JSR (S.D.N.Y. April 26, 2019), ECF No. 139 at 23.
[15]  Adapted from The Court's Instructions of Law to the Jury in *Gupta*, No. 1:11-cr-907-JSR, ECF No. 102 at 20.

### REQUEST H. COUNT ONE: SECOND OBJECTIVE OF CONSPIRACY (FALSE SEC STATEMENTS)[16]

The second alleged objective of conspiracy is making, or causing to be made, false statements in reports and documents required to be filed with the SEC.  To prove that this was an objective of the conspiracy, the government must prove beyond a reasonable doubt that the defendants undertook a scheme that meets or would meet the following five elements of the offense:

*First*, that MiMedx was required by the Securities Exchange Act of 1934 to file the documents charged in this count of the indictment with the SEC.  The SEC requires public companies to file quarterly reports, or Form 10-Qs, for each of the first three quarters of every fiscal year and an annual report, or Form 10-K, for the entire fiscal year. The SEC also requires public companies to file a current report on Form 8-K for, among other reasons, public announcements or releases that disclose material non-public information regarding the company's results of operations or financial condition for a completed quarterly or annual fiscal year period. If you find that shares of MiMedx were publicly traded, then MiMedx was required to file annual, quarterly, and periodic reports with the SEC.

*Second*, that the particular document or documents alleged in the indictment contained a false or misleading statement of fact.  A statement is "false" if it was untrue when made, and known at the time to be untrue by the person making it or causing it to be made.  A statement is misleading if it is either an untrue statement as to a material fact or if it omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

---

[16]  Adapted from Jury Charge in *Block*, No. 1:16-cr-595-JPO (Tr. 2509–11); *Amanat*, No. 1:15-cr-536-PGG, ECF No. 847 at 63–65.

*Third*, it is not enough that the statement was false or misleading, you must also find that the defendant acted knowingly, willfully, and with intent to deceive.  I have already defined these terms for you, and the same definitions apply here.

*Fourth*, that the false or misleading statement of fact was material, meaning it would have been important to a reasonable investor in relying upon the statement in making an investment decision.

*Fifth*, that the defendant made or caused to be made that false or misleading statement of material fact.  In this regard, each defendant need not have physically made or caused to be made the alleged false or misleading statement.  It is sufficient to establish this element of the offense if the government proves beyond a reasonable doubt that Mr. Petit and Mr. Taylor agreed that they or a co-conspirator would cause that false or misleading statement of material fact to be made in the SEC report at issue.

As I have instructed you previously, good faith on the part of a defendant is a complete defense to a charge of conspiracy based on filing false statements with the SEC.  The burden is on the government to prove fraudulent intent and consequent lack of good faith beyond a reasonable doubt.

### REQUEST I. COUNT ONE: THIRD OBJECTIVE OF CONSPIRACY (IMPROPERLY INFLUENCING AUDITS)[17]

The third alleged objective of the conspiracy was to take actions to fraudulently influence, coerce, manipulate, and mislead independent public and certified accountants engaged in the performance of audits of MiMedx's financial statements.[18]  To prove that this was an objective of

---

[17] Adapted from Jury Instructions in *Amanat*, No. 1:15-cr-536-PGG, ECF No. 847 at 65–66.
[18] Indictment ¶ 65.

the conspiracy, the government must prove beyond a reasonable doubt that the defendant undertook a scheme that meets or would meet the following three elements of the offense:

*First*, that one of the conspirators was a director or officer of a corporation whose securities are publicly traded.

*Second*, that one of the co-conspirators made or caused to be made a materially false or misleading statement to an auditor in connection with an audit or an examination of MiMedx's financial statements or the preparation of any document or report required to be filed with the SEC. My previous instructions regarding falsity and materiality apply here, except that you should consider whether the false or misleading statement would have been material to a reasonable auditor.[19]

*Third*, that the defendant acted willfully.  I have already defined "willfully" for you, and the same definition applies here.

My instructions regarding good faith, which I will turn in a few moments, also apply here.

### REQUEST J. CONSIDER ONLY THE CHARGES[20]

The defendant is not charged with committing any crime other than the offenses in the indictment. You have heard evidence of other acts allegedly committed by the defendant. When that evidence was introduced, I instructed you that it was to be considered by you solely for a limited purpose.  I will explain that limited purpose again in a moment.  But I want to emphasize to you now that you are not to consider that evidence for any other purpose and you are only to return a verdict as to the charges contained in the indictment.

---

[19] *See SEC v. Straub*, 921 F. Supp. 2d 244, 268 (S.D.N.Y. 2013) (Sullivan, J.) (adopting "reasonable auditor" standard).
[20] Adapted from 1 Sand et al., *supra*, ¶ 3.01, Instr. 3-3; ¶ 5.10, Instr. 5-25, 5-26.

23

Let me remind you that the defendant you are considering is not on trial for committing any act not alleged in the indictment.  Accordingly, you may not consider evidence of a similar act as a substitute for proof that the defendant you are considering committed the crime charged.  Nor may you consider this evidence as proof that the defendant you are considering has a criminal personality or bad character.  Evidence of the other, similar act was admitted for a much more limited purpose, and you may consider it only for that limited purpose.

If you determine that the defendant you are considering committed the acts charged in the indictment and the similar acts as well, then you may, but you need not draw an inference that in doing the acts charged in the indictment, the defendant you are considering acted knowingly and intentionally and not because of some mistake, accident or other innocent reasons, or that the crimes charged in the indictment were part of a common scheme or plan with the uncharged acts.

Evidence of similar acts may not be considered by you for any other purpose.  Specifically, you may not use this evidence to conclude that because the defendant you are considering committed the other act he must also have committed the acts charged in the indictment.

### REQUEST K. GOOD FAITH[21]

In considering the charges alleged in this case, you must consider whether the defendant acted in good faith.  As I mentioned earlier, good faith is a complete defense to the charges in this case.

Count One charges each defendant with securities fraud.  Good faith on the part of a defendant is a complete and absolute defense to this charge because it would be inconsistent with acting knowingly and with the intent to defraud.  If a defendant believed in good faith that he was

---

[21] Adapted from the Jury Charge in *Block*, No. 1:16-cr-595-JPO (S.D.N.Y. June 29, 2017) (Tr. 2536–37); *see also Lumiere*, No. 1:16-CR-483-JSR, ECF No. 80 at 118; The Court's Instructions of Law to the Jury, *United States v. Adelson*, 2:05-CR-325-JSR (Feb. 21, 2006), Docket No. 67 at 23; 1 Sand et al., *supra*, ¶ 8.01, Instr. 8-1.

acting properly, even if he was mistaken in that belief, and even if others were injured by his conduct, there would be no crime.

Count Two charges each defendant with entering into a conspiracy knowing the conspiracy's objective was to commit an offense against the United States. Good faith on the part of a defendant is a complete and absolute defense to this count as well because it is simply inconsistent with an unlawful intent to join a conspiracy. If a defendant believed in good faith that he was acting properly, even if he was mistaken in that belief, and even if others were injured by his conduct, there would be no crime.

An honest mistake of judgment or negligence is not unlawful intent, and a defendant who acts on such a basis can still be acting in good faith. A defendant who believes in good faith that his actions comply with the law cannot be found guilty of the crimes charged in this case. A statement made with good faith belief in its accuracy does not amount to a false statement and is not a crime. This is so even if the statement is, in fact, erroneous. Similarly, simple incompetence or corporate mismanagement is not a crime.[22] Therefore, if you find that a defendant believed he was acting in accordance with the law, he cannot be found to have acted with the required intent, and you must find him not guilty.

The burden of establishing criminal intent and lack of good faith rests upon the government. The defendants are under no burden to prove their good faith. Rather, the government must prove knowledge, criminal intent, and a lack of good faith on the part of the defendant beyond a reasonable doubt. If the evidence leaves you with a reasonable doubt as to whether a defendant acted in good faith, then you must find that defendant not guilty.

---

[22] *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477, 479 (1977).

### REQUEST L. SALES PRACTICES

You have heard evidence that MiMedx employees, including Mr. Petit and Mr. Taylor, engaged in certain sales tactics or efforts at the ends of fiscal quarters to close sales and meet the company's quarterly revenue guidance.  You heard evidence that such sales practices included offering discounts or incentives to customers, or offering customers the ability to return or exchange products.  Offering such incentives to meet sales or earnings goals is a common business practice and is not illegal.[23]

### REQUEST M. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES[24]

You have heard references during the trial to generally accepted accounting principles, commonly known by the acronym "GAAP."  Specifically, the government has argued that Mr. Petit and Mr. Taylor knowingly, willfully, and with intent to defraud recognized revenue from sales to distributors in violation of the following GAAP sources: 1) SEC Staff Accounting Bulletin

---

[23] *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004) ("[O]ffering incentives to meet goals, aggressive or not, is not suspect when . . . 'real products [were] shipped to real customers who then paid with real money.' . . . Offering incentives to meet sales or earnings goals is a common practice, and, without additional allegations not present here, the allegation that the sales at issue were made pursuant to incentives to meet goals set by management is an insufficient basis on which to infer conscious misbehavior or recklessness."); *United States v. Goyal*, 629 F.3d 912, 919 (9th Cir. 2010); *SEC v. Espuelas*, 698 F. Supp. 2d 415, 430 (S.D.N.Y. 2010).

[24] Adapted from the instruction that the Second Circuit approved in *United States v. Simon*, 425 F.2d 796, 805–06 (2d Cir. 1969) (Friendly, J.).  Although a GAAP violation is not an element of the offenses with which defendants have been charged, *see Rigas*, 490 F.3d 208, 222 (2d Cir. 2007), an instruction regarding the relevance of GAAP is appropriate and necessary in this case. Here, the government devotes several paragraphs of the indictment to alleging the relevant GAAP standards, MiMedx's public accounting policies modeled on those standards, and the defendants' purported knowledge of those standards.  Indictment ¶¶ 9–12.  Moreover, the indictment alleges that the recognition of revenue from the sales to Distributors-1 through -4 was fraudulent because defendants supposedly knew that such revenue could not be fully booked or book immediately under the relevant GAAP principles.  *See id.* ¶¶ 24–25, 33, 36, 38, 41, 47–48, 51, 54, 59.  An instruction on the relevance of GAAP to defendants' intent is therefore appropriate and would assist the jury in evaluating the defendants' good faith.  *See Rigas*, 490 F.3d at 220; *Ebbers*, 458 F.3d 110, 125 (2d Cir. 2006); *Simon*, 425 F.2d at 805–06.

**A-180**

No. 104, specifically Topic 13, Revenue Recognition, and 2) Accounting Standards Codification, Subtopic 605-15-25-1.

I will first describe GAAP to you. GAAP includes the conventions, rules, and procedures that define approved accounting practices at a particular time.[25] Bear in mind that financial accounting is not a science, and often requires judgment and estimation. These principles change over time and, even at any one point, may be indeterminate. There are multiple sources of GAAP, which may present conflicting treatments of particular accounting questions that must be resolved by consulting a hierarchy of GAAP sources.[26] Thus, accountants long have recognized that GAAP is far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. GAAP, rather, includes a range of "reasonable" treatments, leaving the choice among alternatives to management.[27]

GAAP neither establishes nor shields guilt in a securities fraud case.[28] Thus, even if you find that a defendant violated or caused others to violate GAAP, that fact alone will not establish a violation of the criminal law.[29] You may consider GAAP in determining whether a defendant acted in good faith, because a good-faith attempt to comply with GAAP, or good-faith reliance on an accountant's advice regarding GAAP, may negate the existence of an intent to deceive.[30]

---

[25] *Generally Accepted Accounting Principles*, Black's Law Dictionary (11th ed. 2019).

[26] *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100–01 (1995).

[27] *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979).

[28] *See United States v. Rigas*, 490 F.3d 208, 220 (2d Cir. 2007).

[29] Adapted from Jury Instructions 36, *United States v. Goyal*, No. 3:04-CR-201-MJJ (May 3, 2007), ECF No. 248 at 36.

[30] *See Rigas*, 490 F.3d at 220; *Ebbers*, 458 F.3d at 125; *see also Vista Outdoor Inc. v. Reeves Family Tr.*, 234 F. Supp. 3d 558, 566 n.5 (S.D.N.Y. 2017) (Rakoff, J.) ("To be sure, GAAP can be probative of whether a defendant acted in 'good faith,' *i.e.*, without an intent to deceive in certain types of securities fraud actions."), *aff'd*, 725 F. App'x 17 (2d Cir. 2018).

Evidence regarding GAAP may be helpful but not necessarily conclusive evidence that a defendant acted in good faith, and that certain statements and representations were not materially false or misleading.[31]  The weight and credibility you give such evidence should depend, among other things, on the following considerations: 1) the authoritativeness of the GAAP standards that the parties have relied upon in this case; 2) the extent to which those standards contemplate, deal with, and apply to the circumstances you found to have existed here; 3) the weight you give to the expert opinion evidence, if any, offered by the parties.  As to that last consideration, you should consider the definiteness with which the experts testified, the reasons given for their opinions, and any other facts you find to bear on their credibility.

Remember that the determination of good faith is yours to make, and you are not required to accept any expert witness's evaluation of a defendant's good faith.[32]  Bear in mind also that the government is not required to present an accounting expert to negate the defendants' good faith, but may instead do so through other witnesses and evidence, so long as it establishes intent and the corresponding lack of good faith beyond a reasonable doubt.[33]

### REQUEST N. VENUE[34]

In addition to the foregoing elements of the offenses, the government must prove, for each offense, that venue is proper in the Southern District of New York.  The Southern District of New York is the judicial district that includes Manhattan and the Bronx, and several other counties not relevant here.

---

[31] *Simon*, 425 F.2d at 806.
[32] *Id.* at 805–06.
[33] *See Rigas*, 490 F.3d at 220–21; *Ebbers*, 458 F.3d at 125–26.
[34] Adapted from The Court's Instructions of Law to the Jury in *United States v. Pinto-Thomaz*, 1:18-CR-579-JSR (S.D.N.Y. April 26, 2019), ECF No. 139 at 23-24; *Margulies*, 1:17-CR-638-JSR, ECF No. 203 at 113; *Block*, No. 1:16-CR-595-JPO (S.D.N.Y. June 29, 2017).

**A-182**

Venue is proven if any act in furtherance of the crime you are considering occurred in the Southern District of New York, regardless of whether it was the act of the defendants or anyone else.  With respect to the conspiracy charge, that means the government must prove that one of the conspirators, not necessarily either of the defendants, but any of the parties involved in the conspiracy knowingly committed at least one overt act in the Southern District of New York in furtherance of the conspiracy during the life of a conspiracy.

Furthermore, on the issue of venue, and on this issue alone, the government can meet its burden by a preponderance of the evidence, that is, by showing that it is more likely than not that the act occurred in the Southern District of New York.

**A-183**

**III.      CONCLUDING INSTRUCTIONS[35]**

**REQUEST A. SELECTION OF FOREPERSON; RIGHT TO SEE EXHIBITS
AND HEAR TESTIMONY; COMMUNICATIONS WITH COURT**

You will shortly retire to the jury room to begin your deliberations.  As soon as you get to the jury room, please select one of your number as the foreperson, to preside over your deliberations and to serve as your spokesperson if you need to communicate with the Court.

You will be bringing with you into the jury room a copy of my instructions of law, and a verdict form.  Let me pause here and show you the verdict form.  It is this very simple, one-page document, and it asks you, as to each count, to either check the box "guilty" or "not guilty."  The counts go in the same order that they were in the instructions, which is different than the order of the indictment.  So we have, first, the securities fraud count and then the conspiracy count.

After you have reached a verdict, if you do, and have filled out the verdict form, your foreperson will sign it and date it, and it will then be sealed by your foreperson in this envelope marked "verdict."  And then it will be brought to me, and I will not open that envelope until you are all back here in the court room.  Then we will ask each one of you whether that is, in fact, your verdict.  The reason we go through all those technicalities is to make sure we have your verdict exactly as you decided.

In addition, we will send into the jury room all of the exhibits that were admitted into evidence.  This will include any audio and video recordings and a device to play them, as well as the transcripts of the recordings.  Please remember that the transcripts of the recordings are just an aid, and it is the recordings themselves that are in evidence.  If you want any of the testimony provided, that can also be done, either in transcript or read-back form.  But please remember that

---

[35] All Concluding Instructions are adapted from The Court's Instructions of Law to the Jury in *Lumiere*, No. 1:16-CR-483-JSR, ECF No. 80 at 128-31; *Gupta,* No. 1:11-CR-907-JSR, ECF No. 102 at 22-24.

30

**A-184**

it is not always easy to locate what you might want, so be as specific as you possibly can be in requesting portions of the testimony.

Any of your requests, in fact any communication with the Court, should be made to me in writing, signed by your foreperson, and given to the Marshal, who will be available outside the jury room throughout your deliberations. After consulting with counsel, I will respond to any question or request you have as promptly as possible, either in writing or by having you return to the courtroom so that I can speak with you in person.

### REQUEST B. VERDICT; NEED FOR UNANIMITY; DUTY TO CONSULT

You should not, however, tell me or anyone else how the jury stands on any issue until you have reached your verdict and recorded it on your verdict form. As I have already explained, the government, to prevail on a given charge against the defendants, must prove each essential element of that charge beyond a reasonable doubt. If the government carries this burden with respect to a defendant, you should find that defendant guilty of that charge. Otherwise, you must find that defendant not guilty of that charge.

Each of you must decide the case for yourself, after discussing the evidence in the case with your fellow jurors, and your verdict must be unanimous. In deliberating, bear in mind that while each juror is entitled to his or her opinion, each should exchange views with his or her fellow jurors. That is the very purpose of jury deliberation; to discuss and consider the evidence; to listen to the arguments of fellow jurors; to present your individual views; to consult with one another; and to reach a verdict based solely and wholly on the evidence.

If, after carefully considering all the evidence and the arguments of your fellow jurors, you entertain a conscientious view that differs from the others, you are not to yield your view simply because you are outnumbered. On the other hand, you should not hesitate to change an opinion which, after discussion with your fellow jurors, now appears to you erroneous.

31

In short, your verdict must reflect your individual views and must also be unanimous.  This completes my instructions of law.

Dated: October 19, 2020

Respectfully submitted,

/s/ Amanda N. Tuminelli
Eric B. Bruce
Jennifer B. Loeb
Altin H. Sila
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005
Telephone: (202) 777-4500
Email: Eric.Bruce@freshfields.com
Email: Jennifer.Loeb@freshfields.com
Email: Altin.Sila@freshfields.com

Matthew I. Menchel
Amanda N. Tuminelli
Kobre & Kim LLP
800 Third Avenue
6th Floor
New York, NY 10022
Telephone:  (212) 488-1200
Email: matthew.menchel@kobrekim.com
Email: amanda.tuminelli@kobrekim.com

*Attorneys for Parker H. Petit*

/s/ William D. Weinreb
William D. Weinreb
Michael T. Packard
Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Ave., Suite 520
Boston, MA 02199
Telephone:  (617) 712-7100
Email: billweinreb@quinnemanuel.com
Email: michaelpackard@quinnemanuel.com

William A. Burck
Daniel Koffmann
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Email: williamburck@quinnemanuel.com
Email: danielkoffmann@quinnemanuel.com

*Attorneys for William Taylor*

1

KANKPETC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          19 CR 850 (JSR)
                                         Telephone Conference
5   PARKER H. PETIT AND WILLIAM
    TAYLOR,
6
                 Defendants.
7
    ------------------------------x
8
                                         New York, N.Y.
9                                        October 23, 2020
                                         2:00 p.m.
10  Before:
                     HON. JED S. RAKOFF,
11
                                         District Judge
12
                          APPEARANCES
13
    AUDREY STRAUSS,
14       Acting United States Attorney for the
         Southern District of New York
15  SCOTT HARTMAN
    EDWARD IMPERATORE
16  DANIEL TRACER
         Assistant United States Attorneys
17
    FRESHFIELDS BRUCKHAUS DERINGER US LLP
18       Attorneys for Defendant Petit
    BY:  ERIC BRENDAN BRUCE
19       JENNIFER LOEB
         -AND-
20  KOBRE & KIM LLP
    BY:  MATTHEW I. MENCHEL
21       AMANDA TUMINELLI

22  QUINN EMANUEL URQUHART & SULLIVAN LLP
         Attorneys for Defendant Taylor
23  BY:  WILLIAM WEINREB
         DANIEL KOFFMANN
24       MICHAEL PACKARD
         KATHLEEN MARINI
25

**A-188**

KANKPETC

1      (The Court and all parties appearing telephonically)

2      THE COURT:  This is Judge Rakoff.

3      Could counsel please identify themselves.

4      MR. HARTMAN:  Good afternoon, your Honor.  Scott

5   Hartman, for the government.  And with me on the line for the

6   government are Edward Imperatore and Daniel Tracer from my

7   office.

8      MR. WEINREB:  Good afternoon, your Honor.  This is

9   William Weinreb, on behalf of Mr. Taylor.  And with me on the

10  line are William Burke, Daniel Koffmann, and Michael Packard.

11  Mr. Taylor is also on the line.

12      MR. BRUCE:  Good afternoon, your Honor.  This is Eric

13  Bruce, along with my colleagues, Jennifer Loeb, Matthew

14  Menchel, Amanda Tuminelli, on behalf of Mr. Petit, who is also

15  on the line.

16      THE COURT:  Thank you, all, for calling.

17      I was a little taken aback by the volume of motions

18  in limine filed in this case.  You should all recognize that

19  there's no right to a motion in limine.  They are a courtesy

20  provided by the Court in cases in order to help flag in advance

21  issues that might otherwise occupy sidebars or recesses, but as

22  you might anticipate, many questions of what will be allowed

23  and not allowed cannot be made -- many decisions on that cannot

24  be made until well into the trial because they may turn on how

25  things have developed, and trials, by their nature, don't

**A-189**

3

KANKPETC

1  always go according to plan.  Nevertheless, I will give you my

2  rulings on those that I think can be ruled on currently, but I

3  also want to note that all these rulings are subject to the

4  qualification that things could change.  The most obvious such

5  instance, which happens, in my experience, very frequently, is

6  that the Court, on a motion in limine, will exclude a certain

7  kind of evidence, and then the other side goes and opens the

8  door, and then I have no choice but to admit that evidence

9  because it's reasonably responsive to what the other side put

10  in.  And there's no way I can anticipate that in advance.  So

11  all these rulings I'm about to give come with that caveat.

12        The first motion in limine, the defendants move to

13  preclude the government from using certain terms that they

14  consider prejudicial, such as shell company, bribe, kickback,

15  and the like.

16        That motion is denied.  Those are everyday terms

17  familiar to most jurors.  They are not inflammatory.  They

18  describe misconduct, which is what the government is charging,

19  and if they can't be proven beyond a reasonable doubt, of

20  course, that will inure to the benefit of the defendants.  So

21  that motion is denied.

22        The second motion is that the defendants move to

23  preclude the government from introducing evidence of

24  Mr. Petit's wealth.  I think that this should be granted in

25  part and denied in part.  General statements about the wealth

KANKPETC

1    of any party, or any witness, for that matter, is usually

2    totally irrelevant and can be prejudicial.  However, the nature

3    and amount of the defendant's compensation from MiMedx is, as I

4    understand it, tied in part to the alleged motive and intent

5    that the defendants had for their alleged misconduct, and in

6    that context, it can be admitted.  So the best guidance I can

7    give you at this preliminary stage is a statement, let's say,

8    on opening statement by the government, if the opening

9    statement was, and Defendant X is a rich, rich man, that would

10   be totally improper, but if the statement was something of,

11   "And Defendant X had a financial motive to do what he did, and

12   here's what it was," that would be proper.

13           Third, the government moves to preclude the defendants

14   from introducing evidence relating to their age, health

15   conditions, family background, charitable giving, and military

16   service, or the like.  Once again, this motion is granted in

17   part and denied in part.  The jury is entitled to have some

18   basics about a party's background, although I caution the

19   defense that this cannot be introduced through hearsay, but if,

20   for example, the defendants took the stand, they could describe

21   their upbringing and things of that sort, that would be

22   perfectly proper.

23           Charitable giving is, I think, less relevant and more

24   likely to be misleading.  And military service beyond the fact

25   of military service would probably not be allowed, but, again,

**A-191**

5

KANKPETC

1    some of this will have to be decided on a question-by-question

2    basis; the most I can do now is give you that general overview.

3            With respect to the fourth motion, the government

4    moves to preclude the defense from introducing evidence

5    relating to punishment and the like.  The defense does not

6    object, and says they have no plans of introducing such

7    evidence.  So that motion is, depending how you like to look at

8    it, it's either moot or granted on consent.

9            Fifth, the government moves to preclude the defense

10   from introducing evidence about the healing effect of MiMedx's

11   product.  I don't really see that this is materially relevant

12   to any issue in this case.  It really doesn't go to good faith.

13   The allegation here is an accounting fraud, and if it was a

14   fraud just because you thought the product was good, that's no

15   defense; if there was no fraud, you don't need any evidence

16   that the product was good.  So that motion is essentially

17   granted.

18           The sixth motion is Mr. Taylor moves to preclude the

19   government from calling witnesses in MiMedx's accounting

20   department, the audit committee, and Cherry Bekaert, MiMedx's

21   outside auditing firm, seeks to preclude them from answering

22   questions about the accounting treatment of the sales at issue

23   in this case.  I think, as I understand it from the

24   government's response, the government primarily wants to ask,

25   if you had known X, or Y, or Z, would you have accounted for

**A-192**

6

KANKPETC

1   these transactions in the same way you did?  And that is

2   perfectly proper.  It goes to materiality, it goes to

3   concealment.  If we get into more technical accounting issues,

4   I may need to modify this if it begins to look like it's

5   constituting improper expert testimony, but, for now, the

6   motion is denied.

7          Seventh, Mr. Petit moves to preclude the government

8   from having accountants at Cherry Bekaert testify as fact

9   witnesses that the loan to SLR was a related-party transaction

10  that MiMedx was required to disclose in its public filings with

11  the SEC, and that representations from Petit to Cherry Bekaert

12  were false.  Although this was filed, as were several other

13  motions from the defense that we'll talk about later, a week

14  after the cutoff date for motions were due, allegedly because

15  the government had not earlier signaled that it would seek to

16  introduce such evidence in its case, which, I might add, is no

17  excuse whatsoever for filing something without permission of

18  the Court beyond the deadline set by the Court, but we'll talk

19  about all that later.

20         I think I cannot rule on this motion until the

21  question is put to the first accountant to whom it is put,

22  because I think it will turn on both how the question is

23  phrased, and what's been admitted up to then, and so forth.  I

24  could well conceive that question might not be asked or might

25  not be permitted on direct, but might be permitted on redirect,

**A-193**

7

KANKPETC

1    so this is a good example of one that I think is appropriate

2    for the Court to reserve on at this time.

3            Eighth, the defendants move to preclude the government

4    from introducing statements from certain unindicted

5    coconspirators unless and until the Court finds these

6    individuals qualify as coconspirators.  That used to be the

7    law.  It hasn't been law for about 30 years.  Statements of the

8    sort referenced here can come into evidence subject to

9    connection.  If the connection is not made, I will then

10   instruct the jury, in fairly specific detail, what they need to

11   exclude and not take into account, but the statements will come

12   in at the time proffered.

13           Ninth, the defense moves to preclude the government

14   from introducing evidence concerning parallel civil litigation

15   against defendants.  I'm dubious that this will be admitted,

16   but I can't rule finally on it.  The government says that they

17   believe this will be a basis to show motive, bias, et cetera,

18   but they also say they will only introduce such evidence on

19   cross-examination.  So when we get to cross-examination, if the

20   matter comes up, I'll rule on it then.

21           Tenth, the government seeks to exclude evidence that

22   after the reporting periods at issue in this case, some of the

23   four distributors ultimately paid all or part of their

24   outstanding debts to the company.  That is both irrelevant and

25   prejudicial, and that motion is granted.

KANKPETC

1          Eleventh, the government seeks to require the defense

2     to make an evidentiary proffer before offering a

3     reliance-on-accountant defense.  I think it's premature.  Let's

4     see if the defense does offer this.  If so, I may allow the

5     government to call rebuttal witnesses, but until unless it's

6     actually offered, I don't think I need to reach that issue.

7          Twelfth, similarly, the government seeks to require

8     the defense to make a factual proffer before introducing

9     evidence of interactions with lawyers to show the defendants

10    acted in good faith.  I'm skeptical that can be done without a

11    waiver of the attorney-client privilege, but, again, it's

12    premature at this point, so we'll deal with it when it is an

13    actuality, if it does become one.

14         Thirteenth, the government seeks to admit evidence of

15    Mr. Petit's prior involvement in a prior enforcement action by

16    the SEC concerning accounting improprieties at Healthdyne, Inc.

17    It's claimed that this is not only 404(b) evidence, but also

18    shows Mr. Petit's knowledge and understanding that certain

19    transactions could be used to conceal the kind of scheme that's

20    charged here in the indictment.  Normally, I would rule on this

21    motion after opening statements – let's see what the defense

22    says about their defense in this case — but assuming, as is so

23    often the case in white collar criminal cases, that the defense

24    is lack of intent, then, subject to further argument, I am at

25    least leaning towards allowing this in with, of course, an

KANKPETC

1    appropriate limiting instruction as to Mr. Taylor.

2              Fourteenth, Mr. Taylor moves to preclude the

3    government from introducing evidence relating to the 2016

4    revenue recognition memo absent a showing that Taylor had

5    knowledge reflected in the memo in 2015, when the contested

6    transactions occurred.  I think the premise of this motion,

7    that the memo postdates conduct charged in the indictment, is

8    wrong, and so that motion is denied.

9              Fifteenth, Mr. Petit moves to preclude a statement

10   concerning the nature and extent of his involvement in the SLR

11   loan made in the so-called white paper, which, as I understand

12   it, the government intends to introduce to try to show that he

13   misled the audit committee by lying to his own lawyers about

14   his involvement in the SLR loan.  I am inclined to think that

15   the probative value of this is more than outweighed by the

16   possibility of confusion and prejudice, and so I grant the

17   motion to exclude.

18             Sixteenth, the defendants move to preclude the

19   government from introducing evidence relating to the audit

20   committee's investigations and findings because they are

21   improper evidence, unduly prejudicial, and so forth.  The

22   government argues this motion is moot because it has agreed not

23   to introduce this evidence in its case in chief, but it

24   reserves the right to introduce the evidence during

25   cross-examination.

**A-196**

KANKPETC

1          So this was a classic case where it would be premature

2    for me to rule on it now.  If and when it comes up later in the

3    trial, I'll rule on it then.

4          Seventeenth, the defense moves to preclude the

5    government from introducing evidence regarding their respective

6    terminations from MiMedx in 2018.  The government says that it

7    had told defense counsel it would not introduce such evidence

8    in its case in chief provided the defense agreed not to

9    question any government witness regarding the separation of any

10   witness from the company following the audit committee report.

11         Again, as that proposed arrangement indicates, it's

12   really premature for me to rule on this now, though I am

13   leaning towards granting the defense motion, but I can't say

14   that for sure until we see how it all plays out.

15         Eighteenth, the defense moves to preclude the

16   government from introducing evidence related to MiMedx's

17   receipt of revenue in 2020.  The government argues this motion

18   is moot because it has agreed not to introduce the evidence in

19   its case in chief.

20         I am again leaning towards probably granting this

21   motion, obviously, but given the government's statement, it's

22   premature to rule on it finally at this point.

23         Nineteenth, the defendants move to preclude the

24   government from introducing any evidence related to AvKARE as

25   irrelevant, prejudicial, et cetera.  It says that the

KANKPETC

1    government had represented they would not put this at issue.

2    I'm, again, leaning towards granting the motion, but I'm not

3    going to make a final decision now.  We'll see how it plays

4    out.  For now, it's premature.

5          Twentieth, the government seeks to preclude defendants

6    from introducing evidence that they did not engage in fraud

7    with customers other than CPN, SLR, Stability, and First

8    Medical.  That motion is granted.

9          Twenty-first, the government moves to preclude the

10   defense from offering the proffered expert opinions of Jason

11   Flemmons.  This relates, also, to a Rule 17 subpoena issue that

12   we'll get to later.  At this point, it's premature; we haven't

13   gotten to the defense case.  I think it is likely that we will

14   have a hearing outside the presence of the jury probably some

15   evening before we get to the -- shortly before we get to the

16   defense case regarding the proffered expert opinions of

17   Mr. Flemmons, but I decline to rule on them now.

18         Twenty-second, the government seeks to exclude

19   cross-examination of certain witnesses on certain admitted or

20   suspected bad acts, such as an arrest for selling marijuana, a

21   conviction for drunk driving, and the like.  While the defense

22   has confirmed that they will not cross-examine regarding these

23   arrests, they say they may seek to show that the witness did

24   not originally disclose certain arrests to the government, and

25   this goes to the cooperation agreement that these witnesses in

**A-198**

KANKPETC

1    some cases had.

2          Again, it's premature for me to rule on this until we

3    get to those circumstances, but I am initially inclined to

4    grant the government's motion.  Incidentally, if either side is

5    about to put a question to a witness that seemingly was either

6    precluded by one of my in limine rulings or that I left open,

7    do not put the question in the hearing of the jury.  We can

8    either have a sidebar, or often it will be just sufficient to

9    say, Judge, this relates to an in limine ruling you made, and

10   you can use the numbers that I'm giving you this afternoon in

11   saying that, but don't put the question until, of course, I

12   have permitted the question, if I do.

13         There was a twenty-third motion in limine received out

14   of time from the defense, which seeks to preclude the

15   government's summary witness, Corina Chanbury, from testifying

16   regarding the effect of the alleged fraud on Mr. Petit's and

17   Mr. Taylor's bonuses.  That motion is denied.

18         There was also filed last night, without permission of

19   the Court, a motion to quash the government's Rule 17 subpoena

20   to the defense expert witness, Jason Flemmons.  I may want to

21   hear further argument on this, either in a few minutes or first

22   thing Monday morning, but my initial take is that the defense

23   doesn't have standing to challenge the subpoena.

24         There was also a joint telephone call made to my

25   chambers on October 21st, a couple of days ago, regarding five

Kaqnpet1a                    Opening – Mr. Tracer

1    product out to the buyer.  They don't wait to be paid before

2    they record the revenue or before they show the money on their

3    books.

4            That's called recognizing revenue, or it's sometimes

5    called revenue recognition, when you show that you got money

6    from selling product.  Again, MiMedx didn't wait.  They

7    recognized their revenue right away when they shipped product.

8            Now, you will learn that that's something that

9    companies are allowed to do, but only if certain requirements

10   are met.  There are rules for recognizing revenue.  If a sale

11   meets the requirements, you can recognize revenue when you ship

12   the product, even if you haven't been paid.

13           But if it doesn't meet the requirements, you can't.

14           What kind of requirements?

15           Basic things, like you've actually shipped the

16   customer the product they want to buy, or the customer has

17   actually agreed to pay for the product in a certain amount of

18   time.  You'll learn that as experienced corporate executives,

19   these defendants understood those rules.

20           Now, there are two groups of people at MiMedx who keep

21   track of revenue.  There's accountants and there's auditors.

22           So, first, like any company, MiMedx had accountants,

23   and their job was to keep track of the company's money.  They

24   relied on the defendants to tell them the truth about the sales

25   of product.

**A-200**

Kaqnpet1a                    Opening - Mr. Tracer

1        Why would someone send two e-mails like that?

2        To hide a secret deal and cook the books; to paint a

3    fake picture for the company's investors.

4        What other kind of fraudulent tricks will you hear

5    about?

6        You will learn that sometimes a distributor was

7    willing to take product, but MiMedx didn't have the product

8    that they needed.  Now, normally that doesn't sound like a big

9    problem, right?  If you're doing legitimate business, you just

10   wait until you have what the buyer wants, and then you sell it

11   to them.

12       But you see, the defendants weren't doing legitimate

13   business, and they didn't want to wait.  They needed to hit

14   their revenue that quarter.  Doing the sale next week or next

15   month, it wouldn't help them.  They might miss their number.

16       So what did they do?

17       They agreed to ship the distributor some other

18   product, some stuff that the distributor didn't want.  And they

19   told them that MiMedx would swap it out in a later quarter for

20   something they did want.  It was the defendants' secret swaps.

21       And why would someone do that?  Why would you send

22   someone something they don't even want, and then tell them,

23   hey, look, you'll send it back later and then I'll send you

24   what you want?  Why do that?  Why go through that effort?

25       You go through that effort to inflate revenue, to make

Kaqnpet1a                    Opening – Mr. Tracer

1    a sale look like it's legitimate now.

2            And, of course, they hid these secret swaps from their

3    accountants.

4            Why?

5            Because they knew it was against the rules to record

6    revenue when you send a customer something they don't even

7    want.

8            They told one thing to the distributor, but they told

9    a different story to the accountants.  To the accountants, they

10   made it look like a normal sale.  These were secret deals.

11           Why?

12           Because they needed those secret swaps to pad their

13   revenue and hit their numbers.

14           What other secret deals did the defendants make?

15           You will hear at the end of another quarter a

16   distributor was willing to take product, but only if that

17   distributor could give back whatever they didn't sell.  And the

18   defendants knew that you can't recognize revenue when you ship

19   stuff to a customer, but the customer can just give back

20   whatever they don't sell.  That's against the rules.

21           So Petit, the CEO of the company, he wrote that

22   distributor a secret letter saying that they could return

23   whatever they didn't sell.

24           Petit backdated that letter.  He falsely dated it

25   earlier to confirm to the distributor that they could give back

Kaqnpet1a                    Opening — Mr. Tracer

1    anything that they had bought.

2           Petit kept this letter a secret from MiMedx's

3    accountants and from the auditors.  Why?

4           So they wouldn't know the true terms of the deal.

5    They wouldn't know about his secret deal.  And they would

6    otherwise prevent the company from recognizing revenue, so he

7    could defraud his investors and help pad the bottom line.

8           One last example of the defendants' fraud.

9           You'll see that the defendants had one distributor, he

10   agreed to take millions of dollars of product to help them meet

11   their number at the end of a quarter.  But the problem was the

12   distributor was having trouble paying.  Months went by and they

13   were barely paying.  And the defendants knew that this would be

14   a big problem.

15          Why?

16          Because you can't recognize revenue when you sell

17   something to someone who can't pay for it.  That's against the

18   rules.  And the defendants knew that the accountants and the

19   auditors would start to question whether MiMedx should have

20   been allowed to recognize revenue from the sale if the buyer

21   couldn't pay for it anytime soon.

22          So what did the defendants do?  Tell the truth?  Be

23   honest?  Explain what was happening?

24          No.  Again, they turned to fraud.

25          Petit, the CEO of the company, arranged for his

**A-203**

KAQPPET2                          Andersen - Direct

1   Q.   Good afternoon, Mr. Andersen.  Sir, where do you live?

2   A.   In Zanesville, Indiana.

3   Q.   And what do you do for a living?

4   A.   I'm a CFO for a biosciences research institute.

5   Q.   Okay.  What does CFO mean?

6   A.   Chief financial officer.

7   Q.   Okay.  How long have you held that position as CFO?

8   A.   About four-and-a-half years.

9   Q.   And, sir, do you have a college degree?

10  A.   Yes.

11  Q.   Okay.  What degree did you get?

12  A.   I hold a Bachelor's in accounting, Master's in accounting

13  and MBA.

14  Q.   Okay.  Let's start with your Bachelor's degree, when did

15  you get that?

16  A.   In 1996.

17  Q.   Okay.  And what was your Bachelor's degree in?

18  A.   Accounting.

19  Q.   And you mentioned some advance degrees, what advance

20  degrees do you have?

21  A.   I have a Masters in accountancy and a Masters in business

22  administration.

23  Q.   Okay.  I just want to talk about those quickly.  You said

24  you have a masters in accountancy, what is that?

25  A.   It's a master's degree in accounting.

**A-204**

Kaqnpet3                    Andersen - Direct

1

2    Q.  Mr. Andersen, I think you are allowed to take your mask off

3    in the box.

4         THE DEPUTY CLERK:  Yes.

5    Q.  What is a master's in accountancy?

6    A.  A master's in accountancy is a five-year degree in

7    accounting.

8    Q.  What year did you get that?

9    A.  In 1996.

10   Q.  You mentioned an MBA.  What is an MBA?

11   A.  Master's in business administration.

12   Q.  What year did you get your MBA?

13   A.  In 2003.

14   Q.  Did you have any area of focus or specialty in getting your

15   MBA?

16   A.  I did.

17   Q.  What was that?

18   A.  General management and finance.

19   Q.  Now, aside from your education, do you have any

20   professional certifications, sir?

21   A.  I do.

22   Q.  OK.  What certifications do you have?

23   A.  I am a licensed CPA, certified public accountant, and I

24   hold a CFA designation, a Chartered Financial Analyst.

25   Q.  What is a CPA?

Kaqnpet3                        Andersen - Direct

1   firms that does audits around the world.

2   Q.  What was your job at Deloitte?

3   A.  My job was an auditor at Deloitte.  I was an audit manager.

4   Q.  What kind of companies did you audit when you worked at

5   Deloitte?

6   A.  Banks, broker/dealers, manufacturing, not-for-profits a

7   variety.

8   Q.  And when you were auditing companies, where did you get

9   information about those companies from?

10  A.  From the companies themselves, from the management teams.

11  Q.  And one more.  You mentioned working at Eli Lilly.  What is

12  Eli Lilly?

13  A.  Eli Lilly and Company is a large pharmaceutical company

14  based in Indianapolis.

15  Q.  How long did you work at Eli Lilly for?

16  A.  11 years.

17  Q.  Is Eli Lilly a public company?

18  A.  It is.

19  Q.  What does that mean, Mr. Andersen, for a company to be a

20  public company?

21  A.  It means that the shares of the company are available to

22  the public, to individual investors, that it's registered with

23  the SEC.

24  Q.  What is the SEC?

25  A.  The Securities and Exchange Commission.

**A-206**

Kaqnpet3                    Andersen - Direct

1   Q.  OK.  And do public companies have any obligations with

2   respect to the SEC?

3   A.  They do.

4   Q.  What kind of obligations, generally speaking?

5   A.  They have to produce quarterly and annual financial

6   statements and reports.

7   Q.  Can you remind us, what was your role at Eli Lilly?

8   A.  I had various roles at Eli Lilly and Company.  One of them

9   was corporate controller for the U.S. affiliate.  I held an

10  investments director role.  I worked on the acquisitions team.

11  Q.  Can you just explain, what is the role of controller?  What

12  did that involve?

13  A.  Controller is responsible for the accounting, the

14  budgeting, the financial reporting, the analysis, and the

15  internal controls.

16  Q.  OK.  Now, you mentioned you came to work at MiMedx

17  afterwards, is that right?

18  A.  Yes.

19  Q.  Sir, when did you start working at MiMedx?

20  A.  In the middle of August 2015.

21  Q.  And was MiMedx a public or a private company?

22  A.  Public company.

23  Q.  And what was your role --

24  A.  My role --

25  Q.  -- when you joined MiMedx?

Kaqnpet3                    Andersen - Direct

1  A.  Yes, Mr. Petit had oversight for the financial statements,

2  financial results of the company, participated in earnings

3  release calls, the calls made to investors, worked with outside

4  analysts and had certain interfaces with customers of MiMedx.

5  Q.  OK.  We'll come back to some of those in a little bit.  Can

6  you just tell us approximately how often did you speak and

7  interact with Mr. Petite when you worked at the company?

8  A.  I would say an average of about once a week.

9  Q.  You also mentioned Mr. Taylor.  What was his role at the

10 company?

11 A.  His role was the COO, or chief operating officer at the

12 company.

13 Q.  At a high level, what were his duties and responsibilities?

14 A.  Overseeing the operations of the company.

15 Q.  Did Mr. Taylor have any role with respect to the finances

16 of the company?

17 A.  Yes.

18 Q.  Can you describe what those roles were?

19 A.  Yes.  Similar Mr. Taylor, participated on the earnings

20 calls, had oversight as part of the executive management for

21 the overall financial results of the company and with his areas

22 as well.

23 Q.  Approximately how often did you speak and meet with

24 Mr. Taylor?

25 A.  Approximately once a week as well.

**A-208**

Kaqnpet3                    Andersen – Direct

1  Exhibit 1608.

2          THE COURT:  Received.

3          (Government Exhibit 1608 received in evidence)

4          MR. TRACER:  Mr. Peckett, can we put that up.

5          I am just going to go through this stipulation,

6  Mr. Andersen.

7          The parties agree that:

8          1.  Government Exhibit 100 consists of a true and

9  accurate copy a form 8-K filed by MiMedx with the SEC on July

10 30, 2015.

11         2.  Government Exhibit 101 consists of a true and

12 accurate copy of a form 10-Q for the quarter ending June 30,

13 2015, filed by MiMedx with the SEC on August 7, 2015.

14         Government Exhibits 101A and 101B consist of true and

15 accurate copies of certifications signed by Parker H. Petit

16 which accompany the form 10-Q labeled Government Exhibit 101

17 and were filed by MiMedx with the SEC on August 7, 2015.

18         4.  Government Exhibit 103 consists of a true and

19 accurate copy of a form 10-Q for the quarter ending September

20 30, 2015, filed by MiMedx with the SEC on November 6, 2015.

21         5.  Government Exhibits 103-A and 103-B consist of

22 true and accurate copies of certifications signed by Parker H.

23 Petit, which accompany the form 10-Q labeled Government Exhibit

24 103 and were filed by MiMedx with the SEC on November 6, 2015.

25         6.  Government Exhibit 1014 consists of a true and

**A-209**

Kaqnpet3                    Andersen - Direct

1   accurate copy form 8-K filed by MiMedx with the SEC on February

2   23, 2016.

3            7.   Government Exhibit 105 consists of a true and

4   accurate copy of a form 10-K for the year ending December 31,

5   2015, filed by MiMedx with the SEC on February 29, 2016.

6            8.   Government Exhibits 105-A and 105-B consist of

7   true and accurate copies of certifications signed by Parker H.

8   Petit which accompany the form 10-K labeled Government Exhibit

9   105 and were filed by MiMedx with the SEC on February 29, 2016.

10           Government Exhibit 106 consists of a true and accurate

11  copy of a form 14A filed by MiMedx with the SEC on April 3,

12  2015.

13           Government Exhibits 107 through 111 consist of true

14  and accurate copies of form 4 filings with the SEC.

15           And Government Exhibit 150-R consists of a true and

16  accurate copy of a proxy statement filed with the SEC on June

17  16, 2019.

18           Pursuant to the stipulation, the government offers

19  Government Exhibits 100 through Government Exhibit 111 into

20  evidence.

21           THE COURT:  Received.

22           (Government Exhibits 100 through 111 received in

23  evidence)

24           MR. TRACER:  Thank you, your Honor.

25           Mr. Peckett, can we publish what's been now admitted

Kaqnpet3                    Andersen – Direct

1   Q.  Mr. Andersen, could you just read the title of that last

2   paragraph on page 8 of the company's 10-Q?

3   A.  "Revenue Recognition."

4   Q.  OK.  Could you remind us what does revenue recognition

5   mean?

6   A.  Revenue recognition is basically you how you record the

7   sales that are being made when product gets sold.

8   Q.  Can you read the first and second sentences of that

9   paragraph?

10  A.  "The company sells its products through a combination of a

11  direct sales force and independent stocking distributors and

12  representatives in the U.S. and independent distributors in

13  international markets.  The company recognizes revenue when

14  title to the goods transfers to customers, provided there are

15  no material remaining performance obligations required of the

16  company or any matters of customer acceptance."

17  Q.  Just to take a few points, in the first sentence it talks

18  about some of the sales being direct sales force versus

19  independent stocking distributors.

20          Do you see that?

21  A.  Yes.

22  Q.  What's the difference between the sales force versus the

23  distributors?

24  A.  The direct sales force is selling basically to directly to

25  customers end users, or people who supply the product to the

**A-211**

Kaqnpet3                    Andersen - Direct

1   end users, and the independent stocking distributors

2   distributors are really more middlemen, if you will, who will

3   sell it down the line.

4   Q.  Did MiMedx use distributors to sell product while you

5   worked at the company?

6   A.  Yes.

7   Q.  It also mentions in the second sentence the company

8   recognizes revenue.

9        Can you just remind us, what does revenue mean?

10  A.  Revenue is basically the product sales.  How much money the

11  company has made.

12  Q.  Mr. Andersen, when you worked at MiMedx, did you believe

13  that revenue was an important metric for the company?

14  A.  Yes.

15  Q.  OK.  Why?

16  A.  Because bonuses were tied to revenues, because the

17  valuation of the company was based upon growth in revenues.

18  Q.  When you say the valuation of the company, what do you mean

19  by that?

20  A.  I mean that the shares of the company would be worth more

21  based upon the growth in revenue over time.

22  Q.  When you worked at MiMedx, did you consider the company's

23  revenue to be the most important metric that it reported?

24  A.  Yes.

25  Q.  Did you observe anyone else at the company who paid

**A-212**

Kaqnpet3                    Andersen – Direct

1    attention to revenue?

2    A.   Yes.

3    Q.   Who else paid attention to revenue while you worked there?

4    A.   The executive leadership team.

5    Q.   Who did that include?

6    A.   Mr. Pete Petit, Mr. Bill Taylor, Mike Senken, Lexi Haden.

7    Q.   Throughout the year did MiMedx keep track of revenue as it

8    was coming in?

9    A.   Yes.

10   Q.   How did the company keep track of revenue?

11   A.   As product gets sold, those transactions get recognized in

12   a general ledger or in the accounting system, so it's easy to

13   track and report kind of on a real-time basis how much product

14   has actually been sold and how much revenue is being

15   recognized.

16   Q.   Were there e-mail communications about that that you

17   observed?

18   A.   Yes.

19   Q.   Who was part of those e-mail communications about keeping

20   track of revenue that you observed?

21   A.   The executive leadership team.

22   Q.   Again, who did that include?

23   A.   Mr. Pete Petit and Mr. Bill Taylor, Mike Senken and Lexi

24   Haden.

25           MR. TRACER:  At this point I would like to offer

**A-213**

Kaqnpet3                          Andersen - Direct

1   another stipulation into evidence.

2          Mr. Peckett, if you could take that down.  This is

3   Government Exhibit 1601.  I offer this into evidence.

4          THE COURT:  Received.

5          (Government Exhibit 1601 received in evidence)

6          MR. TRACER:  OK.  I am not going to read the whole

7   thing at this time, but I am just going to summarize.

8          The parties agree:

9          1.  That certain government exhibits consist of true

10  and accurate copies of e-mails and attachments maintained by

11  MiMedx Group.

12         Pursuant to this stipulation --

13         And, Mr. Peckett, if we could doe take it down and

14  display just for the witness and counsel what's been marked as

15  Government Exhibit 1056.

16  BY MR. TRACER:

17  Q.  Mr. Andersen, do you see that e-mail?

18  A.  Yes.

19  Q.  Who is it an e-mail from?

20  A.  It is an e-mail from Mr. Pete Petit.

21         MR. TRACER:  Pursuant to the stipulation, the

22  government offers GX 1056 into evidence.

23         THE COURT:  Received.

24         (Government Exhibit 1056 received in evidence)

25         MR. TRACER:  Mr. Peckett can we display that for

Kaqnpet3                    Andersen - Direct

1   everybody.

2   BY MR. TRACER:

3   Q.  Mr. Andersen, again, who is this e-mail from that we are

4   looking at?

5   A.  Mr. Pete Petit.

6   Q.  What is the date of e-mail?

7   A.  It is October 14, 2015.

8   Q.  So what quarter would that be in, in the quarters of the

9   year?

10  A.  This is in the fourth quarter.

11  Q.  Who's the first recipient right below the date listed

12  there?

13  A.  It is Mike -- sorry, bill Taylor.

14  Q.  Mr. Andersen, are you also included on this e-mail?

15  A.  I am.

16         MR. TRACER:  Thank you, Mr. Peckett.

17  Q.  Now I want to ask you to just read a little bit of this

18  e-mail from Mr. Petit.  If you could look toward the bottom of

19  the page, there's a line by Mr. Petit that says, "With growth

20  rates of 50 percent."  It's the last two lines of the e-mail.

21  A.  "With growth rates of 50 percent, our revenue multiple

22  should be at least 5 to 7.  However, this point, our valuation

23  all hinges on revenue growth rate.  We all need to focus on

24  that issue."

25  Q.  Just a couple of questions.  When Mr. Petit says growth

Kaqnpet3                    Andersen - Direct

1    rates of 50 percent growth -- what kind of growth or growth of

2    what metric did you understand that to refer to?

3    A.  This is growth in revenue from one period of time to the

4    same period of time in the prior year.

5    Q.  When Mr. Petit says toward the end of that first line

6    that's highlighted "our valuation all hinges on revenue growth

7    rate," what did you understand that to mean, Mr. Andersen?

8    A.  That valuation of the company depended upon or would be --

9    let me say it differently, the valuation would be more if the

10   growth rate is higher.

11   Q.  In other words, if revenue went up?  Is that the idea?

12   A.  Yes.

13   Q.  At the time, Mr. Anderson, did you agree that valuation

14   depended on revenue growth?

15   A.  Yes.

16   Q.  Finally, when he said "we all need to focus on that issue,"

17   what did you understand that to mean?

18   A.  That revenue growth or selling as much product as possible

19   was a priority of the company.

20          MR. TRACER:  Mr. Peckett, we can take that down.

21          Thank you.

22   BY MR. TRACER:

23   Q.  Now, Mr. Andersen, when you were hired at the company, was

24   revenue supposed to play a role in your compensation?

25   A.  Yes.

**A-216**

Kaqnpet3                    Andersen - Direct

1   revenue was recognized in those quarters?

2   A.  In Q3 it was $2,187,110.

3   Q.  How about Q4?

4   A.  Q4 was 450 though 675.

5   Q.  Just one more line on this.  It's got First Medical.  Are

6   you familiar with an entity called First Medical?

7   A.  Yes.

8   Q.  What was First Medical?

9   A.  First Medical is a distributor of MiMedix as well.

10  Q.  Do you know where they were located?

11  A.  I believe it was Saudi Arabia.

12  Q.  Focusing on the chart, what quarter were you asked to look

13  at revenue for First Medical for?

14  A.  For Q4 of 2014.

15  Q.  According to the ledgers that you looked at, how much

16  revenue was recorded between December 26 and 31 of 2015?

17  A.  $2,540,000.

18  Q.  Just stepping back for a second, Mr. Andersen, when MiMedx

19  sells product, do they wait for the customer to actually pay

20  before they record revenue when they make a sale?

21  A.  No.  Generally speaking, no.

22  Q.  So when do they record revenue?

23  A.  They record revenue generally speaking at the time the

24  product is shipped, at the time the title transfers to the

25  customer.

**A-217**

Kaqnpet3                    Andersen - Direct

1   Q.  Dos that practice have a name in accounting?

2   A.  Accrual accounting.

3   Q.  In your experience as an accountant and an auditor, why

4   would a company adopt accrual accounting as opposed to just

5   waiting to get the cash.

6   A.  Because cash flows can be lumpy over time, so a better

7   indicator of actual performance is the accrual basis.  So it's

8   what were the activities that actually occurred during that

9   particular time period.

10              MR. TRACER:  OK.  Mr. Peckett we could take down

11  Government Exhibit 903.

12  Q.  Now, Mr. Andersen --

13              THE COURT:  Counsel, keep in mind that we are going

14  end in about four minutes.

15              MR. TRACER:  OK.  This is a logical break, or I'm

16  happy to do a little bit more.

17              THE COURT:  If this is a logical break, we'll end now.

18  Thank you.

19              MR. TRACER:  All right.

20              THE COURT:  All right.  So, ladies and gentlemen,

21  we're off to a very good start, and I thank you for your

22  excellent work.

23              We will resume at 9:45 a.m., so it's important that

24  you be back in the jury room at least five minutes before that

25  so we can get started promptly.  In the meantime have a

**A-218**

```
KARPPET1                    Andersen - Direct
```

1    just want to --

2           THE COURT:  Let me.  I can control it from here.  Try

3    it now.

4    BY MR. TRACER:

5    Q.  Mr. Andersen, can you hear me?

6    A.  Yes.

7           MR. TRACER:  Okay.  That's much better.  Thank you.

8           Okay.  So, Mr. Pechet, if you can pull that up?  Okay.

9    You've already done it.

10   Q.  That bottom paragraph there, Mr. Andersen, can you read the

11   title of the bottom paragraph?

12   A.  Revenue recognition.

13   Q.  Can you remind us, what is revenue recognition that?

14   A.  That is when the company recognizes when it sells product,

15   it records how much money it expects to receive from the

16   customers for those sales.

17   Q.  Okay.  Can you remind us, relative to the sale, when does

18   the company record the revenue?

19   A.  Generally when the product is sold, when title passes to

20   the customer and the product is shipped.  That's generally when

21   the company recognizes revenue.

22   Q.  Does MiMedx wait to receive actual payment?

23   A.  No.

24   Q.  Okay.  Now, Mr. Andersen, if I could ask you to read for us

25   the third sentence here, that says "In cases where"?

KARPPET1                    Andersen – Direct

1   A.  "In cases where the company utilizes distributors or ships

2   product directly to the end user, it recognizes revenue upon

3   shipment, provided all other revenue recognition criteria have

4   been met."

5   Q.  Okay.  So, Mr. Andersen, the company's filing talks about

6   revenue recognition criteria; do you see that?

7   A.  Yes.

8   Q.  Okay.  And do you have an understanding of what that's a

9   reference to?

10  A.  Yes.

11  Q.  Okay.  What is that a reference to?

12  A.  This is a reference to the rules in GAAP literature that

13  talk about when a company can recognize revenue or when it can

14  recognize the sales.

15  Q.  Okay.  Are you familiar with those requirements?

16  A.  Yes.

17  Q.  Okay.  And while you worked at MiMedx as an accountant, did

18  you have the opportunity to apply those criteria to MiMedx?

19  A.  Yes.

20  Q.  Okay.  And for what purposes were you applying revenue

21  recognition criteria at MiMedx?

22  A.  For the purpose of making sure that the accounting was

23  correct and that the financial statements were correct.

24  Q.  Okay.  Can you list what the revenue recognition criteria

25  are?

KARPPET1                    Andersen – Direct

1   A.  Yes.  Well, it's the revenue recognition criteria that were

2   in place at the time.

3   Q.  Can you tell us what those are?

4   A.  The four criteria are:  A, persuasive evidence that an

5   arrangement exists; B, the -- sorry, the delivery of product or

6   services has occurred; that collectibility is reasonably

7   assured; and that the price is fixed or determinable.

8           MR. TRACER:  Okay.  Mr. Pechet, could we publish just

9   for the witness what's been marked as Government Exhibit 902.

10  Q.  Mr. Andersen, can you see what's been marked as Government

11  Exhibit 902?

12  A.  Yes.

13  Q.  Okay.  What is this?

14  A.  These are the four revenue recognition criteria from GAAP.

15  Q.  Okay.  And are these the criteria that you applied when you

16  were working as an accountant at MiMedx?

17  A.  Yes.

18          MR. TRACER:  Okay.  Government offers GX902 into

19  evidence.

20          MR. WEINREB:  Objection to it being received as

21  evidence, not as a demonstrative.

22          MR. TRACER:  We can use it as a demonstrative, your

23  Honor.  That's fine.

24          THE COURT:  Okay.  Received as a demonstrative but not

25  in evidence.

155

KARPPET1                    Andersen - Direct

1           MR. TRACER:  Thank you.

2           Mr. Pechet, can we publish this demonstrative to the

3      jury?

4      BY MR. TRACER:

5      Q.  Okay.  So, Mr. Andersen, I just want to walk through some

6      of your work around these criteria at MiMedx.  Focusing on the

7      first bullet, it talks about persuasive evidence of an

8      arrangement.

9           When you worked at MiMedx, if you were looking at a

10     sale, what kinds of things did you look at to determine if a

11     sale to a customer had persuasive evidence of an arrangement?

12     A.  To look at whether or not there was an agreement with that

13     customer.  We'd look at a purchase order from the customer or

14     an invoice from the customer, and preferably all three of those

15     things would align.

16     Q.  Okay.  You mentioned a purchase order.  Generally speaking,

17     what is a purchase order?

18     A.  A purchase order is a customer basically creating an order

19     to buy product from the company.

20     Q.  Okay.  You mentioned an invoice.  What's an invoice?

21     A.  An invoice is the bill that the company sends to the

22     customer for the sale of that product.

23     Q.  Okay.  And when you were looking at these criteria, did you

24     look at whether those documents, like the agreement or the

25     purchase order or the invoice, included the terms of the deal?

**A-222**

KARPPET1                     Andersen - Direct

1    A.  Yes.

2    Q.  Okay.  Would that include looking at when the buyer has to

3    pay?

4    A.  Yes.

5    Q.  Okay.  The next bullet in the demonstrative talks about

6    delivery having occurred.  Do you see that?

7    A.  Yes.

8    Q.  Mr. Andersen, in your work at MiMedx, what kinds of things

9    would you look at to determine if a sale to a customer involved

10   final delivery or delivery having occurred?

11   A.  You'd look at whether the product had actually been shipped

12   to the customer, whether or not title to that product had

13   passed to the customer, and any other -- any other arrangements

14   around the delivery.

15   Q.  Okay.  In your analysis at MiMedx, would it be significant

16   to you if there was an --

17              MR. WEINREB:  Objection, leading.

18              THE COURT:  Sustained.

19   Q.  Okay.  When you were analyzing product at MiMedx, did you

20   ever come to learn whether there were agreements to exchange

21   product?

22   A.  Not that I recall, no.

23   Q.  Okay.  And if such an agreement had existed, would it be

24   relevant to your analysis of whether delivery had occurred?

25              MS. LOEB:  Objection.

SOUTHERN DISTRICT REPORTERS, P.C.

KARPPET1                    Andersen - Direct

1          THE COURT:  Overruled.

2     A.  Sorry, would you repeat the question?

3     Q.  Sure.  If you had learned that there was an agreement to

4     exchange product when a sale was made, would that be relevant

5     to your assessment of whether delivery had occurred?

6     A.  Yes.

7     Q.  And why would that have mattered to you?

8     A.  Because under this criteria, if there's an agreement for an

9     exchange, then you have to look at has delivery actually

10    occurred at that point.

11    Q.  Okay.  The next bullet talks about the seller's price being

12    fixed and determinable.  Do you see that?

13    A.  Yes.

14    Q.  Okay.  Mr. Andersen, in your work at MiMedx, what kind of

15    things did you look at to determine if a sale to a distributor

16    involved a fixed and determinable price?

17    A.  You look at kind of the three documents that I mentioned.

18    You look at if there's an agreement, a distributor agreement,

19    you look at the distributor agreement.  If a purchase order,

20    you look at the purchase order, and if an invoice, you look at

21    the invoice.  And you're looking for what are the payment terms

22    listed on those documents.

23    Q.  Okay.  In your assessment of sales at MiMedx, did you look

24    at whether there were rights of return?

25    A.  Yes.

KARPPET1                    Andersen - Direct

1   Q.   Okay.  What does a right of return mean?

2   A.   It means that the customer, when they buy the product, has

3   the ability to return the product to the company in exchange

4   for a refund.

5   Q.   And in your assessment of sales at MiMedx, why would it

6   matter if there was a right of return?

7   A.   Because the right of return, under the accounting rules,

8   has to be -- has to be considered, and when there's a right of

9   return, you may not be able to recognize revenue at the time of

10  sale.

11  Q.   Okay.  In your assessment of sales at MiMedx, did you look

12  at whether there was economic substance to the buyer?

13  A.   Yes.

14  Q.   Okay.  And in simple terms, what does that mean, whether

15  there was economic substance to a buyer?

16  A.   It means, does the buyer have the ability to stand on its

17  own?  Is it truly economically separate from the company

18  selling product to it?

19  Q.   Okay.  And why is that important to your assessment of a

20  sale at MiMedx?

21  A.   Because if the customer doesn't have economic substance, if

22  they're not truly separate from the company as a standalone

23  entity, then you probably wouldn't recognize the revenue right

24  away.  You would wait until some future point.

25  Q.   Okay.  And which, if any, of these factors would that

**A-225**

KARPPET1                    Andersen – Direct

1    affect, if there was a lack of economic substance?

2    A.  It's under the seller's price, the buyer fixed and

3    determinable.  It gets contemplated under that factor or that

4    criteria.

5    Q.  All right.  And the fourth talks about collectibility being

6    reasonably assured.  Do you see that?

7    A.  Yes.

8    Q.  Okay.  What kinds of things did you look at with respect to

9    sales at MiMedx to determine whether collectibility was

10   assured?

11   A.  So you look at the ability of the customer to pay; so the

12   history of making payments, the credit score or credit rating

13   of that customer.  You could look at their balance sheet.

14   Q.  You mentioned their payment history.  Why would that

15   matter?

16   A.  Because if there's a history of making payments, it's

17   pretty good evidence that the customer will continue to make

18   payments and has the wherewithal to make payments.

19   Q.  And would that be significant to your analysis at MiMedx of

20   whether collectibility is reasonably assured?

21   A.  Yes.

22   Q.  Okay.  And just to be clear, if a company wants to

23   recognize revenue, does it have to meet some of these criteria

24   or all of these criteria?

25   A.  It has to meet all of these criteria.

**A-226**

Karnpet2                    Andersen - Direct

1   robust than the audit in scope and in the amount of work that

2   gets done.

3   Q.  When you worked at MiMedx, Mr. Andersen, did you have any

4   role with respect to the audits and reviews that were being

5   conducted by Cherry Bekaert?

6   A.  Yes.

7   Q.  What was your role?

8   A.  My role as controller was to help facilitate the audit of

9   the company's books and records and to help facilitate the

10  review of the 10 quarter, the 10-Q, the quarterly financial

11  statements.

12  Q.  What kind of things with you do in that role?

13  A.  Answer their questions, provide them with documents.

14  Q.  And when you -- sorry.  Are you familiar with the term

15  management representation letter?

16  A.  Yes.

17  Q.  What is a management representation letter?

18  A.  A management representation letter is, it is a letter that

19  the auditors are required to obtain from management of the

20  company.  Basically it gives them assurance that everything has

21  been disclosed to them by management and that there's nothing

22  that management is aware of that would make the financial

23  statements wrong.

24  Q.  While you worked at MiMedx, did you sign management

25  representation letters?

Karnpet2                    Andersen – Direct

1    A.  Yes, I did.

2    Q.  Who else signed them?

3    A.  Other members of management in the accounting department.

4    Q.  What's the purpose of a management representation letter

5    that you signed?

6    A.  It's to give the auditors assurance about certain

7    transactions they might call into question and give them

8    assurance that the financial statements that we shared and

9    asked them to review or to audit are correct.

10              MR. TRACER:  At this point the government offers a

11   stipulation, Government Exhibit 1600.

12              THE COURT:  Received.

13              (Government Exhibit 1600 received in evidence)

14              MR. TRACER:  Mr. Pechet, can we publish it.  And I am

15   going to summarize and read three paragraphs.

16              This stipulation states that the parties agree:

17              1.  Government Exhibit 600 is a true and accurate copy

18   of a management representation letter signed by Parker H.

19   Petit, Michael Senken and John Cranston and submitted on behalf

20   of MiMedx to Cherry Bekaert on August 7, 2015.

21              2.  Government Exhibit 601 is a true and accurate copy

22   of a management representation letter signed by Parker H.

23   Petit, Michael Senken, Mark Andersen, and John Cranston and

24   submitted on behalf of MiMedx to Cherry Bekaert on November 6,

25   2015.

**A-228**

Karnpet2                        Andersen - Direct

1          3.   Government Exhibit 602 is a true and accurate copy

2     of a management representation letter signed by Parker H.

3     Petit, Michael Senken, and John Cranston, and submitted on

4     behalf of MiMedx to Cherry Bekaert on February 29, 2016.

5          The government offers Government Exhibits 600, 601 and

6     602 pursuant to the stipulation.

7          THE COURT:   Received.

8          (Government Exhibits 600, 601 and 602 received in

9     evidence)

10          MR. TRACER:   Thank you, your Honor.

11          Mr. Pechet, can we publish what's now been admitted as

12    Government Exhibit 601.

13    BY MR. TRACER:

14    Q.   Mr. Andersen, can you see that?

15    A.   Yes.

16    Q.   What is that?

17    A.   This is the management representation letter for the third

18    quarter of 2015.

19    Q.   Again, what months is the third quarter?

20    A.   July, August, September.

21    Q.   Does this relate to the same period of the 10-Q that we

22    looked at earlier this morning?

23    A.   Yes.

24          MR. TRACER:   OK.  Mr. Pechet, can we go to page 4 of

25    this document.

Karnpet2                    Andersen – Direct

1   BY MR. TRACER:

2   Q.  Mr. Andersen, who signed this management representation

3   letter?

4   A.  Mr. Pete Petit, Mr. Mike Senken, myself, and Mr. John

5   Cranston.

6          MR. TRACER:  Mr. Pechet, if we can go back to page 2.

7   I want to pull out some of the clauses and ask Mr. Andersen to

8   read them.

9   BY MR. TRACER:

10  Q.  Paragraph 7.  Can you read that?

11  A.  Yes.  "There are no material transactions that have not

12  been properly recorded in the accounting records underlying the

13  interim financial information."

14         MR. TRACER:  OK.  Mr. Pechet, can you go lower in the

15  page and blow up paragraph 9A.

16  BY MR. TRACER:

17  Q.  Can you read that.

18  A.  "We have no knowledge of any fraud or suspected fraud

19  affecting the company involving:

20         "(a) management."

21         MR. TRACER:  The last one, Mr. Pechet can you blow up

22  12A.

23         MS. LOEB:  Objection.  *In limine* matter No. 7, your

24  Honor.  May I ask that it be taken off the screen while we --

25         THE COURT:  Hang on.

SOUTHERN DISTRICT REPORTERS, P.C.

**A-230**

Karnpet2                        Andersen - Direct

1          MS. LOEB:  May I ask that the exhibit be taken off the

2     screen while we discuss this matter.

3          THE COURT:  I'm sorry.

4          MS. LOEB:  May I ask that the exhibit be taken off the

5     screen while we discuss the matter, your Honor.

6          THE COURT:  Yes.

7          Overruled.  You can put it back up.

8          MR. TRACER:  Thank you.  Mr. Pechet, can you blow up

9     paragraph 12(a).

10    BY MR. TRACER:

11    Q.  Mr. Andersen, can you read that.

12    A.  Yes.  "The following have been properly recorded or

13    disclosed in the interim financial information:

14         "(a) related-party transactions, including sales,

15    purchases, loans, transfers, leasing arrangements, and

16    guarantees, and amounts receivable from or payable to related

17    parties."

18    Q.  Mr. Andersen, when you were asked to sign this letter,

19    generally speaking, what kind of things did you understand you

20    were supposed to disclose pursuant to this paragraph?

21         MS. LOEB:  Objection.

22         THE COURT:  Overruled.

23    A.  Anything that is a related-party transaction, meaning a

24    transaction that occurs between two parties who might not

25    otherwise be doing business at arm's length terms.

SOUTHERN DISTRICT REPORTERS, P.C.

Karnpet2                     Andersen - Direct

1              MR. TRACER:  OK.  Mr. Pechet, you can take this down.

2              Let's put up Government Exhibit 602.

3    BY MR. TRACER:

4    Q.  Do you recognize this document, sir?

5    A.  Yes.

6    Q.  What is this?

7    A.  This is the management representation letter for the -- for

8    year end.

9    Q.  What is the date?

10   A.  February 29, 2016.

11   Q.  So what period does that relate to if it's for the year

12   end?

13   A.  This is for the full year 2015 and it covers the full year

14   of 2014 as well.

15             MR. TRACER:  OK.  Mr. Pechet, can we just go to page

16   5.

17   BY MR. TRACER:

18   Q.  Who signed this letter for the year?

19   A.  Mr. Pete Petit, Mr. Mike Senken, and Mr. John Cranston.

20             MR. TRACER:  Mr. Pechet, if we can go back a page or

21   two and -- it's actually page -- we'll need page 2 and page 3.

22   Yes.  13, just the beginning and then subparagraph (d).

23   BY MR. TRACER:

24   Q.  Mr. Andersen, if you can just read 13 and 13(d).

25   A.  "There are no side agreements or other agreements (either

Karnpet2                        Andersen - Direct

1   written or oral) that have not been disclosed to you."

2   Q.  Are you familiar with the term side agreement?

3   A.  Yes.

4   Q.  In your work at MiMedx, was it part of your job to

5   determine whether there were any side agreements in connection

6   with sales?

7   A.  It would have been important as part of my job to

8   understand whether there are any side agreements related to

9   sales.

10  Q.  What would be a side agreement in connection with a sale?

11  A.  So, the documents that I mentioned earlier would have been,

12  you know, a distributor agreement, a purchase order or an

13  invoice.  Those documents contained certain terms.  A side

14  agreement would be something that was agreed that was different

15  from what was contained in those documents.

16  Q.  When you say "agreed," agreed between who?

17  A.  Agreed between -- it could be written or oral.  It could be

18  just a verbal agreement between management of the company and

19  the customer.

20  Q.  While you were working at MiMedx, if somebody as you

21  described in management had made a side agreement with a

22  customer, what, if anything, would they need to do with respect

23  to accounting?

24  A.  They would have to report that to accounting.

25  Q.  And why?

**A-233**

Karnpet2                        Andersen - Direct

1    A.  So that the accounting could be done correctly to

2    contemplate that side agreement.

3    Q.  As a member of MiMedx' accounting department, whose

4    responsibility was it to bring that side agreement to your

5    attention if it existed?

6    A.  It would have been the responsibility of the person who

7    negotiated the side agreement.

8    Q.  And if that person did not bring to it your attention, did

9    you have other ways to find out about it?

10   A.  No.

11          MR. TRACER:  Mr. Pechet, we can take that down.

12   BY MR. TRACER:

13   Q.  I want to ask one more thing about audits, which is the

14   topic that brought us here.  Are you familiar with the term

15   audit confirmation?

16   A.  Yes.

17   Q.  What is an audit confirmation?

18   A.  It is a letter that the auditor sends directly from the

19   auditor to a -- to one of the -- usually a customer or other

20   party that does business with the company to independently

21   verify either the receivable balance, the amount that the

22   customer owes to the company, or other terms.

23   Q.  In your experience working as an auditor, were those

24   confirmations significant to you?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

Karnpet2                    Andersen - Direct

1   A.  "MiMedx third quarter record revenue is $49 million."

2   Q.  While you worked at MiMedx, Mr. Andersen was it typical for

3   the titles of the press releases to focus on revenue?

4   A.  Yes, I believe so.

5   Q.  Why was that?

6   A.  I believe revenue was --

7           MR. WEINREB:  Objection.

8           THE COURT:  Sustained.

9           MR. TRACER:  OK.

10  BY MR. TRACER:

11  Q.  Mr. Andersen, did you consider revenue to be the most

12  important metric at the company when you worked there?

13  A.  Yes.

14          MR. TRACER:  If you can, Mr. Pechet, go a little

15  further down in the document and pull up -- there's a series of

16  bullet points in bold -- yeah.  Third quarter preliminary

17  highlights.

18  BY MR. TRACER:

19  Q.  Mr. Andersen, can you read the first bullet that's there?

20  A.  "Q3 is 16th consecutive quarter of meeting or exceeding

21  revenue guidance."

22  Q.  Are you familiar with something called revenue guidance?

23  A.  Yes.

24  Q.  What is revenue guidance?

25  A.  It's the communication from the company to investors in the

Karnpet2                    Andersen - Direct

1  public setting expectations about what future revenue would be.

2  Q.  So does it relate to future periods or past periods?

3  A.  When you're giving guidance it's related to future periods.

4  Q.  Was the guidance that MiMedx gave a specific number or was

5  it a range of numbers?

6  A.  It was a range.

7  Q.  When you worked at MiMedx, did anyone at MiMedx pay

8  attention to whether MiMedx would meet or exceed its revenue

9  guidance?

10            MS. LOEB:  Objection.

11            THE COURT:  Sustained.

12            MR. TRACER:  OK.

13  BY MR. TRACER:

14  Q.  Mr. Andersen, when you worked at MiMedx, did you pay

15  attention to whether MiMedx met or exceeded its revenue

16  guidance?

17  A.  Yes.

18  Q.  Did you observe whether other members of management also

19  paid attention to it?

20            MS. LOEB:  Objection.

21            THE COURT:  Sustained.

22            MR. TRACER:  OK.

23  BY MR. TRACER:

24  Q.  Did you believe that it was important whether MiMedx met or

25  exceeded its revenue guidance?

Karnpet2                    Andersen - Direct

1    A.  Yes, I believed it was important.

2    Q.  Why did you think that was important?

3    A.  Because it was the most important metric by which the

4    company's success was being measured.

5    Q.  When you say being measured, by who?

6    A.  By research analysts covering the company and --

7    Q.  Sorry.  What did you say?

8    A.  By research analysts covering the company and by potential

9    investors and investors of the company.

10   Q.  Could you read the third and fourth bullet points.

11   A.  "Q3 revenue of $49 million increased by 46 percent over Q3

12   2014."

13              And the next one, "$49 million revenue is at upper

14   end of $47 to $50 million Q3 guidance range."

15   Q.  You see that fourth quarter talks about being at the upper

16   end.  What does that mean, guidance being at the upper end?

17   A.  It means that the -- if you take the average, the midpoint

18   of the range, it was boater than the average point, better than

19   the midpoint.

20   Q.  Did you consider it significant whether MiMedx fell in the

21   upper end or the lower end of its projected guidance?

22   A.  I think it's significant, if you're in the upper end that's

23   a more positive outcome than being in the lowered end.

24   Q.  Were MiMedx's press releases also filed with the SEC?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

Karnpet2                    Andersen - Direct

1    Q.   Did you ever have the opportunity to see members of

2    management talk about revenue to people outside the company?

3    A.   Yes.

4    Q.   In what context did you observe that?

5    A.   There's a call in which this happens.  There's an earnings

6    release call where management discusses results with outside

7    investors or analysts covering the company.  There was also an

8    occasion where I was able to attend meetings between management

9    and external analysts covering the company where revenue was

10   discussed.

11   Q.   You've used the term analyst a few times.

12            What is an analyst?

13   A.   An analyst is someone who covers the company, provides

14   perspectives to investors, usually recommendations on whether

15   to buy or to sell the stock.

16   Q.   When you listen to these earnings calls, who typically did

17   most of the speaking on MiMedx's earnings calls?

18   A.   Mr. Pete Petit.

19   Q.   Why did you listen in on earnings calls?

20   A.   For me it was a general interest, plus it was part of

21   development in my role.

22   Q.   What do you mean by "development"?

23   A.   Development for me personally as I viewed my role as being

24   corporate controller, but also successor to the CFO.  So it was

25   important for me to understand the investor relations aspect of

**A-238**

Karnpet2                    Andersen - Direct

1   A.  Mr. Bill Taylor.

2   Q.  When Mr. Taylor says grew by over 50 percent, what metric

3   do you understand him to be talking about?

4   A.  That's a -- 50 percent is -- it's revenue, how much did

5   revenue increase year over year.  So it's this year compared to

6   the prior year, the same period of time.

7          MR. TRACER:  OK.  Thank you, Mr. Pechet.

8          You can take those down.

9   BY MR. TRACER:

10  Q.  Now, Mr. Andersen, you testified yesterday about certain

11  accounting concerns you had while you worked at MiMedx, is that

12  right?

13  A.  Yes.

14  Q.  And approximately when did you raise those concerns at

15  MiMedx?

16  A.  Over a period of time between October of 2015 and January

17  of 2016.

18  Q.  Generally speaking, what kinds of accounting issues or

19  concerns did you have in that period?

20  A.  Revenue recognition was the accounting issued that I had.

21  Q.  Specifically, what was the nature of your concern with that

22  revenue recognition?

23  A.  My concern was that the company was recognizing revenue

24  sooner than it should have so that revenue was overstated for a

25  period of time.

Karnpet2                      Andersen - Direct

1  Q.  You had mentioned sending an e-mail at some point, is that

2  right?

3  A.  Yes.

4  Q.  Why did you put those concerns into writing through an

5  e-mail?

6  A.  Because I had done enough work on this, enough analysis and

7  research that I was not comfortable signing the management

8  representation letter for the year end for the audit that was

9  underway.

10         I knew that there were very high stakes around this

11 because company bonuses were tied to this metric, the earnings

12 release had already gone out at that point for the full year of

13 2015.  And it was -- it had reached a point where my discomfort

14 with the numbers was such that I felt I had to communicate it

15 and communicate it formally and timely.  So I sent the e-mail

16 to my boss, Mr. Senken, indicating those concerns.

17 Q.  Just to be clear, when you sent the e-mail, was that the

18 first time you had these concerns, on the day you sent the

19 e-mail?

20 A.  No.

21 Q.  What kinds of facts had you observed at MiMedx that gave

22 you those concerns?

23 A.  There was work that we were doing around the receipt of

24 payments from customers where payments weren't being received

25 when they should have been received, which caused me to then

Karnpet2                    Andersen - Direct

1   look at more information on the sales to those customers, their

2   ability to pay, and when they were paying, and that led me to

3   do more research and raise these concerns.

4   Q.  What kind of steps, if any, did you take to look into those

5   concerns when they came to your attention?

6   A.  I looked at documentation, looked at accounting literature,

7   looked for comparative examples in the accounting literature to

8   see how the accounting should be handled.

9   Q.  Did your work or did your looking at any of these things

10  allay your concerns about how the company was recognizing

11  revenue?

12  A.  No.

13          MR. TRACER:  I would like to show the witness what's

14  been marked as Government Exhibit 1113.

15  BY MR. TRACER:

16  Q.  Can you see this document, sir?

17  A.  Yes.

18  Q.  What is it?

19  A.  This is the e-mail that I sent to Mr. Senken on January 18.

20          MR. TRACER:  The government offers Government Exhibit

21  1113 into evidence.

22          THE COURT:  Received.

23          (Government Exhibit 1113 received in evidence)

24          MR. TRACER:  Mr. Pechet, can we publish that to the

25  jury, please.

Karnpet2                    Andersen - Direct

1   Q.  Mr. Andersen, let's start with some of the high-level

2   information.

3                MR. TRACER:  Mr. Pechet, can you just blow up the

4   e-mail, top of the e-mail.

5   BY MR. TRACER:

6   Q.  Mr. Andersen, can you read who it's from and who it's to.

7   A.  This is from myself, Mark Andersen, to Mr. Senken.

8   Q.  What is the date of the e-mail?

9   A.  January 18, 2016.

10  Q.  Do you remember what day of the week that was?

11  A.  It was a Monday.

12  Q.  What's the subject?

13  A.  The subject is revenue recognition and controls.

14  Q.  Did you later learn whether this e-mail was shared with

15  other people beside Mr. Senken at MiMedx?

16  A.  Yes.

17  Q.  How did you learn about that?

18  A.  Through subsequent conversations that I had --

19  Q.  OK.

20  A.  -- with members of the management.

21  Q.  And which members of management are you talking about?

22  A.  Pete Petit, Bill Taylor, Mike Senken.

23               MR. TRACER:  Mr. Pechet, if we can go to the body of

24  the e-mail.  I want to start where it says Mike comma, and then

25  it's got that first paragraph.

SOUTHERN DISTRICT REPORTERS, P.C.

**A-242**

195

Karnpet2                    Andersen - Direct

1   A.  Not necessarily, no.

2   Q.  OK.  By sending this e-mail, how, if at all, did you expect

3   that that would affect the facts that were known to you?

4           MR. WEINREB:  Objection.

5           THE COURT:  Sustained.

6           as I tried to indicate in my prior ruling, I'm not

7   sure of what evidentiary value, if any, his expectations is, so

8   you should really refrain from that.

9           MR. TRACER:  Understood.

10  BY MR. TRACER:

11  Q.  Mr. Andersen, did you speak with any members of MiMedx's

12  management after you sent this e-mail?

13  A.  Yes.

14  Q.  Who did you speak with?

15  A.  The first conversations I had were with Mr. Senken,

16  Mr. Evans, and Mr. Cranston.

17  Q.  What department do those people work in?

18  A.  The finance and accounting department.

19  Q.  When you met with them after sending the e-mail, what, if

20  anything, did Mr. Senken say to you?

21  A.  He said that -- a number of things.  This was normal course

22  of business, that this was what they'd always done, that I

23  didn't understand all the facts and circumstances, that the

24  accounting was correct.  He told me that in the course of those

25  meetings that my concerns had been shared with the external

Karnpet2                        Andersen - Direct

1   auditors with the audit committee and with external counsel and

2   that none of them agreed with me and that my conclusions were

3   wrong.

4   Q.  Did he bring any new facts to your attention in those

5   conversations that you had not known about the deals?

6   A.  There were some new facts that he brought into those

7   conversations.

8           THE COURT:  Counsel, we're going to give the jury a

9   midmorning break.

10          Is this a good time?

11          MR. TRACER:  It is, your Honor.

12          THE COURT:  All right.  Very good.  So, ladies and

13  gentlemen, we will take a 15-minute break at this time.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

Karnpet2                    Andersen - Direct

1   controls, which is why you had a little problem before.  But I
2   do want to get it to the maximum that we can get it, given that
3   we have jurors spread throughout every part of the courtroom
4   without getting the feedback.  Let me try it a little louder
5   now, and we'll see if it works or still has a problem.
6               Do you want to say something?
7               MR. TRACER:  Testing for audio.
8               THE COURT:  That seems OK.
9               Let's try it with the witness.
10              THE WITNESS:  Testing for audio.
11              THE COURT:  OK.  That sounds good.
12              On the remote possibility that counsel might have
13  objections to questions let's hear first from -- it's listed
14  here as front attorney, middle attorney and rear attorney.
15              Anyone want to qualify for rear attorney?
16              Let's see.  I think front attorney is probably the
17  government.  So let me raise yours a little bit.  Speak into
18  it.
19              MR. HARTMAN:  Testing, testing.
20              THE COURT:  OK.
21              The middle attorney?
22              MS. LOEB:  Objection.
23              THE COURT:  All right.  Let me raise that a little
24  bit.  Try again.
25              MS. LOEB:  Objection.

Karnpet2                    Andersen - Direct

1          THE COURT:  Better.

2          And rear attorney.

3          Hold on.  Go ahead.

4          MR. WEINREB:  Objection.

5          THE COURT:  OK.  I think we've got it up to a good

6    level now.

7          So the jury I will say did not indicate any problems

8    hearing, and they seem to be fully attentive, but I like to

9    make sure we're helping them as much as possible.

10          We will go to 12:45.

11          (Continued on next page)

Karnpet2                     Andersen – Direct

1          (Jury present)

2          THE COURT:  Please be seated.

3          All right.  Counsel.

4          MR. TRACER:  Thank you.

5    BY MR. TRACER:

6    Q.  Mr. Andersen, before we broke, you said you had certain

7    conversations with Mr. Senken, is that right?

8    A.  Yes.

9    Q.  Did any of your conversations with Mr. Senken allay your

10   concerns about revenue recognition at the company?

11   A.  No.

12   Q.  I want to look at the e-mail that you sent.

13          MR. TRACER:  Mr. Pechet, if we could pull back up

14   Government Exhibit 1113.

15   BY MR. TRACER:

16   Q.  You will see that below the initial paragraph there's some

17   bullet points.  All right.  I want to start with that first

18   bullet point that starts with SLR.

19          Could you remind the jury, what is SLR?

20   A.  SLR was a distributor customer of MiMedx.

21   Q.  How much revenue was connected to sales to SLR, according

22   to your e-mail?

23   A.  I put here approximately $4.5 million.

24   Q.  OK?

25   A.  Can you read what you wrote about SLR?

SOUTHERN DISTRICT REPORTERS, P.C.

KARPPET3                    Andersen - Direct

1    Q.  Okay.  And at any point while you worked at MiMedx, were

2    you told that SLR had received a loan prior to making payments

3    to MiMedx?

4    A.  No.

5    Q.  Okay.  And let me ask you this.  If Mr. Petit had known

6    that SLR was turned down for a bank loan --

7            MS. LOEB:  Objection.

8            THE COURT:  Overruled.

9    Q.  And, sir, while you were working at MiMedx, if Mr. Petit

10   had known that SLR was turned down for a bank loan and then

11   encouraged his family members to make a loan --

12           MS. LOEB:  Objection.

13           THE COURT:  Sustained.

14   Q.  Okay.  While you were working at MiMedx, if a loan had been

15   made by Petit's family members to SLR, should that fact have

16   been disclosed to you, as a member of the accounting

17   department?

18           MS. LOEB:  Objection.

19           THE COURT:  Overruled.

20   A.  Yes.

21   Q.  And whose responsibility would it be to share that

22   information with you?

23   A.  Mr. Petit's.

24   Q.  And if, in fact, Mr. Petit had encouraged family members to

25   make that loan, what impact, if any, would that have on your

KARPPET3                    Andersen - Direct

1   analysis of revenue recognition?

2            MS. LOEB:  Objection.

3            THE COURT:  Overruled.

4   A.  It would have called into doubt whether the customer had

5   the ability to pay MiMedx.  So whether or not this

6   collectibility is reasonably assured would have been called

7   into doubt and revenue would not have been recognized until

8   that criterion had been met.

9   Q.  When you say not recognized until the criteria had been

10  met, what do you mean?

11  A.  The sales would not have been recorded and not have been

12  recorded in revenue in that time period.

13  Q.  Okay.  Specifically, which revenue recognition factor does

14  that go to?

15  A.  So that would be the collectibility as reasonably assured.

16  Q.  Okay.  And was that one of the factors mentioned in your

17  e-mail, Government Exhibit 1113, that we looked at?

18  A.  Yes.

19  Q.  Okay.  And, Mr. Andersen, when you raised that issue of

20  collectibility in your e-mail, did you expect to be advised of

21  all the facts related to SLR's financial condition?

22            MR. WEINREB:  Objection.

23            THE COURT:  Overruled.

24  A.  Yes.

25  Q.  Okay.  And, Mr. Andersen, just to be clear, even if you had

KARPPET3                    Andersen - Direct

1    learned of this loan in the fourth quarter of 2015, would that

2    have caused you to question revenue in the third quarter of

3    2015?

4    A.  Yes.

5    Q.  And why?

6    A.  Because I would have questioned whether or not the

7    collectibility is reasonably assured was met at the time of the

8    sale that occurred during the third quarter.

9         MR. TRACER:  Okay.  Mr. Pechet, we can take this down.

10   Q.  I want to go back to your e-mail, Mr. Andersen, Government

11   Exhibit 1113.  The next bullet point in your e-mail talks about

12   Stability Biologics.  Can we focus on that?  Can you remind us,

13   what is Stability Biologics?

14   A.  Stability Biologics was a distributor, customer of MiMedx.

15   Q.  Okay.  And did there come a time when there were any other

16   transactions between MiMedx and Stability?

17   A.  Yes.

18   Q.  What was that?

19   A.  Stability was under -- MiMedx was in negotiations to buy

20   the company, Stability.

21   Q.  Did they end up, in fact, buying Stability?

22   A.  Yes, I believe so.

23   Q.  Okay.  And the sales that were made as a distributor, did

24   those happen before or after MiMedx acquired Stability?

25   A.  They happened before.

KARPPET3                    Andersen - Direct

1    amniotic-related products so you may proceed on your own."

2    Q.  Okay.  Now, having read that paragraph, Mr. Andersen, do

3    you believe that the description of the exchange or return in

4    that paragraph should have been brought to your attention if

5    this letter existed at the time you worked at MiMedx?

6    A.  Yes.

7    Q.  Okay.  And if this letter existed, whose responsibility

8    would it be to bring it to your attention?

9    A.  Mr. Petit's.

10   Q.  Okay.  And why should this letter have been brought to your

11   attention?

12   A.  Because this is -- this would be a factor in determining

13   whether or not you can recognize revenue on the sales to

14   Stability Biologics.

15   Q.  Okay.  And in particular, what about this letter or what in

16   this letter impacts your view of revenue recognition from sales

17   to Stability?

18   A.  So the right of return or exchange is a factor that has to

19   be considered under the revenue recognition criteria.  And when

20   there's a right of return, then additional stipulations have to

21   be met in order to be able to recognize the revenue.

22   Q.  Okay.  And in this case, if you had known about the right

23   of return described here, how would that have impacted your

24   view of revenue recognition?

25   A.  I would not have recognized the revenue on this sale, most

KARPPET3                    Andersen – Direct

1   likely.

2   Q.  And why not?

3   A.  Because if you can't -- if you can't estimate how much

4   product is going to be returned at the time of the sale, then

5   you're precluded from recognizing those sales at that time.

6   Q.  Okay.  And, Mr. Andersen, are you familiar with something

7   called a contingent sale?

8   A.  Yes.

9   Q.  What is a contingent sale?

10  A.  A contingent sale is basically, I sell product -- an

11  example would be, I sell product to you and the contingency

12  would be you would pay me when you sold it to a customer of

13  yours, for example, or some other event occurred that would

14  then trigger the fact that title had actually passed and that

15  you would actually owe me for the money that I sold to you.

16  Q.  And if there is a contingent sale, how does that affect

17  revenue recognition?

18  A.  Contingent sale doesn't get recognized until the

19  contingency has been resolved.

20  Q.  And we looked at your e-mail before about Stability.  When

21  you were analyzing Stability, was that one of your concerns?

22  A.  Yes.

23  Q.  And why did you have that concern?

24  A.  Because, to me, it appeared that the sale of this product

25  to Stability was -- and their acceptance of this product was

KARPPET3                    Andersen – Direct

1  BY MR. TRACER:

2  Q.  I'll read directly from the e-mail.  And, Mr. Andersen, if

3  there was a sale in 2015 where MiMedx had said:  So we can ship

4  what we have now in stock, and I will physically come back to

5  Dallas and make changes in early July, should that kind of

6  agreement have been brought to your attention in connection

7  with the sale?

8            MS. LOEB:  Objection.

9            THE COURT:  Overruled.

10  Q.  Should that kind of agreement have been brought to your

11  attention, if it existed, in connection with the sale?

12  A.  Yeah, I'm uncertain on how to answer because it should have

13  been brought to the attention of accounting, but I wasn't there

14  at the time of the sale.

15  Q.  Right --

16            THE COURT:  Just so that I'm clear.  What was your

17  involvement in the year-end review or audit or whatever?

18            THE WITNESS:  My involvement in the year-end audit was

19  compiling all of the numbers for the entire year and providing

20  those numbers to the auditors.

21            THE COURT:  So if you had been made aware of this

22  document at that time in connection, would it have altered what

23  you would have presented?

24            THE WITNESS:  Yes, it would have.

25            THE COURT:  All right.  Very good.

**A-253**

KARPPET3                     Andersen - Direct

1          MR. TRACER:  That's all I have on that.  You can take

2     that down Mr. Pechet.

3     BY MR. TRACER:

4     Q.  And lastly, Mr. Andersen, were you ever told whether anyone

5     had made a cash payment to the owner of CPM prior to CPM making

6     any purchase?

7     A.  No.

8     Q.  Okay.  And again, in connection with your role as an

9     accountant, if that were true or if such a payment had been

10    made, should that have been brought to your attention at the

11    accounting department?

12    A.  Yes.

13    Q.  And whose responsibility would it be to bring that to your

14    attention?

15    A.  Whomever had entered into that agreement.

16    Q.  Okay.  And if you had known those facts, how would that

17    affect your accounting for the transaction?

18    A.  A payment to a customer generally is a reduction of

19    revenue; so it would have reduced revenue most likely.

20    Q.  Okay.  Now, Mr. Andersen, you testified yesterday that

21    there came a time when you left MiMedx; is that right?

22    A.  Yes.

23    Q.  Okay.  And before you left MiMedx, did you meet with any

24    members of MiMedx's senior management?

25    A.  Yes.

KARPPET3                    Andersen - Direct

1   Q.  Who did you meet with?

2   A.  I had several meetings with Mike Senken, as previously

3   referenced, but I also met with Bill Taylor and Pete Petit.

4   Q.  Okay.  Do you remember approximately when did you meet with

5   Mr. Pete Petit?

6   A.  I believe it was June -- sorry, January 25th.

7   Q.  Okay.  And can you tell us, during that meeting, as best as

8   you recall, what did you say and what did Mr. Petit say during

9   that meeting before you left MiMedx?

10  A.  My recollection is Mr. Petit said that he was disappointed

11  in the way that I had handled the concerns that I had raised in

12  the e-mail.  He expressed concern for my family in that

13  meeting, told me that he would prefer that I had just come and

14  talked to him as these issues would come up.

15          He told me that this was, you know, what they had

16  always done; that this was part of building the business.  It

17  was an entrepreneurial business, and this was part of taking

18  risks in the business and that I needed to be able to accept

19  those risks.

20          And I told Mr. Petit in that meeting that I thought

21  that I was not questioning his integrity when I sent that

22  e-mail and that I thought -- I believed that this was a

23  difference of opinion on accounting issues.

24  Q.  Okay.  You said that -- you described Mr. Petit expressing

25  concerns about your family.  What did you understand him to

**A-255**

KARPPET3                    Andersen - Direct

1   mean by that?

2   A.  What I understood was that, you know, I viewed it as the

3   way that I handled it wasn't great and that, you know, if my

4   career was ended at MiMedx, it would obviously have an impact

5   on my ability to earn money and provide for my family.  So I

6   took it as genuine concern that my actions might have

7   jeopardized my ability to provide for my family.

8   Q.  What was your understanding of why that would affect your

9   family?

10  A.  That if I were fired from MiMedx, that I would not be able

11  to continue to earn a living.

12  Q.  At that point, were you concerned that you might be fired?

13  A.  When I sent the e-mail, I was concerned that I might be

14  fired.  I don't think that -- at the time that I met with

15  Mr. Petit, I was not really concerned that I would be fired at

16  that point, no.

17  Q.  Okay.  If you thought you would be fired, why did you send

18  the e-mail?

19  A.  I sent the e-mail because I had to -- you know, I

20  understood the stakes at the time and how important revenue

21  recognition was.  We were getting ready to do the year-end

22  audit, and I needed to formally communicate how uncomfortable I

23  was with the revenue recognition.

24          And I had sought external counsel at the time and

25  tried to figure out what was the best way to handle the

SOUTHERN DISTRICT REPORTERS, P.C.

KARPPET3                    Andersen - Direct

1    situation, and the best way that I could figure out to handle

2    the situation was to send the e-mail to Mr. Senken.

3    Q.   Okay.   You mentioned telling Mr. Petit that you didn't

4    think it was about his integrity; is that right?

5    A.   That's correct.

6    Q.   And why did you say that?

7    A.   Because I believed that these were all legitimate

8    transactions with real customers, that these weren't fictitious

9    sales, and that I believed that this was a disagreement of

10   they thought the accounting was okay and I thought it wasn't.

11   Q.   Okay.   And at the time, did you believe that you had all

12   the facts that were disclosed to you?

13   A.   I believed that I had all the facts, yeah.   I mean, I

14   wasn't aware of any facts that hadn't been disclosed to me at

15   that time.

16   Q.   And, sir, would your view of whether this is an accounting

17   issue or an integrity issue be affected by whether there were

18   terms of the sale that were not disclosed to you?

19           MS. LOEB:   Objection.

20           MR. WEINREB:   Objection.

21           THE COURT:   Well, I think the door was opened there by

22   no objection being raised to the questions that led up to it.

23   Overruled.

24           MS. LOEB:   Your Honor, may we approach?

25           THE COURT:   No.

KARPPET3                    Andersen - Direct

1          MS. LOEB:  The -- the --

2          THE COURT:  Counsel.

3   A.  I think if there were things that were not disclosed, it

4   would call into question integrity.

5   Q.  And did your conversation ultimately with Mr. Petit allay

6   your concerns that you had raised in the e-mail?

7   A.  No.

8   Q.  Did you feel that the company did a thorough job looking

9   into your concerns?

10  A.  No.

11  Q.  Why not?

12  A.  Because, in part, I was the one who raised the concerns,

13  but I -- I was told that the company had reviewed this with --

14  had raised my concerns, shared my concerns with the audit

15  committee, with the external auditors, and others, but I was

16  not involved in any of those conversations.  I don't know what

17  was conveyed to the auditors.

18          In the follow-up meetings that I had with Mr. Senken,

19  Mr. Evans and Mr. Cranston, I didn't believe that that was an

20  intellectually honest approach to the concerns that I had

21  raised.  They were making arguments to me, but we weren't

22  really diving into accounting literature and using examples and

23  analysis of the facts and circumstances to determine what the

24  correct accounting should have been.

25  Q.  Now, did there come a time when your job at MiMedx changed?

Karnpet4                    Andersen – Cross

1          THE WITNESS:  Meaning that by sending the e-mail, I

2    had created disappointment, dissatisfaction with my job, right?

3    There was tension.  Before accepting this revised job offer, I

4    wanted to make sure that there was enough of a relationship

5    that would allow me to do the job under the revised role.

6          THE COURT:  How long did this meeting last?

7          THE WITNESS:  My guess would be 20 to 30 minutes, but

8    I don't remember for sure.

9          THE COURT:  Was it mostly you talking, mostly him

10   talking or a fair balance of both?

11         THE WITNESS:  My recollection, probably a fair balance

12   of both.

13         THE COURT:  And tell us again what the conversation

14   was.

15         THE WITNESS:  So the conversation was Mr. Petit had

16   expressed disappointment with the way I had raised the

17   concerns, and that I should have just come and talked to him if

18   I had concerns, had issues, that he expressed concern for my

19   family.  He talked about the fact that this was kind of the way

20   they've always run the business, that this was them -- this was

21   the business taking risks and that I needed to be able to be

22   comfortable with the business taking risks in order to grow.

23         THE COURT:  What did you say to him?

24         THE WITNESS:  My response to Mr. Petit was I did not

25   think that -- the issues that I raised I did not think were --

Karnpet4                    Andersen - Cross

1  I wasn't questioning his integrity but that these were

2  differences on the accounting concerns.

3          THE COURT:  OK.  And what did he say to that?

4          THE WITNESS:  I'm not sure that I remember exactly

5  what he said in response to that.

6          THE COURT:  Wasn't that the critical question?

7          THE WITNESS:  Whether I questioned his integrity?

8          THE COURT:  No.  Whether you were questioning his

9  accounting.

10          THE WITNESS:  The critical question was -- I mean, the

11  accounting had been the critical question, and at this point I

12  viewed that as -- I had received the company's response.  It

13  was -- in the company's mind it was resolved, and I had now a

14  different job and a different role in the company going

15  forward.

16          THE COURT:  OK.

17          Counsel, you may proceed under that rubric so to

18  speak.

19          MS. LOEB:  Thank you, your Honor.

20  BY MS. LOEB:

21  Q.  One of the things you just mentioned, Mr. Andersen, was

22  that you had a hard time remembering sitting here today what

23  that conversation consisted of, correct.

24  A.  Yes, I don't remember all the specifics of that

25  conversation.

Karnpet4                    Andersen - Cross

1    everything that was happening and why I had these accounting

2    concerns.  And then, as time evolved and things happened, I

3    updated those notes.

4              THE COURT:  Are you still objecting?

5              MR. TRACER:  Yes, your Honor.  These are hearsay.

6              THE COURT:  Well, it is hearsay to the extent it is

7    not inconsistent with his prior testimony, but why would you

8    want to object to something that's consistent with his prior

9    testimony?

10             MR. TRACER:  I don't think there is a ground for that,

11   but I --

12             THE COURT:  I am going to allow it.

13   BY MS. LOEB:

14   Q.  In your notes to yourself, Mr. Andersen, you wrote of your

15   conversation with Mr. Petit and Mr. Taylor on January 25, that

16   "they wanted to understand the concerns I had and take the

17   opportunity to share additional facts and circumstances."

18             Correct?

19   A.  Yes, that's what I wrote.

20             MS. LOEB:  OK.  You can take it down now, Mr. McLeod.

21   Thank you.

22   BY MS. LOEB:

23   Q.  Now, in that meeting you didn't think that Mr. Petit was

24   trying to change your mind about the accounting judgments that

25   you had reached, correct?

Karnpet4                    Andersen – Cross

1    A.  No, I don't think so.

2    Q.  You felt like he was trying to just explain the business

3    judgments to you, correct?

4    A.  Yes, I think he was trying to explain part of the business

5    in that conversation, yes.

6    Q.  In your mind, what you were talking about, accounting, was

7    different from what he was talking about, which was business,

8    correct?

9    A.  I am not sure that those two things are separate

10   necessarily.  The one leads to the other.

11   Q.  In your mind, though, a business decision is different from

12   an accounting decision, correct?

13   A.  Yes.  They can be separated.

14   Q.  Mr. Petit told you in this meeting you could always come

15   talk to him about concerns you had, correct?

16   A.  Yes, he did say that.

17   Q.  He told you his door is always open to you, correct?

18   A.  I don't remember him specifically saying that but something

19   to that effect, yes.

20   Q.  Do you remember telling the government on a prior occasion

21   that his door is always open for to you come talk to him?

22   A.  I don't remember saying it.

23   Q.  Now, you indicated in your direct testimony that you had

24   started to think about and talk about these issues as far back

25   as October of 2015, correct?

Karnpet4                    Andersen - Cross

1    A.  Yes, that's correct.

2    Q.  When you had raise these issues in the past, you would

3    always raise them to Mr. Senken, correct?

4    A.  Yes, Mr. Cranston and Mr. Senken.

5    Q.  OK.  Up until this point, you had never discussed these

6    concerns with Mr. Petit, correct?

7    A.  That's correct.  I believe that's correct.

8    Q.  So this meeting in which you requested to sort of clear the

9    air in your words, Mr. Petit was calm in that meeting, correct?

10   A.  Yes, he was calm.

11   Q.  He was professional in that meeting, correct?

12   A.  Yes, I would say he was professional.

13   Q.  He did not have any adverse reaction to the information

14   that you shared in that meeting, correct?

15   A.  Not in that meeting, no.

16   Q.  He told you that he was concerned for your family, correct?

17   A.  Yes.

18   Q.  Which you testified on direct you actually interpreted to

19   be his genuine concern for the well-being of you and your

20   family, correct?

21   A.  Yes, that's correct.

22   Q.  This was not a question of integrity, right?

23   A.  That I said to him that I did -- I didn't think that this

24   was a question of his integrity.

25   Q.  Rather, you thought it was a difference of opinion on

**A-263**

Karnpet4                    Andersen - Cross

1    accounting matters, correct?

2    A.  Yes.

3    Q.  I want to switch gears to something you talked about at the

4    end of your testimony yesterday, which is something called

5    accrual-based accounting.

6              Do you remember your testimony yesterday about

7    accrual-based accounting?

8    A.  I remember talking about accrual-based accounting.

9    Q.  OK.  So accrual-based accounting means that a company

10   recognizes or counts revenue at the time that it sells product

11   rather than at the time it gets paid, right?

12   A.  That is a simple explanation of accrual accounting, yes.

13   Q.  And there's nothing wrong with accrual-based accounting?

14   A.  No, there's nothing wrong with accrual-based accounting.

15   Q.  In fact, accrual-based accounting is the way that all

16   companies, all public companies recognize revenue, correct?

17   A.  Yes, that's my understanding, that all public companies are

18   required to use the accrual method of accounting.

19   Q.  It's the default way to actually account for sales under

20   the generally accepted accounting principles, correct?

21   A.  Yes.  It is a way for all transactions, yes.

22   Q.  Just so there's no confusion as we go forward, generally

23   accepted accounting principles there is a shorthand for that

24   called GAAP, right?

25   A.  Yes.

**A-264**

Karnpet4                     Andersen – Cross

1   Q.  That's basically a set of universal rules that apply to

2   business and corporate accounting, correct?

3   A.  Yes.

4   Q.  They're established by an independent body called the

5   Financial Accounting Standards Board?

6   A.  And others, yes.

7   Q.  And you testified yesterday that the reason that

8   accrual-based accounting is used is because it's actually

9   considered a more accurate picture of a company's finances at a

10  given moment in time, correct?

11  A.  That's correct.

12  Q.  So one analogy that I would like to know if you agree with

13  is it's sort of like writing a check, when you write a check

14  you record the date of the check as the day that it's written

15  and not necessarily the date that it is cashed by the

16  recipient, is that correct?

17  A.  Yes, I think that's correct in your example there.

18  Q.  So, applying that to this, this would be a company

19  recording or counting the money it gets at the time it makes

20  the sale, not when it gets paid on that sale, correct?

21  A.  Yes.

22  Q.  So you will agree with me that there's nothing nefarious

23  about the fact that at MiMedx, like all other public companies,

24  used accrual-based accounting to count their revenue?

25  A.  No.  There's nothing nefarious about accrual-based

SOUTHERN DISTRICT REPORTERS, P.C.

Karnpet4                    Andersen – Cross

1  accounting.

2  Q.  It's also the same methodology you used, for example, at

3  Eli Lilly, where you worked for several years before MiMedx?

4  A.  Yes.

5  Q.  You testified yesterday that you have a college degree in

6  accounting, is that right?

7  A.  Yes.

8  Q.  Also a master's degree in accounting?

9  A.  Yes.

10  Q.  You also have an MBA, is that right?

11  A.  Yes.

12  Q.  And more than 20 years of experience working in accounting?

13  A.  Yes.

14  Q.  You also testified yesterday that on occasion when an

15  accounting matter would cross your desk, before opining on that

16  matter, you would need to conduct some additional research on

17  that matter, right?

18  A.  That's often the case, yes.

19  Q.  Talk to experts about that matter, right?

20  A.  On complicated things, yes.

21  Q.  Because accounting is complicated, right?

22  A.  Accounting can be complicated, yes.

23  Q.  Even for somebody with two advanced degrees and 20 years of

24  experience in accounting, right?

25  A.  Some accounting can be complicated, yes.

Karnpet4                    Andersen - Cross

1    Q.  So I want to ask some specific questions about your

2    experience and your expertise in GAAP.

3             Are you an expert in GAAP?

4    A.  I wouldn't consider myself an expert in GAAP.  I would

5    consider myself experienced in applying GAAP.

6    Q.  Do you have any specialized training in GAAP?

7    A.  Do I have any -- I have had years of continuing

8    professional education in GAAP, plus college education and

9    others.

10   Q.  Do you hold any special accreditations in interpreting

11   GAAP?

12   A.  I am a licensed CPA.

13   Q.  I want to ask you about the specific principle that's at

14   issue in this case, which I believe you testified yesterday is

15   revenue recognition, is that right?

16   A.  That's correct.

17   Q.  That's the rules that govern just what we were talking

18   about, when in the course of a sale a company is allowed to

19   recognize the money from that sale, right?

20   A.  That's correct.

21   Q.  Are you familiar --

22   A.  Can I clarify one thing.  It's not when are they

23   recognizing the money, but it's when they are actually

24   recognizing the sale, because I consider money to be the cash

25   transaction.

Karnpet4                    Andersen - Cross

1    Q.  So when they're recognizing the fact that that sale took

2    place?

3    A.  Yes.

4    Q.  Are you familiar with Accounting Standards Codifications?

5    A.  Yes.

6    Q.  And that's the actual book of rules that tells accountants

7    like yourself how to apply GAAP, right?

8    A.  It's the primary source, but there are many other sources

9    that get used in addition to that.

10   Q.  OK.  So, back in 2015, which is the time period where you

11   raised these concerns, there was a specific Accounting

12   Standards Codification topic that related specifically to

13   revenue recognition, correct?

14   A.  That's correct.

15   Q.  That's ASC 605?

16   A.  That's correct.

17           MS. LOEB:  Mr. McLeod, could you bring up DX 639.

18   BY MS. LOEB:

19   Q.  This is the ASC 605 that's up here on your screen, right?

20   A.  It looks like it, yes.  It is an introduction to it.

21   Q.  Would it surprise you to learn that ASC 605 --

22           THE COURT:  I never allow a question that begins with

23   that formulation.  That is a form of counsel testifying.

24           Rephrase the question.

25   BY MS. LOEB:

**A-268**

Karnpet4                     Andersen - Cross

1  Q.  Mr. Andersen, were you aware that ASC 605 is 347 pages

2  long?

3  A.  I could not have told you how many pages was in ASC 605.

4  Q.  OK.  ASC 605 has all the rules for revenue recognition,

5  correct?

6  A.  I am not sure that it has all the rules in it, but this is

7  the prime source of GAAP.

8  Q.  It contains the subparts to the rules?

9          MR. TRACER:  Objection.

10          THE COURT:  Yes.  I am not sure what that means given

11  the previous answer, but put another question.

12  BY MS. LOEB:

13  Q.  Are you aware that there are -- well, let's say this.

14  There is a subpart of ASC 605 that's called SAB topic 13?

15  A.  Say that SAB topic again.

16  Q.  13.

17  A.  Yes.

18  Q.  That discusses the Securities and Exchange Commission's

19  view of how to apply all those rules to the area of revenue

20  recognition, correct?

21  A.  It does have a topic by the SEC that talks about how to

22  apply rules, yes.

23  Q.  And yesterday Mr. Tracer asked you about the specific -- or

24  actually it may have been earlier this morning he asked you

25  about the four criteria that the SEC advises on how to

SOUTHERN DISTRICT REPORTERS, P.C.

**A-269**

Karnpet4                    Andersen – Cross

1  recognize revenue under accrual-based accounting, correct?

2  A.  Yes.

3  Q.  That's contained within SAB topic 13?

4  A.  Yes, those four criteria are contained there, yes.

5  Q.  Are you aware that just that subpart, topic 13, is 29

6  single-spaced pages?

7          MR. TRACER:  Objection.

8          Your Honor, it is not in evidence this document.

9          THE COURT:  Do you want to offer it?

10         MS. LOEB:  I will offer it into evidence, your Honor.

11         There is a stipulation that applies to its

12  authenticity.

13         MR. TRACER:  We would object.

14         THE COURT:  Ground?

15         MR. TRACER:  This is effectively a legal instruction.

16         It's a legal treatise.

17         THE COURT:  This is a legal instruction?  I'm sorry.

18  I thought we were talking about -- let me see that.

19         Do you have the document there?

20         All three hundred and some pages.  I will just go

21  through it.

22         So, tell us again -- let's maybe take this from the

23  start.  What is the Financial Accounting Standards Board?

24         THE WITNESS:  That's the FASB.  That's the primary

25  center of the accounting rules or the accounting principles

SOUTHERN DISTRICT REPORTERS, P.C.

KARPPET5                    Andersen - Cross

1    Q.  Isn't it true that offering a right of return can be an
2    acceptable way to keep a customer happy?
3              MR. TRACER:  Objection.
4              THE COURT:  Sustained.
5    Q.  There's nothing inherently wrong about offering a customer
6    a right of return, is there?
7    A.  No.
8    Q.  And it can be appropriate to recognize revenue even when
9    there is a right of return present, correct?
10             MR. TRACER:  Objection.
11             THE COURT:  I think there is a legitimate question
12   there, but the phraseology is ambiguous.  Rephrase it, please.
13   Q.  There's nothing in the generally accepted accounting
14   principles that precludes a company from recognizing revenue
15   when there is a right of return present?
16             MR. TRACER:  Objection.
17             THE COURT:  Ground?
18             MR. TRACER:  702.
19             THE COURT:  I'm sorry, what was the ground?
20             MR. TRACER:  702.
21             THE COURT:  702.  This has come up now twice.  I'll
22   explain it after we excuse the jury, but overruled.  The
23   question will stand.
24   BY MS. LOEB:
25   Q.  Arrangements can be allowed under GAAP for a company to

**A-271**

KARPPET5                    Andersen – Cross

1  recognize revenue even when there is a right of return?

2  A.  Within GAAP there are specific rules that address how to

3  handle when there is a right of return from a customer, and

4  those specific rules provide guidance of when revenue can be

5  recognized and when it can't.

6  Q.  So stated differently, GAAP allows for a company to

7  recognize revenue even when there is a right of return under

8  certain circumstances, correct?

9  A.  Under certain circumstances, that's true.

10 Q.  And one of the circumstances that you just testified to a

11 few minutes ago was when a company can estimate the amount of

12 returns they actually expect to get back, correct?

13 A.  If other criteria are also met, that's true.

14 Q.  So, for example, when Apple sells iPads that customers have

15 a right to return, Apple can still record the revenue based on

16 its assessment of how many of those iPads are likely to come

17 back to it, right?

18          MR. TRACER:  Objection.

19          THE COURT:  Sustained.

20 Q.  In order for a company to know -- in order for a company to

21 correctly recognize revenue, it has to be able to reasonably

22 estimate what it expects to come back by way of a return,

23 correct?

24 A.  That's one of the criteria, but there are others that also

25 have to be met.

KARPPET5                    Andersen - Cross

1   Q.  Determining what it means to have a -- what a reasonable
2   expectation of a return means that's a matter of judgment;
3   would you agree?
4   A.  Could you restate that question?  If you're asking does
5   setting expectation about future returns require judgment, the
6   answer is yes.
7   Q.  Deciding what's reasonable is a question of judgment,
8   correct?
9   A.  Yes.
10  Q.  It's a question of discretion, correct?
11  A.  In the GAAP criteria, it requires, generally speaking, a
12  history of returns experience.  It has to be contemplated, and
13  then you apply experience on top of that.
14  Q.  And it's up to the accounting professionals to apply their
15  judgment to reach that answer, correct?
16  A.  That's correct.
17  Q.  At some point in the third quarter of 2015, you were asked
18  to provide accounting advice on the recognition of revenue that
19  was specific to storage of products in freezers; is that
20  correct?
21  A.  Sorry, resay the time frame again?
22  Q.  The third quarter of 2015?
23  A.  Yes.  Yes, that's correct.
24  Q.  Do you remember who asked you to look into the issue of
25  whether customers could store products in freezers?

KARPPET5                    Andersen – Cross

1   A.  I don't.

2   Q.  But do you remember that you researched that question?

3   A.  I remember that there was a question around buy and hold

4   that I researched and gave a response on.

5   Q.  And when you say "buy and hold," what does "buy and hold"

6   mean?

7   A.  It means that the customer buys it but that the company

8   continues to hold the product rather than ship it right away.

9   Q.  And you were asked to give your opinion as to whether that

10  would be proper under a certain set of circumstances; is that

11  right?

12  A.  Based on some information I was given, I provided a

13  response around what those criteria were, yes.

14  Q.  You discussed that matter with Mr. Cranston, correct?

15  A.  I don't remember discussing with Mr. Cranston.  I just

16  don't have a specific recollection of that.

17  Q.  You offered your assessment that, as long as specific

18  criteria were met, that the revenue associated with that

19  freezer arrangement could still be recognized, correct?

20  A.  I believe that's correct.

21  Q.  And you mentioned your assessment to Mr. Petit and

22  Mr. Taylor; is that right?

23  A.  I don't recall that at this point.

24  Q.  When you met with the prosecutors on April 29th of 2019,

25  you told them that you had had conversations about the freezers

KARPPET5                    Andersen – Cross

1   with Pete Petit and Bill Taylor in the third quarter of 2015,

2   correct?

3   A.  I don't know.  I don't recall that conversation.

4   Q.  And so as you understood it, the situation was there was a

5   customer who wanted to have product, to purchase product but

6   they didn't have the means to store it yet; is that right?

7   A.  I'm sorry, I'm trying to remember all the details around

8   that.  I believe that's the case.  I just don't have a specific

9   recollection of all the details around that.

10  Q.  You researched the issue, correct?

11  A.  I believe I did some accounting research around that issue,

12  yes.

13  Q.  And you indicated that there were certain circumstances

14  under which it would be totally appropriate for the company to

15  recognize revenue under that scenario, correct?

16  A.  Yes.

17          MS. LOEB:  If I can have you, Mr. McLeod, bring up

18  DX254.

19  Q.  Mr. Andersen, does seeing the message up here on the screen

20  refresh your recollection as to whether you worked with

21  Mr. Cranston on this matter?

22  A.  I don't specifically remember working on this.  I mean, to

23  this extent, having this conversation and this e-mail, I don't

24  remember.

25          MS. LOEB:  Your Honor, I would offer DX254 into

SOUTHERN DISTRICT REPORTERS, P.C.

KARPPET5                    Andersen – Cross

1   BY MS. LOEB:

2   Q.  Based on your conversations with Mr. Senken in that initial

3   conversation, you got comfortable with the third-quarter

4   financials, correct?

5   A.  That's correct.

6   Q.  And you felt like you didn't need to raise the issues

7   further at that time, right?

8   A.  That's correct.

9   Q.  But as we discussed, there came a point at which you

10  revisited that comfort level, right?

11  A.  Yes.

12  Q.  In January of 2016, correct?

13  A.  That's when I sent the e-mail, correct.

14  Q.  Correct.  And so at that point, you again believed that you

15  had reached a fundamental disagreement with Mr. Senken about

16  the accounting rules, correct?

17  A.  At the point that I sent the e-mail, I wasn't -- I wouldn't

18  know whether I disagreed or not.  I was just raising the

19  concerns that I had at that point.

20  Q.  And in your first conversation with Mr. Senken after

21  sending your e-mails, it became apparent to you that you had

22  reached a disagreement with him about the proper treating of

23  the accounting decisions, correct?

24  A.  Through those subsequent conversations, yeah, I think

25  that's a fair characterization.

KARPPET5                    Andersen - Cross

1    Q.  So let's talk about the specific things that you learned in

2    the course of your work as controller that led you to develop

3    these concerns again in January of 2016.

4                So the first distributor I want to ask you about is

5    SLR.  Okay?

6    A.  Okay.

7    Q.  You were aware that Jerry Morrison, the principal of SLR

8    used to be an employee of MiMedx, right?

9    A.  At some point, I became aware of that, yes.

10   Q.  You were aware that when he left his position at the

11   company, he entered into a consulting agreement with the

12   company?

13   A.  Yes, I became aware of that, as well.

14   Q.  You were aware that Mr. Morrison was originally being paid

15   $15,000 a month for consulting for the company, right?

16   A.  That's correct.

17   Q.  You were aware that those payments were later increased to

18   $25,000 a month, right?

19   A.  Yes, that's correct.

20   Q.  You were aware that Mr. Morrison's company, SLR, was in a

21   distributor relationship with the company, correct?

22   A.  That was my understanding, yes.

23   Q.  You were aware that Mr. Morrison had placed a large initial

24   stocking order of approximately $4.6 million in product,

25   correct?

**A-277**

KARPPET5                    Andersen - Cross

1   A.  Yes, I was aware of that.

2   Q.  You were aware that some part of his order was not being

3   shipped, but rather, was going to be stored in freezers at a

4   different location, correct?

5   A.  Yes, I was aware that there was a buy-and-hold

6   circumstance, yes.

7   Q.  Because this is an arrangement that you'd previously been

8   asked to look into, correct?

9   A.  That's correct.

10  Q.  And you had researched the requirements for a buy and hold

11  and reported back as to your findings, correct?

12  A.  Yes, I responded to the question around buy and hold and

13  what would qualify and gave that specific guidance back, yes.

14  Q.  You were aware that the request to hold the product in the

15  freezer had been made in writing by SLR, correct?

16  A.  Yes.

17  Q.  And, in fact, that was one of the key requirements under

18  your analysis of the buy and hold or bill and hold, correct?

19  A.  Yes, that's a key requirement under the GAAP literature,

20  yes.

21  Q.  You were aware that Mr. Morrison's original payment terms

22  on that $4.6 million purchase had been 30 days, correct?

23  A.  Yes.

24  Q.  And you were aware that those payment terms were later

25  changed to 90 days, correct?

**A-278**

KARPPET5                    Andersen - Cross

1   Q.  So at the very least, the facts that I've just gone through

2   are the things you knew at the time you raised your concerns?

3   A.  Raised my concerns on January 18th in the e-mail?

4   Q.  Yes.

5   A.  Yes.

6   Q.  Now, with respect to Stability, a different distributor,

7   you were aware that they had purchased $2.2 million of product

8   in the third quarter, correct?

9   A.  Yes.

10  Q.  You were aware that the purchase orders for those purchases

11  had 30-day payment terms, correct?

12  A.  Yes.

13          MR. TRACER:  Objection.

14          THE COURT:  Overruled.

15  Q.  You were aware that the purchase orders for that purchase

16  was logged in the accounting system just like every other PO?

17  A.  I don't know that.

18  Q.  Are you aware of any facts that suggest that they weren't

19  logged in the accounting system?

20          MR. TRACER:  Objection.

21          THE COURT:  Overruled.

22  A.  I'm not aware of any.  I just don't know either way.

23  Q.  So you have no reason to believe that the purchase order

24  from Stability was not treated like every other purchase order

25  that the company received?

SOUTHERN DISTRICT REPORTERS, P.C.

KARPPET5                    Andersen – Cross

1          THE COURT:  I'm sorry, where are you?

2          MR. HARTMAN:  This is the third paragraph, the second

3     sentence.

4          THE COURT:  Let me focus you here on the fact that one

5     of the key disputed issues with respect to these charges is

6     whether the defendants, either of them, acted with fraudulent

7     intent.  In particular, a defendant, even if he actually caused

8     MiMedx to improperly record revenue, is not guilty of

9     securities fraud unless he not only knew the revenue was

10    improperly recorded but also intended thereby to deceive

11    MiMedx's investors.

12         What's your objection to that?

13         MR. HARTMAN:  The concern is "actually caused MiMedx

14    to improperly record revenue" and "knew that revenue was

15    improperly recorded."  I think for the reasons the Court just

16    explained, the issue is not going to be whether the revenue was

17    properly recorded or not recorded under GAAP, but whether the

18    defendants executed a fraudulent scheme.

19         THE COURT:  Well, I understand that, but your position

20    is it wasn't properly recorded.

21         MR. HARTMAN:  We agree with that.

22         THE COURT:  No, no, that's part of your case.  You're

23    not contending, like the government in Simon, that, oh,

24    everything was recorded properly, but it was still a fraudulent

25    scheme.  You're saying it was grossly improperly recorded, if I

SOUTHERN DISTRICT REPORTERS, P.C.

**A-280**

Kasnpet1                          Andersen - Cross

1   acquisition?

2   A.   That's correct.  I never asked a question of Mr. Petit that

3   he refused to answer.

4   Q.   At the time that you sent your e-mail, you were also aware

5   that Stability had started to pay towards its revenue

6   balance -- excuse me, towards its receivable balance for the

7   third quarter purchase, correct?

8   A.   Yes, I knew that Stability paid approximately $200,000 out

9   of the $2 million plus balance that they owed.

10  Q.   And you were aware that MiMedx sold Stability additional

11  product in the fourth quarter, correct?

12  A.   Yes.

13  Q.   You had access to that purchase order in the regular course

14  of business, correct?

15  A.   I believe so.

16  Q.   It was stored on the company's systems just like every

17  other purchase order the company received?

18  A.   I don't know that for sure.

19  Q.   Do you have reason to disagree with me that it was stored

20  in the regular course?

21          MR. TRACER:  Objection.

22          THE COURT:  Sustained.

23  BY MS. LOEB:

24  Q.   Are you aware of any fact to suggest that it was treated

25  any differently?

Kasnpet1                    Andersen - Cross

1   testimony to be that Mr. Petit, your view, that Mr. Petit

2   should have disclosed the existence of a loan at all because it

3   demonstrated to you that SLR didn't have the independent

4   ability to pay without that loan.

5          Did I understand your testimony correctly?

6   A.  I am not sure I would have characterized it that way or

7   said it exactly that way.

8   Q.  Well, the gist of your chief complaint about not knowing

9   about the loan was it bore on your analysis about

10  collectibility, correct?

11  A.  The way the question was asked is from a standpoint of --

12  if you compare it to -- this may be you a longer answer than

13  you want.  I'm just trying to explain it.  If SLR obtained a

14  loan, you know, where they just went to the bank and obtained a

15  loan and got the funds and they paid MiMedx, that would be a

16  different set of facts and circumstances than what was asked of

17  me.

18         If they couldn't get the loan from a bank, and instead

19  they were encouraged to get the loan from family members, that

20  loan might not have otherwise happened.  That's a different set

21  of facts and circumstances, and it weighs in on how you think

22  about their wherewithal to pay and the reasonability -- and is

23  collectibility reasonably assured.

24  Q.  I just want to make sure I understand this.  There's two

25  things you just said that were important Mr. Tracer's question

SOUTHERN DISTRICT REPORTERS, P.C.•

Kasnpet1                    Andersen – Cross

1    that were included in his question that you are saying led to

2    the answer.

3            So the first thing is that family members were

4    encouraged to make the loan.  Did I hear you correctly, that

5    was important to you in answering the question yesterday?

6    A.   It's important from -- yes, it's important from a

7    standpoint of, if they were making the loan at the request of

8    Mr. Petit and this would not have otherwise happened in just

9    the normal course of business, that was an important factor,

10   yes.

11   Q.   So if the facts establish that it wasn't at the

12   encouragement of Mr. Petit, that would change your answer to

13   Mr. Tracer's answer, is that correct?

14           MR. TRACER:  Objection.

15           THE COURT:  Overruled.

16   BY MS. LOEB:

17   Q.   I will ask my question again.  Yesterday you told

18   Mr. Tracer it would change your opinion if you knew that

19   Mr. Petit's family members had been encouraged to make a loan.

20           My question is, if the facts did not establish that,

21   if there were no facts establishing that Mr. Petit encouraged

22   his family members to make a loan, would you still believe that

23   that was information that you needed to know to bear on

24   collectibility?

25   A.   Whether or not Mr. Petit facilitated that -- encouraged

Kasnpet1                    Andersen - Cross

1   that loan, if there were no facts -- that changes the facts and

2   circumstances, and I would --

3   Q.  Now --

4   A.  -- still want to understand the full set of facts and

5   circumstances to make an evaluation of revenue recognition.

6   Q.  The other thing you said is that it would be important to

7   you to know if he had been denied a commercial loan.

8           Did I get that right?

9   A.  Yes, if they had sought a commercial loan through unrelated

10  parties in the normal course of business and been denied and

11  then sought this as an outlet, that would be a set of facts and

12  circumstances that I would consider.

13  Q.  So if the facts show that there was no encouragement and

14  there was no denial of a commercial loan, then your answer to

15  Mr. Tracer would have been different yesterday, is that right?

16  A.  My answer would have been different from a standpoint of,

17  if those things had occurred, that would have been important to

18  know.  It still would have been important to know any other

19  facts and circumstances to be able to make an accounting

20  determination.

21  Q.  As it relates to any loan from any party a bank or

22  otherwise, you never told Mr. Petit that he had a duty to

23  disclose that to accounting if he ever learned how a customer

24  was financing its payments, right?

25  A.  No, I never said that to Mr. Petite.

**A-284**

KASPPET2                    Andersen – Cross

1            THE COURT:  Yes.

2            MR. WEINREB:  Yes.

3            THE COURT:  In your role as controller, were you

4  involved in the determination of what the returns reserve would

5  be at the company?

6            THE WITNESS:  I don't believe that I was directly

7  involved, but it would have fallen under my responsibilities

8  overall as controller.

9            THE COURT:  All right.

10 BY MR. WEINREB:

11 Q.  And you're aware that GAAP accounting requires a company to

12 have a returns reserve if it expects returns?

13 A.  The GAAP requires a company to have a returns reserve if

14 they have returns?

15 Q.  Yes.

16            MR. TRACER:  Objection.

17 Q.  If they expect returns?

18            THE COURT:  Overruled.

19 A.  I believe that GAAP allows companies to establish a returns

20 reserve when they have returns -- when they allow for returns.

21 Q.  And if a company has a returns reserve, it has to calculate

22 how big it is?

23            MR. TRACER:  Objection.

24            THE COURT:  Ground?

25            MR. TRACER:  Relevance.

SOUTHERN DISTRICT REPORTERS, P.C.•
·
·
·
·

**A-285**

KASPPET2                    Andersen - Cross

1          THE COURT:  It may be marginal, but I think it's

2     within the broad limits of the relevancy rule.  Overruled.

3     BY MR. WEINREB:

4     Q.  So the reason that a company establishes a returns reserve

5     is because it expects product to be returned, correct?

6     A.  That would be why they would establish a returns reserve,

7     correct.

8     Q.  And when they establish it, when they're deciding how big

9     it should be, they have to estimate the likely amount of

10    returns?

11    A.  Yes, that's correct.

12    Q.  And each dollar that the company puts into that reserve,

13    it's pulled from revenue, correct?

14    A.  Yes, that's correct.

15    Q.  So the bigger reserve, the lower the revenue?

16    A.  That's correct.

17    Q.  And the establishment of the -- well, the goal at MiMedx --

18    well, let me ask a different question.

19          The establishment of that reserve was under your

20    responsibility, correct?

21    A.  Under my overall responsibility as corporate controller,

22    yes.

23    Q.  And MiMedx's goal in establishing that return was to lower

24    its revenue enough so that this reserve was always big enough

25    to cover the actual returns that came in?

SOUTHERN DISTRICT REPORTERS, P.C.•
·
·
·
·

KASPPET2                    Andersen – Cross

1    A.  I would say it slightly differently.  Their goal was to

2    basically recognize an appropriate amount of revenue for that

3    period, taking into account the expected future returns of

4    product.

5    Q.  And the expected future returns, the amount of those would

6    have to be subtracted from reported revenue, to report the

7    revenue, correct?

8    A.  Yes.

9    Q.  And MiMedx did that, correct?

10   A.  Yes, MiMedx had a returns reserve.  Yes.

11   Q.  And you're not aware of any quarter in which MiMedx ever

12   failed to lower revenue enough to cover expected returns, are

13   you?

14           MR. TRACER:  Objection.

15           THE COURT:  Sustained.  And I gave counsel some leeway

16   here, even though I thought the relevancy was marginal.  I

17   think it's time you go on to something else, counsel.

18   BY MR. WEINREB:

19   Q.  Mr. Andersen, yesterday you also testified that a

20   reasonable likelihood of collectibility is one of the four

21   revenue recognition criteria, correct?

22   A.  Yeah, the collectibility is reasonably assured is one of

23   those four, yes.

24   Q.  And ability to pay is part of that concept, correct?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.•
.
.
.
.

**A-287**

KASPPET2                          Andersen - Cross

1   Q.  And you also testified that the fact that a customer,

2   particularly a new customer, actually makes payments is

3   evidence that the customer did have an ability to pay, correct?

4   A.  That is, yes, one factor among -- among those that you

5   would consider, yes.

6   Q.  And by the same token, if a customer does not have the

7   ability -- does not pay, then that causes you to question

8   whether they had the ability to pay?

9   A.  Yes.

10  Q.  You testified yesterday that in the fall of 2015, you were

11  doing work around the receipt of payments from customers where

12  payments weren't being received when they should have been

13  received.  Do you recall that?

14  A.  Yes.

15  Q.  In other words, customers were paying later than they were

16  obligated to pay under the purchase order or some other written

17  agreement?

18  A.  Yes.

19  Q.  And this wasn't just one or two customers, correct?

20  A.  That's correct.

21  Q.  In your experience at MiMedx, it was not uncommon to have

22  customers pay late?

23          MR. TRACER:  Objection.

24          THE COURT:  Well, once again, I think it's of marginal

25  relevance, but I think it's not zero; so I will allow it.

SOUTHERN DISTRICT REPORTERS, P.C.•
.
.
.
.

KASPPET2                    Andersen – Cross

1   Overruled.

2   A.  Will you ask it again, please?

3   Q.  Yes.  It was not uncommon to have customers at MiMedx pay

4   late?

5   A.  Yes.  There were many customers who were paying late.  Yes,

6   that's true.

7   Q.  And these were customers whose sales had been recognized as

8   revenue upon shipment?

9          MR. TRACER:  Objection.

10          THE COURT:  Overruled.

11  A.  It's my understanding that the majority of the revenue that

12  was recognized was upon shipment.  I can't tell you that all of

13  it was, but it was also -- those customers were also part of

14  the concerns I raised around revenue recognition.

15  Q.  Okay.  But you -- the fact that for many customers -- you

16  just testified many customers were overdue in their bills.

17  That didn't typically cause MiMedx to restate the revenue for

18  those customer sales, did it?

19          MR. TRACER:  Objection.

20          THE COURT:  Well, as phrased, sustained.

21  Q.  So every month you had a financial and operations review;

22  is that right?

23  A.  I don't remember exactly.

24  Q.  On a regular basis, you reviewed, along with others, the

25  list of customers who were overdue?

SOUTHERN DISTRICT REPORTERS, P.C.•

KASPPET2                    Andersen – Cross

1  versus another, that's not like a mathematical formula that you

2  can just plug in variables and get an answer for it?

3           MR. TRACER:  Objection.

4           THE COURT:  Why don't you tell us again how this will

5  determine whether a sale should be recorded as revenue in one

6  quarter versus another?

7           THE WITNESS:  I'm sorry?  I'm try to hear you.

8           THE COURT:  Yes, I'm sorry.  How does one determine,

9  from an accountant standpoint, whether a sale should be

10  recorded as revenue in one quarter versus another?

11           THE WITNESS:  You have to look at these four criteria

12  and see whether they've been met.

13           THE COURT:  And do you want to remind us what the four

14  criteria are?

15           THE WITNESS:  I'm sorry?

16           THE COURT:  Do you want to remind us what the four

17  criteria are?

18           THE WITNESS:  Yes.  Persuasive evidence of an

19  arrangement exists, the delivery of product where services have

20  occurred, collectibility is reasonably assured, and I'm missing

21  one in there.  Collectibility reasonably assured, product

22  delivery is served -- oh, and price is fixed or determinable.

23           THE COURT:  And I think what counsel is trying to ask

24  you is, is there some degree of discretion or flexibility in

25  the application of those criteria?

**A-290**

KASPPET2                    Andersen – Cross

1           THE WITNESS:  There can be on a complex transaction.

2    On a normal, recurring transaction, the systems are set up to

3    just report -- all of that's been determined, and they just get

4    recorded.  On a more complex transaction, then you have to

5    apply judgment and try to figure out how to account for it.

6           THE COURT:  Okay.  Go ahead, counsel.

7    BY MR. WEINREB:

8    Q.  The four criteria that you just mentioned, part of your

9    training as an accountant is in how to apply those criteria,

10   correct?

11   A.  That's fair.  The training in accounting is how to look at

12   the GAAP principles and how to apply them even as they change,

13   but yes.

14   Q.  And professional accountants get trained in how to do that

15   analysis when they study accounting in school?

16   A.  That's one of the things that you learn in the accounting

17   program in school, yes.

18   Q.  All right.  But even so, two trained professional

19   accountants can sometimes look at the same sale and disagree

20   about when it should be recorded as revenue?

21           MR. TRACER:  Objection.

22           THE COURT:  Sustained.

23   Q.  In your experience, did you ever get into disagreements

24   with other accountants about whether things should be recorded

25   as revenue?

SOUTHERN DISTRICT REPORTERS, P.C.•

**A-291**

KASPPET2                    Andersen – Cross

1      MR. TRACER:  Objection.

2      THE COURT:  Sustained.

3  Q.  At MiMedx, you sometimes disagreed with your colleagues

4  over whether certain transactions should be reported as

5  revenue?

6      MR. TRACER:  Objection.

7      THE COURT:  I'll allow that.

8  Q.  For exam -- I'm sorry.  Did you answer?

9  A.  Yes, I mean, I think I've shared that we reached a

10  disagreement, difference of opinion on how revenue should be

11  recognized.

12  Q.  So just to give you an example, you and John Cranston had a

13  disagreement over how to account for cash discounts given to

14  customers in exchange for early payments.  Do you remember

15  that?

16  A.  I have a rough recollection of that as I sit here and think

17  about it.

18  Q.  You believe that those cash discounts should lower the

19  company's reported revenue?

20      MR. TRACER:  Objection.

21      THE COURT:  Ground?

22      MR. TRACER:  Relevance.

23      THE COURT:  Sustained.

24  Q.  Suffice it to say there were occasions, as you've testified

25  yesterday, when you and your colleagues in the MiMedx

**A-292**

KASPPET2                          Andersen - Cross

1    accounting department disagreed on how to apply GAAP correctly?

2    A.   There were instances where we disagreed, and the instance

3    you referenced, there is a process to reach agreement and get

4    aligned on the conclusion.

5    Q.   And that's what happened when you wrote your e-mail to

6    Mr. Senken on January 18th, 2016, expressing your concerns

7    about the revenue recognition for certain sales?

8              MR. TRACER:  Objection, motion in limine 11.

9              THE COURT:  No, I don't think it's controlled by

10   motion in limine No. 11.  Overruled.

11   A.   Will you repeat the question?  I missed the last part of

12   it.

13   Q.   Yes.  So a disagreement on how to properly apply GAAP, that

14   occurred and that actually was the -- well, that was -- you

15   encountered that when you wrote your e-mail to Mike Senken on

16   January 18th, 2016, expressing your concerns about revenue

17   recognition for certain sales?

18   A.   In the follow-up response to that e-mail, yeah, I think

19   there was disagreement.

20   Q.   In fact, you met with him and John Cranston and Al Evans to

21   discuss your concerns?

22   A.   Yes.

23   Q.   Do you recall yesterday testifying about your discussions

24   with them?

25   A.   Yes.

SOUTHERN DISTRICT REPORTERS, P.C.•
· · · ·

KASPPET2                    Andersen - Cross

1   Q.  And according to your testimony, you told them facts that

2   made you believe that a sale of product to SLR did not meet

3   GAAP revenue recognition criteria, correct?

4   A.  I actually don't remember saying that in my testimony, but

5   I believe that that was part of the discussion, yes.

6   Q.  And you told them facts that made you believe that a sale

7   of product to Stability Biologics did not meet GAAP revenue

8   recognition criteria?

9   A.  Yes, that was part of the discussion.

10  Q.  They didn't challenge your account of the underlying facts,

11  did they?

12  A.  I'm not sure that they challenged -- they didn't say that

13  the facts that I had were wrong in those conversations.

14  Q.  No, they just disagreed with you about whether those facts

15  prevented MiMedx from recognizing the revenue from those sales?

16  A.  Sorry, will you say that again?  I'm struggling to hear

17  you.  I apologize.

18  Q.  I apologize myself.

19          They just disagreed with you about whether those facts

20  prevented MiMedx from recognizing the revenues from those

21  sales?

22  A.  I think that, yeah, they definitely disagreed on how to

23  recognize revenue.

24  Q.  They argued that you didn't have all the facts and

25  circumstances required to reach the current judgment because

KASPPET2                    Andersen - Cross

1   you hadn't spoken with the market professionals to understand

2   the market demand?

3              MR. TRACER:  Objection.

4              THE COURT:  Sustained.

5              MR. WEINREB:  I believe he testified to all of this

6   yesterday.

7              THE COURT:  Sorry?

8              MR. WEINREB:  I believe he testified to all of this

9   yesterday.

10             THE COURT:  It may or may not be, but you'll have to

11  show me the transcript citation.

12  BY MR. WEINREB:

13  Q.  So, Mr. Andersen, you testified yesterday that Mike Senken

14  said these were just the normal ways of doing business at

15  MiMedx?

16  A.  Yes, I believe I paraphrased it that way.  Yes.

17  Q.  And you also said that this is what they'd always done at

18  the company?

19  A.  Yes.

20  Q.  He expressed his belief that you just didn't understand all

21  of the facts and circumstances?

22  A.  Yes.

23  Q.  And Mike Senken was your direct supervisor, right?

24  A.  Yes, he was.

25  Q.  Okay.  He ran the accounting department at MiMedx?

SOUTHERN DISTRICT REPORTERS, P.C.•
·
·
·
·

**A-295**

KASPPET2                    Andersen – Cross

1   A.  Yes.

2   Q.  It was his responsibility to make the final call on the

3   accounting decisions?

4           MR. TRACER:  Objection.

5           THE COURT:  Overruled.

6   A.  Yes.

7   Q.  And he just disagreed with your analysis?

8   A.  Yes, that's what he communicated to me.  Yes.

9   Q.  When you and Mike Senken couldn't agree on things, your

10  concerns were referred to the audit committee of the board of

11  directors, correct?

12  A.  I was told that, but I don't know that.

13  Q.  Well, they did interview you eventually, didn't they?

14  A.  They did interview me, yes.

15  Q.  Now, the board of directors has overall oversight for the

16  company, correct?

17  A.  Yes.

18  Q.  Everyone in the company ultimately reports to them?

19  A.  I would say it differently.  I think the CEO typically

20  reports to the board, and everybody else within the company

21  reports to the CEO.

22  Q.  Three members of the board of directors were on a committee

23  called the audit committee?

24  A.  Sorry, did you ask me how many?

25  Q.  I said were there three members on the board of directors

SOUTHERN DISTRICT REPORTERS, P.C.•
·
·
·
·

KASPPET2                    Andersen – Cross

1   who sat on a committee called the audit committee?

2   A.  I believe there are at least two independent directors from

3   the independent board of directors members who were on the

4   audit committee.

5   Q.  All right.  Fair to say that the audit committee has

6   oversight for the financial statements of the company?

7   A.  Ultimately, yes.

8   Q.  And when financial statements -- those are the quarterly

9   financial reports or 10-Qs?

10  A.  Yes.

11  Q.  And also the annual financial reports or 10-Ks?

12  A.  Yes.

13  Q.  They were ultimately responsible for making sure that those

14  get out, are filed?

15  A.  I think, at the end of the day, I guess you could say

16  they're ultimately responsible for that, yes.

17  Q.  And the audit commit also had oversight over the company's

18  relationship with its auditors, Cherry Bekaert, correct?

19          MR. TRACER:  Objection.

20          THE COURT:  Sustained.

21  Q.  Mr. Andersen, didn't you testify yesterday that the audit

22  committee had oversight over the company's relationship with

23  its auditors, Cherry Bekaert?

24  A.  Yes.

25  Q.  Was that true?

KASPPET2                    Andersen – Cross

1   A.  I believe that's a requirement under Sarbanes-Oxley.

2   Q.  Sarbanes-Oxley is a federal law that states what audit

3   committees have to do?

4          MR. TRACER:  Objection.

5          THE COURT:  Ground?

6          MR. TRACER:  The law.

7          THE COURT:  Well, do you want me to repeat the

8   question or answer yes to the correct statement of the law just

9   given by defense counsel?  I think the witness knows the answer

10  as well.  Overruled.

11  Q.  That's correct, isn't it?

12  A.  Sorry, will you say it again?  I want to make sure I answer

13  it correctly.

14  Q.  That Sarbanes-Oxley is a federal law that says, among other

15  things, what the audit committees have responsibility for?

16  A.  That's my understanding, yes.

17  Q.  The two members of the audit committee, who interviewed you

18  about your e-mail to Mike Senken, were Terry Dewberry and Joe

19  Bleser?

20         MR. TRACER:  Objection.  It relates to motion in

21  limine 11, and I'd be happy to give some more detail.

22         THE COURT:  What's that?

23         MR. TRACER:  I said, It relates to motion in limine

24  11, and I'd be happy to provide more context for the Court.

25         THE COURT:  All right.  I think, ladies and gentlemen,

**A-298**

KASPPET2                    Andersen - Cross

1    what we're going to do is give you your mid-morning break at

2    this time, and I'm going to try to work out with counsel all

3    remaining issues for the next hour or so, so we don't have

4    these constant interruptions.  So we'll see you in 15 minutes.

5              (Jury not present)

6              THE COURT:  Please be seated.  All right.

7              MR. WEINREB:  Your Honor, it might help if I go first

8    on this one; although, I'm happy to defer to the government.

9              MR. TRACER:  We should probably excuse the witness for

10   this.

11             THE COURT:  I'm sorry, what?

12             MR. TRACER:  I was just going to ask that we excuse

13   the witness for this.

14             THE COURT:  Oh, yes.  Thank you very much.

15             (Witness temporarily excused)

16             THE COURT:  So before we turn to the argument,

17   Mr. Weinreb, I can barely hear you.  The witness, more

18   importantly, can barely hear you.  I have a feeling the jury

19   can barely hear you.  We didn't have this problem with the

20   other lawyers.  Now, I know that trial lawyers are

21   traditionally very soft-spoken and shy, but overcome that

22   somehow and speak up.

23             But now, let me hear from the government on the point

24   at issue.

25             MR. TRACER:  Sure, your Honor.  So there's

**A-299**

KASPPET2                          Andersen – Cross

1    fundamentally two issues with what is happening here.  I don't

2    disagree that, on his direct examination, the defendant

3    mentioned, but this was a cabined point, that he was told by

4    Senken that the audit committee had looked at this, but that

5    was the scope of his direct.

6              The reason this is being re-elicited on cross, and we

7    went over this a little bit yesterday in the sidebar, but I

8    think this is going even farther beyond what happened

9    yesterday, is that he's trying to set up a reliance on the

10   audit committee defense here.

11             And there's two problems with this.  I think, No. 1,

12   for the reasons we explained in motion in limine 11, that is

13   improper here.  There is not a foundation for it.  And second

14   of all, this witness has now testified repeatedly that he has

15   no idea what the board of directors, including the audit

16   committee, did.  And so to ask questions that sort of leave

17   this -- leave this impression in the minds of the jury that the

18   audit committee looked at this and blessed it because there

19   were two members and they had oversight and they talked to him,

20   I think is misleading.  And there is no foundation to be

21   properly eliciting that information through this witness.

22             So for those reasons, we think this line of

23   questioning is problematic.

24             THE COURT:  Let me hear from defense counsel.

25             MR. WEINREB:  So, your Honor, this has nothing to do

KASPPET2                    Andersen - Cross

1    with motion in limine 11 or a reliance on the auditors defense.

2    The government opened the door to this particular testimony,

3    wide open, in their direct when they questioned Mr. Andersen at

4    length and tried to portray him as a whistleblower who blew the

5    whistle on management's mis-accounting of certain transactions

6    and then management sought to retaliate against him by

7    basically moving him into a position where he felt like his

8    future was over.

9           But there's another narrative, which is that

10   Mr. Andersen is the controller, who is responsible for signing

11   the management rep letters, without which the company could not

12   get audited financials and could not file their 10-K.  And when

13   he reported his concerns to the accounting department, they

14   disagreed with him and told him that he was wrong.

15          And at that point, it was elevated to the audit

16   committee, which ultimately has responsibility for the audits.

17   And they asked him a bunch of questions about his concerns, and

18   he gave them answers.  And based on his answers, they did not

19   believe that it would be appropriate to change the accounting

20   under GAAP.  And, yet, he still refused to sign the audit, the

21   management letter, the management representation letter.

22          Essentially, he held the entire company hostage to his

23   views about the proper accounting.  And at that point, there

24   was simply no alternative but to see if there was -- to have a

25   controller in place who would be willing to agree with