# 21-543(L)

## 21-559(CON)

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

### Docket Nos. 21-543(L), 21-559(CON)

◄ ◆◆◆ ►

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

PARKER H. PETIT, WILLIAM TAYLOR,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX
## VOLUME I OF III
## (Pages SA-1 to SA-192)

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
One St. Andrew's Plaza
New York, New York 10007
(212) 637-2200

# TABLE OF CONTENTS

PAGE

Excerpts from Trial Transcript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-1

GX-50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-145

GX-103-A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-169

GX-251 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-170

GX-402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-214

GX-403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-224

GX-601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-232

GX-709 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-236

Excerpts from GX-715 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-240

GX-716 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-242

GX-728 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-249

GX-733 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-250

GX-900 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-258

GX-1002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-260

GX-1033 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-261

GX-1040 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-262

GX-1044 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-264

GX-1056 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-265

GX-1079 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-274

GX-1080 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SA-281

ii

PAGE

GX-1085 ................................................... SA-285

GX-1099 ................................................... SA-295

GX-1115 ................................................... SA-303

GX-1118 ................................................... SA-306

GX-1122 ................................................... SA-311

GX-1251 ................................................... SA-316

GX-1509 ................................................... SA-317

GX-1612 ................................................... SA-319

Court Exhibit 2, The Court's Instructions of Law to the Jury ............. SA-328

Opinion and Order of the Honorable Jed S. Rakoff,
    entered February 21, 2021 ...................................... SA-359

**SA-1**

```
Kaqnpet3                    Andersen - Direct
```

1   Lilly and Company, including investor analyst, investments

2   director.  I was a corporate controller for the U.S. affiliate.

3   I served in a technical accounting consulting role.  I was a

4   financial analyst on a product team.

5           And I believe that's it at Lilly.

6   Q.  Where did you work after Eli Lilly?

7   A.  When I left Lilly I joined MiMedx in 2015.

8   Q.  What kind of company was MiMedx when you joined it?

9   A.  MiMedx was a publicly traded company.

10  Q.  What kind of business did they do?

11  A.  Regenerative medicine business.

12  Q.  Do you know what kind of products they sold?

13  A.  Primarily wound healing products.

14  Q.  I just want to go back over a couple of the places.  You

15  mentioned working at KPMG.  What is KPMG?

16  A.  KPMG is one of the big four public accounting firms.

17  Q.  Generally speaking, what was your job at KPMG?

18  A.  My job was an auditor.

19  Q.  And what kind of companies did you audit?

20  A.  A variety, manufacturing, not-for-profits.

21  Q.  You also mentioned working at Deloitte.  What is Deloitte?

22  A.  Deloitte is another big four public accounting firm.

23  Q.  When you say big four public accounting firm, what does

24  that mean?

25  A.  It means it's one of the international public accounting

**SA-2**

Kaqnpet3                    Andersen - Direct

1   A.  My role was vice president finance, corporate controller.

2   Q.  And when you joined as the controller, who did you report

3   to?

4   A.  Mr. Mike Senken, the CFO.

5   Q.  What does CFO mean again?

6   A.  It's the chief financial officer.

7   Q.  And aside from Mr. Senken, did you have the chance to work

8   with others in the executive management at MiMedx when you

9   worked there?

10  A.  Yes.

11  Q.  Who else from executive management did you have to the

12  chance to work with?

13  A.  I worked with Pete Petit, with Bill Taylor, with Lexi

14  Haden, general counsel.

15  Q.  You mentioned Mr. Pete Petit.  Can you tell us, what was

16  his role at the company?

17  A.  His role was the CEO or chief executive officer.

18  Q.  And what were his duties and responsibilities generally as

19  the CEO?

20  A.  Strategy, visionary leadership of the entire company,

21  overall responsibility and the oversight.

22  Q.  Did he have any role with respect to the finances of the

23  company?

24  A.  Yes.

25  Q.  Can you describe what those roles were.

Kaqnpet3                         Andersen - Direct

1   A.  Yes, Mr. Petit had oversight for the financial statements,

2   financial results of the company, participated in earnings

3   release calls, the calls made to investors, worked with outside

4   analysts and had certain interfaces with customers of MiMedx.

5   Q.  OK.  We'll come back to some of those in a little bit.  Can

6   you just tell us approximately how often did you speak and

7   interact with Mr. Petite when you worked at the company?

8   A.  I would say an average of about once a week.

9   Q.  You also mentioned Mr. Taylor.  What was his role at the

10  company?

11  A.  His role was the COO, or chief operating officer at the

12  company.

13  Q.  At a high level, what were his duties and responsibilities?

14  A.  Overseeing the operations of the company.

15  Q.  Did Mr. Taylor have any role with respect to the finances

16  of the company?

17  A.  Yes.

18  Q.  Can you describe what those roles were?

19  A.  Yes.  Similar Mr. Taylor, participated on the earnings

20  calls, had oversight as part of the executive management for

21  the overall financial results of the company and with his areas

22  as well.

23  Q.  Approximately how often did you speak and meet with

24  Mr. Taylor?

25  A.  Approximately once a week as well.

```
Kaqnpet3                    Andersen - Direct
```

1    Q.  Now, where were you physically assigned to work when you

2    took that position?

3    A.  In Marietta, Georgia, the company headquarters.

4    Q.  Were you living in Georgia at the time?

5    A.  No.

6    Q.  Where were you living at the time?

7    A.  I was in the Indianapolis area.

8    Q.  Did the job require you to move?

9    A.  Yes.

10   Q.  What did that move entail for you?

11   A.  The move entailed temporary housing, a couple of stints in

12   temporary housing; enrolling, I had three children still school

13   age, so I was enrolling children in new schools; actually

14   physically moving finding a home in Georgia and moving into

15   that home.

16   Q.  Had you ever lived in Georgia before?

17   A.  No.

18   Q.  The role you took as controller, what department was that

19   in at MiMedx?

20   A.  In the finance and accounting department.

21   Q.  All right.  At this point I want to show you some

22   documents.  So first I would like to admit a stipulation into

23   evidence, Government Exhibit 1606.

24          MR. TRACER:  OK.  Mr. Peckett, can we publish that for

25   the jury.

Kaqnpet3                    Andersen - Direct

1          What is that number?

2   A.  That's the same number, the same quarter, third quarter,

3   but for the prior year, 2014.

4   Q.  OK.  So what happened to revenue between the third quarter

5   of 2014 versus the third quarter of 2015 according to this

6   10-Q?

7   A.  It increased from about $33 million to about $49 million.

8          MR. TRACER:  Now, Mr. Peckett, we could take this page

9   down and go to page 8 of the document.

10  BY MR. TRACER:

11  Q.  Mr. Andersen, just starting at top there, it's got a point

12  one.  Do you see that?

13  A.  Yes.

14  Q.  Can you read for us point one followed by the first

15  sentence that follows.

16  A.  So, "Basis of Presentation."

17          "The accompanying unaudited condensed consolidated

18  financing statements have been prepared in accordance with

19  accounting principles generally accepted in the United States

20  of America ("GAAP") from interim financial information and with

21  the instructions to form 10-Q and article of regulation S."

22  Q.  You can stop there.  This sentence mentions the materials

23  being prepared in accordance with GAAP.  Do you see that?

24  A.  Yes.

25  Q.  Mr. Andersen, what is GAAP?

Kaqnpet3                    Andersen - Direct

1   A.  GAAP is the set of accounting principles or accounting

2   rules that accountants apply in the public companies follow.

3   Q.  In your work at MiMedx, did you have the opportunity to

4   apply GAAP?

5   A.  Yes.

6   Q.  Can you give us some examples of how you were applying GAAP

7   in your role as the controller at MiMedx?

8   A.  Looking at specific transactions, doing accounting research

9   on those transactions, the building of the financial statements

10  such as what you see in this 10-Q, making sure that it conforms

11  to the accounting rules and making sure that the footnotes

12  prepared also follow those rules.

13  Q.  Was it important that the financial statements complied

14  with GAAP?

15  A.  Yes.

16  Q.  Why is that?

17  A.  Because that's what's required when you're registered with

18  the SEC as a public company.

19  Q.  Just so we understand it, are those basically the rules of

20  accounting, for how you account for things?

21  A.  Yes.

22          MR. TRACER:  Now, Mr. Peckett, if we could stay on the

23  same page, but moving to the final paragraph on the page with

24  the bold title.

25  BY MR. TRACER:

Kaqnpet3                         Andersen - Direct

1   Q.  In what way was revenue connected to your compensation?

2   A.  Revenue growth was a determination of my bonus.

3   Q.  Mr. Andersen, as the company's controller, did you have

4   access to the books and records of the company?

5   A.  Yes.

6   Q.  As a general matter can you explain to us, after a sale

7   happens to a customer, how does revenue get entered in MiMedx's

8   books?

9   A.  So there are a couple of different ways that that could

10  happen.  If product is shipped out, the sale of that product or

11  the shipment of that product gets captured and the sale gets

12  reported in the systems of the company, which then makes the

13  accounting records with our sales being recognized.  You can

14  also make a manual entry to record sales in the books and

15  records.

16  Q.  When either an automatic entry or a manual entry like that

17  gets made, does that hit the company's general ledger?

18  A.  It does.

19  Q.  OK.  Can you explain to us, what does that mean, the

20  general ledger of a company?

21  A.  The general ledger is where all of the accounting entries

22  are accumulated into one place.

23  Q.  Mr. Andersen, prior to your testimony here in court, have

24  you reviewed any portions of MiMedx's general ledger?

25  A.  Yes.

Karnpet2                          Andersen - Direct

1    the earnings release.

2    Q.  Who else was involved?

3    A.  Other members of management, other members of the finance

4    and accounting department, so myself.  John Cranston, Mike

5    Senken.  There were Bill Taylor, Pete Petit, Lexi Haden, all

6    worked on those earnings releases.

7            MR. TRACER:  At this point I would like to admit

8    another stipulation, Government Exhibit 1607.

9            THE COURT:  Received.

10           (Government Exhibit 1607 received in evidence)

11           MR. TRACER:  Thank you.  I am going to read a few of

12   the paragraphs in here.

13           It is agreed between the parties:

14           3.  That Government Exhibit 201 is a true and accurate

15   copy of a MiMedx press release dated July 30, 2015 announcing

16   MiMedx's earnings for the second quarter of 2015.

17           I am skipping ahead to paragraph 6.

18           Government Exhibit 203 is a true and accurate copy of

19   a MiMedx press release dated August 6, 2015, providing further

20   information about MiMedx's earnings for the second quarter

21   2015.

22           7.  Government Exhibit 204 is a true and accurate copy

23   of a MiMedx press release dated October 12, 2015, announcing

24   MiMedx's earnings for the third quarter of 2015.

25           8.  Government Exhibit 205 is a true and accurate copy

Karnpet2                         Andersen – Direct

1  of a MiMedx press release dated October 29, 2015, providing

2  further information about MiMedx's earnings for the third

3  quarter of 2015.

4          9.  Government Exhibit 206 is a true and accurate copy

5  of a MiMedx press release dated January 10, 2016, announcing

6  MiMedx's earnings for year-end 2015.

7          10.  Government Exhibit 207 is a true and accurate

8  copy of a MiMedx press release dated February 23, 2016,

9  providing further information about MiMedx's earnings for

10  year-end 2015.

11          Pursuant to the stipulation, the government offers

12  Government Exhibits 201, 203, 204, 205, 206 and 207.

13          THE COURT:  Received.

14          (Government Exhibits 201 and 203 through 207 received

15  in evidence)

16          MR. TRACER:  Thank you.

17          Mr. Pechet, can we publish what's now been admitted

18  into evidence as Government Exhibit 204.

19  BY MR. TRACER:

20  Q.  Mr. Andersen, what is this?

21  A.  This is the earnings release for the third quarter of 2015.

22  Q.  Again, what months is the third quarter?

23  A.  July, August, September.

24  Q.  Can you read the title right underneath "News Release" of

25  the press release?

```
        Karnpet2                 Andersen - Direct
 1      A.  "MiMedx third quarter record revenue is $49 million."
 2      Q.  While you worked at MiMedx, Mr. Andersen was it typical for
 3      the titles of the press releases to focus on revenue?
 4      A.  Yes, I believe so.
 5      Q.  Why was that?
 6      A.  I believe revenue was --
 7              MR. WEINREB:  Objection.
 8              THE COURT:  Sustained.
 9              MR. TRACER:  OK.
10      BY MR. TRACER:
11      Q.  Mr. Andersen, did you consider revenue to be the most
12      important metric at the company when you worked there?
13      A.  Yes.
14              MR. TRACER:  If you can, Mr. Pechet, go a little
15      further down in the document and pull up -- there's a series of
16      bullet points in bold -- yeah.  Third quarter preliminary
17      highlights.
18      BY MR. TRACER:
19      Q.  Mr. Andersen, can you read the first bullet that's there?
20      A.  "Q3 is 16th consecutive quarter of meeting or exceeding
21      revenue guidance."
22      Q.  Are you familiar with something called revenue guidance?
23      A.  Yes.
24      Q.  What is revenue guidance?
25      A.  It's the communication from the company to investors in the
```

Karnpet2                    Andersen - Direct

1   public setting expectations about what future revenue would be.

2   Q.  So does it relate to future periods or past periods?

3   A.  When you're giving guidance it's related to future periods.

4   Q.  Was the guidance that MiMedx gave a specific number or was

5   it a range of numbers?

6   A.  It was a range.

7   Q.  When you worked at MiMedx, did anyone at MiMedx pay

8   attention to whether MiMedx would meet or exceed its revenue

9   guidance?

10              MS. LOEB:  Objection.

11              THE COURT:  Sustained.

12              MR. TRACER:  OK.

13  BY MR. TRACER:

14  Q.  Mr. Andersen, when you worked at MiMedx, did you pay

15  attention to whether MiMedx met or exceeded its revenue

16  guidance?

17  A.  Yes.

18  Q.  Did you observe whether other members of management also

19  paid attention to it?

20              MS. LOEB:  Objection.

21              THE COURT:  Sustained.

22              MR. TRACER:  OK.

23  BY MR. TRACER:

24  Q.  Did you believe that it was important whether MiMedx met or

25  exceeded its revenue guidance?

Karnpet2                    Andersen - Direct

1    A.  Yes, I believed it was important.

2    Q.  Why did you think that was important?

3    A.  Because it was the most important metric by which the

4    company's success was being measured.

5    Q.  When you say being measured, by who?

6    A.  By research analysts covering the company and --

7    Q.  Sorry.  What did you say?

8    A.  By research analysts covering the company and by potential

9    investors and investors of the company.

10   Q.  Could you read the third and fourth bullet points.

11   A.  "Q3 revenue of $49 million increased by 46 percent over Q3

12   2014."

13          And the next one, "$49 million revenue is at upper

14   end of $47 to $50 million Q3 guidance range."

15   Q.  You see that fourth quarter talks about being at the upper

16   end.  What does that mean, guidance being at the upper end?

17   A.  It means that the -- if you take the average, the midpoint

18   of the range, it was boater than the average point, better than

19   the midpoint.

20   Q.  Did you consider it significant whether MiMedx fell in the

21   upper end or the lower end of its projected guidance?

22   A.  I think it's significant, if you're in the upper end that's

23   a more positive outcome than being in the lowered end.

24   Q.  Were MiMedx's press releases also filed with the SEC?

25   A.  Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

Karnpet2                    Andersen - Direct

1   Q.  Did you ever have the opportunity to see members of

2   management talk about revenue to people outside the company?

3   A.  Yes.

4   Q.  In what context did you observe that?

5   A.  There's a call in which this happens.  There's an earnings

6   release call where management discusses results with outside

7   investors or analysts covering the company.  There was also an

8   occasion where I was able to attend meetings between management

9   and external analysts covering the company where revenue was

10  discussed.

11  Q.  You've used the term analyst a few times.

12      What is an analyst?

13  A.  An analyst is someone who covers the company, provides

14  perspectives to investors, usually recommendations on whether

15  to buy or to sell the stock.

16  Q.  When you listen to these earnings calls, who typically did

17  most of the speaking on MiMedx's earnings calls?

18  A.  Mr. Pete Petit.

19  Q.  Why did you listen in on earnings calls?

20  A.  For me it was a general interest, plus it was part of

21  development in my role.

22  Q.  What do you mean by "development"?

23  A.  Development for me personally as I viewed my role as being

24  corporate controller, but also successor to the CFO.  So it was

25  important for me to understand the investor relations aspect of

Karnpet2                    Andersen - Direct

1    that job.

2    Q.  What kind of information do you remember being reported or

3    discussed on these earnings calls?

4    A.  Progress of the company, any product developments that

5    occurred, definitely a focus on revenue and the results

6    achieved and growing revenue.

7            MR. TRACER:  I'm going to go back to Government

8    Exhibit 1607.  Mr. Pechet, if you could put that up.  I'm going

9    to read some additional paragraphs on there.

10           The parties agree:

11           1.  That Government Exhibit 200 and all parts and

12   subdivisions thereof is a true and accurate recording of a

13   MiMedx Group Inc. earnings calling to the investing public on

14   April 28, 2015 relating to MiMedx's earnings for the first

15   quarter of 2015, and

16           2.  Government Exhibit 200-T a true and accurate

17   transcript of that call.

18           No. 4.  Government Exhibit 202 and all parts and

19   subdivisions thereof is a true and accurate recording of a

20   MiMedx shareholder call on July 30, 2015, relating to MiMedx's

21   earnings for the second quarter of 2015.

22           5.  Government Exhibit 202-T is a true and accurate

23   transcript of that call.

24           11.  Government Exhibit 208 and all parts and

25   subdivisions thereof is a true and accurate copy of a MiMedx

Karnpet2                    Andersen - Direct

1    earnings call to the investing public on February 23, 2016,

2    relating to MiMedx's earnings for the fourth quarter of 2015.

3         12.  Government Exhibit 208-T a true and accurate

4    transcript of that call.

5         Pursuant to the stipulation, the government offers

6    Government Exhibit 200A and 200A-T, 200B and 200B-T, 202A and

7    202A-T, and 208A and 208A-T.

8         THE COURT:  Received.

9         (Government Exhibits 200-T-A, 200-A, 200-B, 200-T-B,

10   202-T-A, 202-A, 208-T-A, 208-A, 208-T-B and 208-B received in

11   evidence)

12        THE COURT:  Ladies and gentlemen, you don't have to

13   worry about all these numbers.  At the end of the case, you

14   will be given an index to all the exhibits that have been

15   received indicating their number, what they are and so forth,

16   as well as you'll get a hard drive with all the exhibits, and

17   you can then pull up any exhibit you want during your

18   deliberations.  So it won't be a problem and certainly not a

19   memory test, because I know we might have difficulty

20   remembering 200A-T, 200 B, etc., etc.

21        MR. TRACER:  Thank you.

22        Mr. Pechet, if we can now play as well as show what's

23   now been admitted as Government Exhibit 200 and 200-T, and this

24   should be an audio file.

25        If you could go to the next page before we play it.

Karnpet2                    Andersen - Direct

1              Yes.

2              (Audio played)

3              MR. TRACER:  Thank you.

4              Mr. Pechet, could we do the same thing with Government

5    Exhibit 200B and 200B-T

6              (Audio played)

7              MR. TRACER:  Thank you.

8              Mr. Pechet, can we do the same thing with Government

9    Exhibit 202A and 202A-T.

10             (Audio played)

11             MR. TRACER:  OK.  Just a few more of these,

12   Mr. Pechet.

13             Can we do Government Exhibit 208A and 208A-T.

14             (Audio played)

15   BY MR. TRACER:

16   Q.  Mr. Andersen, do you recognize the voice on that call?

17   A.  Yes.

18   Q.  Whose voice is that?

19   A.  Mr. Pete Petit.

20             MR. TRACER:  OK.  The last one.

21             Mr. Pechet, could you put up 208B and 208B-T.

22   BY MR. TRACER:

23   Q.  Mr. Andersen, do you recognize the voice on that snippet?

24   A.  Yes.

25   Q.  Whose voice is that?

```
         Karnpet2                    Andersen - Direct
```

1    A.  Mr. Bill Taylor.

2    Q.  When Mr. Taylor says grew by over 50 percent, what metric

3    do you understand him to be talking about?

4    A.  That's a -- 50 percent is -- it's revenue, how much did

5    revenue increase year over year.  So it's this year compared to

6    the prior year, the same period of time.

7              MR. TRACER:  OK.  Thank you, Mr. Pechet.

8              You can take those down.

9    BY MR. TRACER:

10   Q.  Now, Mr. Andersen, you testified yesterday about certain

11   accounting concerns you had while you worked at MiMedx, is that

12   right?

13   A.  Yes.

14   Q.  And approximately when did you raise those concerns at

15   MiMedx?

16   A.  Over a period of time between October of 2015 and January

17   of 2016.

18   Q.  Generally speaking, what kinds of accounting issues or

19   concerns did you have in that period?

20   A.  Revenue recognition was the accounting issued that I had.

21   Q.  Specifically, what was the nature of your concern with that

22   revenue recognition?

23   A.  My concern was that the company was recognizing revenue

24   sooner than it should have so that revenue was overstated for a

25   period of time.

KARPPET3                    Andersen - Direct

1          MR. TRACER:  And thank you.

2          Mr. Pechet, if we could display that, I'm going to

3    summarize and read some of the stipulation:

4          The parties agree that, No. 1, Government Exhibit 700

5    is a true and accurate copy of a Fed Ex package and tracking

6    information for a package sent by Pam Martin, executive

7    assistant to Parker H. Petit, to Brian Martin on December 29,

8    2015.

9          Government Exhibit 701 is a true and accurate copy of

10   a letter bearing the date September 25th, 2015, the letter,

11   that was sent via Government Exhibit 700.

12         Government Exhibit 702 is a true and accurate copy of

13   a Fed Ex package and tracking information for a package sent by

14   Pam Martin, executive assistant to Parker H. Petit, to Brian

15   Martin on December 30, 2015.

16         Government 703 is a true and accurate copy of a

17   distributor agreement between MiMedx and Stability that was

18   sent via 702.

19         I'm just going to introduce at this point, Government

20   Exhibits 700, 701, 702 and 703, pursuant to the stipulation.

21         THE COURT:  Received.

22         (Government's Exhibits 700, 701, 702 and 703 received

23   in evidence)

24         MR. TRACER:  Okay.  Mr. Pechet, can we put up

25   Government Exhibit 701.

KARPPET3                    Andersen - Direct

1    A.  "Dear Mr. Bill and Mr. Mike, As per our discussion dated

2    the 24th of June 2015 to confirm our payment terms for the

3    second purchase order sent to you, 25th of June, 2015, items

4    will be shipped before the end of June 2015.  Payment upon the

5    following:  PO is for MOH tender.  Payment follow after four

6    months.  If we couldn't sell, we will accept the request from

7    MiMedx to keep the products and keep trying to liquidate in the

8    market and transfer the money accordingly."

9    Q.  Okay.  And, Mr. Andersen, after you saw this e-mail, did

10   you have an understanding of what the payment terms were going

11   to be for this fourth-quarter sale?

12   A.  Yes.

13   Q.  And what did you understand they were going to be?

14   A.  That they would be the terms listed here in this e-mail.

15   Q.  Okay.  And the terms listed in this e-mail, do those

16   payment terms raise any revenue recognition concerns?  Did they

17   raise any revenue recognition concerns to you?

18   A.  Yes.

19   Q.  Okay.  Can you describe why these terms raised concerns to

20   you?

21   A.  Yes, because there is the purchase orders for -- the

22   payment follows four months after the MOH tender.  The MOH

23   tender is a Ministry of Health tender; so that's a contingent

24   payment term.  So you wouldn't recognized revenue until that

25   contingency is resolved.

KARPPET3                    Andersen - Direct

1          And then the next one is, B, if they keep the products

2    and keep trying to liquidate and market and transfer money

3    accordingly.  In other words, First Medical doesn't pay MiMedx

4    until they sell this product to a customer, and then they give

5    the money to MiMedx.

6    Q.  And in terms of the factors you looked at this morning, how

7    does that affect your analysis of whether it's appropriate to

8    recognize revenue at the time of the sale?

9    A.  It means that you would not recognize revenue at the time

10   of the sale because there's a contingency here, and it means

11   that the fixed and determinable criterion has not been met.

12   Q.  So when would it, from your perspective at the time, to be

13   appropriate to recognize revenue on these payment terms?

14   A.  When the contingency is resolved, or in other words, when

15   the Ministry of Health tender has been received.

16   Q.  Now, Mr. Andersen, after these e-mails were brought to your

17   attention at 11:25 and 11:29, did you share those concerns with

18   anybody at MiMedx?

19   A.  Yes.

20   Q.  Who did you share those with?

21   A.  Mr. Cranston.

22   Q.  And what, if anything, did you and Mr. Cranston do?

23   A.  So at that point, we discussed the problem with revenue

24   recognition.  We walked down the hall to go talk to Mr. Bill

25   Taylor --

KARPPET3                         Andersen - Direct

1   Q.  Okay.

2   A.  -- and discuss our concerns with him.

3   Q.  Did you go immediately to Mr. Taylor, or did you wait?

4   A.  We went immediately.

5   Q.  Why did you go immediately to Mr. Taylor?

6   A.  Because this was late in the month of December; so we were

7   getting ready to close the books for December, and we needed to

8   get this resolved to know whether it was in revenue or not.

9   Q.  Okay.  And, Mr. Andersen, did you then have a conversation

10  with Mr. Taylor about this issue?

11  A.  Yes.

12  Q.  Okay.  And I'm going to ask you, in as much detail as you

13  recall, once you ran down the hall to his office, can you tell

14  us what you said and what Mr. Taylor said about this issue of

15  the contingent payment term?

16  A.  Yes.  So the best that I recall is we explained to

17  Mr. Taylor that these payment terms were a problem from a

18  revenue recognition standpoint, that the contingency was a

19  problem, that we needed to have a fixed payment term in order

20  to be able to recognize the revenue.

21         Mr. Taylor told us that he would go back to the

22  customer, to First Medical, with revised payment terms, and we

23  discussed that those 180-day payment terms, although not the

24  typical 30-day payment terms, but at least it was a fixed

25  payment term; so the 180-day payment terms would work, and

KARPPET3                    Andersen - Direct

1   that's what he would go back to the customer and get.

2   Q.  Did you explain your concerns with revenue recognition?

3   A.  Yes.

4   Q.  What did you explain about that?

5   A.  That the contingency, this was a problem, and that we

6   needed to have a fixed payment term in order to recognize

7   revenue.

8   Q.  Did Mr. Taylor commit to do anything as a result of the

9   conversation?

10  A.  Yes.  He committed to go back to the customer and get fixed

11  payment terms.

12          MR. TRACER:  Now, we can take that down, Mr. Pechet.

13  Q.  Did there come a time when you received additional

14  information about the terms of the First Medical order?

15  A.  Yes.

16          MR. TRACER:  Okay.  Can we show the witness what's

17  been marked as Government Exhibit 1093.

18  Q.  What is this, sir?

19  A.  This is an e-mail from Bill Taylor to Bassam El Hage.

20          MR. TRACER:  Government offers 1093 into evidence.

21          THE COURT:  Received.

22          (Government's Exhibit 1093 received in evidence)

23          MR. TRACER:  Thank you.  Can we publish that to the

24  jury.

25  BY MR. TRACER:

Karnpet4                    Andersen - Cross

1   A.  Yes.

2   Q.  And you were talking to him about that e-mail, right?

3   A.  Yes.

4   Q.  He also told you that he had discussed the concerns you

5   raised in your e-mail outside of just the two of you, right?

6   A.  Yes, I was told that.

7   Q.  He told you that he discussed your concerns with the audit

8   committee of the board of directors, correct?

9   A.  Yes, he did.

10  Q.  He told you that he had discussed your concerns with the

11  company's outside auditors, correct?

12  A.  Yes, he did.

13  Q.  I believe you testified on direct that's Cherry Bekaert,

14  correct?

15  A.  Yes.

16  Q.  He also told you that he had discussed your concerns with

17  outside counsel I believe is what you said to Mr. Tracer, is

18  that right?

19  A.  Yes, that's correct.

20  Q.  That means outside lawyers?

21  A.  That was my understanding, yes.

22  Q.  OK.  Mr. Senken also told you that everyone he had

23  discussed it with disagreed with the concerns you had raised in

24  the e-mail, correct?

25  A.  Yes, that's correct.

Kasnpet3                    Andersen - Cross

1          (Jury present)

2          THE COURT:  Please be seated.

3          All right.

4          Let's get the witness.

5          (Witness resumed)

6          THE COURT:  All right.

7          Counsel.

8          MR. WEINREB:  Thank you, your Honor.

9     BY MR. WEINREB:

10    Q.   So, Mr. Andersen --

11         THE COURT:  Why don't you take your mask off there.

12    BY MR. WEINREB:

13    Q.   Mr. Andersen, just to recap, after your conversation with

14    Mike Senken, after you and he did not resolve your issues in

15    that conversation, you had another opportunity to explain your

16    concerns to people at the company, correct?

17    A.   Did I have the opportunity --

18    Q.   After --

19    A.   Did I have the opportunity?  Yes, I could have taken the

20    opportunity, but the resolution had basically happened by

21    January 25 with me being assigned to a new role.

22    Q.   Before that happened, though, you were interviewed by the

23    audit committee of the board of directors, correct?

24    A.   No, that's not correct.  I wasn't interviewed by the audit

25    committee until February 11.

Kasnpet3                    Andersen - Cross

1   Q.  Understood.  But you were interviewed by the audit

2   committee and given a chance to explain your concerns to them?

3   A.  I was interviewed by them.  I was there to answer their

4   questions as part of their investigation.

5   Q.  So they asked you a series of questions about these very

6   concerns that you had raised in your e-mail, correct?

7   A.  I don't remember all the questions that they asked me at

8   that point.

9   Q.  I'm not asking you right now if you remember all the

10  questions.  You do remember that they asked you a series of

11  questions?

12  A.  They did ask me questions in that meeting, yes.

13  Q.  And you answered their questions.

14          MR. TRACER:  Objection.

15          THE COURT:  Overruled.

16  A.  Yes, I answered their questions.

17  Q.  And the questions they asked you were about the matters

18  that you had raised in your e-mail with Mike Senken, correct?

19  A.  I don't remember the exact questions that they -- I

20  remember a few of the questions.

21  Q.  I will ask you about some specific ones --

22  A.  Sure.

23  Q.  -- and if you don't remember, you can let me know.

24          When they interviewed you, by the way, do you recall

25  that Lexi Haden, the company's general counsel, was present

Kasnpet3                    Andersen - Cross

1   taking notes?

2              MR. TRACER:  Objection.

3              THE COURT:  Sustained.

4   BY MR. WEINREB:

5   Q.  Was somebody there taking notes to your recollection?

6   A.  Yes.

7   Q.  Was it Lexi Haden, the company's general counsel?

8              MR. TRACER:  Objection.

9              THE COURT:  No, I think he's cured the problem.

10             Overruled.

11             THE WITNESS:  I can go ahead and answer?

12             THE COURT:  Yes.

13  A.  Yes, it was Lexi laden.

14  Q.  Do you recall that you told the audit committee that your

15  issue with the recognition of revenue by the distributor called

16  First Medical was that the timing of payments seemed to be

17  contingent on the tender from ministry of health in Saudi

18  Arabia?

19             MR. TRACER:  Objection.

20             THE COURT:  Sustained.

21  Q.  Do you remember raising a concern about First Medical?

22             MR. TRACER:  Objection.

23             THE COURT:  Overruled.

24  A.  At the audit committee or prior to the audit committee?

25  Q.  No, at the audit committee.

Kasnpet3                    Andersen - Cross

1    A.  I don't remember that at the audit committee.

2    Q.  Let me show you the notes from that meeting and see if it

3    refreshes your recollection.

4             MR. TRACER:  Objection.

5             THE COURT:  Ground?

6             MR. TRACER:  Characterization.

7             THE COURT:  Yes.

8             So, if you want to show a witness a document, you

9    cannot identify the document in any way, shape, or form.  Given

10   the way you set this up, I am going to preclude your showing

11   this to the witness because I don't think the harm can be

12   erased.

13            MR. WEINREB:  Very well, your Honor.

14   BY MR. WEINREB:

15   Q.  So do you recall that you testified on direct that you had

16   a concern with revenue recognition from a distributor called

17   First Medical because you believed that the timing of payments

18   seemed to be contingent on a tender from the ministry of health

19   in Saudi Arabia.

20            Do you recall that?

21   A.  Yes, I recall that.

22   Q.  Do you recall the audit committee asking you if there was a

23   right of return in the contract?

24   A.  I don't remember that.

25   Q.  OK.  You also expressed the belief that Stability

Kasnpet3                    Andersen - Cross

1   Biologics, another distributor, might being planning to return

2   the product it had purchased if it was not acquired by MiMedx.

3           Do you recall raising that concern?

4   A.  Sorry.  Repeat that.  I want to make sure I answer this

5   correctly.

6   Q.  Certainly.

7           So you also expressed the belief that Stability

8   Biologics might be planning to return the product it had

9   purchased if it was not acquired by MiMedx?

10  A.  That's correct.

11  Q.  And do you recall that you were asked if Stability had a

12  contractual right to return the product?

13  A.  I don't remember being asked that by the audit committee.

14  Q.  But, in fact, they did not have a contractual right,

15  correct?

16          MR. TRACER:  Objection.

17          THE COURT:  Sustained.

18  BY MR. WEINREB:

19  Q.  And you also raised concerns that the distributor called

20  SLR had purchased product but had not taken delivery of it

21  right away because it didn't have the freezer capacity to do

22  that.

23          Do you recall that?

24  A.  I recall that being the circumstances of SLR, yes, in that

25  their purchase.

SOUTHERN DISTRICT REPORTERS, P.C.•

Kasnpet3                    Andersen - Cross

1   Q.  I'm sorry?

2   A.  I remember that being the circumstances for SLR's purchase.

3   Q.  Do you recall being asked by the audit committee whether

4   that arrangement was a contractual arrangement, and you said it

5   was not?

6   A.  I do not remember that part of the conversation with the

7   audit committee, no.

8   Q.  Suffice to say, however, that you were interviewed by the

9   audit committee, they asked you questions, and you answered

10  them to the best of your ability?

11  A.  I believe that's correct, yes.

12  Q.  I want to turn to a different topic.  This is something

13  that you testified about yesterday, which was an e-mail that

14  you were shown and you were asked --

15          MR. WEINREB:  Actually, can we put this up.

16  Q.  This is Government Exhibit 1094.  Do you recall the

17  government showing this to you yesterday?

18  A.  I do.

19  Q.  And you testified that you viewed this e-mail as giving

20  First Medical a right of return, correct?

21  A.  Yes, I believe that this does convey that, yes.

22  Q.  OK.  Just to clarify, you're not a lawyer, are you?

23  A.  No, I am not a lawyer.

24  Q.  You are not an expert in contract law?

25  A.  No, I would not hold myself as out expert in contract law.

KASPPET4                    Carlton - Direct

1   A.  Ministry of Health, the government.

2   Q.  What does it mean where it says "PO is for MOH tender"?

3   A.  They were bidding on a tender.

4   Q.  That's the type of government contract that you just

5   described?

6   A.  That's correct.

7   Q.  All right.  And how much product ultimately did First

8   Medical buy from MiMedx in June, roughly?

9   A.  I think it was a couple million.  I'm not sure of the exact

10  number.

11  Q.  All right.  And when did MiMedx record revenue on its books

12  for that sale, to your understanding?

13  A.  Recorded revenue when it shipped, which was June, second

14  quarter.

15  Q.  All right.  Now, let me --

16          MR. IMPERATORE:  We can take that down.  Thank you.

17  Q.  Let me now direct your attention to December of 2015.  Did

18  there come a time that negotiations arose over another

19  potential sale to First Medical?

20  A.  Yes.

21  Q.  December 2015 is in which quarter?

22  A.  Fourth quarter.

23  Q.  And as of December 2015, how easy or difficult was it at

24  that point for MiMedx to reach its quarterly revenue guidance

25  for the fourth quarter?

KASPPET4                    Carlton - Direct

1    A.  Difficult.

2    Q.  Why do you say that?

3    A.  There was a gap between where the company was performing

4    and where the expectations were at the end of the quarter.

5    Q.  And when you refer to the "expectations," are you talking

6    about the revenue guidance figure?

7    A.  Correct.

8    Q.  What, if anything, did Mr. Taylor indicate to you about the

9    importance of reaching the revenue guidance number for that

10   quarter?

11   A.  It was extremely important for the total valuation of the

12   company.

13   Q.  How did it come to be that you started discussing a sale

14   with First Medical in December?

15   A.  I was talking to Bill about another tender that was coming

16   up in 2016 and that maybe we could pull that tender into 2015.

17   Q.  Whose idea was that?

18   A.  I can't remember.  Bill and I were discussing it, the

19   likelihood of trying to pull that tender up into 2015.

20   Q.  Okay.  So let me just unpack what you're describing here.

21   So you described that the tender was going to happen sometime

22   in 2016?

23   A.  I believe March of '16.

24   Q.  Okay.  So that's in the future by about three months or so;

25   is that right?

KASPPET4                    Carlton - Direct

1   A.  Correct.

2   Q.  So in other words, the government contract is not going to

3   be awarded by the Saudi government until that tender?

4           MR. MENCHEL:  Objection, leading.

5           THE COURT:  No, I think it was just for clarification.

6   Overruled.  You may answer.

7   A.  That's correct.  The government was going to establish a

8   tender for March of 2016 to be bid on at that time.

9   Q.  Okay.  And so your discussions with Mr. Taylor are in

10  December of 2015; is that right?

11  A.  That's correct.

12  Q.  And I think you testified a moment ago that you discussed

13  the possibility of pulling up or pulling in the tender?

14  A.  Yes.

15  Q.  Explain what you mean by that?

16  A.  That we knew the tender was coming.  We had won the

17  previous tender, and so we were going to ask, as a favor, to

18  pull that order up into December to help us hit our guidance

19  for the fourth quarter.

20  Q.  And who was going to be doing the favor?

21  A.  First Medical.

22  Q.  Why was that a favor?

23  A.  Because they normally wouldn't have ordered until sometime

24  in the first or maybe second quarter of the next year.

25  Q.  Did First Medical want to buy MiMedx product and get it in

KASPPET4                          Carlton - Direct

1    stock before the end of December?

2    A.  No.

3    Q.  So if the tender was not going to be awarded until roughly

4    March of 2016, why negotiate the sale in December?  Why not

5    wait until March to negotiate it?

6    A.  Because we needed to make up the gap on the number and

7    achieve guidance for the fourth quarter.  A lot of pressure was

8    placed on hitting that number at the end of fourth quarter.

9    Q.  And if it hadn't been for the revenue target or the

10   quarterly revenue figure, when would that sale to First Medical

11   more naturally have taken place in relation to the tender?

12   A.  Sometime at the end of the first quarter or maybe more over

13   the second quarter potentially, after the bid already took

14   place.

15   Q.  All right.  So let's talk in more detail about your

16   negotiations with First Medical.  Who participated -- well, let

17   me -- I'm sorry.  Let me withdraw that.

18          You mentioned -- who were the participants in the

19   negotiations for MiMedx in the fourth quarter negotiation?

20   A.  It was primarily myself and Bill Taylor and Pete Petit and

21   Chris Cashman.

22   Q.  And what was Mr. Taylor's role, in particular, in the

23   negotiation process?

24   A.  He sort of took point as the decision maker on our side,

25   working with Majed on their side; and I was the sales contact

KASPPET4                    Carlton - Direct

1   on our side, working with Bassam on their side.

2   Q.  And did these negotiations, like in the second quarter,

3   happen over the phone?

4   A.  Yes.

5   Q.  All right.  So let's focus on the early phase of the

6   December negotiations.  What sort of terms did First Medical

7   want from MiMedx?

8   A.  The previous order was four months, and that was the kind

9   of basis to start negotiating, at four months.  They also

10  wanted -- actually, that ultimately became six months, but it

11  started at four, and they wanted a right of return if the

12  tender did not issue.  That was what they were concerned about.

13  Q.  All right.  And when you say a "right of return if the

14  tender did not issue," just explain what you mean by that?

15  A.  Their finance team on their side was concerned that if in

16  the event the tender somehow didn't issue, meaning the

17  government contract didn't happen for various reasons, they

18  didn't want to be obligated to keep the products.  They wanted

19  to send it back.

20  Q.  Okay.  And so, in other words, if the government contract

21  were not awarded or were not paid for, what would First Medical

22  get to do?

23  A.  They wanted to be able to send them back.

24  Q.  Okay.

25  A.  That was a concern of theirs.

KASPPET4                        Carlton - Direct

1   Q.  And would they have to pay for it?

2   A.  No.

3   Q.  And to whom did First Medical communicate their desire in

4   this negotiation process?

5   A.  Myself and Bill, and then ultimately Pete and Chris were

6   involved.

7   Q.  Okay.  And what, if anything, did First Medical communicate

8   about why they wanted that right of return?

9           MR. BURCK:  Objection.

10          THE COURT:  Well, without -- are you offering this for

11  its truth?

12          MR. IMPERATORE:  Let me ask a clarifying question.

13  That may help.

14          THE COURT:  All right.

15  BY MR. IMPERATORE:

16  Q.  Was Mr. Taylor a part of those early discussions with First

17  Medical about their desire for a right of return?

18  A.  Yes.

19  Q.  And in those discussions, what did First Medical say about

20  why they wanted a right of return?

21          MR. BURCK:  Objection.

22          THE COURT:  So you're just offering this as a

23  communication that Mr. Taylor received but not for its truth?

24          MR. IMPERATORE:  Correct, your Honor.

25          THE COURT:  All right.  With that limitation, it will

KASPPET4                        Carlton - Direct

1   be received.

2   A.  Can I answer?

3   Q.  Yes.

4   A.  They were concerned because the sale was to be in the

5   future, and they were concerned that -- their finance team was

6   concerned that if something happened to the tender and the

7   government didn't fund the tender, meaning fulfill the

8   contract, they didn't want to be stuck with all the products.

9   Q.  Okay.  And if the tender wasn't awarded, why would they be

10  stuck with the products?  Just explain that.

11  A.  It was a pretty heavy inventory load, a couple million, and

12  they were worried about having too much inventory and being

13  overly extended financially.  So they wanted the right to send

14  it back if the tender didn't issue.

15  Q.  And if they sent it back to MiMedx, would they have to pay

16  for it?

17  A.  They wouldn't have to pay, no.

18  Q.  In these early discussions, what, if anything, did

19  Mr. Taylor say about his desire to give a right of return to

20  First Medical?

21  A.  Initially, he asked me to try to convince them not to

22  demand a right of return.  We talked extensively about maybe

23  helping them sell product, leave it in the market, maybe extend

24  payment terms, you know, beyond six months.  But at the end of

25  the day, they were pretty stuck on wanting the right of return,

Kasnpet5                    Carlton - Direct

1   Q.  We can see down at the bottom there a collection of text

2   messages with Mr. El Hage shortly thereafter.

3          You write to Mr. El Hage, "Bassam I think Bill Taylor

4   is going to ask Mr. Majid.  FYI."

5          What are you referring to there?

6   A.  Bill was going to speak directly with Majid, decision maker

7   to decision maker, and try to get this done.

8   Q.  Then he goes on to say, "I'm trying my best, but the

9   financial team didn't support me.  I don't know what to say.

10  OK.  Let him try."

11         What do you understand Mr. El Hage to be saying there?

12  A.  He was basically saying that he and I were not able to get

13  the PO at our level, and it needed to go to the level of Majid,

14  speaking with Bill.

15  Q.  Then you go on to say -- read what you say in the next

16  message.

17  A.  What did I say?

18  Q.  Yes.

19  A.  "We won't require payment for six months, and we can return

20  whatever isn't sold.  Would that help?"

21  Q.  Who authorized you to say that?

22  A.  Bill.

23         MR. IMPERATORE:  Let's move to the next page.

24  Q.  Then we see up at the top you indicate to Mr. Taylor --

25  just read what you wrote in that first message.

Kasnpet5                          Carlton - Direct

1  A.  "Bassam just texted that the financial team rejected his

2  PO."

3  Q.  What do you mean by that?

4  A.  He wasn't able to get a PO from his financial team on their

5  side.

6  Q.  You are using the term PO.  What are you referring to?

7  A.  Purchase order for the products.

8  Q.  When you wrote that the financial team rejected his PO, are

9  you referring to a purchase order that does not have the right

10  of return on it?

11  A.  At the time, yes, they wanted the right of return in

12  writing from Bill to do the PO.  They wouldn't just trust, you

13  know, my text to Bassam.

14  Q.  What are you indicating in this text message to Mr. Taylor

15  about why the PO was rejected?  Let me withdraw that.

16          Now, we can then move on later in the text exchange.

17          OK.  And then Mr. Taylor says, "Did Bassam put in the

18  six-month terms on his PO request."

19          And your response was?

20  A.  I said, "Yes, Bassam knows the terms are six months, too."

21  Q.  OK.  And then down below you can see that you exchange some

22  messages with Mr. El Hage?

23  A.  Uh-huh.

24  Q.  He says, "If you ask Mr. Bill to contact Mr. Majid to

25  support the order."

Kasnpet5                    Carlton - Direct

1   government, dealing with ISIS, and there was a war in Yemen

2   going on.  A lot of stuff that they were talking about.

3   Q.  How, if at all, did First Medical convey that these issues

4   fed into their desire for a right of return?

5   A.  They kept deferring to their finance team, you know, the

6   people that actually cut the PO, more concerned about that.

7   You know, the what-if scenario, that if the government didn't

8   fund the tender, there's no sale.

9   Q.  Following this phone call, ultimately was there agreement

10  reached with First Medical to buy products from MiMedx?

11  A.  Yes.  Actually, that -- I believe close to that day or just

12  shortly after.

13  Q.  And roughly how much?

14  A.  I think it was about $2 million.  I'm guessing.

15  Q.  Well, we'll look at the document in a moment.

16  A.  OK.

17  Q.  During those negotiations, what, if anything, did First

18  Medical say it would do if it didn't get that right of return?

19  A.  They were not going to order.

20  Q.  Was it your understanding that MiMedx would have reached

21  its fourth quarter revenue guidance if it not made that sale to

22  First Medical?

23  A.  I don't think so.  I would have to check the numbers, but I

24  think that order put us into the guidance.

25          MR. IMPERATORE:  If you could please publish,

SOUTHERN DISTRICT REPORTERS, P.C.•
•
•
•

Kat3pet1                    Carlton - Direct

1   Q.  To your understanding, was it MiMedx or the customer who

2   was supposed to sign the audit confirmation form and submit it?

3   A.  The customer.

4   Q.  Let me direct your attention to late January 2016.  So this

5   is about a month after the fourth quarter sale to First

6   Medical.  Did there come a time that First Medical received an

7   audit confirmation form?

8   A.  Yes.

9        MR. IMPERATORE:  Mr. Charalambous, please display

10  Government Exhibit 1115 for identification.

11  Q.  Is this an e-mail from to Mr. Taylor and to you?

12  A.  Yes.

13       MR. IMPERATORE:  The government offers Government

14  Exhibit 1115.

15       MR. BURCK:  No objection.

16       THE COURT:  Received.

17       (Government's Exhibit 1115 received in evidence)

18       MR. IMPERATORE:  Mr. Charalambous, please publish

19  Government Exhibit 1115.

20  Q.  We see here up at the top it is an e-mail from John

21  Cranston to Bill Taylor and dated January 21 of '16.

22       Remind us who John Cranston is.

23  A.  He worked in finance.  I think his title is corporate

24  comptroller.

25  Q.  I think down at the box it says "vice president corporate

SOUTHERN DISTRICT REPORTERS, P.C.•
•
•
•
(212) 805-0300

Kat3pet1                     Carlton - Direct

1    treasurer."

2    A.  Okay.

3    Q.  He writes in the e-mail, "Draft of auditor letter to

4    Bassam.  Okay to release to be sent."

5           Do you see that?

6    A.  Yes.

7    Q.  Let's look at the attachment.  So just in a nutshell, what

8    is this document?

9           MR. IMPERATORE:  We can display the attachment,

10   please.

11   Q.  What is this document in very general terms?

12   A.  The audit confirmation.

13   Q.  We see up at the top it says MiMedx.  There is a date

14   January 20, 2016.  It lists First Medical attention Bassam El

15   Hage.  And it goes on to say, "Our auditors, Cherry Bekaert

16   LLP, are conducting an audit of our financial statements.

17   Please confirm the amounts on invoices below as shown by our

18   records that were due us at December 31, 2015.  The invoices

19   that have been selected for confirmation may represent only a

20   portion of the balance due from you," and it goes on to -- it

21   lists two invoices.

22           Do you see that?

23   A.  Yes.

24   Q.  And the top invoice is dated December 26, 2015, in the

25   amount of about $2.1 million.  How, if at all, does that relate

Kat3pet1                      Carlton - Direct

1   to the fourth quarter purchase that you just testified about?

2   A.  That was the fourth quarter order.

3   Q.  And then it says "credit terms net 180."  Do you see that?

4   A.  Yes.

5   Q.  I believe we saw yesterday that Mr. Taylor sent an e-mail

6   to First Medical, the first e-mail indicating 180-day payment

7   terms; is that right?

8   A.  Correct.

9   Q.  If we can look down at the bottom.  There is a section that

10  says "special sale or payment terms (if any)."  Do you see

11  that?

12  A.  Yes.

13  Q.  Then there is a signature block.  Is that supposed to be

14  signed by someone at MiMedx or someone at First Medical?

15  A.  First Medical.

16          MR. IMPERATORE:  Let's look at Government Exhibit 1511

17  in evidence, please.  If we can publish that, Mr. Charalambous.

18  So let's move to page five.  So if we see here on page five, if

19  you can just read the -- if we can blow up that portion,

20  please.

21  Q.  We see here there are two text messages at the top where

22  you write to Mr. El Hage on January 25 at 11:50 and 11:52.

23          Would you read what you wrote in those two messages.

24  A.  "Bill is curious if you have the new tender for us to sign?

25  Can legal take a look at it ahead of time so Bill is clear to

Kat3pet1                     Carlton - Direct

1    sign on second.  Also, when the audit letter comes, just

2    acknowledge as correct.  No need to send them any other

3    information."

4    Q.  When you sent these messages, Mr. Carlton, were you alone

5    or were you with someone else?

6    A.  I was with Bill.

7    Q.  Where were you?

8    A.  Pete's conference room.

9    Q.  Was there some meeting that was going on in that time frame

10   that day?

11   A.  Yes.

12   Q.  When you sent these messages, what, if anything, did

13   Mr. Taylor ask you to do?

14   A.  He directed me to do this.  I typed it the way he told me

15   to type it.

16   Q.  Did you send these messages at Mr. Taylor's direction?

17   A.  On the spot.

18   Q.  When you say "on the spot," what do you mean by that?

19   A.  At the same time.

20   Q.  So was he with you?

21   A.  Yeah.

22   Q.  Giving you the substance of what to put in these messages?

23   A.  Yes.

24   Q.  Whose idea was it to send these messages?

25   A.  Bill.

Kat3pet1                    Carlton - Direct

1   Q.  When did you send them in relation to speaking to

2   Mr. Taylor?

3   A.  On the spot.

4   Q.  So, when you write in the second message, "Also, when the

5   audit letter comes, just acknowledge as correct.  No need to

6   send them any other information."  Who supplied the content of

7   that message?

8   A.  Bill.

9   Q.  When it came to the right of return, what was your

10  understanding of what Mr. Taylor was instructing?

11  A.  He wanted to keep them separate.

12          MR. BURCK:  Objection.

13          THE COURT:  I'll allow it to stand.  He had answered

14  before the objection, but I'll allow it to stand in any event.

15  Q.  Let me see if I can reask that.

16          Mr. Carlton, when it came to the right of return, what

17  was your understanding of what Mr. Taylor was instructing here?

18  A.  My understanding is he wanted to keep that as a separate

19  matter.

20  Q.  When you say "a separate matter," what was he instructing

21  when it came to the audit confirmation itself?

22  A.  He didn't want that to be in the audit.  Just get a

23  signature.

24  Q.  When you say no need to send them any other information,

25  what are you referring to there?

Kat3pet1                    Carlton – Direct

1    A.  The return.

2    Q.  In other words, don't send the return, don't put the

3    audit -- excuse me.  Don't put the return in the audit

4    confirmation?

5    A.  Correct.

6    Q.  What was the purpose of sending this message?

7    A.  He just wanted to get his signature.  The purpose was to

8    withhold information from the auditors.

9    Q.  Did you believe what you were doing was wrong?

10   A.  Yes.

11   Q.  Why?

12   A.  I wasn't normally involved in audits, but my understanding

13   is audits should not have a filter and they can have access to

14   the customer directly without, without filters.

15   Q.  Is it okay in your view to hide information from auditors?

16   A.  No.

17   Q.  Did you believe you were doing that here?

18   A.  Yes.

19        MR. IMPERATORE:  Let's now, if we can page down to the

20   next page in Government Exhibit 1511.  I believe it is the

21   fourth page, please.  I'm sorry.  If we can scroll to the page

22   with the -- one more page, please.  The sixth page.  Excuse me.

23   My apologies.

24        If we can look at Government Exhibit 1509 in evidence.

25   Excuse me, 1509 for identification, please.

Kat3pet1                    Carlton - Direct

1   following."  He goes on to say, "Bottom line they ordered way

2   more than they needed last quarter and will be fine with

3   nothing or minimal this quarter."

4              Do you see that?

5   A.  Yes.

6   Q.  By the second quarter of 2015, was it get easier or harder

7   to sell product to CPM?

8   A.  Harder.

9   Q.  Why?

10  A.  The relationship was becoming in some ways hostile.  They

11  were complaining about a lot of things.  And they were upset

12  with our local representation.  It was just becoming difficult

13  to deal with CPM at that point.

14  Q.  And here he says "They ordered way more than they needed

15  last quarter."  What quarter would that have been?

16  A.  That would have been the first quarter of 2015.

17  Q.  We can take that down.

18             At the early stages of negotiating that second quarter

19  order, how was the negotiation going?

20  A.  Not well.

21  Q.  Did there come a time that you elevated the negotiations

22  within MiMedx?

23  A.  I did.

24  Q.  What did you do?

25  A.  When Bill proposed the final offer to Bill McLaughlin, Mark

Kat3pet1                    Carlton - Direct

1    Brooks turn it down and so I called Pete.

2    Q.  What, if anything, did you say to Mr. Petit?

3    A.  I let him know that the deal was being rejected, and if he

4    wanted to jump in, save it.  If not, the deal is going to be

5    zero for the quarter.

6    Q.  Why did you tell Mr. Petit that?

7    A.  Pete didn't like surprises on the number.  And he was very

8    hands on if there was an opportunity to help.  So, I pulled him

9    in.

10   Q.  Okay.  I believe you testified earlier Mr. Schultz was

11   physically down in Texas negotiating with Mr. Brooks.

12   A.  He was.

13   Q.  Where were you, Mr. Petit and Mr. Taylor at the time?

14   A.  In Atlanta.

15   Q.  Were you in touch with Mr. Schultz by phone?

16   A.  Yes.

17   Q.  Did you have one call or more than one call?

18   A.  Multiple.

19   Q.  What, if anything, was he, how often was he --

20   A.  It was like a play-by-play on what was going on, especially

21   at the end of June.

22   Q.  So let me now direct your attention to the last week of

23   June, roughly.  Was Mr. Schultz in touch with you by phone?

24   A.  He was.

25   Q.  Did there come a point when you learned that a deal was

Kat3pet1                    Carlton – Direct

1    being reached?

2    A.  I did.

3    Q.  What did Mr. Schultz tell you?

4    A.  He called and told me that Pete got it done.  Brooks is

5    going to order.

6    Q.  What, if anything, did Mr. Schultz tell you about how

7    Mr. Petit got it done?

8    A.  He said Brooks is going to get cash.

9    Q.  Explain in more detail what Mr. Schultz told you.

10   A.  He described it that Brooks was going to get cash for this

11   order, and that freed it up, that got it done.  That Brooks is

12   going to order.

13   Q.  I'm sorry.  I cut you off.

14   A.  Because of the call with Pete.

15   Q.  Was Mr. Schultz indicating that Mr. Petit had a call with

16   Mr. Brooks that helped get the deal done?

17   A.  Yes.

18   Q.  When you say Mr. Brooks was going to get cash, explain what

19   you mean by that.

20   A.  He said Brooks was going to ask for cash.  And Pete agreed

21   and that got it done.

22   Q.  Just to orient ourselves here.  CPM is the distributor; is

23   that right?

24   A.  Correct.

25   Q.  And so, they're buying product from MiMedx; is that right?

Kat3pet1                    Carlton – Direct

1   A.  Yes.

2   Q.  And their job at the end of the day is going to be to pay

3   MiMedx?

4   A.  Yes.

5   Q.  When you're describing Mr. Brooks getting cash, are you

6   saying MiMedx was going to pay Mark Brooks?

7   A.  Yes.

8   Q.  To do what?

9   A.  To free up the $2 million order.

10  Q.  What was Mr. Schultz's tone on the phone as he described

11  this to you?

12  A.  Shocked.

13  Q.  What was your reaction?

14  A.  Same.

15  Q.  Why were you shocked?

16  A.  I didn't think this could be done.  Paying cash for an

17  order.  We were kind of joking about it in a strange way.

18  Q.  Why were you joking about it?

19  A.  I -- I didn't know how this would be done.  We were --

20  commenting that, you know, would you wire the money, you know,

21  leave it in a bag somewhere.  We just didn't know how this

22  would be done, in terms of the transaction.

23  Q.  When you say -- why are you describing it in those terms?

24  A.  Just we were just surprised that Brooks was asking for

25  something kind of outrageous and he got it.

Kat3pet1                    Carlton - Direct

1   Q.  In all your years in sales, have you ever heard of a deal
2   to pay the principal of a distributor in cash to get him to
3   place an order?
4   A.  No.
5   Q.  Why was that unusual?
6   A.  It seemed like a bribe.
7   Q.  You were Mr. Schultz's boss; is that right?
8   A.  Correct.
9   Q.  Did Mr. Schultz speak with you about the possible mechanics
10  of the payment as well?
11  A.  He didn't know.  We spoke about it, but he didn't know how
12  it was going to work.
13  Q.  What did he tell you about the potential mechanics of the
14  payment?
15  A.  He said he spoke to Bill about maybe having this be paid
16  through a local LLC consultancy with a different person.  Bill
17  said he'd think about it, but you know, he didn't have -- he
18  didn't have the answer at that point.
19  Q.  What was your understanding of why the payment might need
20  to be put through a local LLC?
21  A.  Well, the first reaction is we didn't know how we would be
22  able to pay cash directly to a customer.  So, he said he spoke
23  to Bill about maybe using another gentleman's consultancy LLC
24  to have a three, third-party involved.  Bill said he'd think
25  about it.

Kat3pet1                    Carlton - Direct

1    That's what he told me.  I wasn't on the conversation.

2    Q.  Who was that third party you were referring to?

3    A.  A gentleman named Bill Cochrane.

4    Q.  Let's look at Government Exhibit 1201 for identification,

5    please.  Is this an e-mail that you received from Bill

6    McLaughlin relating to CPM?

7    A.  Yes.

8         MR. IMPERATORE:  The government offers Government

9    Exhibit 1201.

10        MR. MENCHEL:  No objection.

11        MR. BURCK:  No objection.

12        (Government's Exhibit 1201 received in evidence)

13        MR. IMPERATORE:  We can display Government Exhibit

14   1201.

15   Q.  Up at the top we see this is an e-mail from Bill McLaughlin

16   to you and Lexi Haden.  Who is Lexi Haden?

17   A.  The general counsel of MiMedx.

18   Q.  Down below we see here it says, "Lexi and Mike, attached

19   please find the fourth amendment to the distributor agreement

20   and the second amendment to the consulting agreement signed by

21   Mark."  And he asks Lexi, "Would you please forward me the

22   fully executed documents once Pete signs."

23        Do you see that?

24   A.  Yes.

25   Q.  He says, "Thank you for working with us and making this

Kat3pet1                    Carlton - Direct

1    happened."

2          Let's look at the attachment which is the consulting

3    agreement.  Up at the top here, this is listed as the second

4    amendment to a consulting agreement dated June 26, 2015.  And

5    then down below, it says, "The second amendment to consulting

6    agreement amends that certain consulting agreement that was

7    effective January 23, 2012," and it goes on to say "between

8    MiMedx and Mark Brooks" who it defines as the consultant.  Do

9    you see that?

10   A.  Yes.

11   Q.  And then it goes on to say in section 3, down at the bottom

12   spilling on to the next page, "Compensation.  In consideration

13   of duties or services performed by the consultant set forth

14   herein, company shall pay the consultant a one-time consulting

15   fee in the amount of $200,000 to be paid to consultant on or

16   before June 30, 2015."

17          When was June 30, 2015 in relation to the end of the

18   second quarter?

19   A.  It was the final day.

20   Q.  And when Mr. Brooks was going to be paid cash, what was the

21   amount of the cash payment?

22   A.  200,000.

23   Q.  Let's go look at the duties section up at the top.  Would

24   you just read what that says under "duties."

25   A.  "In conjunction with designated company staff and under the

Kat3pet1                        Carlton - Direct

1   direction and control of the company's chairman or CEO, the

2   consultant shall provide reasonable and mutually agreed upon

3   market intelligence and other reasonable sales consulting as

4   requested by the company from time to time and other services

5   on a project basis as agreed to by both parties."

6   Q.   Did Mr. Brooks ever perform these services?

7   A.   To my knowledge, no.

8   Q.   How do you know that?

9   A.   I knew him well.  He was -- we had a relationship.  I knew

10  him from the very beginning of our relationship as a company.

11  I don't remember him ever doing this.

12  Q.   As the senior vice president of sales, would you have been

13  in a position to know whether Mr. Brooks actually did any

14  consulting work?

15  A.   In my opinion, yes, yeah.

16  Q.   And what was the nature of Mr. Brooks' relationship with

17  MiMedx at that point?

18  A.   At that point it was hostile.

19  Q.   Was Mr. Brooks coming down to MiMedx to meet with them and

20  provide consulting services?

21  A.   He only traveled to Atlanta one time to potentially meet,

22  and he literally turned the car around and flew back to Dallas

23  and never made it to the office.  So to my knowledge, he never

24  made it to the office.

25  Q.   Was that about a consulting or something else?

Kat3pet1                    Carlton - Direct

1   A.  We were trying to rebuild the relationship that was at that

2   point, as I said, hostile.  Very difficult person to negotiate

3   with, to deal with.  We were trying to suggest to come to

4   Atlanta, meet with Bill and Pete, kind of bury the hatchet.

5   This was prior in the winter prior to this, and he turned

6   around and flew back to Dallas.  So I don't know if we had any

7   meetings.

8   Q.  During this negotiation period, what, if anything, did

9   Mr. Petit ask you for in connection with Mr. Brook's contact

10  information?

11  A.  He needed his number.  I provided Brooks' phone number to

12  Pete.

13  Q.  If we look down below where it says, "In consideration of

14  duties or services provided by consultant, the company shall

15  pay the consultant a one-time consulting fee --" this is

16  section 3 -- "in the amount of $200,000."

17          Does that truthfully, accurately represent what that

18  payment was for?

19  A.  In my opinion, no.

20  Q.  What was that $200,000 payment for?

21  A.  What was reported to me is that payment triggered the order

22  for the quarter.

23  Q.  When you say triggered the order, what do you mean by that?

24  A.  When Brooks got that payment, he was willing to order

25  product.

Kat3pet1                    Carlton - Direct

1   Q.  And then down below it says, "Company shall also pay the

2   consultant $5,000 for each of the months of July, August,

3   September, October and November 2015 for monthly meetings

4   relative to the duties described in section 2."

5          To your knowledge, did Mr. Brooks ever do that?

6   A.  No, we talked about terminating the relationship shortly

7   after this deal.

8   Q.  Was there any relationship as of the fall of 2015?

9   A.  No, I think at that point we terminated.  I don't have the

10  date, but at some point around there.

11  Q.  Did CPM ultimately place a second quarter order?

12  A.  Yes.

13  Q.  How, if at all, does that $200,000 payment relate to the

14  second quarter order?

15  A.  It directly related.

16  Q.  How so?

17  A.  Once the payment was promised, then the order came in

18  within hours.

19  Q.  Then if we can look down at the signature blocks here.  We

20  see a signature block for Mr. Petit and also for Mark Brooks.

21  Is that correct?

22  A.  Yes.

23  Q.  Then just above that there is a provision that relates to

24  stock.  It says, "The parties further acknowledge that the

25  company has granted to the consultant the following options to

SOUTHERN DISTRICT REPORTERS, P.C.•

•
•
•

(212) 805-0300

612

Kat3pet1                    Carlton - Direct

1    purchase shares of common stock as compensation for services

2    perform under this agreement."

3              To your knowledge, were the options or stock actually

4    given as compensation for consulting services?

5    A.  To my knowledge, no.

6    Q.  What were they for?

7    A.  To keep the relationship strong for orders.

8    Q.  And we see here as of June, June 11 and June 26, there is

9    an award of shares of what are called restricted stock.  Do you

10   see that?

11   A.  Yes.

12   Q.  Under this agreement, did Mr. Brooks get both 200,000 in

13   cash and stock?

14   A.  He got both.

15   Q.  We can take that down.  Thank you.

16             Did MiMedx have the products in stock that CPM was

17   willing to buy in the second quarter?

18   A.  Actually, no.

19   Q.  Let's display Government Exhibit 1027 for identification,

20   please.  Up top is this an e-mail from Jeff Schultz, copying

21   you and Mr. Petit?

22   A.  Yes.

23             MR. IMPERATORE:  The government offers Government

24   Exhibit 1027.

25             MR. MENCHEL:  No objection.

Kat3pet1                    Carlton - Direct

1   Q.  What is SLR?

2   A.  It was a new distributor run by Jerry Morrison who used to

3   work for us directly.

4   Q.  I believe we looked at some e-mails of Mr. Morrison's

5   earlier.

6   A.  Yes.

7   Q.  What was his role at MiMedx?

8   A.  He was a local manager in Dallas.

9   Q.  In sales?

10  A.  Yes.

11  Q.  Did he ultimately change and go to SLR?

12  A.  He basically started SLR as a distributor to replace CPM.

13  Q.  When roughly did that happen?

14  A.  Sometime in the third quarter, maybe September.

15  Q.  When did MiMedx start selling product to SLR?

16  A.  September.

17  Q.  Did you participate in any discussions with MiMedx senior

18  management about the possibility of doing business with SLR?

19  A.  I did.

20  Q.  With whom?

21  A.  Bill, Pete and Chris.

22  Q.  What, if anything, did Mr. Petit and Mr. Taylor say about

23  their desire to do business with SLR?

24  A.  Positive reaction.  Thought it was a good idea.

25  Q.  Through your work, have you become familiar with what a new

Kat3pet1                    Carlton - Direct

1   distributor needs to do to get up to speed?

2   A.   Yes.

3   Q.   How?

4   A.   Just experience, working with distributors over the years.

5   Q.   Have you worked with new distributors in that regard?

6   A.   Yes.

7   Q.   In your experience, what does a new distributor typically

8   need to do in order to establish a distribution network before

9   it even starts selling product to end users?

10  A.   Need to be vendor credentialed at the hospital, local

11  contracts, vendor access, what's called value analysis

12  committee to be approved in the hospital to be a vendor.  It is

13  a process.

14  Q.   How long does that process typically take, in your

15  experience?

16  A.   It varies.  In my opinion, 30 to 90 days, depending.

17  Q.   To develop those networks?

18  A.   Yes.

19  Q.   That's before even making a sale?

20  A.   Correct.

21  Q.   Let's now turn to Government Exhibit 1037 for

22  identification.  Is this an e-mail that you received, you and

23  Mr. Taylor received in September 2015 related to Jerry

24  Morrison?

25  A.   Yes.

Kb23pet1                    Schultz - Direct

1    Q.  What was the name of it?

2    A.  SLR Medical Consulting.

3    Q.  Was SLR in existence before Mr. Morrison left MiMedx?

4    A.  Yes, it was.

5    Q.  Were you familiar with how much business SLR was doing at

6    the time Mr. Morrison was still at MiMedx?

7    A.  Yes, I did.

8    Q.  Based on your understanding, how busy was SLR before

9    Mr. Morrison left MiMedx?

10   A.  It wasn't that busy.  He had a distributorship that did,

11   that sold some implants such as like total knee replacements

12   and shoulders.  He was very minimal the business he was doing,

13   before he, before he left MiMedx.

14   Q.  About how much was he doing in terms of business?

15   A.  I got to say probably 10, 10 grand, maybe 15 grand a month

16   at the max.  Nothing.  Very minimal.

17   Q.  At some point after Mr. Morrison left MiMedx, did he place

18   a large order for product?

19   A.  Yes, he did.

20   Q.  Do you remember about how much that order was?

21   A.  I believe it was around $4.5 million.

22   Q.  What kind of product did he order?

23   A.  He ordered OrthoFlo which was an amniotic fluid product

24   that we had.

25   Q.  At the time Mr. Morrison ordered the OrthoFlo, was that a

Kb23pet1                    Schultz - Direct

1   product that MiMedx had been selling for a while?

2   A.  Well, we just initially started selling it.  But yes, that

3   was a product we had underneath our belt for a few, maybe a

4   month or two months.

5   Q.  Did you speak with Mr. Morrison at some point after he took

6   delivery of some of that OrthoFlo product?

7   A.  Yes, I did.

8   Q.  What were the circumstances in which you spoke with him?

9   A.  I went down to Dallas to see Jerry and just check on him

10  and see how things were going.  And look at his inventory for

11  AminoFix, which was a surgical product.  And I went down and

12  met him at his office and he goes, he goes, Schultzy, you got

13  to look at this.  I said what?  He opened up like four or five

14  freezers that were from the -- they were huge.  They were from

15  the floor to the ceiling and they were just jammed with

16  OrthoFlo.  And I said, well, open it up, let me see it.  He had

17  to put gloves on to even look at the product, because it was so

18  cold, it was minus 80 degrees.

19          And I looked at him, I said, Jerry, how are you going

20  to sell it?  He said, bro, I don't know.  It will probably take

21  me two years to sell this product.  He goes, I don't know how I

22  am going to get rid it.  I said, if I hear anything going on,

23  other distributors that need it, we'll send them over to you

24  and hopefully they can use that product.

25  Q.  Did anyone instruct you to help Mr. Morrison sell the

Kb23pet1                    Schultz - Direct

1    OrthoFlo product?

2    A.  Yes.  From our executive team, from Pete Petit and Bill

3    Taylor and Chris Cashman, they said, hey, listen, if you have

4    anything that can help Jerry move the product or purchase the

5    product, try to steer them that way because he has so much

6    inventory.

7    Q.  Let's talk about CPM.  Just remind us how did CPM compare

8    to the other distributors that MiMedx worked with?

9    A.  They were the largest stock and bill distributor at MiMedx

10   within the surgical division, which was my division.

11   Q.  Where was CPM located?

12   A.  They were out of Dallas, Texas.

13   Q.  Did you have any responsibilities with respect to CPM in

14   particular?

15   A.  Yes, I did.

16   Q.  What was your responsibility with respect to CPM?

17   A.  I was the relationship guy with Mark Brooks who was the CEO

18   of CPM.  There was so much hostility between MiMedx and Bill

19   Taylor and Pete Petit that I had somewhat of a relationship

20   with him to where it was pretty good.  So I was kind of the

21   liaison between MiMedx and CPM in Dallas.  I was head of the

22   relationship.

23   Q.  Who was the principal of CPM?

24   A.  Mark Brooks.

25   Q.  Mr. Schultz, I want to look at a document together.  This

Kb23pet1                    Schultz - Direct

1   is Government Exhibit 1002 which is already in evidence.

2   Mr. Pechet, if you can put that up on the screen.

3           Mr. Schultz, this is an e-mail from Jerry Morrison to

4   Mike Carlton cc'ing yourself and Tim O'Brien on May 31, 2015.

5   Do you see that?

6   A.  Yes, I do.

7   Q.  First of all, who is Tim O'Brien?

8   A.  Tim O'Brien was the -- I was the vice president.  He was

9   the national sales director of surgical for us.

10  Q.  How did he compare to you in the org chart?

11  A.  He reported to me.

12  Q.  The subject line here is CPM.  Is that right?

13  A.  Yes.

14  Q.  I'd like you to read the first two paragraphs.  Then I want

15  to ask you some questions about that.

16          Can you read those out loud, please.

17  A.  "Mike, as far as I am aware, there has been no response to

18  BT with regards to a sit down.  Mark has been in a meeting or

19  gone every time I tried to get in front of him the past two

20  weeks.  Bill McLaughlin is happy to meet, however, he has not

21  gained an approval from Mark.  My opinion is we pick the number

22  we need and begin that negotiation now.  Brooks believes he

23  could totally miss an entire quarter and still get his discount

24  the following.  BT doesn't think that is correct.  Since there

25  has been 10 amendments to the CPM agreement the past year, I'm

Kb23pet1                    Schultz - Direct

1   not sure if either party knows exactly.  Bottom line they

2   ordered way more than they needed last quarter and will be fine

3   with nothing or minimal this quarter.  Oh, and if we don't ship

4   their free product ASAP, we will have a much more difficult

5   time with the negotiation process."

6   Q.   Mr. Schultz, there are a couple places in here where

7   someone is referred to as BT.  Do you understand who that is?

8   A.   Yes, it's Bill Taylor.

9   Q.   And the Mark who is referenced here, who is that?

10  A.   Mark Brooks.

11  Q.   There is also a reference to Bill McLaughlin.  Who is that?

12  A.   Bill McLaughlin is the chief financial officer of CPM.

13  Q.   Focusing on the middle paragraph here.  Mr. Morrison says,

14  "My opinion is we pick the number we need and begin that

15  negotiation now."  What do you understand him to mean by that?

16  A.   That means we need to pick the number that Mark, we want

17  Mark to order, so that we can hit the quarterly number, and

18  we're going to be able to hit that number and meet the

19  guidelines and expectations that we set out to Wall Street.

20  Q.   Mr. Morrison says at the bottom line, "They ordered way

21  more than they needed last quarter and will be fine with

22  nothing or minimal this quarter."  Do you see that there?

23  A.   Yes, I do.

24  Q.   What's your understanding of what he's talking about there?

25  A.   They over ordered last quarter and they don't really need

Kb23pet1                    Schultz - Direct

1    any product.  They don't need any inventory.  They've got so
2    much in there that, you know, if they ordered nothing they're
3    fine.  If minimal, they're fine.  So they don't need an order.
4    Q.  Who is the "they"?  Who do you understand that to be?
5    A.  CPM.
6    Q.  This e-mail is dated May 31, 2015.  Is that right?
7    A.  Yes.
8    Q.  What quarter is that?
9    A.  That's second quarter of 2015.  That's the end of the
10   second month of the quarter.
11   Q.  When does the second quarter of 2015 end?
12   A.  It ends on June 30, the following month.
13            MR. HARTMAN:  I want to look at another e-mail.
14   Mr. Pechet, if you can please put this up just for the parties
15   and for the witness.  This what's been marked for
16   identification as Government Exhibit 1004.
17   Q.  Mr. Schultz, this is an e-mail from Mark Diaz to a number
18   of people including yourself.  It's dated June 15, 2015.  Do
19   you see that?
20   A.  Yes.
21   Q.  Who is Mark Diaz?
22   A.  Mark Diaz was the vice president of sales operations at
23   MiMedx.
24            MR. HARTMAN:  The government offers Government Exhibit
25   1004.

KB2Qpet2                    Schultz - Direct

1   Q.  Mr. Schultz, at some point did you call Mr. Taylor to

2   discuss Mr. Brooks' demands?

3   A.  Yes.

4   Q.  Can you describe that phone call?

5   A.  Yes.  I -- I was standing there, and I was talking with

6   Bill, and I called Mr. Taylor, and I called Bill, and I said,

7   "Bill, this $200,000," I said, "I was talking to Bill Cochrane,

8   and he mentioned that, hey, we could put" --

9              MR. PACKARD:  Objection.  Hearsay.

10             MR. HARTMAN:  Your Honor --

11             THE COURT:  Overruled.

12  Q.  Go ahead.

13  A.  So I was -- so I talked to -- I called Bill, and I said,

14  "Bill, I was just talking to Bill Cochrane here, and he said,

15  hey, obviously we can't put this $200,000 on the books because

16  it's something that should be off the books.  You can put it

17  through Roundhouse Medical, but you're going to have to gross

18  it up because I don't want to take a hit on the taxes, and then

19  I can pay Mark Brooks through my distributor to him himself."

20  And Bill just said, "You know, let me think about it."

21  Q.  Did Mr. Taylor say, "There's no reason to do that"?

22  A.  No.

23  Q.  And why were you suggesting that it be run through

24  Mr. Cochrane's company?

25  A.  Because we knew you couldn't put it on the books and the

KB2Qpet2                    Schultz - Direct

1   audit committee couldn't see it.  It was totally out of left

2   field.

3   Q.  Why couldn't the audit committee see it?

4   A.  Because that would be, you know, at the time we thought it

5   couldn't be shown on the books because it would affect the

6   revenue.

7   Q.  Mr. Schultz, was it your understanding that revenue would

8   be reduced to account for this $200,000 payment?

9   A.  No.

10  Q.  Why not?

11  A.  Because it -- we wouldn't have got to the quarterly number.

12  If they would have took the 200,000 off the number, we wouldn't

13  have got to the quarterly number.  So, obviously, they didn't

14  want to put it on the books because that would reduce us from

15  getting closer to that quarterly number that we had to get to

16  report our sales revenue to Wall Street.

17  Q.  Mr. Schultz, at some point did you speak with Mr. Carlton

18  about what had happened with Mr. Brooks?

19  A.  Yes.

20  Q.  And can you describe that conversation?

21  A.  Yes.  I called Mike Carlton, who was a senior VP at global

22  sales, my manager, and I said, "Mike, you wouldn't believe

23  this, what I just witnessed here."

24          And he goes, "What are you talking about?"

25          I said, "Mark Brooks asked for 200,000 in cash and

KB2Qpet2                    Schultz - Direct

1    THE COURT:  Overruled.

2  A.  We were going to take back the order.  We're going to take

3  back the products they didn't want.

4  Q.  And who directed you to tell Mr. Brooks that?

5  A.  Mr. Taylor.

6  Q.  And did you have an understanding about whether Mr. Petit

7  was aware that MiMedx had committed to take back the product

8  that Mr. Brooks didn't want?

9    MR. BRUCE:  Objection.  Lack of foundation.

10    THE COURT:  Sustained.

11    MR. BRUCE:  Thank you.

12  Q.  Mr. Petit is cc'd on this email.  Is that correct?

13  A.  Yes, he is.

14  Q.  Why is Mr. Petit cc'd on this email?

15  A.  Because Pete had to be aware of everything that was going

16  on with CPM.

17  Q.  Specifically, with respect to the offer to swap out the

18  product in a subsequent quarter, is it your understanding

19  Mr. Petit was aware of that?

20    MR. BRUCE:  Objection.

21    THE COURT:  Sustained.

22  Q.  Mr. Schultz, would you have put Mr. Petit on this email if

23  he weren't aware of the fact that you were offering to swap out

24  this product?

25  A.  No.

KB63PET4                    Docter - Direct

1  A.  So, did you say 42.9?

2  Q.  42.1 rather than 49.

3  A.  42.1 would have been almost 20 percent below $49 million,

4  15 percent below 49 million, and that would be considered to be

5  a huge miss.  And again, assuming analysts' consensus by the

6  line at the bottom was in that vicinity, that would have missed

7  not only company guidance, but analyst consensus.

8  Q.  Can you say how, if at all, it would have affected your

9  investment decision if that had occurred?

10 A.  Well, so, if the stock was trading at a certain price and

11 we could have sold all our stock at that price, we would do

12 that immediately.  We would not, I mean, our whole investment

13 philosophy about the company would be changed.

14       MR. HARTMAN:  Mr. Pechet, before we take this down,

15 can we look at page 3 again.  And the second section there says

16 guidance highlights include.

17 Q.  And it says, Mr. Docter, can you read what's written there

18 on the first bullet point under guidance highlights include.

19 A.  Certainly.  "Fourth quarter 2015 revenue expectations of

20 49.5 to $52.5 million."

21 Q.  And the next bullet point as well, please.

22 A.  "Full year 2015 revenue expectations of 185 to $188

23 million."

24 Q.  And Mr. Docter, what do you understand these bullet points

25 to be saying?

KB93PET1                    Martin - Direct

1  A.  Sorry.  So there was some general discussions, a
2  presentation of Physio given.  And then Mr. Taylor and
3  Mr. Petit, myself, Tom Johnston and Martin Hall, who was also
4  there at the second meeting, had a separate discussion.  We
5  talked about how we could move forward as a distributor, and
6  Mr. Petit and Mr. Taylor also showed an interest that they may
7  be interested in acquiring Stability Biologics.  And what I
8  mean by that is purchasing the shares of Stability Biologics.
9  Q.  In other words, did you understand that there was an
10 interest at that point in MiMedx potentially acquiring
11 Stability?
12 A.  Yes, that is correct.
13 Q.  Who first raised the topic of a potential acquisition?
14 A.  I believe it was Mr. Petit.
15 Q.  What was his demeanor or tone when he raised that
16 possibility?
17 A.  That Mr. Petit and Mr. Taylor were very excited about the
18 possibility of working with Stability Biologics.
19 Q.  When you say working with, what do you mean?
20 A.  I mean, partnering as a distributor, but then looking at
21 the potential to acquire Stability Biologics.
22 Q.  How, if at all, did you leave things with Mr. Petit and
23 Mr. Taylor at the end of that second meeting?
24 A.  I apologize.  I didn't hear your question.
25 Q.  How did you end things with them?  They brought up this

KB93PET1                    Martin - Direct

1   acquisition.  How did you leave things at the end of that

2   second meeting?

3   A.  We left things where we were going to move forward with

4   talking about a distribution agreement, and then we were going

5   to start a process called due diligence where they were going

6   to look into the possibility of Stability, purchasing Stability

7   Biologics.

8   Q.  Could you explain what is due diligence?

9   A.  Due diligence is when a company looks at the financial

10  records and the operations of a company they're interested in

11  acquiring to make sure they understand the business, they

12  understand the customers, they understand what the business is

13  really, and how profitable it is.

14  Q.  So did MiMedx subsequently engage in due diligence with

15  respect to Stability?

16  A.  Yes, it started almost immediately after this second

17  meeting.

18  Q.  As part of that due diligence, did you provide any

19  information to MiMedx?

20  A.  Yes, we provided financial information.  Almost immediately

21  after the meeting, I provided the tax returns for Stability

22  Biologics for the previous four years, and we had some

23  discussions about how Stability Biologics ran its books and

24  records, its income statement and financial statements.

25            MR. TRACER:  Mr. Charalambous, if we could publish

KB93PET1                        Martin - Direct

1   just for witness what's been marked as Government Exhibit 1047.

2   Q.  Sir, do you recognize this?

3   A.  I do.

4   Q.  Just generally speaking, what is this?

5   A.  The end e-mail is a message from Mr. Pete Petit to Pam

6   Martin saying, tax returns, he said print --

7   Q.  So, if you could just, generally speaking, what is this

8   document.  The jury doesn't see it.

9           MR. MENCHEL:  I have no objection.

10          MR. TRACER:  Thank you very much.  Can we publish that

11  for the jury.

12          (Government's Exhibit 1047 received in evidence)

13  Q.  So focusing on the bottom e-mail at 5:40, Mr. Martin, what

14  is this?

15  A.  I had sent the previous four years of Stability Biologics

16  tax returns to Mr. Pete Petit.

17  Q.  Was this part of what you called the due diligence process?

18  A.  Yes.

19  Q.  What's the date that you sent this to him?

20  A.  I sent this on September 23 of 2015.

21  Q.  When was that in relation to the second meeting you just

22  described?

23  A.  Very shortly.  Within a few days.  Shortly after.

24          MR. TRACER:  If we can go to the top e-mail,

25  Mr. Charalambous.

SOUTHERN DISTRICT REPORTERS, P.C.··
                ··
                ··
                ··
            (212) 805-0300

KB93PET1                    Martin - Direct

1    Q.  If you could read what Mr. Petit wrote.

2    A.  Sure.  Mr. Petit wrote:  Print.  Set up a folder.

3    Q.  So just to be clear, Mr. Martin, why were you sending four

4    years of Stability's tax returns at this point to MiMedx?

5    A.  I was sending this so MiMedx could begin its due diligence

6    process and understand Stability Biologic's financial

7    statements, including its income statement and its balance

8    sheet.

9    Q.  I want to show you a snippet of the attachment.

10            MR. TRACER:  Mr. Charalambous, could we go to page 7.

11   Q.  And Mr. Martin, just generally speaking, what are we

12   looking at on page 7?

13   A.  This is the balance sheet of Stability Biologics.

14   Q.  For what year?

15   A.  For 2014.

16   Q.  So would this be the tax return that covers the year 2014?

17   A.  Yes, that is correct.

18   Q.  So as of September 2015, would this be your most recently

19   filed tax return?

20   A.  Yes, it would.

21   Q.  So, directing your attention to the first line cash, do you

22   see that?

23   A.  Yes.

24   Q.  What was the cash in Stability's bank account at the end of

25   the year?  If you look to the right-hand side you'll see it

KB93PET1                     Martin - Direct

1  says end of tax year.

2  A.  Yes.  At the end of the year Stability Biologics had

3  $98,584 in the bank.

4  Q.  Did you view that as a high balance or low balance?

5  A.  I believe it is a relatively low balance, given that

6  Stability Biologics was generating over $20 million a year in

7  sales.

8  Q.  So why was Stability's cash in such a low position?

9  A.  Stability Biologics was focusing its cash and its use of

10  cash in building its tissue processing center in San Antonio.

11  While it had a construction loan to build out the building, it

12  was using cash flow from selling other people's products to

13  fund the operations of that processing center before any

14  products were manufactured.

15  Q.  We can take that down.

16        Mr. Martin, at either of the two meetings that you've

17  just described, did you actually agree to purchase any product

18  from MiMedx?

19  A.  No, not during the two meetings themselves.

20  Q.  Did there come a time when you were asked to purchase

21  product from MiMedx?

22  A.  Yes.

23  Q.  Approximately when was that?

24  A.  Approximately around the 25th to 26th of September in 2015.

25  Q.  So, what quarter would that be in September 2015?

KB93PET1                    Martin - Direct

1   Q.  Would you have made that purchase if you had not also been

2   discussing an acquisition at that time?

3   A.  No, I would not.

4   Q.  Would you have made that purchase without Mr. Petit's

5   comments about the figuring out the payment terms later on?

6   A.  No, I would not.  As I felt that if I had done that, I

7   would have put the company Stability Biologics in great

8   jeopardy, because it would not have been able to pay for the

9   inventory.

10  Q.  At that point, the right to return or exchange product, did

11  you get that in writing at that point?

12  A.  No, I did not.

13  Q.  Mr. Martin, who made the decision as to what inventory and

14  quantities of MiMedx product Stability would purchase?

15  A.  There was some discussions between Tom Johnston and Mike

16  Carlton as far as what products they were interested in.

17  That's how that initiated.  And ultimately, the discussion

18  moved to a gentleman named Mark Diaz who was an employee at

19  MiMedx in the sales operations.  And he was the one who was

20  aware of what was available from MiMedx to be sold to

21  Stability.

22  Q.  Just to be clear, who made the ultimate decision of what

23  products and what amounts you would purchase?

24          MR. MENCHEL:  Objection to the extent this calls for

25  an answer based on hearsay.  There is a lack of foundation.

1518

KB93PET1                    Martin - Direct

1    THE COURT:  No, I think the foundation has been laid.
2    Overruled.
3    Q.  Just to your understanding, who was it that made the final
4    decision about the quantities and amounts of MiMedx product
5    that Stability would purchase?
6    A.  On the first purchase order, that was agreed upon with
7    myself, Tom Johnston, and Mike Carlton.  On the second two
8    purchase orders, it was agreed on by MiMedx based on what
9    products were available.
10   Q.  So just to be clear, at that point, did MiMedx have an
11   inventory that Stability was willing to buy?
12   A.  No, not entirely.
13            MR. TRACER:  Mr. Charalambous, if we can publish for
14   the witness what's been marked as 1300.
15   Q.  And generally speaking, what is this?
16            MR. MENCHEL:  I have no objection to its admission.
17            MR. BURCK:  No objection.
18            MR. TRACER:  I offer Government Exhibit 1300.
19            THE COURT:  Received.
20            (Government's Exhibit 1300 received in evidence)
21            MR. TRACER:  Mr. Charalambous, can we publish this for
22   the jury.
23   Q.  And Mr. Martin, is this an e-mail that you're on?
24   A.  Yes, I'm on this e-mail.
25            MR. TRACER:  Mr. Charalambous, can we go to the second

SOUTHERN DISTRICT REPORTERS, P.C.••
•• ••
• • ••
•• ••
(212) 805-0300

KB93PET1                    Martin - Direct

1   A.  Well, the agreement that I had in my conversation with

2   Mr. Petit would be that we would figure out a payment plan at a

3   later date.  So there was no formal agreement in place.

4   Q.  Did you believe you were bound by any fixed payment term at

5   that point?

6   A.  No, I do not.

7   Q.  Based on the financial condition of Stability as you

8   describe it earlier, what, if anything, would happen if

9   Stability were compelled to pay within a 30-day fixed term?

10  A.  If Stability was forced to pay these invoices, Stability

11  would have been bankrupt or insolvent.

12         MR. TRACER:  Thank you, Mr. Charalambous.

13  Q.  Now, Mr. Martin, I'm going to switch gears a little bit.

14  You testified earlier about something called a distribution

15  agreement.  Could you remind us what is a distribution

16  agreement.

17  A.  A distribution agreement is an agreement between a product

18  manufacturer and a distributor that outlines payment terms, it

19  outlines the ability to return product, it outlines other

20  rights and obligations for each party, and whether and how each

21  party is supposed to act within their relationship.

22  Q.  So at the time that you issued those purchases we just

23  looked at on September 29 and September 30, did you have a

24  written signed distribution agreement with MiMedx?

25  A.  No, there was no written signed agreement, distribution

1533

KB93PET1                          Martin - Direct

1    agreement between Stability and MiMedx.

2    Q.  Why not?

3    A.  A draft agreement had been sent by MiMedx legal counsel on

4    September 25 or 26, around that time frame.  And I had not had

5    a chance to review the agreement.

6    Q.  At that point, were any of the terms that would be in a

7    distribution agreement still under negotiation in your mind?

8    A.  Yes.  In my mind, all of the terms in a distribution

9    agreement would have been still under negotiation.

10   Q.  Had you agreed upon a payment term as of the date of the

11   third quarter purchase?

12   A.  No.

13   Q.  Had you agreed on whether there would be a right of return

14   at that point?

15   A.  I believed that we had.  And that agreement was in a

16   conversation with Mr. Petit and I, but we had no normal written

17   agreement outlining that.

18   Q.  And directing your attention to the fall of 2015.  So from

19   approximately September until the November or December time

20   period.  You mentioned there was a draft distributor agreement.

21   Did you exchange drafts of that agreement?

22   A.  Yes.

23   Q.  And during that time, what was the purpose of exchanging

24   those drafts?

25   A.  Well, typically, while negotiating an agreement, one party

KB9Qpet2                          Martin - Direct

1   Q.  Would you actually have to make that payment any more in

2   your view?

3   A.  No, I would not and neither would Stability Biologics.

4   Q.  Did there come a time after this email, so after

5   December 23, when the topic of payment from Stability came up

6   with anybody at MiMedx?

7   A.  Yes.

8   Q.  Who brought it up?

9   A.  On a phone call with Mr. Pete Petit, a number of items were

10  discussed.

11  Q.  I just want to ask a few questions before you get there.

12  Just to be clear, who did it come up with?

13  A.  Mr. Pete Petit.

14  Q.  Approximately when did it come up with Mr. Pete Petit?

15  A.  In the last few days of December.

16  Q.  And did you have a conversation at that point with him?

17  A.  Yes, I did.

18  Q.  How did that conversation occur?

19  A.  It occurred by telephone.

20  Q.  So, Mr. Martin, if you can tell us as much as you recall

21  about what happened in that conversation on the phone with

22  Mr. Petit.

23  A.  Sure.  Mr. Petit and I had a conversation in the last few

24  days of December, and we discussed a number of items.  One of

25  the items we discussed was that Mr. Petit wanted me to sign a

KB9Qpet2                    Martin - Direct

1    distribution agreement.  The distribution agreement had not

2    been signed.  It was three months later.  Stability Biologics

3    had not made a payment yet for any of the inventory from the

4    third quarter.

5            The second item that came up on the call was that

6    Mr. Petit requested Stability Biologics make a payment.  This

7    is the first time a request was made around that inventory in

8    the third quarter.  And eventually there was a substantial

9    payment that he requested, about a million dollars.  Eventually

10   I told him the maximum we could pay was about $225,000.

11           The third item that came up on that call was Mr. Petit

12   asked for an additional payment or additional inventory

13   purchase from Stability Biologics; that Stability Biologics

14   purchase additional inventory from MiMedx.  And then I had also

15   requested on that call that I get a letter from Mr. Petit that

16   outlined the terms that we had discussed in September; that if

17   the acquisition did not move forward, Stability Biologics had

18   the right to return all of the inventory that it had purchased

19   from MiMedx.

20   Q.  So, it sounds, Mr. Martin, like a number of things came up

21   on that call.  Let me just ask some specific questions about

22   them.  So you started with payment.  Just to be clear, on the

23   call did Mr. Petit ask for any payment?

24   A.  Yes, he did.

25   Q.  How much did he ask for at that point?

KB9Qpet2                          Martin - Direct

1   A.  I believe the initial amount he asked for was around a

2   million dollars.

3   Q.  Had he ever asked for Stability to make a payment prior to

4   the last few days of December?

5   A.  No.

6   Q.  And when was this in relation to the end of the year?

7   A.  This was a few days before the end of the year.

8   Q.  And so based on the timing of that request, what was your

9   understanding, if any, of why Mr. Petit was asking you for

10  payment at that point?

11           MR. MENCHEL:  Objection.

12           THE COURT:  Overruled.

13  A.  It was my understanding Mr. Petit was asking for a payment

14  towards the purchase of inventory in the third quarter because

15  if I had not paid, then the auditors at MiMedx would question

16  the validity of booking the sale -- MiMedx's booking of the

17  sale in the third quarter.

18  Q.  Just to be clear, what are auditors, sir?

19  A.  Publicly traded companies have outside auditors.  Auditors

20  come in and look at the validity of transactions that are

21  booked by the company to make sure that they conform with

22  accounting standards.

23  Q.  Did you know whether MiMedx had public accountants at that

24  point?

25  A.  Yes, I did.

1563

KB9Qpet2                         Martin - Direct

1   Q.  So, after he made that request of you, did you agree to

2   make any payment?

3   A.  Yes, I did.

4   Q.  Did you agree to the million dollars that he requested?

5   A.  No.

6   Q.  Why not?

7   A.  Stability Biologics didn't have a million dollars to pay.

8   Q.  So how much did you agree to pay?

9   A.  I agreed to pay the first purchase order amount of

10  $225,000.

11  Q.  So why did you select that amount of $225,000?

12  A.  I selected that amount first because it was something

13  reasonable that Stability Biologics could afford, but,

14  secondly, it tied into the purchase order of the 1 cc.

15  OrthoFlow which was actually a product it believed that

16  Stability would -- could sell in the marketplace.

17  Q.  Was that the only product you bought that you actually

18  expected to sell?

19  A.  From those purchase orders, yes.

20  Q.  Mr. Charalambous, if we could put up for the witness what's

21  been marked as Government Exhibit 728.  Do you recognize that

22  document?

23  A.  Yes.

24  Q.  What is it?

25  A.  This is the check I wrote for the $225,000 dated

KB9Qpet2                          Martin - Direct

1   December 31, 2015.

2              MR. TRACER:  Government offers GX-728.

3              MR. MENCHEL:  No objection.

4              MR. BURCK:  No objection.

5              THE COURT:  Received.

6              (Government's Exhibit 728 received in evidence)

7   Q.  Thank you.  Mr. Charalambous, could we publish that for the

8   jury?

9              Mr. Martin, if you could just explain what this is?

10  A.  Again, this is the check for $225,000 that Stability

11  Biologics paid that was in relation to the first purchase order

12  we have discussed that was from September of 2015.

13  Q.  What was the date that you cut this check?

14  A.  December 31, 2015.

15  Q.  Just to be clear, what was your understanding of what could

16  happen with respect to MiMedx's auditors, if anything, if you

17  had not made any payment by the end of the year?

18  A.  I believe the auditors at MiMedx would have questioned the

19  validity of booking the three purchase orders Stability

20  provided.  They would have questioned whether MiMedx should

21  have booked those transactions as revenue in the third quarter.

22  Q.  Now, Mr. Charalambous, could we put that check side by side

23  with a document we looked at earlier, which was Government

24  Exhibit 1051.  If you could highlight the amount in 1051, on

25  the bottom right.  Thank you.

1565

KB9Qpet2                    Martin - Direct

1        Could you remind us, Mr. Martin, what is Government

2   Exhibit 1051 that's on your right-hand side?

3   A.  This exhibit is one of the purchase orders Stability

4   Biologics provided to MiMedx in September of 2015.

5   Q.  So again, with these documents, can you just explain what

6   relationship was there, if any, between the amount of check you

7   wrote on December 31 and the amount in the first purchase order

8   from the September order?

9   A.  Yes.  This check was to pay for the first purchase order

10  that Stability Biologics made for $225,000.

11  Q.  And specifically why did you agree to pay for this purchase

12  order?

13  A.  I agreed to pay for this purchase order because it was

14  actually the product that I believed Stability Biologics could

15  potentially sell.

16  Q.  We could take that down.

17        I want to go back.  I think another thing you

18  mentioned that came up on the call with Mr. Petit is that he

19  asked for an additional purchase of product.  Is that right?

20  A.  Yes.

21  Q.  Who brought up the idea of Stability making an additional

22  purchase at that point?

23  A.  Mr. Petit did.

24  Q.  And did he say what size, if any, purchase he was looking

25  for?

1566

KB9Qpet2                      Martin - Direct

1   A.  Approximately $450,000.

2   Q.  Again, when is this phone call in relation to the end of

3   the quarter?

4   A.  This phone call happened a couple days before the end of

5   the quarter.

6   Q.  And when was that phone call in relation to the acquisition

7   you described earlier?

8   A.  That phone call was just over two weeks before the

9   acquisition closed.

10  Q.  Based on the timing of that request, what was your

11  understanding, if any, of why Mr. Petit was asking you to

12  purchase product at that point?

13          MR. MENCHEL:  Objection.

14          THE COURT:  Sustained.

15  Q.  Had Mr. Petit asked you to make any purchases between the

16  end of September and the end of December?

17  A.  Are you referring to this specific purchase or up until

18  this phone call?

19  Q.  I'm sorry, up until the time of this purchase, from the end

20  of September until late December, had Mr. Petit asked you to

21  make any purchases of product?

22  A.  No.

23  Q.  When was this in relation to the end of the quarter?

24  A.  This was a few days before the end of the quarter.

25  Q.  Did you have any understanding of whether MiMedx reported

1567

KB9Qpet2                    Martin - Direct

1   its revenue on a quarterly basis?

2   A.  Yes, I did.

3   Q.  So, based on your understanding, what relationship was

4   there, if any, between the timing of Mr. Petit's request and

5   what he was asking you to do?

6          MR. MENCHEL:  Objection.  Same question I objected to

7   before, basically.

8          THE COURT:  Sustained.

9       (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KB93PET3                    Martin - Direct

1  Q.  Mr. Martin, at that time, so at the end of December, were
2  you in fact interested in having Stability purchase more
3  product?
4  A.  No.
5  Q.  Why not?
6  A.  Stability Biologics had not sold any of the MiMedx
7  inventory it purchased at the end of the third quarter.
8  Q.  Could you pay for more product at that time?
9  A.  No.
10 Q.  Did Stability's financial circumstances come up on that
11 call with Petit?
12 A.  Yes, in relation to the fact that Stability Biologics could
13 not make the larger payment that Mr. Petit had originally
14 requested.
15 Q.  And notwithstanding that comment, did Mr. Petit still ask
16 you to make an additional purchase?
17 A.  Yes.
18 Q.  Sir, did you ultimately agree to make a purchase in the
19 fourth quarter?
20 A.  Yes, I did.
21 Q.  Was the reason that you agreed to make a purchase in order
22 to be able to continue to supply Stability's customers?
23 A.  No, it was not.
24 Q.  What was the reason you agreed to make that purchase?
25 A.  The reason I agreed to make the purchase on behalf of

KB93PET3                    Martin - Direct

1   Stability Biologics was to assist MiMedx with its revenue in
2   the fourth quarter.
3   Q.  What relationship was there, if any, between your agreement
4   to purchase product and the comment by Mr. Petit you described
5   earlier about being a good partner?
6           MR. MENCHEL:  Objection.  Calls for speculation.
7           THE COURT:  Well, the line I've been drawing has been
8   the one between where I thought it was simply speculation and
9   where I thought there was a basis for the witness to have a
10  understanding, although, of course, that can be subject to
11  cross-examination.  And I think this is in the latter category,
12  so the objection is overruled.
13  Q.  Just to be clear, how, if at all, did your agreement to
14  purchase product at the request of Mr. Petit relate to the
15  comment you had heard him make about being a good partner in
16  the third quarter?
17  A.  Purchasing the product would, would allow Stability
18  Biologics to be a good partner to MiMedx and would continue the
19  discussions around the acquisition.
20  Q.  Was that your understanding at the time?
21  A.  Yes.
22  Q.  I'd like to show the witness Government Exhibit 725.
23  Generally speaking, what is that?
24  A.  This is a purchase order that Stability Biologics issued to
25  MiMedx at the end of the fourth quarter in 2015.

1570

KB93PET3                         Martin - Direct

1    MR. TRACER:  Government offers 725 in evidence.

2    MR. MENCHEL:  No objection.

3    THE COURT:  Received.

4    (Government's Exhibit 725 received in evidence)

5    MR. TRACER:  Mr. Charalambous, can we publish that.

6  Q.  What's the date of this purchase order?

7  A.  December 31, 2015.

8  Q.  How does that relate to the timing of the fourth quarter?

9  A.  This is the last day of the fourth quarter in 2015.

10 Q.  If you can just go down to the bottom, the total amount of

11 the purchase.

12 A.  The total amount of the purchase is $450,675.

13 Q.  And who determined the type and amount of product that

14 Stability would purchase in the fourth quarter?

15 A.  Mark Diaz, who was in sales operations at MiMedx,

16 determined 100 percent of the type and quantities of products

17 that would be purchased at the end of the fourth quarter.

18 Q.  Do you know what he based that product mix on?

19 A.  It's my understanding he based that product mix on what was

20 available at MiMedx.

21 Q.  Sir, when did you expect to pay for this $450,000 of

22 product?

23 A.  I did not expect to pay for this product.

24 Q.  Why not?

25 A.  For two reasons:  One is because I had requested a letter

SOUTHERN DISTRICT REPORTERS, P.C.··
··
· ·
··
(212) 805-0300

KB93PET3                          Martin - Direct

1  that formalized the terms that Mr. Petit and I had discussed in

2  September that basically stated that I had the right, if we

3  weren't going to be acquired, that I had the right to return

4  all of the product.

5          Secondly is that the acquisition at this point was

6  very close to being done and would in fact be completed two

7  weeks later.  So either I would return all of the product, if

8  the acquisition didn't happen, or I would be acquired --

9  Stability Biologics would be acquired by MiMedx, and would not

10 owe any of the money.

11 Q.  Either way, would you have to pay this $450,000?

12 A.  No.

13 Q.  What was the purpose of buying it if you weren't going to

14 pay for it?

15 A.  The purpose of buying it was to show good will and be a

16 good partner to MiMedx.

17 Q.  You can take that down.  You also mentioned the

18 distribution agreement coming up on the call.  Is that right?

19 A.  That is correct.

20 Q.  At that point, so by late December of 2015, had a

21 distribution agreement been signed?

22 A.  No, it had not.

23 Q.  What, if anything, did Mr. Petit say about the distribution

24 agreement on that call?

25 A.  Mr. Petit wanted a distribution agreement signed.

KB93PET3                    Martin - Direct

1   two weeks later.

2   Q.  So would that give you comfort in signing this agreement,

3   even if you knew it to be inaccurate?

4   A.  If the acquisition moved forward, then the fact that this

5   distribution agreement would not be relevant because Stability

6   Biologics would in essence be a wholly-owned subsidiary of

7   MiMedx.

8   Q.  To be clear, would you have signed this distribution

9   agreement if you had not received that right of return letter

10  we looked at before?

11  A.  No, I would not have.

12          MR. TRACER:  Mr. Charalambous, we can take that down.

13  Q.  Sir, I want to go back to the acquisition that you

14  discussed for a moment.  Could you remind us, when did the

15  discussions about a potential acquisition between MiMedx and

16  Stability, when did those begin?

17  A.  It began in late September of 2015.

18  Q.  Just again, when was that in relation to the sale of

19  product, the first sale of product between MiMedx and

20  Stability?

21  A.  They were around the same time.

22  Q.  Did there come a time when MiMedx actually acquired

23  Stability?

24  A.  Yes.

25  Q.  When was that?

SOUTHERN DISTRICT REPORTERS, P.C.··
·· 
· · 
·· 
(212) 805-0300

KB93PET3                    Martin - Direct

1   A.  The acquisition occurred and closed on January 13 of 2016.

2   Q.  At that point, how much money did Stability owe MiMedx from

3   outstanding purchases?

4   A.  The two -- the four purchase orders that are issued totaled

5   approximately $2.6 million and Stability had paid $225,000, so

6   Stability still owed MiMedx just under $2.4 million.

7   Q.  And what happened to that outstanding balance as part of

8   the acquisition?

9   A.  As part of the acquisition, in essence the payable on

10  Stability's books and the receivable on MiMedx's books canceled

11  each other out.  They were put into due to/due from accounts

12  that were on MiMedx's books and Stability's books, but as a

13  wholly-owned subsidiary then, no moneys were due.

14  Q.  Did you ever in fact have to pay for any of that?

15  A.  No, not in addition to the $225,000.

16  Q.  Did those amounts end up factoring into the purchase price

17  for the acquisition?

18  A.  No.

19  Q.  Why not?

20  A.  The purchase price and the structure of the acquisition of

21  Stability Biologics was done with two parts.  There was an

22  upfront payment negotiated between Mr. Petit and myself and Tom

23  Johnston.  That upfront payment was negotiated be a flat rate

24  of $10 million.  And then there were going to be two earn out

25  payments.  Those earn out payments were, basically, the total

Kba3pet2                      Urbizo - Direct

1   A.  It was approximately 4.6 to $4.7 million.

2   Q.  In connection with that Q3 sale, did you know what SLR's

3   annual revenue was at that point in time?

4   A.  I did, yeah.

5              Oh.  MiMedx's revenue to SLR?

6   Q.  No, SLR's annual revenues.

7   A.  No, I did not know.

8   Q.  If SLR's annual revenue up until the time of that third

9   quarter purchase was approximately $1 million, is that

10  something you would have wanted to know about?

11  A.  Yes.

12  Q.  Why, if SLR is buying $4.6 million worth of product, is $1

13  million in annual revenue something you would have wanted to

14  know?

15             MS. LOEB:  Objection.

16             THE COURT:  Overruled.

17  A.  I would have wanted to know that to evaluate the revenue

18  recognition criteria on whether or not collectibility is

19  reasonably assured.

20  Q.  How is the annual revenue relevant to that?

21  A.  Well, if they only had a million dollars of revenue in a

22  whole year, then that would suggest that they just ordered over

23  four and a half years' worth of product, and from an economic

24  substance perspective, it wouldn't make sense to me why someone

25  would order that much product or even have the ability to pay

Kba3pet2                    Urbizo – Direct

1    for it.

2         MS. LOEB:  Objection.  As to what makes sense to this

3    witness.

4         THE COURT:  I think you may cross-examine on that but

5    I think that's permissible.  Overruled.

6    Q.  Were you told that during the third quarter of 2015, MiMedx

7    bought freezers for SLR to store OrthoFlo?

8         MS. LOEB:  Objection.

9         MR. PACKARD:  Facts not in evidence.  And not subject

10   to time.  Perhaps we could have a sidebar on this, your Honor.

11        THE COURT:  All right.

12        (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

Kba3pet2                    Urbizo - Direct

1        (In open court)

2        THE COURT:  For the reasons stated at the sidebar, the

3   objection is sustained, although on different grounds than

4   originally made.

5   BY MR. IMPERATORE:

6   Q.  Mr. Urbizo, I think my voice may be a little faint.  If you

7   can't hear me, let me know.  I think there may be an issue with

8   the microphone.

9        Now, was it disclosed to you that the adult children

10  of Mr. Petit made a loan to SLR in the fourth quarter of 2015

11  that came from a trust set up by Mr. Petit?

12  A.  No, it was not.

13  Q.  Let's look at Government Exhibit 401 in evidence.

14        MR. IMPERATORE:  It's not appearing on my screen.  I

15  may be able to look at it on another screen.  Thank you.

16  Q.  So up at the top here we see this is labeled promissory

17  note.  And it says:  For value received and upon terms and

18  conditions set forth herein, SLR Medical -- and it goes on to

19  say.  I'm sorry.  Bear with me.  It refers to another entity

20  called Torpin promises to pay to the order of Torpin an amount

21  of $1.5 million.

22        Do you see that?

23  A.  I do.

24  Q.  To the best of your recollection, when was first time you

25  saw this document?

Kba3pet2                    Urbizo - Direct

1          MS. LOEB:  Objection.  Relevance.

2          THE COURT:  Overruled.

3   A.  The first time I saw this document was a few weeks ago when

4   you showed it to me.

5   Q.  Was I the first person to show it to you?

6   A.  Yes.

7   Q.  Was it disclosed to you that a loan under this promissory

8   note funded roughly $1.4 million of payments by SLR to MiMedx

9   in the fourth quarter?

10  A.  No.

11  Q.  Would you have wanted to know those facts?

12         MS. LOEB:  Objection.

13         THE COURT:  Overruled.

14  A.  Yes.

15  Q.  Would you have expected that they would be disclosed to

16  you?

17         MS. LOEB:  Objection.

18         THE COURT:  Overruled.

19  A.  Yes.

20  Q.  Why?

21  A.  This loan would be relevant to us evaluating the revenue

22  recognition criteria from MiMedx to SLR.

23  Q.  Did you become aware through audit work of SLR's payments

24  to MiMedx in the fourth quarter of 2015?

25  A.  Yes.

Kba3pet2                    Urbizo - Direct

1  Q.  What generally were you told about SLR's payments in that
2  time frame?
3  A.  That SLR had made a large order and had already paid
4  approximately $1.4 million of that amount that was due to
5  MiMedx.
6  Q.  If a loan made in the fourth quarter from Mr. Petit's
7  children coming from a trust set up by Mr. Petit funded in
8  substantial part SLR's payment of $1.4 million to MiMedx, how,
9  if at all, would that have affected your view of the revenue
10  that MiMedx could recognize from the Q3 sale to SLR?
11  A.  I think that this loan is a strong indicator that
12  collectibility was not reasonably assured at the time of the
13  sale.  And that, you know, the economic substance of what was
14  provided to us was not reflected without this loan.  And that
15  revenue should not have been recognized at the time of sale.
16  Q.  And if MiMedx had already recognized revenue in Q3 and the
17  loan was made in Q4, what would you have concluded about what
18  should happen with the Q3 financials?
19  A.  That they should be restated.
20  Q.  So, in short, would you have disallowed the revenue from
21  that sale in Q3?
22          MS. LOEB:  Object to form.
23          THE COURT:  Overruled.
24  A.  Yes.
25  Q.  Let's take a look at page seven.  There is a note here

Kba3pet2                    Urbizo - Direct

1    called a pledge agreement.  And it says:  Pledge to secure the

2    due and punctual payment of all obligations of pledgor to

3    pledgee under the note and hereunder, pledgor hereby pledges

4    and delivers unto pledgee and hereby grants to pledgee a

5    security interest in pledgor's MiMedx inventory.

6           Do you see that?

7    A.  Yes.

8    Q.  If family members who issued the loan, family members of

9    Mr. Petit, got security in the form of product that MiMedx had

10   sold to SLR, how would you have viewed that fact?

11   A.  Again, I think this would be a strong indicator that SLR

12   did not -- was not a fully operating business with the means to

13   an arm's length commercial loan, as typically an arm's length

14   lender would not collateralize --

15           MS. LOEB:  Objection.

16           MR. PACKARD:  Speculation.

17           MR. IMPERATORE:  He's explaining his reasoning, your

18   Honor.

19           MS. LOEB:  Speculating, your Honor.

20           THE COURT:  Well, without prejudice to a followup

21   question, we'll end the last answer with the words "arm's

22   length commercial loan."  But you may put another question.

23   Q.  Why would you have reached that conclusion here if these

24   facts had been supplied to you?

25   A.  I think in my experience as an auditor, a commercial

Kba3pet2                    Urbizo - Direct

1  loan --

2          MS. LOEB:  Objection.

3          THE COURT:  Overruled.

4  A.  -- a commercial loan from an arm's length lender would not

5  risk their, the amount lended to only be able to recover, you

6  know, a very specific type of product, which is liquid amniotic

7  fluid, as it would be hard for a lender to, you know, mitigate

8  their losses with such collateral.

9          MR. PACKARD:  Objection.  Move to strike.

10  Speculation.

11          THE COURT:  Overruled.

12  Q.  If SLR's owner was not successful in getting a $250,000

13  commercial loan from a bank, should that have been disclosed to

14  you?

15          MS. LOEB:  Object to characterization.

16          THE COURT:  Overruled.

17  A.  Yes.

18  Q.  How would you have viewed that from the standpoint of

19  revenue recognition if that had been disclosed to you?

20  A.  I think that's a strong indicator that collectibility was

21  not reasonably assured from the specific entity.

22  Q.  We can take that down.  Thank you.

23          Let me ask you now about another MiMedx distributor.

24  Are you familiar with Stability Biologics?

25  A.  Yes.

Kba3pet2                         Urbizo - Direct

1   Q.  Did you learn whether MiMedx sold product to Stability in

2   the third and fourth quarters of 2015?

3   A.  Yes.

4           MR. IMPERATORE:  Mr. Charalambous, would you please

5   publish Government Exhibit 701 in evidence.

6   Q.  Mr. Urbizo, have you ever seen this before?

7   A.  I saw this when you showed it to me a few weeks ago.

8   Q.  Before I showed it to you, had you ever seen it?

9   A.  No.

10  Q.  Did MiMedx disclose it to you?

11  A.  No.

12  Q.  Would you have expected this letter to be disclosed to you?

13          MS. LOEB:  Objection.

14          THE COURT:  Overruled.

15  A.  Yes.

16  Q.  This letter contains the date September 25, 2015.  In the

17  context of your Q3 review or annual audit, how, if at all,

18  would this letter have affected your view of the amount of

19  revenue that MiMedx could recognize for its sales to SLR --

20  excuse me -- to Stability in the third and fourth quarters of

21  2015?

22  A.  If this letter was disclosed to me, I believe that revenue

23  related to Stability should not have been recognized.

24  Q.  Any of the revenue?

25  A.  Any of the revenue, yes.

Kba3pet2                    Urbizo - Direct

1  Q.  Why is that?

2  A.  In the third paragraph of this letter, the company is

3  essentially giving Mr. Brian Martin of Stability Biologics the

4  right and privilege to return the product at any time he wishes

5  to, or not have to pay for the product if he changes his mind.

6  Q.  We can take that down.  Thank you.

7          Was it disclosed to you that in the third quarter of

8  2015, Stability and MiMedx did not reach an agreement on when

9  payment would be due for the third quarter purchase?

10         MR. PACKARD:  Objection.  Mischaracterize evidence.

11         THE COURT:  Overruled.

12 A.  Can you repeat question please.

13 Q.  Sure.  Was it disclosed to you that MiMedx and Stability

14 did not reach an agreement prior to shipment of the third

15 quarter product about when payment would be due?

16 A.  No.

17 Q.  Was it disclosed to you that Mr. Petit had told a principal

18 of Stability that they could figure out payment terms later?

19 A.  No.

20 Q.  Let's look at Government Exhibit 601 in evidence.  Is this

21 a management representation letter from November of 2015?

22 A.  Yes.

23 Q.  Let's look at item 21.  Would you read what item 21 says.

24 A.  It says:  The terms and conditions of the sales made to

25 Stability Biologics during the quarter ended September 30,

Kba3pet2                    Urbizo - Direct

1    2015, were governed by the company's standard product terms and

2    conditions as referenced on the sales invoice.

3    Q.  If Mr. Petit had indicated in substance to Stability's

4    owner that they could figure out payment terms later after that

5    third quarter sale was made, would this representation be

6    accurate?

7    A.  No.

8    Q.  If there was no agreement in place on when payment was due

9    at the time of shipment, how, if at all, would that have

10   affected your view of revenue recognition?

11              MS. LOEB:  Asked and answered.

12              THE COURT:  Overruled.

13   A.  To me that would mean that the price is not fixed and

14   determinable.  Because you have no enforcement on to when the

15   amount is due.  And if you don't know when the amount is due,

16   then that revenue recognition criteria would not be met.

17              MR. IMPERATORE:  Mr. Charalambous, you can take that

18   down.

19              THE COURT:  Counsel, I think this is probably a good

20   time to give the jury their midmorning break.  So we'll take a

21   15-minute break at this time.

22              (Jury excused)

23              THE COURT:  You may step down.  We'll see you in 15

24   minutes.

25              We'll see you all in 15 minutes.

Kba3pet2                    Urbizo - Direct

1          (Recess)

2          THE COURT:  My law clerk is going to hand out right

3   now to each of the three parties my first cut at the jury

4   instructions so you can take a look at it.  There is also a

5   proposed verdict form.  I will want to know at the close of

6   lunch today the two sides' best estimate of when the testimony

7   will be completed so I can figure out a good time for the

8   charging conference.  Please be seated.

9          (Jury present)

10          THE COURT:  All right.  Counsel.

11   BY MR. IMPERATORE:

12   Q.  Mr. Urbizo, how is the volume, by the way.  Can you hear

13   me?

14   A.  Yes, I can.

15   Q.  When we broke, you were testifying about Government Exhibit

16   701.

17          MR. IMPERATORE:  Mr. Charalambous, would you highlight

18   the last full paragraph, please.  "We appreciate your becoming

19   a distributor."

20   Q.  I believe you testified before the break why, if this

21   letter had been disclosed to you, you would have concluded that

22   it was not appropriate to recognize revenue for the third and

23   fourth quarter sales to Stability.  Is that right?

24   A.  Yes, that's correct.

25   Q.  It refers, it says here:  Therefore, if our discussions do

Kba3pet2                    Urbizo - Direct

1   not come to a conclusion within a reasonable period of time,

2   and you still wish to produce your own amniotic product, we

3   will commit to exchange or take back any of our amniotic

4   related products so you may proceed on your own.

5          Now, does management subjective belief about the

6   likelihood of an acquisition of Stability factor into your

7   assessment of revenue recognition?

8          MS. LOEB:  Objection.

9   A.  It does not.

10         THE COURT:  When there is an objection, you have to

11  wait.

12         THE WITNESS:  I'm so sorry.

13         THE COURT:  Overruled.  The answer will stand.

14  Q.  Why does it not factor into your assessment?

15  A.  Because of the time the product was shipped in Q3 of 2015,

16  this right or privilege was held by the buyer of the product,

17  and the event in which the product could be returned was not in

18  control of MiMedx, as the buyer could have decided that at any

19  point, you know, within this reasonable period of time, that he

20  did not want or need the product and could have returned it and

21  not paid for it.

22  Q.  We can take that down.  Thank you.

23         Now, we talked about a CPM swap.  Was it disclosed to

24  you that MiMedx had reached an understanding to sell products

25  to Stability in the third quarter of 2015 with the

Kba3pet2                    Urbizo - Direct

1  understanding that Stability could swap it for different

2  product in a later quarter?

3  A.  No.

4  Q.  If such an agreement existed, would you have wanted to know

5  about that?

6  A.  Yes.

7  Q.  If such an agreement were disclosed to you, or such an

8  understanding were disclosed to you, how, if at all, would it

9  have affected your view of the amount of revenue that MiMedx

10 could recognize from sales to Stability in the third quarter?

11 A.  That revenue should not have been recognized at that point

12 in time.

13 Q.  Let's let me ask you about another distributor.  Are you

14 familiar with a company called First Medical?

15 A.  Yes.

16 Q.  Did you come to learn whether First Medical had purchased

17 product from MiMedx in the fourth quarter of 2015?

18 A.  Yes.

19 Q.  So let me ask you about that fourth quarter purchase.  As

20 you understood it, what were the payment terms?

21 A.  My recollection was 180 days.

22 Q.  Where did you get that information from?

23 A.  The company would typically provide payment terms or their

24 records, and we would send audit confirmations directly to the

25 customer.  My recollection is First Medical confirmed those

Kba3pet2                    Urbizo - Direct

1    terms.

2              MR. IMPERATORE:  Let's look at Government Exhibit 1094

3    in evidence.  If we can blow up the top portion, please.

4    Q.  It says here, it is an e-mail from Mr. Taylor to

5    ████████████████, December 21, 2015.  And it goes on to

6    say in the body of the e-mail:  In the event that the tender is

7    delayed or for some unlikely event it does not occur, MiMedx

8    will give First Medical additional extended payment terms, if

9    requested, and will assist First Medical in selling the product

10   or another option would be to repurchase the product.

11             It goes on to say:  We will continue supporting sales

12   efforts in the territory.

13             Was this document disclosed to you by MiMedx in

14   connection with your quarterly review or annual audit?

15   A.  No.

16   Q.  Should it have been disclosed to you?

17             MR. PACKARD:  Objection.

18             THE COURT:  Overruled.

19   A.  Yes.

20   Q.  Why?

21   A.  These rights and privileges being extended to the customer

22   in this e-mail change the terms of the contract that we

23   reviewed.

24   Q.  If this e-mail had been disclosed to you, back in

25   connection with your quarterly review or annual audit, how

KBAQpet3                    Urbizo - Direct

1   returning it with incorrect information or just interfere in

2   the confirmation process in any form or fashion that could

3   affect us getting incorrect evidence.

4   Q.  And when you're using the term *client* there, who are you

5   referring to?

6   A.  In this instance, it would be MiMedx.

7   Q.  Let's look at Government Exhibit 1122 in evidence.  We see

8   an email here from Bassam El Hage attaching something called an

9   email confirmation.  Let's look at the attachment, please.

10          Do you recognize what this is, Mr. Urbizo?

11  A.  Yes, I do.

12  Q.  And the email uses the term "AR confirmation."  How, if at

13  all, does that relate to an audit confirm?

14  A.  It's an audit confirmation of an accounts receivable

15  balance.

16  Q.  Same thing?

17  A.  Same thing, yes.

18  Q.  Now, what credit terms are listed on this for the sale in

19  December of 2015?

20  A.  180 days.

21  Q.  We can highlight that, please.  All right.

22          And we see here there is a section down at the bottom

23  that says, "Special sale or payment terms (if any)."

24          In your experience as an audit manager for MiMedx,

25  how, if at all, was this section supposed to be used?

KBAQpet3                    Urbizo - Direct

1   A.  This is something we do as auditors to evaluate whether or

2   not there's any side agreements that were -- or privileges or

3   rights promised to the customer related to these sales in the

4   confirmation that may not be in the standard contract in place,

5   and so it's just a way to audit the company's assertions that

6   the contract provided to us supports the terms of the sale and

7   there's nothing else we need to consider.

8   Q.  OK.  Now, let's look at Government Exhibit 1094 side by

9   side with the audit confirm on 11/22.  So we just looked at

10  Mr. Taylor's email a moment ago.  If we could highlight or blow

11  up the text of that.  If you had known about this email,

12  Government Exhibit 1094, how, if at all, would you have

13  expected it to be disclosed in the audit confirm?

14          MR. PACKARD:  Objection.  Speculation.

15          THE COURT:  Overruled.

16  A.  Yeah, I would have expected the customer to disclose the

17  additional terms and rights that were granted via this email

18  within this section.

19  Q.  Which section are you referring to?

20  A.  The special sale or payment terms.

21  Q.  OK.  And if those terms in this email had been disclosed in

22  the audit confirm, what conclusion would you have reached?

23  A.  As I mentioned previously when we discussed this email,

24  that revenue should not have been recognized at the time of the

25  sale.

Kbb3pet3                    Pechet - Direct

1    1610 into evidence.

2              MR. PACKARD:  No objection.

3              THE COURT:  Received.

4              (Government's Exhibit 1610 received in evidence)

5              MR. TRACER:  Mr. Charalambous, can we publish that.

6              I'm going to read this.

7              The parties agree:  1.  Government Exhibit 729 is a

8    true and accurate copy of all MiMedx sales data through

9    December 31, 2015.

10             Government Exhibit 729 was made at or near the time

11   that the activity reflected in the record took place.  It was

12   made by or based on information transmitted by a person with

13   knowledge of the matters set forth in the record.  It was kept

14   in the course of a regularly conducted business activity, and

15   it was the regular practice of the business to maintain the

16   record.

17             Government offers Government Exhibit 729 into

18   evidence.

19             THE COURT:  Received.

20             (Government's Exhibit 729 received in evidence)

21             MR. TRACER:  Mr. Charalambous, can we publish

22   Government Exhibit 729 to the jury.

23   Q.  Mr. Pechet, prior to your testimony here today, have you

24   had the chance to review Government Exhibit 729?

25   A.  Yes, I have.

Kbb3pet3                              Pechet - Direct

1    Q.  Were you asked to sort the orders that are in the exhibit?

2    A.  Yes.

3    Q.  How were you asked to sort the orders?

4    A.  By sales amount from greatest to least.

5    Q.  So the highest amount of sales are at the top of the chart?

6    A.  Exactly right.

7    Q.  And directing your attention to the top two rows.  Can you

8    read the customer name for those two sales.

9    A.  SLR Medical Consulting.

10   Q.  Can you read moving a little bit over to the right the

11   amount of each of those sales.

12   A.  Sure.  So the first one is $1,835,050.  And the second one

13   is $1,764,000.

14   Q.  Were those the two largest transactions you identified

15   within Government Exhibit 729?

16   A.  Yes.

17            MR. TRACER:  We can take that down.  Mr. Charalambous,

18   can we show the witness what's been admitted I think at this

19   point as Government Exhibit 403.  Is that in evidence?  We can

20   publish that to the jury.

21   Q.  Mr. Pechet, were you asked to review bank account records

22   for a company called Torpin LLC?

23   A.  Yes, I was.

24   Q.  Are those the records that are reflected beginning with

25   what's being shown here at Government Exhibit 403?

KBBQpet6

1      MR. KOFFMAN:  Yes, your Honor.

2      THE COURT:  OK.  Let's turn to instructions 10.  All

3  the instructions relating -- 10 to summary and all the

4  instructions relating to Count Two, which are 11, 12, 13 and

5  14.  Anything from the government?

6      MR. TRACER:  Yes, your Honor.  We have two things to

7  flag in that section.  Number one on page 17, this is in your

8  Honor's instruction 12.  The end of the first paragraph the

9  part that reads:  "The collectibility of payment was not

10  reasonably assured and therefore the revenue from those sales

11  was not properly recorded."  So, the collectibility of payment

12  I think is one of the four factors.  We don't think our case --

13  in fact, our case is not limited to just that factor.  It would

14  be any of the four factors and they apply --

15      THE COURT:  Yeah.  Yeah.  Yeah.  Yeah.  You're right.

16  Let me think.  Well, what language do you suggest?

17      MR. TRACER:  We would suggest something a little

18  broader like "the criteria for revenue recognition were not met

19  from those sales."

20      THE COURT:  OK, I agree the government has clearly

21  written those alternative positions, so I will allow that.

22      Anything else?

23      MR. TRACER:  Sure.  And then the second issue we

24  wanted to raise, this has come up on a few occasions where

25  we've had a concern, and it goes back to one of our motions in

KBBQpet6

1   limine of sort of a reliance on counsel or reliance on

2   accountants-type defense, and your Honor had suggested if we

3   see a place in the charge where it makes sense to give an

4   instruction --

5              THE COURT:  Yeah, but I think defense counsel has been

6   quite good in avoiding that.  Now, once again, if I hear that

7   on summation, I will probably interrupt right then and there

8   and say, "There is no defense of counsel defense here, there is

9   no auditor advice defense."  And no counsel should want me to

10  do that because it will be painful, I assure you, but I think

11  since they've been so good about not raising that, there is no

12  need to sort of plant it in the jury's mind by having a

13  separate instruction.

14             MR. TRACER:  We agree with that, your Honor.

15             THE COURT:  OK.  By the way, let me say while I'm

16  thinking about it, well, obviously, it is common courtesy not

17  to interrupt the other side's summation.  The one exception in

18  my court is if something is said that you are quite sure has

19  absolutely no basis in the record or some counsel inadvertently

20  says something that was never in the record, at that point you

21  should object because the time to correct that is right then

22  and there, rather than at the end of the -- but that's the

23  exception.  Otherwise, you know, if there are other things you

24  need to raise at the end of either side's summation, we'll take

25  them up at the end.

2094

KBBQpet6

1          MR. TRACER:  Sure.  And then one last point on Count

2     Two.  This applies to Count One as well.  We noticed, and we

3     agree with this, the Court has no instruction on venue, and I

4     take it that's because there was a stipulation.

5          THE COURT:  Yes, there was a waiver.  We went through

6     that.

7          MR. TRACER:  As long as that's confirmed.

8          THE COURT:  Yes.

9          Defense counsel?

10          MR. KOFFMAN:  Yes, your Honor, on instruction 12, we

11     also had some proposed amendment to that first paragraph.  So

12     what we -- and I have a blackline, I'm happy to hand up if that

13     will be helpful.

14          THE COURT:  Yes, hand it up.

15          Well, on the first point, which I'm going to be

16     rewording that in any event, but on your second point is that

17     you object to the suggestion that the scheme can contain either

18     a statement that was materially false, you agree with that

19     part.

20          MR. KOFFMAN:  Correct.

21          THE COURT:  But you disagree with the part that, I'll

22     call it, half-truths for lack of a better way.  That's right in

23     the rule.

24          MR. KOFFMAN:  Right, your Honor.  It's not so much a

25     legal issue, as that's just not the government's theory here.

KBBQpet6

1    The government's theory is that the numbers, the revenue

2    numbers that were reported were inaccurate.  This language that

3    we struck alludes to sort of a failure to disclose something.

4    You know, there's something in the financial statements that

5    under GAAP there should have been a footnote, there should have

6    been a disclosure of some sort.  That is not the government's

7    theory in this case, and so we don't see why that instruction

8    would apply.

9             THE COURT:  OK.  Let me hear from the government.

10            MR. TRACER:  Your Honor, I don't think that's quite

11    right.  I think we certainly allege that the revenue figures

12    were materially false, but there is definitely an aspect to

13    certain of the transactions that we've alleged in this case

14    that there was, you know, certain aspects of the transactions

15    were made to appear a certain way, and if the full facts had

16    been disclosed, they would have been accounted for very

17    differently.  So this is an accurate statement of the law.  It

18    tracks the statute, and it's consistent with the way certain of

19    the --

20            THE COURT:  But what your adversary is saying is that,

21    remember, we're dealing here with the securities fraud count,

22    and so the question is what was said to the investors through

23    the various public reports.  And so the fact of an accountant

24    if they had known these facts would have accounted for them

25    differently is relevant to one prong of your conspiracy count.

KBBQpet6

1    But I don't see how it's necessarily relevant to your

2    securities fraud count.

3              MR. TRACER:  I think it is, your Honor.  So, for

4    example, in the 10-K, there's a paragraph that we highlighted

5    that actually talks about how and when MiMedx recognizes

6    revenue from sales to distributors, and I think that --

7              THE COURT:  And you're saying that was false -- that

8    was misleading if they didn't add -- and by the way, we didn't

9    follow that here.

10             MR. TRACER:  Absolutely, and if they didn't disclose

11   certain of the facts around those distributors sales but make

12   it sound as if we do follow certain rules, but they clearly had

13   exceptions that they allowed internally that they did not

14   disclose.

15             THE COURT:  Let me hear from defense counsel.

16             MR. KOFFMAN:  Yes, your Honor.  There's been no

17   testimony from any investor or that I can think of any other

18   witness who said, "You know, I really looked at what they

19   disclosed about the way they record revenue."  All the

20   testimony has been about what the revenue figure was and how

21   fast it was growing.  That's the only potential false statement

22   that could meet the materiality prong.

23             THE COURT:  I'm going to leave it in for now.  After

24   hearing the government's summation, if defense counsel wants to

25   revisit it, and since we're not going to hear from defense

**SA-115**

KBBQpet6

```
 1    counsel until Friday anyway, there will be that opportunity,

 2    but at least from what they just said, it seems to me they at

 3    least have an argument they could be making that would support

 4    that language.  So I'm going to leave it for now.

 5         MR. KOFFMAN:  Yes, your Honor.  And if I could, it

 6    just occurred to me that I neglected to raise an issue as to

 7    one of the earlier instructions.

 8         THE COURT:  Yes, go ahead.

 9         MR. KOFFMAN:  So, we had requested the kind of the

10    Sand standard multiple defendants' charge, and we notice

11    obviously your Honor didn't include it.  We're not seeking to

12    have you just include what we previously added, but we are

13    interested if your Honor could give any guidance on if there

14    is --

15         THE COURT:  No.  No.  No.  I have here several times

16    that I have "each defendant must be considered separately on

17    the evidence against him" and I have also that "each count must

18    be considered separately."  So what else do you want?

19         MR. KOFFMAN:  So I thought that might be the answer.

20    I guess we would -- to the extent your Honor would consider the

21    more robust and charge from Sand --

22         THE COURT:  You know, I am familiar with Sand since

23    I'm a co-author of Sand, but Sand attempts to cover the

24    waterfront because it's being written for thousands of cases.

25    You will see interspersed throughout Sand every once in awhile
```

KBCQpet3                    Milazzo – Direct

1            (Defendant's Exhibits 559 through 593 and 649 received

2       in evidence)

3       DIRECT EXAMINATION

4       BY MR. BRUCE:

5       Q.  Good morning, Mr. Milazzo.

6       A.  Good morning.

7       Q.  Just checking.  Sir, how far did you go in school?

8       A.  I graduated Fordham University with a bachelor's of science

9       in accounting.

10      Q.  What was your first job after you graduated from Fordham?

11      A.  I went to work for KPMG, one of the large audit and

12      accounting firms.

13      Q.  What were your general responsibilities there?

14      A.  I was in the audit practice.  We conducted audits of public

15      and nonpublic companies.

16      Q.  Did you ever become a certified public accountant?

17      A.  I did.  During that time when I worked at KPMG between 1993

18      and 1999, I became a certified public accountant.

19      Q.  Where do you currently work, sir?

20      A.  I currently work at Ankura Consulting.

21      Q.  Can you tell us what Ankura Consulting is?

22      A.  It's a professional services firm, and within that firm I

23      work in the forensic accounting group.

24      Q.  What are your general responsibilities there?

25      A.  I lead engagements, investigations, litigation matters,

KBCQpet3                    Milazzo – Direct

1    general accounting advisory matters.

2    Q.  How long have you worked at Ankura?

3    A.  Since 2016.

4    Q.  And let's just spell that for the court reporter.  How do

5    you spell that?

6    A.  A-N-K-U-R-A.

7    Q.  And since when did you say, sir?

8    A.  2016.

9    Q.  Prior to working at Ankura, where did you work?

10   A.  I worked at FTI Consulting.

11   Q.  What is that?

12   A.  It's also a professional services firm, and I also worked

13   in the forensic accounting group at FTI.

14   Q.  Did you have similar responsibilities at FTI that you now

15   have at Ankura?

16   A.  I did.

17   Q.  How long did you work at FTI, sir?

18   A.  From 2003 through 2016.

19   Q.  And so just for the witness, I would like to show Defense

20   Exhibit 604.  Do you recognize that document, sir?

21   A.  I do.

22   Q.  If I could direct your attention to the word "source" at

23   the bottom and the indication to Defense Exhibit 558.  Do you

24   see that, sir?

25   A.  I do.

KBCQpet3                         Milazzo - Direct

1   Q.  Prior to your testimony today, did you have a chance to

2   review that Defense Exhibit 558?

3   A.  Yes, I did.

4   Q.  Did you analyze it as well?

5   A.  I did.

6   Q.  And does Defense Exhibit 604 fairly and accurately reflect

7   the underlying source data in Defense Exhibit 558?

8   A.  Yes, it does.

9           MR. MENCHEL:  Offer it, your Honor.

10          MR. TRACER:  Government objects pursuant to motion in

11  limine 20 and 401 and 403.

12          THE COURT:  Overruled.

13          MR. BRUCE:  Permission to publish it to the jury.

14          THE COURT:  Yes.  Received.

15          (Defendant's Exhibit 604 received in evidence)

16          MR. BRUCE:  Thank you, your Honor.

17  Q.  Now, Mr. Milazzo, just to help orient the jury, using the

18  heading of this document, can you please provide the jury with

19  a broad overview of what this document is?

20  A.  Sure.  So, the chart looks at the timing of payments

21  between when an invoice was issued and when a payment occurred.

22  So, for example, if an invoice was issued and a payment

23  occurred in 30 days, that would be reflected in that first

24  column, zero to 30 day column.

25          If an invoice was issued and payment occurred in 60

KBCQpet3                    Milazzo - Direct

1    days, then that would be reflected in the second column, the 31

2    to 60 day column.  And so --

3    Q.  Just to interrupt, during what time frame is this exhibit

4    relevant?  What time frame did you analyze?

5    A.  Right.  So it covers invoices from 2014 and 2015.

6    Q.  And what is indicated on the left-hand side of the chart?

7    A.  So, on the Y axis, it's the number of payments from all

8    customers.  So it's the quantity of payments from all

9    customers.

10   Q.  And you started to tell us that along the bottom there are

11   certain designations.  Please continue your explanation.

12   A.  Right.  So those are the days that the payment occurred.

13   So, they're broken into categories of 30-day increments.  So

14   whether the payment occurred in zero to 30 days, or 31 to 60

15   days and so on.

16   Q.  OK.  And if you could please sort of walk the jury through

17   the chart from the left-hand side of the page to the right hand

18   and explain what the bar graphs mean.

19   A.  Sure.  So the first column, zero to 30 days, has a value on

20   the top of that bar of 23,158.  That are the number of payments

21   that occurred in zero to 30 days following the invoice.

22          If you go to the right, the next column is 31 to 60

23   days.  And on the top of that bar is the value of 30,655.  So

24   those are the number of payments that occurred in the period 31

25   to 60 days after the invoice was issued.

KBCQpet3                    Milazzo - Direct

1           If you continue going to the right, the next column 61

2    to 90 days, and the top of that bar is a value of 12,437

3    payments, and that was the number of payments that were made in

4    that period 61 to 90 days from the invoice date.

5           Going to the right, you have the column 91 to 120

6    days, and the top of that bar represents 6,367 payments that

7    were made 91 to 120 days from the invoice date.

8           Continuing to the right, in the 121 to 150-day

9    category, 3,938 payments were made.

10           To the right, the next bar, in the 151 to 180-day

11    category, 1,871 payments were made.

12           In the next column in the 181 to 210-day category,

13    1,214 payments were made.

14           To the right in the 211 to 240-day category, 763

15    payments were made.

16           In the next category 241 to 270 days, 604 payments

17    were made.

18           In the next category 271 to 300 days, 516 payments

19    were made.

20           And then finally in the 300 plus category, 300 plus

21    days category, 2,846 payments were made.

22    Q.   Thank you Mr. Milazzo.  Now, based on your analysis, what

23    conclusion did you reach that's reflected in the blue banner

24    towards the top of the chart?

25    A.   Right.  So all the blue bars from 31 to 60 days to 300 plus

KBCQpet3                          Milazzo - Direct

1    days, if you look at all the payments, it represents greater

2    than 50,000 payments.  It's actually right around 60,000.  But

3    that number is significantly greater than the number of

4    payments made during the zero to 30-day period when you compare

5    to the 23,158 payments that were made in the zero to 30-day

6    category.

7    Q.  Thank you, sir.

8            If we could take that down, and I will now show the

9    witness only Defense Exhibit 605, please.

10           First, do you recognize that document, sir?

11   A.  I do.

12   Q.  And I will direct your attention again to the reference of

13   the source exhibits, the underlying source exhibits at the

14   bottom of the page.  Do you see that?

15   A.  Yes, I do.

16   Q.  Prior to your testimony today, did you have a chance to

17   review and analyze those underlying source documents?

18   A.  Yes, I did.

19   Q.  And does Exhibit 605 fairly and accurately reflect the

20   underlying source data?

21   A.  Yes, it does.

22           MR. BRUCE:  I offer it, your Honor.

23           MR. TRACER:  We object.  401, 403.

24           THE COURT:  Overruled.  Received.

25           (Defendant's Exhibit 605 received in evidence)

KBCQpet3                          Milazzo - Direct

1      MR. BRUCE:  Permission to publish to the jury?

2      THE COURT:  Yes.

3  Q.  Now, Mr. Milazzo, again, could you help orient the jury

4  using the heading as to what this bar graph depicts?

5  A.  Yes.  So, these are the reserves available at the end of a

6  quarterly period.

7  Q.  This is for MiMedx, correct?

8  A.  For MiMedx.  And specifically we're looking at the bad debt

9  reserve and the sales returns reserve.

10 Q.  Can you explain for the jury what those two types of

11 reserves are.

12 A.  So reserves are valuation accounts within the company's

13 books and records.  The company will make an estimate of the

14 amount of an invoice that might not be collectible.  That would

15 be the bad debt reserve.  The company would also make an

16 estimate of the amount of product on an invoice that may get

17 returned.  That would be the sales return reserve.  And

18 generally if a reserve is higher, then the company is being

19 more conservative.  In fact, every time you increase a reserve,

20 the result is that profits are decreased.

21 Q.  Now, sir, to further orient the jury, can you explain

22 what's indicated along the left-hand side of the chart and then

23 along the bottom of the chart again?

24 A.  Sure.  Along the left-hand side is the dollar amount of the

25 reserve, and along the bottom are the quarterly time periods.

KBCQpet3                    Milazzo - Direct

1   Q.  And there's two different colors on the bar graph.  Can you

2   just explain that, briefly?

3   A.  Sure.  The blue color represents the bad debt reserve and

4   then stacked on top of that, the reddish color, is the sales

5   returns reserve.

6   Q.  Would you once again please walk through how the reserves

7   at MiMedx changed over time.

8   A.  Sure.  So in the first quarter 2014, the combined reserve

9   was .831 million.

10        And that increased in Q2 2014 when it increased to

11  .948 million.

12        Then Q3 2014, the reserve increased again to

13  1.878 million.

14        In Q4 of 2014, the reserve increased again to

15  2,591,000.

16        In Q1, 2015 the reserve increased again to 2,954,000.

17        In Q2, 2015 the reserve increased again to 3,534,000.

18        In Q3, 2015 the reserve increased again to 4,661,000.

19

20        And then in Q4, 2015 the reserve decreased slightly

21  but remained relatively flat at 4,532,000.

22  Q.  Thank you, sir.  If we can take that down, please.  I would

23  like to next show you Defense Exhibit 608.  First, do you

24  recognize that document, sir?

25  A.  Yes, I do.

KBCQpet3                         Milazzo – Direct

1   Q.  And, again, referencing the source material at the bottom
2   of the page, prior to your testimony today, did you have a
3   chance to review and analyze that source material?
4   A.  Yes, I did.
5   Q.  Does Defense Exhibit 608 fairly and accurately depict the
6   underlying source material?
7   A.  Yes, it does.
8           MR. BRUCE:  I'll offer it, your Honor.
9           MR. TRACER:  No objection.
10          THE COURT:  Received.
11          (Defendant's Exhibit 608 received in evidence)
12          MR. BRUCE:  If we could publish that to the jury,
13  please.
14  Q.  Mr. Milazzo, again, using the heading, can you please
15  orient the jury as to what this chart depicts generally.
16  A.  Right.  So, it provides the SLR cash balance by month.  So
17  from May 2015 through February 2016, it shows the cash balance
18  available at SLR.
19  Q.  And you understand that SLR is one of the distributors at
20  issue in this case?
21  A.  Correct.
22  Q.  OK.  Can you please walk through this chart for the jury as
23  well?
24  A.  OK, so in May 2015, the bank account total was $257,821.
25          In June 2015, the total was $250,406.

KBCQpet3                    Milazzo - Cross

1          In July of 2015, it was $216,660.

2          In August of 2015, it was $234,453.

3          In September of 2015, it was $298,970.

4          In October 2015, it was $284,177.

5          In November of 2015, it was $400,299.

6          In December of 2015, it was $553,981.

7          And then it continued to increase in January of 2016

8    to $721,995.

9          And then it increased in February of 2016 to $918,254.

10   Q.  Thank you, sir.

11          MR. BRUCE:  Your Honor, I have no further questions.

12          THE COURT:  Anything from Mr. Taylor?

13          MR. KOFFMAN:  No, your Honor.

14          THE COURT:  Cross-examination.

15          MR. TRACER:  Thank you.

16   CROSS-EXAMINATION

17   BY MR. TRACER:

18   Q.  Good afternoon, sir.

19   A.  Good afternoon.

20   Q.  I just want to take a look at some of the charts that you

21   testified about.  Could we pull up Defense Exhibit 604.  Sorry.

22   just give us a moment.  Mr. McLeod, thank you.

23          Mr. Milazzo, this is one of the charts that you

24   created.  Is that right?

25   A.  I verified the information in the chart.

KBCQpet3                    Milazzo - Cross

1    Q.  And just so I understand it, when you say $50,000 payments,
2    those could be multiple payments from the same customer.  Is
3    that right?
4              MR. BRUCE:  Objection.
5              THE COURT:  Overruled.
6              MR. BRUCE:  To form.  Mischaracterizes.
7    A.  Those are 50,000 individual payments.  Like I said, it's
8    really closer to 60,000, but potentially they could be from
9    more than one customer.  I don't know that at this time.
10   Q.  I guess I'm just trying to understand when you say
11   different payments, it could be one customer made multiple
12   payments, you would count those separately, is that how that
13   works?
14   A.  That's a possibility.  I didn't look at the customers
15   individually.  I looked at the payments in total.
16   Q.  So, when you looked at a payment, you didn't pay attention
17   to where it came from?
18   A.  Right.  So, in the company's books and records, they had
19   information about the invoices and the payments that were made
20   on those invoices, and I was able to aggregate the total number
21   of invoices that were paid, but I didn't -- it wasn't within
22   the scope of what I was doing to analyze the customers on a
23   customer-by-customer basis.
24   Q.  Got it.  I guess what I'm asking is when you looked at the
25   invoices, those could have been multiple invoices from the same

KBCQpet3                    Milazzo - Cross

1  customer, that's all I'm trying to get at.

2  A.  It's a possibility, but as I sit here, I don't know for

3  sure.

4  Q.  Thank you.  Focusing on the bar on the left-hand side,

5  those would be payments that were within zero to 30 days.  Is

6  that right?

7  A.  That is correct.  I'm not sure if is this is the same

8  exhibit though.

9         MR. TRACER:  I thought we were on DX-604.  I thought

10  it was Mr. McLeod.  Are we not seeing the same thing?

11         Thank you, Mr. Bruce.

12         Can the jury see that?  No.  Mr. McLeod, are you able

13  to help us out?

14         Thank you.  OK.

15  Q.  Let me start that again.  So, the bar on the left hand

16  side, that is payments that were within 30 days from invoice to

17  payment.  Is that right?

18  A.  That is correct.

19  Q.  And then the next bar over would be payments from 31 to 60

20  days from the invoice to the payment.  Is that right?

21  A.  Correct.

22  Q.  And then the third bar would be payments that come within

23  61 to 90 days of the invoice.  Is that right?

24  A.  That is correct.

25  Q.  OK.  So taken altogether, I take it that 53 plus 12,

KBCQpet3                    Milazzo - Cross

1   approximately 65,000 of the payments you looked at were made

2   within 90 days of the invoice?

3   A.  What was the number that you said?

4   Q.  I'm trying to do quick math.  So 23,000 and 30,000 and

5   12,000.  Those three columns were all within 90 days of the

6   invoice?

7   A.  Correct.

8   Q.  And that would be the overwhelming majority of the payments

9   that you looked at as part of your analysis?

10  A.  I haven't done the math on that, but it would appear to be

11  potentially --

12          THE COURT:  Woa.  We're talking basic arithmetic here.

13          THE WITNESS:  Yeah, I know I said --

14          THE COURT:  So, it's clear that the great majority is

15  in the first 90 days.  Yes?

16          THE WITNESS:  Yes.

17          THE COURT:  Thank you.

18  BY MR. TRACER:

19  Q.  We can take that down.  Mr. McLeod, I appreciate your help.

20  If you could pull up Defense Exhibit 605.  Can the jury see

21  that?

22          This is another chart that you created.  Is that

23  right?

24  A.  I verified the information on the chart.

25  Q.  And so just to be clear, when you're looking at a reserve,

KBCQpet3                    Milazzo - Cross

1    a reserve means that it's taken against the company's revenue.

2    Is that the idea?

3    A.  The sales return reserve is a direct offset against

4    revenue.  The bad debt reserve is an expense.  They both have

5    the impact of reducing profit.

6    Q.  I see.  So only the sales return reserve, that hits top

7    line revenue.  Is that what you're saying?

8    A.  The sales return reserve is technically a contra-revenue

9    account, so it offsets revenue.  The bad debt expense or the

10   bad debt reserve gets recorded as a bad debt expense which is

11   offset against the operating expenses.

12   Q.  I see.  So that's an expense that goes against revenue but

13   it's not contra the top line revenue?

14   A.  Correct.

15   Q.  Got it.  So essentially though either one of these, either

16   a bad debt reserve or a sales return reserve would only be

17   relevant to the extent the company would otherwise have revenue

18   and then it would offset it with the reserve.  Is that how that

19   works?

20   A.  Can you repeat the question?

21   Q.  Sure.  That was a poorly worded.

22        So, the way a reserve works is the company would

23   otherwise recognize revenue and then through either a bad debt

24   reserve or a sales return reserve would offset revenue that

25   would otherwise be recognized.  Is that the idea?

KBCQpet3                    Milazzo - Redirect

1    A.  Generally that's correct.

2    Q.  We could take that down.  If we could just look lastly at

3    Defense Exhibit 608.

4              That was the third chart you created.  Is that right?

5    A.  Again, I verified the information in the chart.

6    Q.  Did you look at one bank account or more than one bank

7    account to make this chart?

8    A.  There were four bank accounts.  At any given time, there

9    were -- there was activity in two to three bank accounts.

10   Q.  I see.  So the numbers in these bars, they add up four

11   different bank accounts; is that the idea?

12   A.  Correct.  Again, at any point in time, there was only two

13   or three active bank accounts, but over this period of time

14   there might have been up to four bank accounts.

15   Q.  Can you read what was the total in the bank accounts in

16   September 2015?

17   A.  $298,970.

18              MR. TRACER:  May I have a moment?  No other questions.

19              THE COURT:  Anything else?

20              MR. BRUCE:  Very briefly, your Honor.

21              THE COURT:  Go ahead.

22   REDIRECT EXAMINATION

23   BY MR. BRUCE:

24   Q.  If we could bring back up defense Exhibit 604, please.

25              Mr. Milazzo, when Mr. Tracer asked you a question, he

KBCQpet3                    Schwartz

1   may well have misspoken, but at least the record reflects that

2   he referred to the top blue banner as $50,000 payments.  And I

3   just want to --

4            THE COURT:  I noted your objection at the time, but it

5   was clear to everyone.

6            MR. BRUCE:  OK.  I was just going to have him clarify

7   it.

8            THE COURT:  It's 50,000 items, not $50,000.

9            MR. BRUCE:  Correct.  That's all I have, your Honor.

10           THE COURT:  Anything else?

11           MR. TRACER:  Nothing further.

12           THE COURT:  Thank you so much.  You may step down.

13           (Witness excused)

14           THE COURT:  Please call whoever is next.

15           MR. BRUCE:  Thank you, your Honor.

16           Mr. Petit calls Jake Schwartz as an unsworn reader.

17           THE COURT:  Yes.  Ladies and gentlemen, this is

18   similar to witnesses we've seen before who are not testifying.

19   They're just reading documents that the parties have accepted

20   into evidence.

21           MR. BRUCE:  May I proceed, your Honor?

22           THE COURT:  Please.

23   BY MR. BRUCE:

24   Q.  Mr. Schwartz, how are you currently employed?

25   A.  I'm an analyst at Kobre & Kim.

KBD3PET1

1          So, I know defense counsel, if I recall correctly,

2     were anxious to have everything done today, including the

3     government, and I'm very much in agreement with that.  So

4     that's another factor to factor in.

5          MR. MENCHEL:  I'm less concerned about that, your

6     Honor, than just I want -- I was allotted two hours, and I know

7     I told you I was going to try to chisel it down, but I think

8     I'll need the full two hours.

9          THE COURT:  If we haven't heard from her, then we

10    could start at about 11:20.  And you would have to break your

11    summation into two parts.

12          MR. MENCHEL:  That's fine.  Can we just confer?

13          THE COURT:  Yes.

14          (Pause)

15          MR. BURCK:  That's fine with the defense.

16          THE COURT:  Very good.  All right.

17          Now let's deal with the only open legal issue, which

18    is this question of in connection with.  So, I took a look at

19    the relevant case law, and it seems to me clear that if someone

20    holds a security that they otherwise would at least consider

21    selling, if they had known the information that they did not

22    know because of the alleged fraud, that that also qualifies in

23    connection with a purchase and sale.

24          In that regard, take a look at *United States v.*

25    *Ebbers*, 458 F.3d 110, 127 (2d Cir. 2006); *United States v.*

1    *Contorinis*, 692 F.3d, 136, 142 (2d Cir. 2012); *United States v.*

2    *Victor Teicher*, a decision of my colleague Judge Haight in the

3    Southern District of New York, reported at 1990 WL 29697;

4    *Castellano v. Young & Rubicam*, 257 F.3d 171, 180 (2d Cir.

5    2011); *O'Donnell v. AXA Equitable Life Insurance Company*, 887

6    F.3d 124, 129 (2d Cir. 2018); and various other cases.

7             So, I think we can do one of two things.  I'll hear

8    from counsel.  Either, if the defendant wants to rely on what

9    it says is evidence of other sales within the relevant period,

10   independent of any decision by the funds to hold on, that's

11   certainly an option.  Then we don't have to change anything.

12   But I think, again, very much subject to hearing from counsel,

13   that an alternative, if you look at page 18 of the charge, top

14   paragraph, fourth line, beginning with the word "specifically,"

15   it presently says, "specifically the purchase or sale of MiMedx

16   stock," the proposal would be to add the words "or the decision

17   to hold on to the stock when, if the alleged fraud had been

18   known, the decision might have been otherwise."

19             So, let me hear from the government and then from

20   defense counsel.

21             MR. TRACER:  Sure, your Honor.  First of all, we would

22   request inclusion of that additional language in light of the

23   fact that that is I think one of our bases for the in

24   connection with.  We did take a look at the transcript last

25   night, and we think there is actually multiple additional stock

KBD3PET1

1    sales that are in the record, so we won't be solely relying on

2    that.  In particular, Government Exhibit 105 describes the

3    repurchase of shares by MiMedx during the relevant time period.

4    In addition, Government Exhibit 106 describes the exercise of

5    options, which are the purchase of securities, by various

6    insiders in the company during the relevant period, as well as

7    the investor testimony that actually talks about them adding

8    and trimming MiMedx stock during the relevant period, which is

9    a reference to buys and sells.

10            So, in light of all of that, we think there are both

11    purchases and sales in the record, but we would add for that

12    language to be included as well as it is one of our bases.

13            THE COURT:  You make one other point which

14    specifically the purchase or sale of MiMedx stock, I think we

15    should change that to securities, because a stock is only one

16    form of security.

17            MR. KOFFMANN:  On behalf Mr. Taylor, we would oppose

18    the change to the instruction that your Honor just articulated.

19    We, notwithstanding the case law, which we haven't had an

20    opportunity to review in full, but we feel confident that that

21    instruction would be erroneous.  So if the government wants to

22    rely on that theory and that instruction is in there, I

23    understand that.

24            THE COURT:  I would think you would welcome this

25    because it's your legal position, as I understood it earlier,

KBDQpet4                    Summation - Mr. Burck

1          Bill Taylor says that CPM will place the $2 million

2     order in a mix that MiMedx can ship by June 30, 2015.  This is

3     June 24.  He's talking about an order that you're going to hear

4     about again after the deal is agreed.  Then you see additional

5     terms that he's talking about, "the overall relationship MiMedx

6     will pay CPM a 25 percent override in the sales to Universal

7     Instrumentation starting July 1, 2015.  In Texas, MiMedx will

8     give CPM visibility to hospitals we are working with to join

9     GPO contracts."  You heard about the GPO contracts these

10    business disputes they were having.

11         Bill is trying to close the deal.  He's trying to get

12    the deal done.  There is also a consulting agreement, an

13    amendment to a consulting agreement.  You heard testimony that

14    there'd been a long-standing consulting agreement between Mark

15    Brooks and the company and MiMedx for a long time, and it was

16    amended.

17         Bill Taylor here throws out a new proposal.

18    "companies shall pay to consultant an hourly rate of a thousand

19    dollars for monthly meetings relative to duties described in

20    section 2."  This is the idea he has.  This was Bill Taylor's

21    final offer.  And you know, because you heard about it from a

22    number of people in this case, it didn't work.  Mark Brooks

23    said, "No way, no how, I'm not doing it.

24         You also know from the testimony that as of the next

25    day after this initial email, this email that tries to

KBDQpet4                    Summation - Mr. Burck

1    summarize the deal, as of June 25, Bill Taylor is not running

2    the negotiation.  He stepped back from the negotiation.  These

3    were texts that you were shown during the trial.  Bill Taylor

4    to Mike Carlton and Jeff Schultz, "Our hands are tied.  He

5    needs to call Pete and discuss."

6          Bill Taylor a few minutes later, "Maybe he and Pete

7    can find a different way to handle."

8          And before we move on, I just want to step back again

9    briefly just to give you more context.  And you saw this at the

10   trial as well.  Back in the first quarter of 2015, so some

11   months before this happened, Bill was also trying to deal with

12   CPM because, as we talked about and as you heard at the trial,

13   long-standing bad blood.  Back in February of 2015, Bill Taylor

14   is sending an email to a bunch of people in MiMedx saying, "We

15   can do all this" - about CPM orders -"but we need to start

16   planning for zero from him."  So Bill Taylor is thinking this

17   relationship may not last.  It may not be worth it.  We may

18   have to think about going to zero on this guy.

19         And then you see again the Q2 2015 email.  And you saw

20   Mr. Menchel brought this up as well.  June 24, 2015, "If this

21   doesn't work for them"- them being CPM/Mark Brooks - "then I

22   guess he is choosing to discontinue doing business with us and

23   we will deal with it.  We are going way above and beyond."

24   That's what Bill Taylor says.  And he meant it.  And it didn't

25   work.  And Mark Brooks hated him.  And he couldn't get the deal

KBDQpet4                          Summation - Mr. Burck

1    done, and so he stepped back.  He stepped back.

2           The next day after he stepped back was the first day

3    the $200,000 payment comes up.  And recall Jeff Schultz's

4    extensive testimony about this, he says that the call was

5    between Pete Petit and Mark Brooks.  Nothing about Bill Taylor.

6    In fact as he said:

7    "Q.  And Bill Taylor wasn't on the call, right?

8    "A.  From what I gather, no."

9           No evidence that he was on that call.

10          And what did Bill Taylor do when he learned about the

11   200K?  We know when he learned about the 200K because we've

12   seen this document.  He was confused.  I want to spend a moment

13   on this email because this email is very, very important.  This

14   is something Mr. Menchel talked about.

15          This is an email that starts as one from Lexi Haden,

16   the general counsel of the company, attaching a draft of the

17   Brooks agreement.  Bill Taylor responds to that email from Lexi

18   Haden and says, "I thought we needed him to forego the stock

19   from June 11 of this year for the 200 K?" Question mark?  Now,

20   using your common sense, somebody asks that question, does it

21   not imply that they believed that the 200K was meant to be

22   replacement for the stock?  You could just read on your own.

23   That's the question he asked.  This is when Bill Taylor found

24   out about the 200K and keeping the stock.  That's the question

25   he asked in response to the email from Lexi Haden.

Kbg3pet2                     Jury Charge

1          Ladies and gentlemen, when you cut through the

2   distractions and the nonsense, when you come back to what this

3   case is really about, the core conduct and the documents, you

4   will reach the only verdict that is consistent with the facts

5   and your common sense, that the defendants, Pete Petit and Bill

6   Taylor, are guilty as charged.  Hold them accountable for their

7   crimes.

8          THE COURT:  Thank you very much.

9          All right.  My law clerk will distribute now to each

10  of the jurors my instructions of law.  We're going to read them

11  together, but you can also take them with you into the jury

12  room when you begin your deliberations.  I'm going to come down

13  and read them with you from the witness box.  This will allow

14  me to take off my mask.  Hello there.

15         So, if you would turn to the table of contents, you'll

16  see that the instructions are divided into three parts.  The

17  first part are general instructions.  These are instructions

18  that apply, frankly, not just to this, but all criminal cases.

19  Then there are the instructions under heading the "charges."

20  Those are the instructions that are particular to the charges

21  in this case.  And finally, there are the concluding

22  instructions, those are about how you fill out your verdict

23  form and things like that.  So let's begin on page 4 with

24  instruction number 1.

25         We are now approaching the most important part of this

Kbg3pet2                    Jury Charge

1    purpose and with intent to aid in the accomplishment of its

2    unlawful purpose.

3          In short, in order to satisfy the second essential

4    element of the charged offense as to a given defendant, you

5    must find beyond a reasonable doubt that the defendant you are

6    considering, with an understanding of the unlawful character of

7    the charged conspiracy, knowingly, intentionally, and with an

8    intent to defraud, joined and participated in the conspiracy

9    for the purpose of furthering any one of the three alleged

10   unlawful objects.

11         In addition to the other two elements, the government

12   must prove beyond a reasonable doubt that at least one of the

13   co-conspirators took at least one overt act in furtherance of

14   the conspiracy.  An overt act in furtherance of a conspiracy

15   can be any act of any kind taken toward effectuating the

16   conspiracy in any respect.  Thus, for example, if two persons

17   conspire to commit a fraud and one of them makes a telephone

18   call to help further the fraud, the overt act requirement is

19   met, even if the fraud is never otherwise carried out.

20         Although the government need not prove more than one

21   overt act, you must unanimously agree on which specific act or

22   acts, if any, the government has proven beyond a reasonable

23   doubt.

24         You will shortly retire to the jury room to begin your

25   deliberations.  As soon as you get to the jury room, please

Kbg3pet2                    Jury Charge

1    select one of your number as the foreperson to preside over

2    your deliberations and to serve as your spokesperson if you

3    need to communicate with the Court.

4         You will be bringing with you into the jury room a

5    copy of my instructions of law and a verdict form on which to

6    record your verdict.

7         Let me pause and show you the verdict form.  It's a

8    simple one-page document.  And as to each defendant, it asks

9    you to check the box whether you find the defendant guilty or

10   not guilty on each of the two counts.  So, it's very

11   straightforward.

12        After you've reached your verdict, your foreperson

13   will sign the verdict form, and date it, and fold it up neatly,

14   and seal it in this envelope very cleverly marked "verdict."

15   And that will then be brought to me by the marshal who will be

16   guarding you.  And then I will call you all back into the

17   courtroom, and we will ask each of you individually whether in

18   fact that is your verdict.  And we go through all those

19   technicalities to be absolutely sure we have your verdict as

20   you decided it.

21        (Continued on next page)

22

23

24

25

KBGQpet3                    Charge

1          THE COURT:  (Continued) Back to the instructions.  In

2     addition, we will send into the jury room a thumb drive with

3     all the exhibits that were admitted into evidence.  If you want

4     any of the testimony provided, that can also be done in either

5     transcript or readback form, but please remember it is not

6     always easy to locate what you want, so be as specific as you

7     possibly can be in requesting portions of the testimony.

8          Any of your requests, in fact any communication with

9     the Court, should be made to me in writing, signed by your

10    foreperson, and given to the marshal who will be available

11    outside the jury room throughout your deliberations.  After

12    consulting with counsel, I will respond to any question or

13    request you have as promptly as possible either in writing or

14    by having you return to the courtroom so that I can speak with

15    you in person.

16          You should not, however, tell me or anyone else how

17    the jury stands on any issue until you have reached your

18    verdict and recorded it on your verdict form.  As I have

19    already explained, the government to prevail on a particular

20    charge against a particular defendant must prove each essential

21    element of that charge beyond a reasonable doubt.  If the

22    government carries its burden with respect to a defendant, you

23    should find that defendant guilty of that charge; otherwise,

24    you must find the defendant not guilty of the charge.

25          Each of you must decide the case for yourself after

KBGQpet3                    Charge

1    consideration with your fellow jurors of the evidence in the

2    case, and your verdict must be unanimous.  In deliberating,

3    bear in mind that while each juror is entitled to his or her

4    opinion, you should exchange views with your fellow jurors.

5    That is the very purpose of jury deliberation -- to discuss and

6    consider the evidence; to listen to arguments of fellow jurors;

7    to present your individual views; to consult with one another;

8    and to reach a verdict based solely and wholly on the evidence.

9    If, after carefully considering all of the evidence and the

10   arguments of your fellow jurors, you entertain a conscientious

11   view that differs from the others', you are not to yield your

12   view simply because you are outnumbered.  On the other hand,

13   you should not hesitate to change an opinion that after

14   discussion with your fellow jurors now appears to you

15   erroneous.

16        In short, your verdict must reflect your individual

17   views and must also be unanimous.

18        This completes my instructions of law.

19        Now, a few other items.  First -- and this is the one

20   part of this process that I don't like, but I'm required at

21   this point to temporarily excuse, Ms. Lee, our remaining

22   alternate juror.  You are not off the hook yet, however.  Even

23   though you cannot participate in the deliberations, you must

24   not discuss the case with anyone.  If, God forbid, anything

25   were to happen to any of our jurors, we would then call you

2507

KBGQpet3

 1    foreperson to make sure you don't resume deliberations until

 2    all 12 of you are back in the jury room.  Counsel and I will be

 3    here to answer any questions you have except during 12:45 to

 4    1:45 when I will excuse counsel so they can get their

 5    well-deserved luncheon, but otherwise we will be here

 6    throughout the time to answer any questions you have.

 7            So without further ado, let us swear in the marshal

 8    who will guard you throughout your deliberations.

 9            (Marshal sworn)

10            THE COURT:  Very good.  Please follow the marshal to

11    the jury room.

12            (The jury retired to deliberate at 11:42 a.m.)

13            THE COURT:  Please be seated.  Anything anyone needs

14    to raise with the Court?  You are excused between 12:45 and

15    1:45 for your lunch.  Otherwise, throughout the time the jury

16    is deliberating, I need to have in this courtroom at least one

17    person from each party who can respond to messages.

18            Very good, and thank you again.

19            As I mentioned, I won't keep repeating it, but I will

20    say one time this was a very well tried case.  And as I said to

21    my colleague, Judge Stein, when I met him on the elevator, it

22    is so much more easy for the judges when the lawyers do such a

23    great job, and I am grateful to all of you.  Thank you.

24            (Recess pending verdict)

25    (Deliberations continued November 17, 2020 at 9:45 a.m.)

KBIQpetF

1          Now we have received quite an interesting note which

2     we've marked as jury note number 7 received at 12:47 p.m.:

3          "Judge Rakoff:  If we find that a defendant (1) had

4     intent to mislead the auditors, and (2) knew that misleading

5     the auditors would operate as a deceit upon purchasers or

6     sellers of MiMedx stock, does that imply that he had intent to

7     deceive purchasers or sellers of MiMedx stock?"

8          I asked the parties to give me their proposed

9     response.  The government's proposal is:  "That is a

10     permissible inference that you may draw from the evidence.

11     Whether you draw that inference or any other inference from the

12     evidence is entirely up to you."

13          And the defendants joint proposal was:

14          "No, a finding of intent to mislead the auditors even

15     with knowledge that misleading the auditors would operate as a

16     deceit upon purchasers or sellers of MiMedx stock cannot serve

17     as a substitute for a separate finding of specific intent to

18     deceive the purchasers or sellers of MiMedx stock.  You, the

19     jury, must determine whether any defendant has specific intent

20     to deceive purchasers or sellers of MiMedx stock.  In so doing,

21     you may find it instructive to review numbers 9 and 13 in the

22     Court's instructions of law to the jury."

23          Now, I thought there was something to both of those

24     responses.  I didn't agree with either of them in their

25     entirety, but I thought -- so I took my hand at what I think



MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme

Without Inflation:

Annual Revenue: $179,034,165

Bonus Payout:
PETIT: $314,818 - $352,030
TAYLOR: $238,572 - $266,772

Revenue Guidance:
Qtr 3, Qtr 4 & Annual *NOT MET*

Reported:

Annual Revenue: $187,296,000

Bonus Payout:
PETIT: $517,254
TAYLOR: $391,980

Revenue Guidance:
Qtrs and Annual *MET*

GOVERNMENT
EXHIBIT
50
19 Cr. 850 (JSR)





MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on Quarterly Revenue Reported in Financial Statements

**Inflated Revenue
Second Quarter of 2015**

*Note: Orders placed by listed distributors within ten days of quarter-end. CPM consulting fees assumed to be part of inflation.*

Sources: GX-603, GX-717, GX-718, GX-855.



MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on Quarterly Revenue Reported in Financial Statements

**Inflated Revenue**
**Third Quarter of 2015**

Note: Orders placed by listed distributors within ten days of quarter-end.

Sources: GX-720, GX-722, GX-723, GX-725, GX-726.



MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on Quarterly Revenue Reported in Financial Statements

Inflated Revenue
Fourth Quarter of 2015

Note: Orders placed by listed distributors within ten days of quarter-end.

Sources: GX-603, GX-720, GX-722, GX-723, GX-724, GX-725.

- CPM: $0
- SLR: $0
- Stability: $450,675
- First Medical: $2,540,000
- Total: $2,990,675

5

## MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on Quarterly Revenue Reported in Financial Statements

### Inflated Revenue by Quarter and Distributor

| Period | CPM | SLR | Stability | First Medical | Total |
|--------|-----|-----|-----------|---------------|-------|
| 2nd Quarter | $1,347,854 | $0 | $0 | $0 | $1,347,854 |
| 3rd Quarter | $0 | $4,663,050 | $2,187,110 | $0 | $6,850,160 |
| 4th Quarter | $0 | $0 | $450,675 | $2,540,000 | $2,990,675 |

*Note: Orders placed by listed distributors within ten days of quarter-end. CPM consulting fees assumed to be part of inflation.*

6

Sources: GX-603, GX-717, GX-718, GX-720, GX-722, GX-723, GX-724, GX-725, GX-726, GX-855.

## MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on Quarterly Revenue Reported in Financial Statements

### Quarterly Revenue Excluding Inflation

| Period | Revenue | | | Percent Inflation |
|---|---|---|---|---|
| | Reported | Inflation | Without Inflation | |
| 2nd Quarter | $45,679,000 | $1,347,854 | $44,331,146 | 3.04% |
| 3rd Quarter | $49,015,000 | $6,850,160 | $42,164,840 | 16.25% |
| 4th Quarter | $51,835,000 | $2,990,675 | $48,844,325 | 6.12% |

Sources: GX-105 and slide 6.

7



MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on Annual Revenue Reported in Financial Statements

**Total Inflated Revenue by Distributor**

Total Inflated Revenue: $11,188,689

- CPM: $1,347,854
- SLR: $4,663,050
- Stability: $2,637,785
- First Medical: $2,540,000

Sources: See slide 6.



MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on Annual Revenue Reported in Financial Statements

**Adjustments for Payments, Discounts and Write-downs Received by Year's End on Inflated Revenue**

Note: Payments, write-downs and discounts applied in the fourth quarter for purchase orders that inflated the second and third quarters.

Legend:
- Payments, Write-downs and Discounts
- Inflation Minus Payments, Write-downs and Discounts ("Net Inflation")

CPM: 1,347,854; $1,347,854; $0
SLR: $4,663,050; $1,354,000; $3,309,050
Stability: $2,637,785; $225,000; $2,412,785
First Medical: $2,540,000; $0; $2,540,000

Sources: GX-603, GX-608, GX-717, GX-718, GX-720, GX-722, GX-723, GX-724, GX-725, GX-726, GX-731, GX-732, GX-733, GX-734, GX-745, GX-850, GX-851, GX-854, GX-855

9



MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on Annual Revenue Reported in Financial Statements

**Annual Net Inflated Revenue**

Annual Net Inflation: $8,261,835

CPM: $0
SLR: $3,309,050
Stability: $2,412,785
First Medical: $2,540,000

Sources: See slide 9.

10

## MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on Annual Revenue Reported in Financial Statements

### Annual Revenue Excluding Inflation

| Period | Reported | Revenue Net Inflation | Revenue Without Inflation | Percent Inflation |
|---|---|---|---|---|
| *Full Year* | *$187,296,000* | *$8,261,835* | *$179,034,165* | *4.61%* |

*Note: Net Inflation is the value of orders placed by listed distributors within ten days of quarter-end netted by payments, write-downs and discounts received as of December 31, 2015.*

Sources: GX-105 and slide 9.

11





MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on Meeting Quarterly Revenue Guidance

Quarterly Revenue Guidance
vs. Reported Revenue With and Without Inflation

Sources: GX-201, GX-205 and slide 7.

13



MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on Meeting Quarterly Revenue vs. Analyst Consensus

**Quarterly Analyst Consensus**
**vs. Reported Revenue With and Without Inflation**

Legend:
- Analyst Consensus
- Reported Revenue
- Revenue Without Inflation

Data points:
- 2Q2015 Consensus: $45,679,000 / $44,988,570 / $44,331,146
- 3Q2015 Consensus: $49,015,000 / $48,894,000 / $42,164,840
- 4Q2015 Consensus: $51,835,000 / $51,838,170 / $48,844,325

Y-axis: $40,000,000 to $54,000,000

Sources: GX-451, GX-452 slide 7.



# MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on Meeting Annual Revenue Guidance and Analyst Consensus

Sources: GX-205, GX-450, GX-452 and slide 11.



MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on PETIT and TAYLOR's Non-Equity Compensation

Without Inflation:

Annual Revenue: $179,034,165

Bonus Payout:
PETIT:
$314,818 – $352,030
TAYLOR:
$238,572 – $266,772

Revenue Guidance:
Qtr 3, Qtr 4 & Annual
*NOT MET*

Reported:

Annual Revenue: $187,296,000

Bonus Payout:
PETIT: $517,254
TAYLOR: $391,980

Revenue Guidance:
Qtrs and Annual
*MET*

16

# MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on PETIT and TAYLOR's Non-Equity Compensation

## Non-Equity Compensation

| Defendant | Annual Salary | MIP Bonus | 2015 Total |
|---|---|---|---|
| PETIT | $560,177 | $517,254 | $1,077,431 |
| TAYLOR | $451,131 | $391,980 | $843,111 |

17

Sources: GX-106.





MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on PETIT and TAYLOR's Non-Equity Compensation

Management Incentive Plan (MIP) Bonus Calculation

| MIP Targets | Percent |
| --- | --- |
| **Base Bonus** | |
| Revenue | 80% |
| EBITDA | 10% |
| Individual Obj. | 10% |
| **Excess Bonus** | |
| Revenue | 100% |

Sources: GX-106, GX-742, GX-743.



MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on PETIT and TAYLOR's Non-Equity Compensation

**PARKER PETIT MIP Bonus: $517,254**

Bonus from Net Inflated Revenue

$165,224

Bonus from Individual Objectives

$37,213

Bonus from Revenue Without Net Inflation

$314,818

Sources: GX-105, GX-106, GX-735, GX-742, GX-743, GX-744, GX-746 and Slide 11.

19



MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on PETIT and TAYLOR's Non-Equity Compensation

**WILLIAM TAYLOR MIP Bonus: $391,980**

Bonus from Net Inflated Revenue

$125,208

Bonus from Individual Objectives

$28,200

Bonus from Revenue Without Net Inflation

$238,572

Sources: See slide 19.

20

# MiMedx: Impact of Alleged 2015 Revenue Recognition Scheme on PETIT and TAYLOR's Non-Equity Compensation

| Category | Total Non-Equity Compensation | | Inflation |
| | Received | Without Net Inflation | |
|---|---|---|---|
| **PETIT Payout** | | | |
| Lower Bound | $1,077,431 | $874,995 | *$202,436* |
| Upper Bound | $1,077,431 | $912,207 | *$165,224* |
| **TAYLOR Payout** | | | |
| Lower Bound | $843,111 | $689,703 | *$153,408* |
| Upper Bound | $843,111 | $717,903 | *$125,208* |

*Note: The "Upper Bound" assumes Individual Objectives were 100% met. The "Lower Bound" assumes Individual Objectives were 0% met.*

Sources: See slide 19 and 20.

21

# MiMedx: Equity Compensation

| Defendant | Number of Shares Granted | Value When Granted |
|---|---|---|
| *February 25, 2015* | | |
| PETIT | 112,547 | $1,071,447 |
| TAYLOR | 72,036 | $685,783 |
| *February 22, 2016* | | |
| PETIT | 134,000 | $1,088,080 |
| TAYLOR | 85,000 | $690,200 |

Source: GX-106, GX-453.

22

## MiMedx: Vested Shares on Date 2015 Financial Results Announced
### (February 23, 2016)

| Defendant | Number of Vested Shares | Fair Value |
|-----------|------------------------|------------|
| PETIT | 4,599,075 | $38,264,304 |
| TAYLOR | 507,398 | $4,221,551 |

Source: GX-106, GX-112, GX-113, GX-453.

23

## MiMedx: Gross Proceeds from Sale of Shares
### TAYLOR

| Year | Number of Shares Sold | Gross Proceeds |
|---|---|---|
| 2015 | 155,989 | $1,560,896 |
| 2016 | 73,845 | $556,741 |
| Total | 229,834 | $2,117,637 |

Source: GX-107, GX-108, GX-109, GX-110, GX-111.

24

4/9/2020                                                    Exhibit

EX-31.1 2 exhibit311-certificationof.htm EXHIBIT 31.1

**Exhibit 31.1**

### CERTIFICATION OF CHIEF EXECUTIVE OFFICER
### PURSUANT TO RULES 13a-14(A) AND 15d-14(A)
### OF THE SECURITIES EXCHANGE ACT OF 1934

I, Parker H. Petit, certify that:

1. I have reviewed this Form 10-Q for the quarter ended September 30, 2015, of MiMedx Group, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 6, 2015                          /s/ Parker H. Petit

                                                Parker H  Petit
                                                Chief Executive Officer





# ANALYST DAY

October 13, 2015

Grand Hyatt, New York, NY

CONFIDENTIAL

MMDX_00188800

GOVERNMENT
EXHIBIT
251
19 Cr. 850 (JSR)

# FORWARD LOOKING STATEMENT

*This presentation contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These statements include, but are not limited to, the market opportunities for and the market acceptance of our products, expectations for products in development, the potential uses for our products, expected outcomes for clinical studies, expected growth in revenue and market share, sustainability of performance, the availability of third-party reimbursement for our products, potential acquisitions, the strength of our patent portfolio, the effectiveness of our risk management and compliance policies, and our expectations for CollaFix™. These statements are based on current information and belief, and are not guarantees of future performance. Our ability to predict results, financial or otherwise, or the actual effect of future plans or strategies is inherently uncertain and actual results may differ from those predicted depending on a variety of factors. Among the risks and uncertainties that could cause actual results to differ materially from those indicated by such forward-looking statements include that our products may not gain the anticipated acceptance in the marketplace or that acceptance may be delayed; the effects of competition; our performance to date may not be sustainable at the same levels; we may not be able to protect our intellectual property and proprietary technology through patents and other means or may be subject to claims that our intellectual property or technology infringes the rights of third parties; our compliance and risk management policies may not be as effective as believed or may not be consistently applied to achieve effectiveness, we may not be able to commercialize CollaFix™ or other products in development as expected; there may be delays or changes in reimbursement for our products; there may be delays in clinical trials or unexpected results; there may be other regulatory changes further impacting our products in the US or other countries; we may not successfully complete the Biologics License Application process for specific micronized products within certain timeframes, at the estimated costs associated with that process, or may not complete the process at all, we may not be able to execute on acquisitions as desired, and the risk factors detailed from time to time in the Company's periodic Securities and Exchange Commission filings, including, without limitation, its 10-K filing for the 2014 fiscal year, and its most recent 10Q. By making these forward-looking statements, MiMedx Group, Inc. does not undertake to update those in any manner except as may be required by the Company's disclosure obligations in filings it makes with the Securities and Exchange Commission under the federal securities laws.*

2



MMDX_00188801

USAO_SDNY_R_000898634

# MiMedx Introduction

Parker H. "Pete" Petit

Chairman & CEO



CONFIDENTIAL

MMDX_00188802

USAO_SDNY_R_000898635



CONFIDENTIAL

MMDX_00188803

USAO_SDNY_R_000898636

# EXECUTIVE MANAGEMENT

| | | |
|---|---|---|
| Parker H. "Pete" Petit | Chairman & Chief Executive Officer |  |
| Bill Taylor | President & Chief Operating Officer | |
| Michael J. Senken | Chief Financial Officer | |
| Christopher M. Cashman | Executive VP & Chief Commercialization Officer | |
| Brent D. Miller | Executive VP | |
| Deborah L. Dean | Executive VP | |
| Thomas J. Koob Ph.D. | Chief Scientific Officer | |
| Donald E. Fetterolf, MD, FACP | Chief Medical Officer | |
| David H. Mason, Jr., MD | VP, Medical Affairs for Clinical Practice | |
| Frank Burrows | VP, Clinical & Scientific Liaison | |
| Randall Spencer | VP, Clinical Innovation | |
| Rebeccah J. C. Brown, Ph.D. | VP, Product Development, Regulatory Affairs, QA | |
| Conan Young, Ph.D. | Director of Research | |

5

MMDX_00188804

USAO_SDNY_R_000898637

# INVESTMENT HIGHLIGHTS

- Regenerative Medicine Technology
- Three Platform Technologies
- Strong I.P. portfolio
    - 25 Amniotic allograft patents issued and allowed, over 100 pending
    - Over 200 patents issued & pending for all technologies
- Four Years of Meeting or Exceeding Revenue Guidance with High Revenue Growth
- High Gross Profit Margins with Excellent Financial Leverage
- Experienced and Effective Management with a 5 Year Strategic Plan
- Direct and Experienced Sales Organization in Wound Care
- Building a Professional Surgical Specialty Sales Organization
- Private Label Agreements with Medtronic and Zimmer
- Strong Balance Sheet and Increasing Positive Cash Flow

6

MiMedx

CONFIDENTIAL

MMDX_00188805

USAO_SDNY_R_000898638

# Strategic Overview

Bill Taylor
President & COO



CONFIDENTIAL

MMDX_00188806

# MISSION AND TECHNOLOGY

## MiMedx is a Regenerative Medicine Company Delivering Innovative Technologies that Enable Healing

### Amniotic Tissue

Enhance Healing
Reduce Scar Tissue
Reduce Inflammation
Immunologically
Privileged

Proven Clinical Results
Logistically Superior
5 year Shelf Life
Stored at Ambient
Conditions

### Amniotic Fluid

Protect & Cushion
Provide Lubrication
Reduce
Inflammation

### Collagen Fiber

Mimics Native Tissue
Biomechanics for
Tendon, Ligament
Repair





8

MiMedx

CONFIDENTIAL

MMDX_00188807

USAO_SDNY_R_000898640



CONFIDENTIAL

MMDX_00188808

USAO_SDNY_R_000898641

# GROWTH STORY CONTINUES

SURGICAL EXPECTED TO GROW AS
LARGE AS WOUND WITHIN 5 YEARS

Wound

Surgical, Spine
& Orthopedic

Projected
Mix in
2019 - 2020

10



CONFIDENTIAL

MMDX_00188809

USAO_SDNY_R_000898642

# GROWTH DRIVERS

- Market Share Gains

- Market Expansion

- Incremental Reimbursement Coverage

- International Expansion

- Product/Platform Development

- Acquisitions (if synergistic & accretive)

11

MiMedx

MMDX_00188810

USAO_SDNY_R_000898643



CONFIDENTIAL

MMDX_00188811

USAO_SDNY_R_000898644

# INCREMENTAL REIMBURSEMENT OPPORTUNITY

Commercial plans yet to cover EpiFix:

- United
- Aetna
- Humana
- Small Others

    Representing over **70 million** lives...

**Significant incremental opportunity in 2016**

13



CONFIDENTIAL

MMDX_00188812

USAO_SDNY_R_000898645

# INTERNATIONAL GROWTH

- Regulatory Established:
  - Canada
  - United Kingdom
  - Switzerland
  - Slovenia
  - Italy
  - Ireland
  - Korea

- Current Targets:
  - Japan
  - Germany
  - Austria
  - Australia
  - Middle East



14



CONFIDENTIAL

MMDX_00188813

USAO_SDNY_R_000898646

# PRODUCT & PLATFORM DEVELOPMENT



15



CONFIDENTIAL

MMDX_00188814

USAO_SDNY_R_000898647



CONFIDENTIAL

MMDX_00188815

USAO_SDNY_R_000898648



CONFIDENTIAL

MMDX_00188816





# U.S. MARKET SUMMARY

- **Advanced Wound Care**
    - Chronic ulcers: diabetic, venous, arterial, pressure
    - Acute wounds: trauma
    - Number of targeted advanced wounds: 2.9 Million
    - US addressable market opportunity $7.7 Billion
- **Surgical**
    - Types of procedures: prostatectomies, C-sections, hysterectomy, bowel resections, scar revision, MOHs, site dehiscence, burns
    - Number of targeted procedures: 2.7 Million
    - US addressable market opportunity $2.9 Billion

- **Orthopedics, Spine, Sports Medicine**
    - Types of procedures: cervical fixation, discectomy, rotator cuff, Achilles, tendinopathies, knee ligament, joint replacement, joint supplementation
    - Number of targeted procedures: 7.8 Million
    - US addressable market opportunity $5.7 Billion

   Total U.S. Market Opportunities $16+ Billion

References: BioMed GPS, 2014 US Wound Market Report; Millenium, 2014 LaprascopicDevices Market Analysis; Millenium, 2014 Orthopedic Soft Tissue Solutions; iData 2014 Soft Tissue Reinforcement & Regeneration & Spinal Implants; Pearl Diver 2011, US Injection volumes

20



MMDX_00188819

USAO_SDNY_R_000898652

**SA-190**



Patents

MiMedx

CONFIDENTIAL

MMDX_00188820

USAO_SDNY_R_000898653

# INTELLECTUAL PROPERTY

**25**    **AMNIOTIC TISSUE**
**Issued and Allowed** Patents
Plus 109 Pending Patents
Protection extending through 2027-2033





**34**    **COLLAFIX**
**Issued and Allowed** Patents
Plus 38 Pending Patents
Protection extending through 2021-2033



22

MiMedx

USAO_SDNY_R_000898654

# PATENT LAWSUITS

- Filed 3 Lawsuits

- Transplant Technology, Inc. d/b/a Bone Bank IPR
  - EpiFix Configuration '494 Patent – **IPR DENIED**
    - PTAB fully denied IPR review of the '494 patent, which means that the primary EpiFix configuration patent stands as issued
  - Process '687 Patent
    - **3 of 5 grounds rejected**; PTAB granted review on two grounds

- MTF IPR
  - AmnioFix Configuration '701 Patent – **IPR DENIED**
    - PTAB fully denied IPR review of the '701 patent, which means that the primary AmnioFix configuration patent stands as issued
  - Process '437 Patent
    - **6 of 7 grounds rejected**; only one argument remains

23



CONFIDENTIAL

MMDX_00188822

USAO_SDNY_R_000898655