21-543 (L)
*United States v. Petit, Taylor*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

*Rulings by summary order do not have precedential effect. Citation to a summary order filed on or after January 1, 2007, is permitted and is governed by Federal Rule of Appellate Procedure 32.1 and this court's Local Rule 32.1.1. When citing a summary order in a document filed with this court, a party must cite either the Federal Appendix or an electronic database (with the notation "summary order"). A party citing a summary order must serve a copy of it on any party not represented by counsel.*

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 22nd day of August, two thousand twenty-two.

PRESENT: Amalya L. Kearse,
Robert D. Sack,
Steven J. Menashi,
    *Circuit Judges.*

_____

United States of America,

    *Appellee*,

v.                                          Nos. 21-543; 21-559

Parker H. Petit, William Taylor,

    *Defendants-Appellants*.

_____

| | |
|---|---|
| *For Appellee*: | DANIEL TRACER (Scott Hartman, David Abramowicz, *on the brief*), Assistant United States Attorneys, *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY. |
| *For Defendant-Appellant Petit*: | ALEXANDRA A. E. SHAPIRO (Eric S. Olney, Daniel J. O'Neill, Amelia Courtney Hritz, *on the brief*), Shapiro Arato Bach LLP, New York, NY. |
| *For Defendant-Appellant Taylor*: | NATHANIEL Z. MARMUR, Law Offices of Nathaniel Z. Marmur, New York, NY. |

Appeals from judgments of the United States District Court for the Southern District of New York (Rakoff, J.).

Upon due consideration, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that the judgments of the district court are **AFFIRMED**.

Defendants-Appellants Parker Petit and William Taylor are former executives of a publicly traded biopharmaceutical company charged with securities fraud and conspiracy to commit securities fraud. The government sought to prove that Petit, the company's chief executive officer, and Taylor, the company's chief operating officer, fraudulently inflated the company's revenue

2

figures to deceive the investing public into believing that the company was performing better than it actually was. The jury convicted Petit of committing securities fraud but acquitted him of the conspiracy count, and it convicted Taylor of conspiracy to commit securities fraud but acquitted him of the substantive count.

Petit and Taylor appeal their respective convictions. First, Petit argues that he could not have been convicted of securities fraud without the government first proving that his method of reporting revenue violated Generally Accepted Accounting Principles ("GAAP"). Second, Petit and Taylor object to the district court's jury instructions regarding conscious avoidance and their state of mind when they reported revenue figures. Third, Taylor objects to the introduction of certain government exhibits and the exclusion of some of his proffered exhibits.

We reject these arguments and affirm the judgments of the district court. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

I

MiMedx Group, Inc. ("MiMedx") is a publicly traded biopharmaceutical company based in Marietta, Georgia. It derives revenue principally from selling

regenerative bioproducts, such as skin grafts and bioengineered placental tissue, to hospitals and medical suppliers. The company is publicly traded on the NASDAQ under the ticker symbol "MDXG" and regularly grosses tens of millions of dollars in revenue. Parker served as MiMedx's chief executive officer from 2009 until 2018. Taylor served as MiMedx's president and chief operating officer from 2011 to 2018.

In its indictment dated November 25, 2019, the government alleged that Petit and Taylor conspired to use several accounting tricks to artificially inflate MiMedx's reported revenues in its quarterly reports. The government's case focused primarily on four incidents of alleged fraud. The government asserted that on each occasion, Petit and Taylor would negotiate and sign large purchase agreements between MiMedx and a medical supplier just before the quarterly deadline to report revenue to investors. These last-minute purchase agreements misled investors into believing that MiMedx had met its quarterly revenue projections from the year before. In reality, however, the purchase agreements were not fully realized, resulting in a significant gap between the value of the contracts reported to investors and the money actually paid to MiMedx. The investing public, unaware of the discrepancy, purchased and sold MiMedx stock

at values above what would have been paid had the actual value of the contracts been reported.

For example, the government asserted that on the last day of the third quarter of 2015, MiMedx signed a $4.6 million purchase order for "OrthoFlo" with SLR Medical Consulting, LLC. Under the agreement, SLR Medical became the sole distributor of MiMedx medical products in Texas and was obligated to pay the full balance within 30 days of signing. The inclusion of this purchase contract in MiMedx's Q3 2015 revenue was suspicious because SLR Medical was a relatively new company that lacked the financial means and storage capacity to fulfill its end of the contract. By the time full payment was due, SLR Medical had paid only about $10,000 of the $4.6 million contract. SLR Medical was also struggling with storing the significant quantities of OrthoFlo, which required specialized freezers. The government contends that SLR's inability to pay a significant portion of its obligations should have triggered a downward revision of MiMedx's reported revenue in Q3 2015. Instead, Petit coordinated a personal loan from his family's trust through a shell company to SLR Medical, which SLR then used to pay down a significant portion of its obligations to MiMedx. Neither Petit nor Taylor

5

informed MiMedx's internal accountants or its external accountant, Cherry Bekaert, about the loan.

On a separate occasion, the government explained, Petit and Taylor caused MiMedx to execute a $2.54 million purchase order deal with First Medical Co. to meet its year-end and quarterly revenue projections for Q4 2015. The purchase order was at first contingent on First Medical securing a government contract from the Saudi Kingdom. But MiMedx's accountants informed Taylor and Petit that the $2.54 million could not be recognized as revenue because the price was not "fixed and determinable"—a GAAP requirement. In response, Taylor informed the accounting team that payment would instead be made in 180-day increments (which would allow recognition of the revenue in Q4). The government introduced evidence showing that Taylor then sent two emails in rapid succession. The first, addressed to First Medical's president and copying MiMedx's sales executive, read as follows:

> Thank you very much for the EpiFix order placed earlier today. It is very much appreciated. Our accountants have asked for a clarification on the Payment Terms. Because the email referenced was related to the 2015 tender and the July order, they wish to have a clarification. I know this order is for 2016 sales by [First Medical]. I have clarified below their proposal.

6

> Payment terms: 180 days from receipt of product by [First Medical].
>
> Thank you for your consideration. Please advise if this will be acceptable.

App'x 1154. The second email, sent to First Medical's president alone and under the heading "Purchase Order—Clarification" read as follows:

> Further to my email that I just sent relative to the Purchase order 212-2015. We understand that it is expected that the 2016 tender will be issued in March 2016, and it is expected to be as big, or bigger than the tender that was issued to [First Medical] in 2015. In the event the tender is delayed, or for some unlikely event does not occur, MiMedx will give [First Medical] additional extended payment terms if request[ed] and will assist [First Medical] in selling the product or another option would be to repurchase the product. We will continue supporting sales efforts in the territory by continued training …. Thank you again for a strong partnership with MiMedx. Please feel free to contact me at any time with any questions.

App'x 1155. The government argued that Taylor sent the first email to deceive MiMedx's auditors into believing that the First Medical transaction was reportable income and the second to memorialize the actual terms of MiMedx's agreement with First Medical, which made payment of the purchase order contingent on the Saudi government's approval. The two emails were sent about four seconds apart from each other. The terms of the first email met revenue reporting requirements by setting a fixed payment schedule for First Medical to fulfill its obligations. The terms of the second email effectively made the payment schedule indefinite.

7

After four weeks of trial and three days of deliberation, the jury found Petit guilty of securities fraud (but not conspiracy to commit securities fraud) and Taylor guilty of conspiracy to commit securities fraud (but not substantive securities fraud). Petit was sentenced to one year of imprisonment and a $1 million fine. Taylor was sentenced to one year of imprisonment and a $250,000 fine.

Petit and Taylor each filed motions for acquittal and new trials. They argued that the government failed to prove that they possessed the requisite mens rea to be guilty of securities fraud or conspiracy to commit securities fraud. First, they disputed whether the contested transactions described in the indictment violated GAAP. Second, they argued that even if the transactions violated GAAP, the government failed to prove that they themselves believed that the transactions were inconsistent with GAAP so as to make the deception willful. The district court denied Petit and Taylor's post-trial motions. Both Petit and Taylor timely appealed.

## II

The government was not required to prove that Petit and Taylor violated GAAP to show that they had the requisite mens rea to commit the crimes. We rejected a similar argument in *United States v. Rigas*, 490 F.3d 209 (2d Cir. 2007). In

*Rigas*, the defendants were convicted of conspiracy to commit securities fraud for misrepresentations related to their ownership and operation of a publicly traded cable company. We held that the government did not need to prove a violation of GAAP because GAAP "neither establishes nor shields guilt in a securities fraud case." *Id*. at 220. We stressed that even if the defendant had complied with the relevant GAAP standard, a reasonable jury "could have found … that Defendants intentionally misled investors." *Id*. at 221. Compliance with GAAP, we held, "is relevant only as evidence of whether a defendant acted in good faith." *Id*. at 220.

We reach the same conclusion here. The government did not need to prove that Petit and Taylor's representation of MiMedx revenues violated GAAP. It was enough to show that Petit and Taylor intentionally misled investors when they made the disclosures. A reasonable jury could have found them guilty even if their disclosures complied with GAAP. The additional actions they took to mislead the public—such as the secret loan in the SLR Medical deal and the misleading emails in the First Medical one—deceived auditors and investors as to the actual value of the contracts they reported.

The government did not need to offer expert testimony on accounting principles. *See Rigas*, 490 F.3d at 220 ("The government was not required to present

9

expert testimony about GAAP's requirements because these requirements are not essential to the securities fraud alleged here."). The jury was presented with testimony and evidence that showed how Petit and Taylor made last-minute deals to nominally meet their revenue projections and hid the reality of those deals from auditors to avoid having to report lower, more accurate revenue figures to the public. As long as the testimony the government elicited from MiMedx accountants and business associates was based on "the factual foundation laid in earlier admitted testimony and exhibits, the factual nature of the hypotheticals, and the witnesses' reasoning," it did not need to be supplemented with expert testimony. *United States v. Cuti*, 720 F.3d 453, 458 (2d Cir. 2013).

### III

The district court also did not err when instructing the jury about how to find that Petit and Taylor "knowingly and willfully" misled investors. To convict a defendant of criminal securities fraud, the government must prove beyond a reasonable doubt that he (1) knowingly and willfully (2) made an untrue statement of material fact (3) to the investing public through official filings (4) with the specific intent to defraud or deceive. 15 U.S.C. §§ 78j(b), 78ff; 18 U.S.C. § 2; 17 C.F.R. § 240.10b-5. Petit and Taylor argue that the government failed to prove that

they "knowingly" misrepresented MiMedx revenue through their willful ignorance of those errors. They also argue that the government failed to prove that they "willfully" violated the securities laws because it did not show that they intended to violate a specific law when they misrepresented MiMedx revenue. Both challenges misstate the mens rea element of securities fraud under our court's precedents.

## A

We have previously held that "willfulness" in a criminal securities fraud case requires proof that a defendant "had an awareness of the general wrongfulness of his conduct," not that he knew that he was committing a specific legal violation. *United States v. Kaiser*, 609 F.3d 556, 569 (2d Cir. 2010). In *United States v. Kosinski*, we reaffirmed that holding on "willfulness," emphasizing that "so long as a defendant 'act[s] with the intent to do something that the law forbids,' he need not be aware 'of the specific law or rule that his conduct may be violating.'" 976 F.3d 135, 154 (2d Cir. 2020) (quoting *Bryan v. United States*, 524 U.S. 184, 190 (1994)). In this way, "[w]hen a statute limits criminal liability to 'willful' violations, it does not necessarily 'carve out an exception to the traditional rule that ignorance of the law is no excuse.'" *Id.* (quoting *Bryan*, 524 U.S. at 195-96).

11

The more heightened standard for showing willfulness through "[k]nowledge of the specific law that one is violating" has "been required only where a 'highly technical statute[]'—such as a provision of the Internal Revenue Code—prohibits 'apparently innocent conduct.'" *United States v. Henry*, 888 F.3d 589, 599 (2d Cir. 2018) (quoting *Bryan*, 524 U.S. at 194). This case does not fall in that category.

Here, the district court correctly instructed the jury that it could find that Taylor and Petit acted willfully if they "act[ed] deliberately and with a bad purpose, rather than innocently." App'x 824. Petit insists that he could not have acted willfully because he knew neither the specific securities laws he violated nor the specific accounting standards that MiMedx had not followed. We disagree. Conduct such as arranging secret loans or modifying contracts with surreptitious emails is enough to infer willfulness. A reasonable jury could conclude that Petit and Taylor knew they were engaging in wrongful conduct, even if they did not know the specific standards they violated.

**B**

A jury may infer that a defendant knowingly misled the investing public if he "consciously avoided" the discovery of an unjustifiable risk. *Kaiser*, 609 F.3d at

12

565-66. We have required a district court, when giving a conscious-avoidance instruction, to communicate to the jury that it may infer knowledge if (1) the defendant was aware of a high probability of a fact's existence (2) unless the defendant actually believed that fact did not exist. *Kaiser*, 609 F.3d at 565-66. But we will not require specific language so long as the instructions properly communicate the possibilities of an inculpatory awareness of a risk and an exculpatory actual belief. *See, e.g.*, *United States v. Schultz*, 333 F.3d 393, 413 (2d Cir. 2003) (approving a jury instruction that "could have been more precise").

Petit and Taylor argue that the district court erred in its articulation of the conscious avoidance instruction. Toward the end of trial, the district court told the jury:

> [L]et me advise you that a defendant's good faith is a complete defense to both the charges in this case. If the defendant you are considering believed in good faith that he was acting properly, even if he was mistaken in that belief, and even if others were injured by his conduct, there would be no crime ....
>
> However, a defendant may not purposefully remain ignorant of the true facts in order to escape the consequences of the law. Therefore, if you find, for example, that a given defendant was aware of the high probability that the revenue was improperly recorded, but that that defendant, in order to remain ignorant of that fact, deliberately chose not to inquire further, then you may, if you wish, find that the

13

>defendant actually understood that the revenue was fraudulently inflated.

App'x 828-29. The district court's instructions "adequately communicated the essential ideas to the jury." *Schultz*, 333 F.3d at 413-14. First, the district court's instruction that "good faith is a complete defense" conveys the "actual belief" prong of a conscious avoidance instruction. *Compare* App'x 828 ("[I]f a given defendant honestly believed that MiMedx's revenue figures were accurately reported, that would be a complete defense to the charge of securities fraud."), *with United States v. Feroz*, 848 F.2d 359, 361 (2d Cir. 1988) (noting that while the district court "failed to give the recommended instruction on 'actual belief,'" it "*did* accompany [its] instructions with language to the effect that 'a showing of negligence or mistake is not enough to support a finding of willfulness or knowledge'") (alteration omitted).

Second, the district court's explanation that knowledge could be inferred when a defendant "was aware of the high probability that the revenue was improperly recorded, but … deliberately chose not to inquire further," App'x 829, conveys the culpability of an "aware[ness] of a high probability of [a fact's] existence," *Feroz*, 848 F.2d at 360, to avoid reversible error. The district court's

14

instructions communicated to the jury that it could infer knowledge if the facts suggested that the defendants deliberately ignored the risks of their conduct.

IV

Taylor objects to the admission of a government exhibit and the exclusion of a defense exhibit. The district court's evidentiary rulings were based on hearsay concerns—namely that the evidence Taylor sought to introduce contained hearsay and that the evidence the government introduced did not. Our court reviews an evidentiary ruling for abuse of discretion and will disturb such a ruling only if it is "manifestly erroneous." *United States v. Skelos*, 988 F.3d 645, 662 (2d Cir. 2021). Even when a district court errs, we will affirm the district court if "the evidence did not substantially influence the jury." *United States v. Cummings*, 858 F.3d 763, 771 (2d Cir. 2017).

Taylor has not shown that the district court's evidentiary rulings merit reversal. He objects to the exclusion of an email from himself to the Chief Financial Officer of CPM Medical Consultants, LLC, disclaiming a consulting contract with CPM's owner that was supposed to sweeten a last-minute deal to boost revenue. *See* App'x 1180. The district court concluded that Taylor's email was inadmissible hearsay because it was being introduced as proof that he in fact disclaimed the

15

sweetheart consulting contract. *See* App'x 547 ("'Our offer to amend your consulting agreement has been withdrawn.' That's a statement of a fact. There were certain quasi-legal documents that came into evidence previously under your rather expansive verbal act interpretation, but I don't think this is anything other than plain hearsay.").

The district court's decision to exclude the evidence was not "manifestly erroneous"; insofar as Taylor sought to introduce the email to prove that he disclaimed the contract, it was inadmissible hearsay. *Skelos*, 988 F.3d at 662. Nor does the record demonstrate that the disputed defense exhibit fell into one of the recognized hearsay exceptions or exemptions.

The district court admitted the government's exhibit of an email between MiMedx employees that called for "manag[ing] the timing" of the "CPM swap"—a deal in which a Texas medical supplier executed a purchase contract for $2.1 million of MiMedx products that it did not want in one quarter in order to exchange those products for others of roughly equivalent value that it did want in the next quarter. App'x 1139. Taylor, Petit, and MiMedx employees executed the CPM swap to boost MiMedx's recognized revenue just before the filing deadline for the second quarter of 2015. *Id*. The email states that "[w]e have auditors in here

16

the end of July looking at the books" and therefore there should be "[n]o more emails on this." *Id.* The district court admitted the email because "a reasonable jury could infer that [it was] a statement of a co-conspirator." App'x 365. Even if the district court erred in admitting the email, the error was harmless. "[W]here a court, upon review of the entire record, is sure that the evidentiary error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." *United States v. Rowland*, 826 F.3d 100, 114 (2d Cir. 2016). The email between the MiMedx employees was cumulative of several other pieces of evidence that tended to prove that Taylor conspired to commit securities fraud. For example, the jury heard evidence on the two emails sent in rapid succession to First Medical and heard testimony from MiMedx employees as to Taylor's role in the revenue inflation scheme. *See* App'x 358; *see also* App'x 1154-55. We are not convinced that the disputed email had more than a very slight effect on the jury. For that reason, we affirm the judgment here.

\*   \*   \*

We have considered Petit and Taylor's remaining arguments, which we conclude are without merit. For the foregoing reasons, we **AFFIRM** the judgment of the district court.

          FOR THE COURT:
          Catherine O'Hagan Wolfe, Clerk of Court